FILED

2026 May-08  PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **WILLIE EARL SCOTT** | } | |
| | } | |
| **Petitioner,** | } | |
| | } | |
| **v.** | } | **Case No.:   2:18-cv-01787-RDP** |
| | } | |
| **TERRY RAYBON, Warden of William C.** | } | |
| **Holman Correctional Facility,** | } | |
| | } | |
| **Respondent.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Willie Earl Scott's ("Scott") Petition for Writ of Habeas Corpus By Prisoner in State Custody Under Sentence of Death. (Doc. # 1). *See* 28 U.S.C. § 2254. Scott was convicted of (1) two counts of capital murder for the killing and rape or attempted rape of 10-year-old Latonya Sager, and (2) three counts of burglary, attempted murder, and rape in the first degree of Landris Wright. (Doc. # 1 ¶¶ 15, 17). Scott was sentenced to death. (*Id.* ¶ 18). This court sits in a habeas capacity under 28 U.S.C. § 2254 and considers Scott's petition for federal relief from two Alabama capital convictions and a death sentence. Scott alleges that several guilt- and penalty-phase aspects of his capital trial violated his rights under the United States Constitution. Although Scott's petition was filed in 2018, this matter has only been under submission since December 1, 2025, when Scott submitted a court-ordered status report about any viable *Martinez* claims. (Doc. # 41).

Alabama courts have adjudicated most of Scott's federal claims within his petition. As a result, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") – which amended § 2254 – demands deference to those state court constitutional outcomes and constrains the scope

of this court's review. Once AEDPA deference has attached to a constitutional claim, the standard for detaching it, while not insurmountable, is high. Indeed, AEDPA draws a deferential line between objectively wrong constitutional results and those outcomes in which the state courts' correctness is subject to fair-minded disagreement. Adhering to that statutory balance, this court must rectify proven legal and factual errors of extreme constitutional malfunction in Scott's state court capital proceedings. But in undertaking this analysis, this court must bear in mind the correct legal standard applicable here because AEDPA precludes substituting its judgment or otherwise reviewing de novo the decisions of Alabama courts. The question is this: Did the state courts unreasonably reject Scott's arguments?

As the court explains below, many of Scott's adjudicated claims fall well within AEDPA's sizeable range of deference because the Alabama courts reached a reasonable result. For those closer calls – with few exceptions – no objective constitutional error occurred because fair-minded jurists could defend the correctness of the state court decision. Thus, Scott lacks an AEDPA avenue to habeas relief on nearly all his claims, which the Alabama courts addressed on the merits. As to those few adjudicated claims in which AEDPA deference is in doubt, the court concludes habeas relief is inappropriate either under de novo review or because the Alabama Criminal Court of Appeals ("ACCA") did not egregiously address all the constitutional components of the asserted constitutional violation. And for various reasons, Scott cannot prevail on his remaining unadjudicated habeas allegations.

Before turning to Scott's habeas claims and Respondent's defenses, the court sets out a table of contents, shares some background about this capital case, and acknowledges several recurring standards of review that apply under AEDPA.

**TABLE OF CONTENTS**

I.    BACKGROUND ................................................................................................. 6

  A.  State Court Proceedings ............................................................................. 7

  B.  Federal Habeas Proceedings .................................................................... 22

II.   HABEAS REVIEW UNDER AEDPA ........................................................... 23

III.  ANALYSIS ...................................................................................................... 27

  A.  Claim A – Scott has not established a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel at the penalty phase of trial. .............................. 31

    1.  Subclaim (A)(1) – Scott has not shown that trial counsel conducted a constitutionally insufficient mitigation investigation. ........................................... 32

    2.  Subclaim (A)(2) – Scott was not prejudiced by his trial counsel's assistance at the penalty phase of trial. ........................................................................................ 87

    3.  Subclaim (A)(3) – The ACCA did not violate federal law by failing to consider the cumulative impact of trial counsel's ineffective assistance at the penalty phase. ............................................................................................... 115

    4.  Subclaim (A)(4) – The ACCA did not unreasonably determine the facts when it found that the evidence presented at the Rule 32 evidentiary hearing was cumulative. .......................................................................................... 118

    5.  De Novo Review ................................................................................... 121

  B.  Claim B – Scott has not shown a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel at the guilt phase of trial. .......................................... 123

    1.  Subclaim (B)(1) – Scott has not shown that trial counsel was ineffective for choosing not to present a "no-intent" defense. .................................................... 124

    2.  Subclaim (B)(2) – Trial counsel was ineffective by failing to present an integrated guilt and mitigation theory. ................................................................. 139

    3.  Subclaim (B)(3) – Scott has not shown prejudice in light of his witness's lack of credibility ................................................................................... 146

    4.  De novo review ..................................................................................... 150

  C.  Claim C – Scott has not shown a right to habeas relief due to his trial counsel's failure to contest Scott's competency. ......................................................................... 152

    1.  State Court Proceedings ........................................................................ 153

    2.  Subclaim (C)(1) – Scott has not shown ineffective assistance of counsel based on the lack of a second competency hearing ................................................. 158

    3.  Subclaim (C)(2) – Scott has not shown ineffective assistance of counsel based on counsel's performance as related to Scott's competency throughout trial ...... 179

D.  Claim D – Scott has not shown a right to habeas relief related to the consolidation of the rape and murder charges .................................................................... 190

    1.  State Court Proceedings ................................................................................ 191

    2.  Subclaim (D)(1) – Scott has not shown that trial counsel failed to raise the proper arguments to oppose the state's consolidation motion. ........................ 194

    3.  Subclaim (D)(2) – Scott has not shown that trial counsel was ineffective for failing to adequately argue that Scott would be substantially prejudiced by the consolidation of the offenses. ............................................................. 212

E.  Claim E – Scott has not shown a right to habeas relief based on his *Strickland* claim that his trial counsel failed to object to biased jurors ................................ 218

    1.  State Court Proceedings ................................................................................ 218

    2.  This claim is subject to state-barred procedural default. ............................ 221

    3.  Scott has not met his AEDPA burden on his biased-jurors *Strickland* claim.. 223

F.  Claim F – Scott has not shown a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel at the guilt phase of trial for several additional reasons .......................................................................................................... 231

    1.  State Court Proceedings ................................................................................ 233

    2.  Subclaim (F)(1) – Scott has failed to demonstrate that trial counsel was ineffective for not uncovering and presenting compelling evidence that would have cast doubt on the significance of the DNA evidence. .............................. 240

    3.  Subclaim (F)(2) – Scott has failed to demonstrate trial counsel was ineffective for not engaging certain experts ................................................................... 259

G.  Claim G – Scott has not shown a right to habeas relief based on a theory that his appellate counsel failed to argue that the lack of funding for a mitigation investigation constituted ineffective assistance. ......................................................... 275

    1.  State Court Proceedings ................................................................................ 276

    2.  Scott has not met his AEDPA burden on his *Strickland* mitigation expert funds claim ............................................................................................................. 278

H.  Claim H – Scott has not shown a right to habeas relief under a theory that his Sixth Amendment rights were violated when the trial court barred his counsel from talking with him about trial strategy with his relatives ............................................. 286

    1.  State Court Proceedings ................................................................................ 287

    2.  Scott has not met his AEDPA burden on his Sixth Amendment sequestration claim ............................................................................................................. 290

I.  Claim I – Scott has not shown a right to habeas relief because of improper prosecutorial comments to the jury ........................................................................... 301

    1.  State Court Proceedings ................................................................................ 302

2. Scott has not met his AEDPA burden on his improper prosecutorial comments claim ........................................................................... 303

J. Claim K – Scott has not shown a right to habeas relief based on Alabama's capital sentencing structure. ................................................................. 312

 1. Overview of *Apprendi*, *Ring*, and *Hurst* .............................................. 315

 2. State Court Proceedings ......................................................................... 317

 3. Scott has not overcome AEDPA deference related to his structural challenge to his death sentence under the Sixth Amendment ............................... 319

K. Claim J – Scott has not shown a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel due to a failure to object to the trial court's finding that Scott's attempted rape and murder was "particularly heinous, cruel, and atrocious." ............................................................................................. 326

 1. State Court Proceedings ......................................................................... 327

 2. Scott has not overcome AEDPA deference on the structural challenge of his death sentence under the Sixth Amendment. ...................................... 328

L. Claim L – Scott has not shown a right to habeas relief because the death penalty violates the United States Constitution. .......................................... 333

M. *Martinez* issues. ............................................................................................ 336

IV. REMAINING REQUESTS ...................................................................................... 337

V. CONCLUSION ....................................................................................................... 338

## I.       BACKGROUND

The trial court made the following findings of fact at the conclusion of trial: Around 7:00 a.m. on the morning on September 11, 1999, seventeen-year-old Landris Wright was raped twice, tortured, and strangled while in her aunt's Jefferson County, Alabama apartment. (Docs. # 14-7 at 10; 14-16 at 197 (Landris testifying that she was twenty years old and three years after the incident)). Landris escaped and sought help from a man who flagged down a police patrol car. (Doc. # 14-7 at 17). Landris told Officer Terry McClain-Jones that Scott had broken into the apartment, raped her, and was still in her aunt's apartment. (*Id.*). The officer waited for backup and then entered the apartment where she observed Scott sleeping on the bed and wearing boxer shorts. (*Id.*). The officers woke Scott, and he identified himself as George Dwight Goldthwaite. (*Id.* at 18). He had two traffic tickets in his pockets written to George D. Goldthwaite. (Doc. # 14-14 at 19-22). Landris, who was waiting outside, entered the apartment and identified Scott as "Willie 'Red'" and as the individual who raped her. (Doc. # 14-7 at 18). Scott was arrested. (*Id.*; Doc. # 14-2 at 28-29). Gary L. Clark, forensic investigator, and evidence technician for the Birmingham Police Department, testified that he arrived at the scene at 10:50 a.m. and heard Scott yelling from inside the patrol car: "Bitch, I'm going to kill you. I killed a girl last night." (Doc. # 14-7 at 19-20; *see also* Doc. # 14-14 at 25 (noting on the Forensic Investigator Report that the statement had been "Bitch I going to kill you. I kill [sic] someone last night.")).

A little after 10:00 a.m. that same morning, ten year-old Latonya Sager was found dead in her bedroom (at the same residence where Scott lived), facedown, and with semen located on her inner right thigh. (*Id.* at 9, 22). Phyllis T. Rolland, section head of the forensic biology unit of the Alabama Department of Forensic Sciences, compared samples of Scott's DNA with the semen sample taken from Latonya's inner right thigh and confirmed an exact match. (*Id.* at 22).

While the officers were transporting Scott to the Birmingham Police Department, details of Latonya's homicide came over the radio and Scott began to cry, asking, "What's happening at my house?" (*Id.* at 18).

On October 18, 1999, Jefferson County District Court Judge R. Cahill found probable cause and bound over Scott on the offenses of rape in the first degree (Doc. # 14-2 at 30-31), burglary in the first degree (Doc. # 14-10 at 75), and capital murder (Doc. # 14-7 at 41). On February 4, 2000, a Jefferson County Grand Jury indicted Scott on the following crimes: rape and attempted murder of Landris Wright in violation of Ala. Code §§ 13A-6-61 and 13A-4-2 (Doc. # 14-2 at 21-22); capital murder of Latonya – a victim under the age of fourteen in violation of Alabama Code § 13A-5-40(a)(15); capital murder committed during the rape or attempted rape of Latonya in violation of Alabama Code § 13A-5-40(a)(3). (Doc. # 14-7 at 33-34); and burglary in violation of Alabama Code § 13A-7-5. (Doc. # 14-10 at 68). Scott pleaded not guilty of all charges. (Docs. # 14-10 at 77; 14-2 at 57).

### A.   State Court Proceedings

On September 22, 1999, the court appointed Attorneys John Robbins and David Simpson to represent Scott at the trial. (Docs. # 14-2 at 25, 27; 14-7 at 37, 39; 14-15 at 106). The State prosecuted Scott and the trial combined the capital and non-capital charges. The guilt phase began on August 12, 2002, and concluded on August 16, 2002, with the jury finding Scott guilty of both capital offenses as charged in CC-2000-841, as well as rape in the first degree, attempted murder, and burglary in the first degree as charged in CC-2000-840 and CC-2000-842. (Docs. # 14-1 at 60, 62; 14-5 at 65-66; 14-6 at 50; 14-9 at 72-73; 14-10 at 38; 14-13 at 26; 14-20 at 22-23; 14-23 at 84-87; 14-24 at 95; 14-25 at 105). The ACCA summarized the facts and testimony in the   guilt phase as follows:

Willie Earl Scott (Scott), who was 19 years old at the time, lived with his grandmother. Latonya Sager, the 10-year-old murder victim, also lived in the house, as did her younger sister and their mother, Latrice Sager.

Latrice's brother, Albert, his girlfriend, Shaneka Scott, and their two children lived there, too. Shaneka and Scott are cousins. During the evening of September 10, 1999, Latrice went to her mother's house to play cards; Latonya accompanied her mother. Latrice and Latonya returned home at approximately 1:30 a.m. on September 11, 1999. While they were driving home, they saw Scott walking near the house. Latonya and Latrice went to the basement of the house, where their bedrooms were located. Latonya told her mother that she was very tired, and she went into her bedroom. Latonya was wearing her school uniform, which consisted of a white shirt and blue shorts; she was wearing panties and blue slippers, too.

Latrice went into her own bedroom and placed a handgun and some jewelry on the ironing board. She then took a bath. When she came out of the bathroom, she saw Scott come into the house through the garage entrance he regularly used. He ran upstairs into the house. Latrice testified that Scott was playing rap music on the radio in the kitchen. Latrice told Latonya to go upstairs and turn on the air conditioning, which she did. Latonya and Latrice retired to their bedrooms for the night. During the night, Scott's grandmother got up and saw Scott driving away in a Lexus automobile that had been parked outside the house.

On the following morning Albert was attempting to locate a broom downstairs. Latrice told him to look in Latonya's room. The door to Latonya's room was locked and when Albert knocked on the door, Latonya did not answer. Albert removed the doorknob and entered the room with Latrice. Latonya appeared to be sleeping on her stomach and was partially covered by a sheet. Latrice touched Latonya's foot and discovered it was cold. Latonya was dead. Latrice later realized that her gun was missing from her bedroom and that the Lexus was missing from the driveway.

Dr. Bruce Alexander performed the autopsy on Latonya's body. He stated that Latonya weighed 64 pounds and was slightly more than four and one-half feet tall. The doctor observed that Latonya's lower lip was bruised and she had an abrasion or a scratch on her neck. The doctor discovered small hemorrhages in the whites of her eyes, which are consistent with asphyxiation. He discovered extensive hemorrhaging beneath Latonya's vocal cords and her larynx, as well as below her lower left eyelid. The doctor observed extensive swelling of Latonya's brain and hemorrhaging in the area behind the brain. The doctor concluded that the cause of death was asphyxiation with strangulation and possibly also with suffocation.

Dr. Alexander also observed a shiny substance around Latonya's pubic area and inside both of her thighs. That material was collected and analyzed at a laboratory. The results of the analysis revealed the substance to be semen. The semen on Latonya's right inner thigh contained Scott's DNA. The doctor took oral, anal, and vaginal swabs and discovered no sperm in any of the tested areas.

8

Also on the evening of September 10, 1999, Landris Wright had spent the night with her aunt, Gladys Wright Smith; Smith's residence was located less than 10 miles from the residence where Latonya Sager was murdered. Wright and Smith testified that a "peeping Tom" had looked into the bedroom window at approximately 3:20 a.m., and Smith had twice reported the "peeping Tom" to the police that night. At approximately 6:00 a.m. on the morning of September 11, 1999, Scott pushed his way into Smith's home, waving a gun. Smith and Wright were acquainted with Scott, but they had not invited him into the apartment that morning. Smith testified that Scott was acting "weird," so she convinced him to leave the residence and to go with her to a nearby restaurant where she worked. Scott drove to the restaurant in a Lexus automobile.

Scott left the restaurant soon after he arrived there. Fearing for Wright's safety because Scott had left, Smith called Wright and told her to check the doors and the windows in the apartment to be sure they were locked. She also told Wright not to let Scott into her home. Wright did not check the doors because her aunt usually locked them herself. Scott returned to Smith's apartment at approximately 7:00 a.m., while Wright was taking a shower. Wright testified that, when she got out of the shower, Scott threw her on the bed and choked her. The two struggled; Scott had a gun in his hand. Scott raped Wright.

Scott then made Wright go into the bathroom where he forced her head into the toilet and put a pillow against the back of her head. He put a bullet in the chamber of the gun and told Wright he was going to blow her brains out. Scott forced Wright to bathe in the tub for approximately an hour. He then raped her a second time. She said that after he raped her again, he again forced her head into the toilet and then made her get into the tub. While she was in the bathtub, he brought some vinegar from the kitchen and poured it into the bath water. He made Wright clean herself in the bathtub.

Wright said that, after she got out of the tub, Scott made her sit on the bedroom floor. He told her that he had killed a girl on the night before. He also told her that he had killed a boy over drugs and that he had raped another girl. Scott then told Wright to lie on the bed with him. He put his leg across hers so that she could not move and then he fell asleep. When she was certain that Scott was asleep, she ran from the house to a nearby store, where someone flagged down police officers who were in the area.

The police took Wright to Smith's residence and made her wait outside while they went into the house. The police brought Scott out and Wright heard Scott cursing and hollering. She testified that Scott said he would be out of jail the next day. He also attempted to spit on Wright and he threatened to "chop up" her brother. Wright's mother testified that her daughter placed a frantic telephone call to her after she escaped from the house, and she and two of her children drove to Smith's house. She, too, said that when Scott was brought out of the house, he was

9

screaming and saying all kinds of things; he threatened to cut up her son. Wright's mother testified that Scott said, "Y'all tripping about some pussy."

Officer Terri Jones of the Birmingham Police Department was on patrol in the area of Smith's apartment when she was flagged down outside a business. Landris Wright told her that she had been raped by a man who was asleep inside her apartment. Jones and another officer went into Smith's apartment and located Scott, who was asleep on the bed wearing only his underwear. The officers touched him to awaken him and he jumped out of bed, screamed, and ran around, out of control. He knocked down the blinds covering the window and broke the glass in the window with his head or his elbow, as if he intended to jump out of the window. Wright identified Scott as the man who had raped her. After he was arrested, the police found a handgun beneath the bed.

When the officers asked Scott his name, he stated that his name was George Dwight Goldthwaite. Two traffic citations were in the pocket of his pants that the officers found on the floor. Scott's name was not on the citations; the name George Dwight Goldthwaite was on the citations. The citations had been issued the night before and were issued in two locations not far from the scene of the rape. Wright said she knew the suspect by the name "Willie Red" or "Willie Earl." Smith later stated that she knew him by the name Willie Earl Scott. When the officers checked the license plate on the Lexus at the scene, they learned that the vehicle was registered to someone who lived at the house where Latonya Sager had been murdered. While Scott was being transported to the police station, information came over the police radio about Sager's death. Officer Jones testified that Scott began to cry, and he asked, "What happened at my house?"

Forensic tests revealed no semen or DNA from Scott on any of the swabs taken from Landris Wright, or on the bedsheet collected at the scene. The forensic biologist testified that bathing can diminish the presence of semen, but that it is possible to find semen even after a woman has bathed and douched.

*Scott v. State (Scott Direct)*, 937 So. 2d 1065 at 1068-70 (citations omitted).

As the Rule 32 court summarized, trial counsel:

extensively cross-examined Phyllis Roland concerning the forensic tests she conducted. In particular, he questioned her concerning the many items that she failed to test or which were not indicated for Scott's DNA. This included certain couch cushions that were never tested for his DNA. He also had her confirm that it was possible to have a stain from semen transfer to other surfaces. Finally, she explained that semen would likely dry out within hours.

Dr. Bruce Alexander also testified concerning the autopsy he conducted. He confirmed that there was no evidence of trauma to the vagina. He also took oral, anal, and vaginal swabs and discovered no sperm in any of the tested areas. Finally,

> Dr. Alexander claimed that when he examined the victim, the semen around her thighs was not yet dry and still had a "sheen to it."

(Doc. # 14-39 at 32-33).

After the prosecution's case-in-chief, Scott's trial counsel called three guilt-phase witnesses. Charlie May Scott – Scott's aunt –testified that around 9:00 or 10:00 p.m. on September 10, 1999, she had gone to the residence (where Latonya was found dead the next day). (Doc. # 14-19 at 47-50). She testified that Shaneka Scott and Albert Hawkins were there when she left and that they were "fixing to have a card party." (*Id.* at 51-52). Vinnie Scott – Scott's grandmother – testified that Shaneka was taking care of her while she was sick, and that she woke up at some point that night and saw Scott get into a car and leave. (*Id.* at 59-60). She then testified that she heard no one come into the house after that, which she testified she would have heard due to the door slamming and the alarm bell. (*Id.* at 60-61). Scott's counsel then put Scott's ex-girlfriend Rachel Hillary on the stand, who testified that she had seen Scott come to Wing Out where she was working the night before he was arrested, and he was driving a Lexus. (*Id.* at 62-66).

The penalty phase of the trial began on August 19, 2002, and concluded on August 20, 2002, with the jury recommending death by a 10 to 2 vote on each of the two capital counts. (Docs. # 14-6 at 51; 14-9 at 74-75; 14-20 at 163-64, 193; 14-24 at 94, 96). During the penalty phase Scott "made several outbursts and was eventually removed from the courtroom . . . He [also] engaged in a shouting match with the victim's mother and accused her of murdering her own daughter." (Doc. # 14-39 at 33). Scott's aunt, Inez Smith, testified that Scott's mother was currently incarcerated at the Birmingham City Jail due to alcohol-related criminal conduct, Scott had loved his younger sister Kaneisha Jackson, and Scott believed he was responsible for his younger sister's disability and early death because "at a young age Scott may have accidentally

11

pulled Kaneisha off a bed." (Doc. # 14-39 at 34). According to Inez, Scott had joined a gang to try to seek "love," had often been left alone at home to care for his younger sister, had shown love to her, and was talented and loved by his family. (Doc. # 14-39 at 34). Vinnie Scott (Scott's grandmother) testified that she loved Scott and that he loved her, that Scott had taken care of her when she had been hospitalized and returned home. (Doc. # 14-39 at 34-35). Icephen Goldthwaite, Scott's aunt, also testified that Scott's mother had been an alcoholic and drug abuser throughout her life, that she was not a good mother to Scott, and that Scott was loved by his family, and especially by his cousin George. (Doc. # 14-39 at 35). Scott also testified at the penalty phase, and gave what the Rule 32 court described as a "long and sometimes confusing statement" that included accusations of lying, that Scott had been advised by "certain people" not to testify, that he "didn't do what they say I did," that he considered himself to "be a prophet of God," a description of why he liked to rap, an assertion that he was writing a religious book called "Divine Prophet," and a statement that he did not "mind being in a one-man cell" because "I still believe I can make a million from behind bars" from a book publishing deal with "Random House." (Doc. # 14-39 at 35-38). On cross-examination, Scott testified that he was reading *Hannibal Cannibal* by Thomas Harris, and when the State called the victim's mother and father to testify, Scott interrupted and claimed that the father was not his "biological father . . . [but was] the biggest dope dealer, over on Southside." (Doc. # 14-39 at 38). In closing arguments during the penalty phase, Scott's trial counsel made a plea for mercy, emphasized that Scott was loved and had shown love to his family, and underlined that life imprisonment was still a "harsh, harsh punishment." (Doc. # 14-39 at 38-39).

The trial court held a sentencing hearing on October 4, 2002, accepted the jury's recommendation, and sentenced Scott to death for both counts of capital murder and to life

imprisonment for rape in the first degree, attempted murder, and burglary in the first degree. (Docs. # 14-7 at 5, 7; 14-21 at 8-10; 14-23 at 88-89; 14-24 at 98, 100; 14-25 at 107). Scott was also ordered to make restitution payments and pay fines. (Docs. # 14-7 at 5, 8; 14-24 at 101).

Attorneys Talitha Powers Bailey and John Robbins represented Scott in the direct appeal of his death sentence. (Doc. # 14-26 at 55). Scott mostly raised trial court errors in that appeal, including arguments that the trial court improperly: (1) interfered with defense counsel's trial strategy by ordering them to call three witnesses requested by Scott; (2) denied Scott's motion to continue after a necessary witness failed to respond to a subpoena; (3) refused to sever the trial of the capital and non-capital charges; (4) denied defense counsel's pretrial motion to withdraw; and (5) found that § 13A-5-49(8) aggravating circumstances applied. (Doc. # 14-22 at 12-13). Scott's appellate claims included his assertions that: (1) the death penalty statutes in Alabama and in all other states are unconstitutional; and (2) Alabama's capital sentencing scheme violates *Ring v. Arizona*, 536 U.S. 584 (2002). (Doc. # 14-26 at 57-68); *Scott Direct*, 937 So. 2d at 1071-87.

The ACCA affirmed the convictions but remanded with directions for the trial court to correct its sentencing order. (Doc. # 14-26 at 68-69). The ACCA rejected most of Scott's arguments for reversal. First, the ACCA concluded that the trial court did not err in directing counsel to call three witnesses whom Scott wanted to testify. (Doc. # 14-26 at 57-60); *Scott Direct*, 937 So. 2d at 1071-75. The ACCA detailed the trial court's deliberation on this issue, highlighting Scott's repeated insistence on calling the witnesses and the precedent in *Burton v. State*, 651 So. 2d 641 (Ala. Crim. App. 1993), *aff'd, Ex parte Burton*, 651 So. 2d 659 (Ala. 1994). (Doc. # 14-26 at 58-59); *Scott Direct*, 937 So. 2d at 1072-75. Second, the ACCA concluded that because Scott could not establish the probability that Shaneka would be taken into custody over

13

the weekend during a continuance, the court did not abuse its discretion in denying his motions for a continuance. (Doc. # 14-26 at 60-62); *Scott Direct*, 937 So. 2d at 1075-78.

Third, the ACCA concluded that joinder of the capital murder charges with the non-capital charges was not improper under Rule 13.3(a) of the Alabama Rules of Criminal Procedure, because the crimes had many similarities and evidentiary links, and Scott had not shown compelling prejudice caused by the joinder. (Doc. # 14-26 at 62-63); *Scott Direct*, 937 So. 2d at 1078-80. Fourth, the ACCA concluded that the trial court did not abuse its broad discretion in denying a motion to withdraw where defense counsel presented no evidence (either during the initial trial or during a hearing on a motion for a new trial) about a conflict. (Doc. # 14-26 at 63-65); *Scott Direct*, 937 So. 2d at 1080-82. Fifth, the ACCA concluded that there *was* a plain sentencing error when the trial court found the aggravating circumstance that the crime was especially heinous, atrocious, or cruel as compared to other capital offenses because the court relied on improper factors such as Scott's lack of remorse and behavior at trial. (Doc. # 14-26 at 65-67); *Scott Direct*, 937 So. 2d at 1082-85. Sixth, the ACCA concluded that the death penalty statutes in Alabama and in all other states are constitutional, emphasizing that Scott's arguments were vague and conclusory and citing a recent opinion that addressed and rejected similar claims. (Doc. # 14-26 at 67); *Scott Direct*, 927 So. 2d at 1085-86 (citing *Deardorff v. State*, 6 So. 3d 1205 (Ala. Crim. App. 2004)). Seventh, the ACCA concluded that Alabama's capital sentencing scheme does not violate *Ring v. Arizona* and his reasoning has been considered and rejected by multiple recent decisions. (Doc. # 14-26 at 68); *Scott Direct*, 927 So. 2d at 1086-87 (citing *Miller v. State*, 913 So. 2d 1148, 1167-68 (Ala. Crim. App. 2004)).

In conclusion, the ACCA noted that the State had conceded that the trial court's sentencing order was flawed and must be remanded for correction. The ACCA highlighted that the trial court

14

had not entered specific findings on the existence of the statutory and non-statutory aggravating and mitigating circumstances, that it had included an invalid aggravating circumstance, and that it had improperly considered the mental health findings – that is, the findings of the Department of Mental Health that Scott had no prior history of mental illness and was competent at the time of his crime and at the time of trial. (Doc. # 14-26 at 68-69); *Scott Direct*, 927 So. 2d at 1087-88.

On March 22, 2005, on remand, the trial court amended its order. (Docs. # 14-24 at 31; 14-25 at 27). The trial court noted that the jury had rendered guilty verdicts on all counts charged and evaluated both the aggravating and mitigating factors:

> The jury deliberated, after being charged by the Court, and returned its recommendation that the defendant be punished by death with respect to both counts of Capital Murder as charged in Counts I and II of the indictments in Case Number CC-00-841. Ten jurors voted for the death penalty and two jurors voted for life imprisonment without parole for both Counts I and II. . . .

> The Court finds, from the evidence presented in the guilt phase of this trial, that the jury's guilty verdicts are well supported by the evidence and that the defendant was guilty, and is guilty, of the intentional murder of Latonya Sager committed during a Rape in the First Degree, or an attempt thereof and that the defendant was guilty, and is guilty, of the intentional murder of Latonya Sager, an individual who was less than fourteen years of age.

> ### AGGRAVATING CIRCUMSTANCES
> #### Per §13A-5-49 Code of Alabama, 1975

> In regard to the aggravating circumstances pursuant to this code section, the Court finds the following to exist in these cases, and they are considered:

> 1. {§13A-5-49(2)} The defendant was previously convicted of a felony involving the use or threat of violence to the person. (The defendant was previously convicted of Assault First Degree, Case Number CC-96-4202.)

> 2. {§13A-5-49(a)} The capital offenses were committed while the defendant was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit Rape in the First Degree. (This aggravating circumstance was inherent in the Jury's verdict of guilty, as charged in the indictment.)

15

3. {§13A-5-49(8)} The capital offenses were especially heinous, atrocious or cruel compared to other capital offenses.

{Evidence presented in these cases was sufficient to prove that the ten-year (10) old victim was murdered "during" the commission of a rape or an attempt thereof. The word "during", as used in the definition of capital offenses means "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or an attempt thereof'. Code of Alabama, 1975 §13A-5-39(2). Although the autopsy of the victim revealed no evidence of trauma in the genitalia area, the evidence was sufficient to show that the element of "forcible compulsion" was present during the commission of the rape and/or the attempt thereof. As pointed out by the coroner, in his testimony, the victim had evidence of contusion, or bruising, to the lower lip. She had evidence in the whites of the eyes of petechiae, or small hemorrhages – which can be a part of asphyxia, lack of oxygen. On her neck, there was an abrasion, or scratch, and beneath that, deeper, on the internal examination, she had evidence of extensive hemorrhage beneath the vocal cords; her larynx, her voice box. Additionally, she had probable hemorrhage in the mastoid areas – the little bumpy areas behind the ears. She also had swelling of the brain. The coroner went on to explain that when one stops venous return from the head, swelling of the brain is the result, and then there is a series of – a "cycle" that is lethal. He further testified that all of his findings would support his opinion that the victim died of asphyxia, from manual strangulation, and possibly also suffocation, as a mechanism. The totality of all of the circumstances provides ample evidence to support a finding of "forcible compulsion" as defined by law: "Physical force that overcomes earnest resistance or it is a threat, express or implied that places a person in fear of immediate death or serious physical injury to himself or another person." Code of Alabama, 1975 §13A-6-60(8). The Court is aware that this aggravating circumstance was intended to apply to only those conscienceless pitiless homicides which are unnecessarily torturous to the victim, and that torture maybe found where the victim is subjected to serious physical, sexual, or psychological abuse before death. Further, the Court is aware that rape is considered to be a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. It is very often accompanied by physical injury to the female and can also inflict mental and psychological damage. There is no doubt that the victim in these cases was murdered in such a way as to cause her great suffering before she died. This victim was not an adult, but a ten-year (10) old child, who was four feet five inches tall (4'5') and weighed only sixty-four (64) pounds. Her assailant, on the other hand, a much larger and stronger nineteen-year-old (19) male, had been living in her home for at least one (1) month prior to the commission of these offenses. The evidence presented at trial showed that the child was physically abused and strangled to death during the course of, or in connection with, the commission of a rape or an attempt thereof. The nature of this vile and outrageously inhumane offense, without question involved fear and torture to this young child. Taking into consideration the timeframe within which these crimes must have occurred, which without a doubt, was not "instantaneous", the evidence

presented supports the reasonable conclusion that, while the child was being strangled to death, she suffered greatly; (i.e., she had to be alive long enough for her brain to swell while being deprived of oxygen, and she had to feel the defendant's hands squeezing and crushing her throat while this was happening to her. She had to be alive long enough for the hemorrhaging to occur in her eyes and for the extensive hemorrhaging to occur in her neck, during which time she had to feel what was happening to her and experience intense fear. she certainly had to be alive when she received the injury and swelling to her lip, as noted by the coroner, because it is a medically proven fact that bruising or swelling will not occur postmortem. The coroner also stated that the trauma the child received to her lip was not due to strangulation. Therefore, this Court finds that this aggravating circumstance is not only warranted, but is fully justified in these cases.)}

The Court further finds that the following aggravating circumstances do not exist in these cases, and they are not considered:

1. {§13A-5-49(1)} The capital offenses were committed by a person under a sentence of imprisonment;

2. {§13A-5-49(3)} The defendant knowingly created a great risk of death to many persons;

3. {§13A-5-49(5)} The capital offenses were committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

4. {§13A-5-49(6)} The capital offenses were committed for pecuniary gain;

5. {§13A-5-49(7)} The capital offenses were committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;

6. {§13A-5-49(9)} The defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct;

7. {§13A-5-49(10)} The capital offenses were one of a series of intentional killings committed by the defendant;

## MITIGATING CIRCUMSTANCES
### Per §13A-5-51 Code of Alabama, 1975

In regard to mitigating circumstances pursuant to this code section, the Court finds the following to exist in these cases, and it is considered:

1. §13A-5-51(7) Code of Alabama, 1975 The Court finds that the only evidence arguably presented in mitigation pursuant to this code section was that, at the time he committed these crimes, the defendant was nineteen (19) years of age.

17

The Court further finds that the following mitigating circumstances, pursuant to this code section, do not exist and are not considered in these cases:

1. {§13A-5-51(1)} The defendant has no significant history of prior criminal activity. The court finds that the defendant has previously been convicted as an adult of Assault First Degree, as well as Unlawful Possession of a controlled substance.

(Because juvenile adjudications are not convictions under Alabama Law, they cannot be considered as prior criminal activity under Alabama's capital sentencing scheme, and cannot negate the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity. Therefore, this court did not consider the defendant's juvenile adjudications of Criminal Mischief Second Degree, Theft of Property Second Degree, Receiving Stolen property First Degree, Theft of Property First Degree or Attempted Murder.)

2. {§13A-5-51(2)} The capital offenses were committed while the defendant was under the influence of extreme mental or emotional disturbance;

3. {§13A-5-51(3)} The victim was a participant in the defendant's conduct or consented to it;

4. {§13A-5-51(4)} The defendant was an accomplice in the capital offenses committed by another person, and his participation was relatively minor;

5. {§13A-5-51(5)} The defendant acted under extreme duress or under the substantial domination of another person;

6. {§13A-5-51(6)} The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired;

## NON-STATUTORY
## MITIGATING CIRCUMSTANCES
### Per §13A-5-52 Code of Alabama, 1975

In regard to non-statutory mitigating circumstances pursuant to this code section, the Court finds the following to exist in these cases, and they are considered:

1. That the defendant's mother loved alcohol more than she loved him, and he suffered as a result of same. He later joined a gang in search of love.

18

2. That the defendant's grandmother raised him at his mother's request, and she loves him. He visited her in the hospital, cooked for her and rubbed her hand to help her regain feeling in it.

3. That the defendant's younger sister passed away when he was thirteen (13) years old. He loved her deeply and was very sad at her passing, even though when she was very small, the defendant pulled her off the bed and she sustained a serious injury which resulted in her being handicapped and remaining in a wheelchair for the duration of her life.

4. That the defendant is a very talented individual who wrote a rap song, cut a demo and likes writing books.

5. That the defendant stated that he had sex with five (5) females in his age bracket all in one year.

6. Any other mitigating circumstances offered pursuant to this code section.

### [**JUDGMENT**]

In determining the sentences herein, the Court has not been influenced by any references or expressions of community sentiment that have been made. Moreover, the Court has not considered, and has not been influenced by any improper matters that may be contained in the pre-sentence report. Upon considering and weighing the aggravating circumstances against the mitigating circumstances, the Court finds that the aggravating circumstances greatly outweigh the mitigating circumstances. The Court considered the evidence presented by the defendant at the sentencing hearing, where the jury participated, as evidence of non-statutory mitigating factors. Considering the fact that defendant had several family members testify on his behalf all of whom appeared to genuinely love and care for the defendant, it would be a stretch to find that the defendant's background was one of total deprivation. Having weighed the statutory aggravating circumstances against all of the statutory and non-statutory mitigating circumstances, and having given careful consideration and substantial weight to the evidence and the jury's advisory recommendation, the Court finds that the aggravating circumstances in these cases outweigh the mitigating circumstances and that the punishment should be death, in accordance with the jury's recommendation of ten (10) for death and two (2) for life without parole.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** by the Court that the defendant, Willie Earl Scott, is sentenced to death as to both Counts of Capital Murder contained in the indictment in Case Number CC-00-841, as previously recommended by the jury at the sentencing hearing conducted on August 19, 2002, inasmuch as each count of Capital Murder requires different elements of proof.

19

(Docs. # 14-24 at 36-42).

After another appeal, the ACCA affirmed Scott's convictions and capital sentence on May 27, 2005, and denied his application for rehearing on September 16, 2005. *Scott Direct*, 937 So. 2d at 1088-91; (*see also* Docs. # 14-26 at 181; 14-27 at 111). On February 17, 2006, the Alabama Supreme Court denied Scott's petition for a writ of certiorari review. *Id.* at 1065. The United States Supreme Court denied certiorari review on October 2, 2006. *Scott v. Alabama*, 549 U.S. 841 (2006); (*see also* Doc. # 14-27 at 133).

In February 2007, Scott timely petitioned the Jefferson County Circuit Court for postconviction relief under Alabama Criminal Procedural Rule 32. (Docs. # 14-28 at 193-201; 14-29 at 3-79). On May 29, 2007, the State answered and on July 20, 2007 indicated in a Joint Status Update that the State intended to file a motion to dismiss. (Docs. # 14-29 at 137-94, 201 ¶ 5; 14-30 at 4; 14-39 at 30). On July 30, 2007, before the State filed its motion, the Rule 32 court summarily denied Scott's petition without holding an evidentiary hearing and adopted the State's answer verbatim. (Docs. # 14-28 at 8-65; 14-33 at 23). Scott unsuccessfully moved for reconsideration (Doc. # 14-28 at 71-73) and objected to the court's adoption of the state's legal and factual assertions. (Doc. # 14-30 at 8-12).

In December 2007 Scott appealed the denial of his Rule 32 petition. (Docs. # 14-28 at 191; 14-54 at 2-125). On February 17, 2010, the ACCA remanded to the Rule 32 court to make specific written findings as to whether and when Scott paid his filing fee. (Doc. # 14-55 at 120-21). On remand, the Rule 32 court made specific written findings on those issues. (Doc. # 14-32 at 14-15). On March 1, 2010, the Rule 32 court filed a return to the ACCA. *See Scott v. State*, 262 So. 3d 1239 (Ala. Crim. App. 2010) (Note from the reporter of decisions). On March 26, 2010,

20

the ACCA denied relief, affirming the state circuit court's judgment. (Doc. # 14-36 at 35); *Scott v. State* (*Scott Collateral I*), 262 So. 3d 1239 (Ala. Crim. App. 2010).

After the ACCA denied rehearing, *id.* at 1239, Scott petitioned the Supreme Court of Alabama for a writ of certiorari. (Doc. # 14-57 at 2-28). The Supreme Court of Alabama granted certiorari and on March 18, 2011 reversed and remanded to the ACCA with directions to remand to the Rule 32 court. *Ex parte Scott*, 262 So. 3d 1266, 1274 (Ala. 2011); (Docs. # 14-57 at 42, 44-52; 14-39 at 30). In doing so, the Supreme Court of Alabama held that Judge Bahakel's verbatim adoption of the State's answer conflicted with *Ex parte Ingram*, 51 So. 3d 1119 (Ala. 2010) and violated the requirement that such an order reflect the independent and impartial findings and conclusions of the trial court. *Ex parte Scott*, 262 So. 3d 1266, 1274 (Ala. 2011); (Docs. # 14-57 at 42, 44-52; 14-39 at 30-31).

On return from remand, the ACCA remanded to the Rule 32 court with directions to reverse its order dismissing the Rule 32 petition and to enter a new order. *Scott v. State*, 262 So. 3d 1274 (Ala. Crim. App. 2011). The State moved to dismiss all claims in Scott's petition, and the Rule 32 court set it for a hearing in September 2011. (Doc. # 14-33 at 20). In February 2012, the Rule 32 court denied the State's motion to dismiss. (Doc. # 14-33 at 22-24). In June 2012, the Rule 32 court set a briefing schedule on the State's motion to dismiss. (Doc. # 14-33 at 27, 34). On April 4, 2013, the Rule 32 court granted the motion in part and allowed Scott to proceed with an evidentiary hearing on his claim of ineffective assistance of counsel during the penalty phase. (Docs. # 14-36 at 37, 45, 65; 14-39 at 31). On February 2, 2014, the Rule 32 court granted Scott's motion for leave to amend his petition to add claims of ineffective assistance of counsel during the guilt phase and claims that trial counsel had failed to present evidence and arguments about the victim's death being unintentional. (*See* Docs. # 14-37 at 161; 14-39 at 32). On March 12,

21

2014, the State answered and moved to dismiss the amended petition. (Docs. # 14-37 at 186-202; 14-38 at 1-18). On April 29, 2014, an evidentiary hearing was held. (*See* Docs. # 14-39 at 32; 14-40 at 3-201; 14-41 at 3-202; 14-42 at 3-202; 14-43 at 3-154). On May 26, 2015, the Rule 32 court denied Scott's amended Rule 32 petition. (Docs. # 14-39 at 62; 14-45 at 13).

In October 2015, Scott appealed this denial. (Doc. # 14-58 at 2-113). In October 2017, the ACCA affirmed the Rule 32 court. (Doc. # 14-59 at 164-216). Scott applied for rehearing (Doc. # 14-59 at 44-163), and the ACCA overruled it. (Doc. # 14-59 at 216). In December 2017, Scott petitioned the Alabama Supreme Court for a writ of certiorari. (Doc. # 14-60 at 2-74). The Alabama Supreme Court denied the petition. (Doc. # 14-60 at 177).

### B.    Federal Habeas Proceedings

On October 29, 2018, Scott, through his habeas counsel,[1] filed a § 2254 petition in this court. (Doc. # 1). In addition to habeas relief, Scott requested an evidentiary hearing. (*Id.* at 139). Respondent answered and filed a brief on May 23, 2019. (Docs. # 16, 17). Scott filed a reply brief on October 15, 2019. (Doc. # 20). On June 30, 2020, Scott filed a notice of supplemental authority. (Doc. # 21). On November 25, 2024, the court ordered one of Scott's attorneys, Eric B. Schwartz, to show cause as to the appointment of supplemental habeas counsel to screen for potential *Martinez* conflict claims. (Doc. # 26 at 5). On January 21, 2025, Schwartz filed a response identifying an expert to review Scott's postconviction proceedings. (Doc. # 32). On January 29, 2025, this court ordered Schwartz to file a status report on this matter within thirty days. (Doc. # 33). On February 28, 2025, Scott's counsel complied with the Order and proposed filing a status report on or before August 28, 2025 and indicating that Angie Setzer, of the Equal Justice

---

[1] Attorneys Christopher M. Egleson, and Eric B. Schwartz of Sidley Austin LLP; John E. Goodman, John M. Goodman, and Michael F. Walker of Bradley Arant Boult Cummings LLP; and Thomas Patrick Hanrahan of TPHanrahan Dispute Solutions represent Scott on federal habeas review. (Docs. # 1, 2-4).

Initiative, had been engaged by Scott. (Doc. # 34). On August 28, 2025, Scott filed another status report indicating that Setzer was reviewing the record to identify *Martinez* issues and proposed filing another status report on October 31, 2025. (Doc. # 35). On October 31, 2025, Scott filed a status report explaining that Setzer had completed her review. (Doc. # 38). On November 3, 2025, the court ordered Setzer to file her report on or before December 1, 2025. (Doc. # 40). On December 1, 2025, Scott filed Setzer's report, which stated that "postconviction counsel's representation was comprehensive and very effective" and that "[i]n [her] opinion, there is no viable claim pursuant to *Martinez v. Ryan*." (Doc. # 41 at 13).

## II.    HABEAS REVIEW UNDER AEDPA

AEDPA governs this court's review of Scott's habeas claims. *See Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (explaining that AEDPA applies to habeas petitions filed after April 24, 1996). When a petitioner has obtained a state-court adjudication of a constitutional claim on the merits, § 2254(d) significantly restricts a federal court's authority to award habeas relief. "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks omitted) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Under § 2254(d)(1), a petitioner opens the door to habeas relief if he establishes that a state court rejected the merits of a constitutional claim in a manner "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under (d)(2), the petitioner must show that a denial of constitutional relief "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in . . . [s]tate court." 28 U.S.C. §

2254(d)(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)).

The petitioner bears the burden of showing that an adjudicated issue falls within § 2254(d)(1) or (d)(2). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam); *see also id.* at 24-25 (explaining that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a constitutional holding] incorrectly"). Additionally, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (holding that habeas courts reviewing adjudicated claims under AEDPA should "'look through' the unexplained decision to the last related state-court decision . . . and then presume that the unexplained decision adopted the same [merits-based] reasoning").

The exceptions contained in § 2254(d)'s "clearly established Federal law" under (d)(1) are limited to Supreme Court decisions that predate "the last adjudication of [a federal claim's] merits in state court." *Greene v. Fisher*, 565 U.S. 34, 36, 40 (2011); *id.* at 38 (explaining that "§ 2254(d)(1) requires federal courts to focu[s] on what a state court knew and did, and to measure state-court decisions against this Court's precedents *as of the time the state court renders its decision*") (internal quotation marks omitted) (alteration and emphasis in *Greene*). Additionally, the statutory term "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion as to part II of the Court's opinion).

Section 2254(d)(1)'s two main clauses – "contrary to" and "unreasonable application" – have separate meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he

'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis."). As to (d)(1)'s first clause, a state court's decision is contrary to "clearly established precedents [of the Supreme Court] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

And, as to (d)(1)'s second clause, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). AEDPA requires this court to accord a state court "deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Id.* Consistent with § 2254(d)(1) deference, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (internal quotation marks omitted) (emphasis in original) (quoting *Williams*, 529 U.S. at 410). In assessing the reasonableness of a state court's reasons for its decision, a federal court "may consider any potential *justification* for those reasons." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc). The Eleventh Circuit has explained that this approach is consistent with the text of (d)(1) stating that the exception to AEDPA deference was if a state court's "'adjudication of the claim . . . *resulted* in a *decision*' that was either contrary to or involved an unreasonable application of federal law or was based on an unreasonable determination of the facts." *Id.* at 1037 (quoting 28 U.S.C. § 2254(d)(1)-(2)).

If a state court denies a federal claim as meritless and "'fairminded jurists could disagree' on the correctness of th[at] . . . decision," then habeas relief under AEDPA's unreasonable application clause is unavailable. *Richter*, 562 U.S. 86, 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has clarified that a "rule's specificity" must factor into

25

the unreasonableness evaluation. *Richter*, 562 U.S. at 101. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted).

Under § 2254(d)(2), a petitioner may challenge the state court factual findings underlying an adjudicated federal claim as unreasonable based on the evidentiary record. *Wood v. Allen*, 558 U.S. 290, 293 (2010). "[W]hether a state court errs in determining the facts [under AEDPA] is a different question from whether it errs in applying the law." *Rice v. Collins*, 546 U.S. 333, 342 (2006).

Additionally, a presumption of correctness attaches to state court factual findings under § 2254(e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct"). A petitioner must present "clear and convincing evidence" to overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation marks omitted). The Supreme Court has not addressed the relationship between § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304-05 ("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2)."); *see also Cave v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011) ("We have not yet had an occasion to completely define the respective purviews of (d)(2) and (e)(1), and this case presents no such opportunity."). *But see Newland v. Hall*, 527 F.3d 1162, 1183-84 (11th Cir. 2008) (explaining that the "review of a state court's findings of fact – to

ascertain whether the court's decision was based on an unreasonable determination of facts – is circumscribed by both section 2254(d)(2) and 28 U.S.C. § 2254(e)(1)").

As the Supreme Court has reminded us, "[i]f this [habeas review] standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Richter*, 562 U.S. at 103).

With these AEDPA principles in mind, the court turns to its analysis of Scott's habeas allegations.

## III.    ANALYSIS

Relying on the Supreme Court's seminal Sixth Amendment decision in *Strickland v. Washington*, 466 U.S. 668 (1984), Scott asserts an ineffective assistance of counsel claim in Claims A, B, D, E, F, G, and J. After introducing the *Strickland* standard, the court separately assesses each of these claims.

In *Strickland*, the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel who represent criminal defendants at trial or on direct appeal. To prove that a conviction or sentence is unconstitutional because of ineffective assistance,

"[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance – "a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.*; *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be "highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Under the *Strickland* framework, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). As the *Strickland* Court observed, "countless ways [of] . . . effective assistance [exist] in any given case" and that "[e]ven the best criminal defense attorneys would not

28

defend a particular client in the same way." *Id.* The Court cautioned that "[i]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Consequently, an evaluating court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see, e.g.*, *Newland*, 527 F.3d at 1184 ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689). Simply put, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell "within the wide range of competent assistance." *Chandler*, 218 F.3d at 1315, 1317.

When assessing an adjudicated ineffective assistance claim on habeas review, "it is important to keep in mind that [i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference." *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (internal quotation marks omitted) (alteration in *Williams*) (quoting *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)). "Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the [s]tate court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*." *Williams*, 598 F.3d at 789 (internal quotation marks omitted) (emphasis in *Blankenship*) (quoting *Blankenship*, 542 F.3d at 1271, in turn quoting *Rutherford*, 385 F.3d at 1309). Because *Strickland* and § 2254(d) incorporate "'highly deferential' [standards], . . . when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The focus of this doubly deferential inquiry is "whether there is

any reasonable argument that counsel satisfied *Strickland*'s deferential standard" rather than "whether counsel's actions were reasonable." *Id.* at 101, 105 (comparing "whether the state court's application of the *Strickland* standard was unreasonable" under § 2254(d)(1) with "whether defense counsel's performance fell below *Strickland*'s standard" under the Sixth Amendment). Accordingly, this "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012) (internal quotation marks omitted) (alteration added).

As to *Strickland*'s second prong, the burden of proof is less demanding than the performance prong's preponderance of the evidence standard. 466 U.S. at 694. Instead, to satisfy the prejudice component, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is [one] sufficient to undermine confidence in the outcome." *Id.* Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (internal quotation marks omitted). But the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. "[W]hen a [capital] petitioner challenges a death sentence, 'the [constitutional] question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Fla. Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (alterations added) (quoting *Strickland*, 466 U.S. at 695). In sum, this is a "demanding burden" that, coupled with the AEDPA standard of review, requires a petitioner to show that a "state court's

conclusion that [an attorney's] performance at . . . trial didn't prejudice him – that there was no 'substantial likelihood' of a different result – was 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement.'" *Pye*, 50 F.4th at 1041-42 (quoting *Shinn v. Kayer*, 592 U.S. 111, 117-19 (2020)). If the state court has adjudicated the prejudice prong, then a petitioner must establish that the merits-based conclusion contains AEDPA error; otherwise habeas relief is unavailable. *See Cullen*, 563 U.S. at 197-98. With these principles in mind, the court examines how the Alabama courts substantively treated Scott's *Strickland* allegations, and then analyzes each of the subclaims on the merits.

### A.    Claim A – Scott has not established a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel at the penalty phase of trial.

Scott contends that his trial counsel's performance at the penalty phase of trial was deficient and prejudicial because they did not spend enough time preparing a mitigation case, and either missed or mischaracterized, or both, key mitigation evidence that was later presented at the Rule 32 evidentiary hearing. (Doc. # 1 ¶¶ 31-126, 127-39). Scott asserts that the ACCA's rejection of this claim was contrary to and an unreasonable application of Supreme Court precedent under § 2254(d)(1), and involved an unreasonable factual determination under (d)(2). (Doc. # 1 ¶ 139, 141, 143). The court divides its discussion of this claim into four subclaims. These subclaims are labeled IV(A)(1)-(4) in Scott's habeas petition. Similarly, the court labels them (A)(1)-(4). As explained below, Scott has not met his AEDPA burden on any of his subclaims.

Scott seeks de novo review of his *Strickland* subclaims, which is available only if he is able to meet the demanding requirements of (d)(1) and (d)(2) of AEDPA. (Doc. # 1 ¶ 139). Respondent answers that Scott's failure to comply with Alabama's procedural requirement of Rule 28(a)(10) supports habeas denial of portions of subclaims (A)(1) and (A)(2) because the ACCA applied Rule 28(a)(10) in a firmly established manner. (Doc. # 17 at 43, 45-51). Respondent adds that Scott's

failure to exhaust subclaim (A)(3) also is a procedural default that bars habeas review. (*Id.* at 45-51). Respondent contends the remainder of Scott's arguments on this claim are without merit because "it is clear that the ACCA applied the proper standards in addressing Scott's IAC claims." (*Id.* at 53).

### 1. Subclaim (A)(1) – Scott has not shown that trial counsel conducted a constitutionally insufficient mitigation investigation.

Scott's first subclaim concerns the deficient performance prong of *Strickland* and argues that his trial counsel conducted a constitutionally insufficient mitigation investigation at the penalty phase. (Doc. # 1 ¶¶ 31-134). Specifically, Scott argues this was because his counsel failed to invest enough time to adequately investigate potential mitigation defenses (*id.* ¶¶ 38, 45, 127, 130, 133), did not meet enough of his friends and family members and that they did not spend enough time with the friends and family they did meet (*id.* ¶¶ 45, 130), did not make adequate use of the mitigation investigator (*id.* ¶¶ 41, 131), did not obtain necessary records about Scott's childhood and background (*id.* ¶¶ 46-47, 129), did not present a sufficient defense (both in terms of time to present evidence and strategy of "humaniz[ing]" Scott) (*id.* ¶ 50), presented mitigation evidence that diverged tremendously from reality (including by presenting Vinnie as a loving and stable influence and by omitting information about the abuse Scott suffered) (*id.* ¶¶ 56, 59), and failed to retain a mitigation expert. (*Id.* ¶ 132).

Respondent argues that the ACCA's review of Scott's argument about inadequate time and effort spent in a mitigation investigation passes scrutiny under AEDPA because there is no indication in the record that Scott's counsel should have known Scott had been abused (Doc. # 17 at 61, 64-65); trial counsel made a reasonable decision not to use the mitigation expert's assistance (*id.*); trial counsel also made a reasonable decision to present only positive testimony to humanize Scott (*id.* at 62); and trial counsel relied on several sources of information (including discussions

with family members, records of Scott's mental health evaluation at Taylor-Hardin, and an evaluation by Dr. Kimberly Ackerson) to create a full picture of Scott's background. (*Id.* at 60). Respondent also contends that Scott's theory about mitigation evidence diverging from reality (especially with regard to Vinnie) was procedurally defaulted because Scott failed to comply with Rule 28(a)(10) in presenting his arguments to the state courts. (*Id.* at 43). Separately, Respondent asserts that this claim fails on the merits because Scott has produced no evidence that his trial counsel was told by anyone (or that documentary evidence would have revealed) that his grandmother was abusive. (*Id.* at 64-65). Respondent similarly argues that Scott's theory about his counsel's failure to retain a mitigation expert was procedurally defaulted for failure to comply with Rule 28(a)(10). (*Id.* at 43). Respondent also urges that this mitigation expert claim is without merit. (*Id.* at 65-66).

Scott replies that the ACCA unreasonably applied federal law because the ABA Guidelines instruct that counsel must obtain accurate information relevant to a defendant's medical history, educational history, employment, and training history, family and social history, and any religious or cultural influences. (Doc. # 20 at 20 (citing 1989 ABA Guidelines 11.4)). Scott's counsel, therefore, could not have made a "strategic" decision about the mitigation defense because, Scott contends, they abandoned the investigation at an unreasonable juncture. (*Id.* at 21). This led them to believe (incorrectly) that Vinnie was stable, positive, and loving influence. (*Id.* at 22). Moreover, Counsel failed to offer any excuse for not obtaining the readily available DHR records, saying they just "didn't think of it." (*Id.* at 23). Scott argues that this wrong was compounded because counsel failed to hire a mitigation expert after they had argued to the state trial court that it was "critical and constitutionally required." (*Id.*). When Scott's trial counsel were asked at the Rule 32 hearing why they did not hire a mitigation expert, they replied that they "didn't think of it." (*Id.*). Scott

33

further argues that his claim about the grossly inaccurate picture of his grandmother is not procedurally defaulted because his brief to the ACCA included factual and legal citations, so the ACCA's application of Rule 28(a)(10) was unreasonable and also arbitrary. (*Id.* at 35-37). And, he makes substantially the same argument about his failure to pursue a mitigation expert theory. (*Id.* at 37-39). As to both of these theories, Scott contends that this is subject to review on the merits because the ACCA reviewed the merits in an alternative merits ruling. (*Id.* at 36-37, 39).

Scott has fully exhausted Subclaim (A)(1). Although he did not raise it on direct appeal, he raised it on his first collateral appeal with the Rule 32 court (Doc. # 14-29 at 56-59, 63-65), the ACCA (Doc. # 14-54 at 71-80), and the Supreme Court of Alabama (Doc. # 14-56 at 25, 97-101). Scott also raised it on his second collateral appeal with the Rule 32 court (Doc. # 14-35 at 54-62, 67-72), the ACCA (Doc. # 14-58 at 18-25, 32-62, 65-74), and the Supreme Court of Alabama (Doc. # 14-60 at 21-26, 34-46).

The Rule 32 court granted Scott an evidentiary hearing on his *Strickland* claim related to the penalty phase. (*See* Docs. # 14-33 at 76 (granting the hearing); 14-40 (transcript of hearing); 14-41 (same); 14-42 (same); 14-43 (same)). After the hearing, the Rule 32 court reviewed Scott's ineffectiveness allegations for sufficiency under Rule 32. (Doc. # 14-39 at 44). Based on Alabama Criminal Procedure Rules 32.3 and 32.9, as well as the *Strickland* and other legal standards, the Rule 32 court denied Scott's claim that his trial counsel failed to investigate and present significant mitigation evidence (including failure to spend adequate time, investigate DHR and medical records, interview certain friends and family, present evidence from mitigation experts, and learn key facts about the night of the killing). (Doc. # 14-39 at 44-55). The Rule 32 court also "point[ed] out that Scott's behavior during the penalty phase undermined the effectiveness of trial counsel's efforts," describing Scott's dress in a t-shirt and shower shoes, his rambling testimony, and his

34

accusation that Latonya's mother was her real killer and that Latonya's father was a "dope dealer." (Doc. # 14-39 at 51).

Below, the court considers each aspect of Subclaim (A)(1) separately by summarizing the reasoning of the state courts, evaluating Scott's arguments under the AEDPA framework, and (for completeness) alternatively conducting a de novo review.

### a. Lack of Time and Effort, Mitigation Evidence Diverging From Reality, and Failure to Obtain Necessary Documentary Records

Scott first argues that his counsel were ineffective under *Strickland* because they did not spend enough time or effort to investigate the mitigation evidence, which caused them to form beliefs about Scott's background that diverged sharply from reality, including the belief that his grandmother Vinnie Scott was a stable and loving figure in his life. As explained below, all parts of this claim fail to overcome the rule in *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248 (11th Cir. 2016), do not escape AEDPA deference, and fail on de novo review (alternatively). Scott also argues that his counsel were ineffective under *Strickland* for failing to obtain DHR records and other documentary evidence. (Doc. # 1 ¶ 46). The court begins by summarizing the state court proceedings.

Although Scott's amended petition for Rule 32 relief raised this theory (Doc. # 14-37 at 76), the Rule 32 court did not explicitly consider whether Scott's counsel spent inadequate time on the mitigation investigation. (*See* Doc. # 14-39 at 44-55). Scott also raised this claim with the ACCA, arguing that his counsel spent "virtually no time" investigating his case (Doc. # 14-58 at 68) because "the evidence shows that Robbins and Simpson worked only 105 hours on [his] case all the way through trial." (*Id.* at 69). The ACCA rejected these arguments, explaining that a lack of time spent does not, alone, prove that counsel was incompetent. (Doc. # 14-59 at 183-85 (citing *State v. Gissendanner*, 288 So. 3d 923, 940 (Ala. Crim. App. 2015))). Instead, as the ACCA quoted

35

from *Gissendanner* (which in turn quoted from *Owens v. State*, 13 S.W. 3d 742, 754-55 (Tenn. Crim. App. 1999)), "the entire record of the trial proceedings must be examined to determine whether the appellant received effective assistance of counsel." (Doc. # 14-59 at 184 (quoting *Gissendanner*, 288 So. 3d at 940)). The ACCA concluded that "Scott's claim here is without merit" because "the caselaw quoted above establishes that the amount of time counsel spends preparing a case is not dispositive of whether counsel rendered ineffective assistance." (*Id.*).

Scott's Amended Rule 32 Petition also raised the argument that "[t]rial counsel should have thoroughly interviewed all of [his] family members, as well as some of his friends." (Doc. # 14-37 at 85). Specifically, Scott argued that counsel should have interviewed his mother, his grandmother, two aunts, two cousins, and a close family friend, among other family members and friends. (*Id.*). Scott asserted those individuals would have given counsel "the most accurate and comprehensive picture of Scott's background." (*Id.*). The Rule 32 court reasoned that the penalty phase included "considerable evidence of Scott's tortured background as evidenced by the substance abuse of his mother and her unavailability at trial due to her incarceration" and concluded that "certain witnesses would have been largely cumulative of the matters presented at the penalty phase." (Doc. # 14-39 at 50). Scott then argued in his brief to the ACCA that his counsel spent a "paltry" amount of time speaking with his family members. (Doc. # 14-58 at 71). In response, the ACCA reasoned that "there is no per se rule that failing to talk to a defendant's family members within a specified period of time or even at all constitutes ineffective assistance of counsel." (Doc. # 14-59 at 185 (citing *Gissendanner*, 288 So. 3d at 940)). The ACCA then concluded that "Scott's claim here is without merit." (Doc. # 14-59 at 185).

Scott's Amended Rule 32 petition did not raise the specific assertion that his counsel's ineffective investigation led to erroneous belief that Vinnie Scott was the most stable person in his

36

life (*see* Doc. # 14-37), but his Response to State's Proposed Order on Scott's [Amended] Rule 32 Petition for Post-Conviction Relief did raise this claim. (Doc. # 14-39 at 6). The Rule 32 court did not directly address the question about counsel's allegedly erroneous belief that Vinnie Scott was stable and loving, but it did address Scott's general assertion that his trial counsel did not adequately investigate mitigation defenses. As the Rule 32 court explained, adequate trial counsel do not have a duty "to investigate every conceivable line of defense" (Doc. # 14-39 at 46 (quoting *Jones v. Kemp*, 678 F.2d 929, 932 (11th Cir. 1982))). The Rule 32 court further noted that Scott's trial counsel did present mitigation evidence, so the question "is more a matter of degree and whether the extent of mitigation evidence presented was deficient." (*Id.* at 47). The court reasoned that after conducting their investigation, which included "discussions with Scott, Scott's family, records from Taylor-Hardin, and evaluations conducted by Dr. Kamal Nagi and Dr. Kimberly Ackerson," Scott's trial counsel decided that their strategy for the penalty phase was to "attempt to humanize him." (*Id.* at 47-48). After noting that the "collective testimony was quite compelling" – testimony that included Vinnie Scott's – the Rule 32 court concluded that any additional evidence not presented was "not so extreme as to warrant relief" and would have been "otherwise cumulative." (*Id.* at 48-51).

The ACCA did not evaluate this claim on its merits; rather, it concluded that Scott's theory about Vinnie Scott was procedurally defaulted under Alabama Rule of Appellate Procedure 28(a)(10) because "Scott provide[d] no factual or legal authority for this claim" and "has failed to present any alleged use of 'misleading' testimony concerning his relationship with Vinnie was prejudicial and constituted ineffective assistance of counsel at the penalty phase." (Doc. # 14-59 at 192).

37

Scott raised the argument about failure to obtain documentary records in his Amended Rule 32 Petition. (Doc. # 14-37 at 81-84). After listing several places from which counsel did not request records, Scott specifically argued that the failure to request DHR records and the medical records of his family members constituted *Strickland* error. (*Id.* at 83-84). Scott argued that the DHR records would have revealed "a chaotic family, in which [] Scott was shifted from one custodian to another during the first six years of his life." (*Id.* at 83). The medical records, Scott stated, would have revealed that his mother had a history of substance abuse, mental illness, and violence – and that his sister, Kynisha, also suffered from neglect and abuse at the hands of their mother. (*Id.* at 84). The Rule 32 court discussed how Scott's trial counsel had become "well aware of Scott's difficult childhood, background, and psychological state," (Doc. # 14-39 at 48), consulting multiple sources of information, "including discussions with Scott, Scott's family, records from Taylor-Hardin, and evaluations conducted by Dr. Kamal Nagi and Dr. Kimberly Ackerson." (*Id.* at 47). The court then summarized the mitigation evidence presented at trial, which included testimony about Scott's mother (that is, her neglect, substance abuse, and incarceration at the time of Scott's trial), evidence of Scott's remorse, evidence that Scott's grandmother and Icephen Goldthwaite felt considerable love for Scott – all of which was "quite compelling." (*Id.* at 48). The Rule 32 court concluded that "[t]he DHR records, medical records, and certain witnesses would have been largely cumulative of the matters presented at the penalty phase." (*Id.* at 50).

The ACCA quoted from the Rule 32 court's analysis, concluded that "[w]e agree with the circuit court's findings here," and also noted caselaw that indicates "the failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." (Doc. # 14-59 at 187 (quoting *Saunders v. State*, 249 So. 3d 1153, 1171 (Ala. Crim. App. 2016))). The ACCA reasoned that Scott "merely identifies the

general purpose for which he says, Robbins and Simpson could have used this evidence," but that Scott did not "specifically identify any witnesses who could have, or would have, testified to any of the specific evidence contained in these records." (Doc. # 14-59 at 187). Because Scott had stated that the general purpose of this evidence would have been to give "'insight into the full scope of [his] tragic childhood, and the often violent and abusive environment' in which he grew up, this evidence was similar to evidence that had already been presented by Robbins and Simpson at Scott's sentencing thereby rendering it cumulative." (Doc. # 14-59 at 187).

### i.      This claim is not subject to procedural default.

Respondent contends that the argument about the grossly inaccurate picture of Scott's grandmother is procedurally defaulted because the ACCA concluded that Scott had failed to comply with Rule 28(a)(10). (Doc. # 17 at 43). After careful review, the court concludes that Scott's theory related to the misleading testimony of Vinnie Scott is not barred from habeas review because the ACCA's application of Alabama Rule of Appellate Procedure 28(a)(10) did not rest on independent and adequate state grounds.

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases in which an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief."); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available [in state court] . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). Exhaustion requires that a petitioner "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the State's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (alteration in *Pruitt* omitted) (quoting *O'Sullivan v. Boerckel*,

39

526 U.S. 838, 845 (1999)). "Alabama's discretionary direct review procedures bring Alabama [habeas petitioners] within the scope of the *Boerckel* rule." *Id.* at 1359 (internal quotation marks omitted) (quoting *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001)). As a result, *Boerckel* applies to Alabama's postconviction appellate review structure, too. *See Pruitt*, 348 F.3d at 1359 ("Nothing in *Boerckel*'s reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *id.* (concluding that petitioner had "failed to exhaust his state remedies by not petitioning the Alabama Supreme Court for discretionary review of the denial of his state habeas petition").

The purpose of the exhaustion requirement is to afford state courts the first opportunity to correct federal questions about the validity of criminal convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (recognizing that for habeas review "[t]o be appropriate," the petitioner "must have raised these claims in state court to allow the state courts the opportunity to rule on the federal issues"); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (internal quotation marks omitted) (quoting *Barefoot*, 463 U.S. at 887).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). Rather, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y, Fla. Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alteration in *Pope*) (quoting *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th

40

Cir. 2004)). *Cf. Pope*, 680 F.3d at 1284 ("A failure to exhaust occurs . . . when a petitioner has not 'fairly present[ed]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." (alteration in *Pope* modified) (quoting *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (per curiam))).

At times, the doctrines of exhaustion and procedural default intertwine. For example, if a petitioner seeks habeas relief based on a mixture of exhausted and unexhausted federal claims, a district court may dismiss the petition without prejudice. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). Alternatively, a court may stay the habeas action to allow the petitioner to first avail himself of his state remedies. *See Rhines v. Weber*, 544 U.S. 269, 277-87 (2005) (discussing "[s]tay and abeyance" option for mixed habeas petitions). But, "if it is clear from state law that any future attempts at [state court] exhaustion would be futile" because of the state's procedural framework, then a "federal court[] may treat [that] unexhausted claim[] as procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam) (citing *Snowden*, 135 F.3d at 737); *see also Snowden*, 135 F.3d at 736 (explaining that this habeas doctrine avoids a game of "needless 'judicial ping-pong'" when a state procedural rule "obvious[ly]" bars a state court from considering the merits of an unexhausted federal claim) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). For ease of reference, the court refers to this habeas construct as unexhausted procedural default. *Compare Bailey*, 172 F.3d at 1303 (separating the petitioner's habeas claims into "categories" of ones either presented or unpresented "to the Alabama courts"). An "unexhausted procedural default" encompasses claims that a petitioner never raised or only partially exhausted in state court.

A second type of procedural default occurs when a petitioner presents his federal claim without following "'independent and adequate' state procedures." *Mason*, 605 F.3d at 1119

41

(quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). If a state court relies on such a procedural mistake of a petitioner to dismiss the alleged constitutional violation, then that petitioner "will have 'procedurally defaulted his claim[]' in federal court." *Mason*, 605 F.3d at 1119 (alteration added) (quoting *Boerckel*, 526 U.S. at 848). Under the procedural default doctrine, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (internal quotation marks omitted) (alteration in *Ward*) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *see also Snowden*, 135 F.3d at 737 ("Federal courts may apply state rules about procedural bars to conclude that further attempts at exhaustion would be futile."). For reference, the court refers to this habeas scenario as "state-barred procedural default."

To be clear, not all procedural dismissals of a federal claim in state court will prohibit habeas review. Instead, "a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon 'adequate and independent' state grounds." *Ward*, 592 F.3d at 1156 (quoting *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)). The Eleventh Circuit uses "a three-part test . . . to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Judd*, 250 F.3d at 1313. "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." *Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313). "Third, the state procedural rule must be adequate, i.e., firmly established and

42

regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

With these habeas concepts in mind, the court returns to Scott's *Strickland* claim based on the theory that his counsel's inadequate investigation led them to the erroneous belief that Vinnie Scott was a stable and loving presence in his life. The ACCA did not evaluate this claim on its merits, but held that because "Scott provides no factual or legal authority for this claim" nor any "analysis on this issue," it failed to comply with Rule 28(a)(10). (Doc. # 14-59 at 192). According to the ACCA, all that Scott furnished was a "cursory summary of testimony concerning his relationship with Vinnie, with no specific discussion of the facts or law in the form of an argument as to why he claims error." (*Id.*).

Going through these three steps, the last state court rendering a judgment here – the ACCA – clearly and expressly stated that it was relying on "Rule 28(a)(10)." (Doc. # 14-59 at 192), to resolve the federal claim without reaching the merits of that claim. *See Judd*, 250 F.3d at 1313.

Moving to the second part of the test, the ACCA's decision to apply Rule 28(a)(10) rests entirely on state law grounds, requiring that "the brief of the appellate or the petitioner shall contain . . . [a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Because this is not "intertwined with an interpretation of federal law," the second part of the test is satisfied. *See Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313). Although Scott disputes this (Doc. # 20 at 33), he has not clearly presented his reasons for doing so. (*Id.* at 36 (stating without elaboration that "[w]hether a state procedural rule was adequate and independent 'is itself a federal question,'" *id.* (quoting *Lee*

43

*v. Kemna*, 534 U.S. 362, 375 (2002)))). In any event, according to a plain reading of Rule 28(a)(10), the second part of this state-barred procedural default test is met.

The third part of the test, however, has not been met here. Scott does not dispute that Rule 28(a)(10) is "adequate, i.e., firmly established and regularly followed." *Id.* at 1157. What Scott appears to dispute is whether the rule was applied "in an arbitrary or unprecedented fashion." *Id.* (quoting *Judd*, 250 F.3d at 1313). Specifically, Scott argues that the ACCA's application of Rule 28(a)(10) was "arbitrary, unprecedented, and manifestly unfair" because Scott "plainly complied with Rule 28(a)(10)." (Doc. # 20 at 36). In support of this contention, Scott argues that his brief to the ACCA cited one case to demonstrate deficient performance "where trial counsel's failure to investigate mitigation evidence led to a 'grossly inaccurate' understanding of the defendant's background" and to demonstrate prejudice, "cited to specific portions of the record" as well as "eight cases." (*Id.* at 35 (quoting 14-58 at 72 (in turn quoting *DeBruce v. Comm'r*, 758 F.3d 1263, 1274 (11th Cir. 2014)))).

The record casts doubt on whether the ACCA relied on Rule 28(a)(10) in a firmly established manner. Scott's brief did not fit into a category in which a petitioner had done little or nothing to develop his claim on collateral review. Rather, when presenting his argument to the ACCA that the erroneous picture presented about Vinnie Scott violated *Strickland*'s performance prong, Scott cited Robbins's testimony at the Rule 32 evidentiary hearing that he believed Vinnie was "the most stable person" in Scott's life. (Doc. # 14-58 at 72 (quoting Doc. # 14-40 at 152)). Scott's brief also cited caselaw supporting the contention that presenting a "grossly inaccurate" picture of evidence is deficient. (*Id.* (citing *DeBruce*, 758 F.3d at 1274)). Scott then tied this conclusion back to his broader allegations about deficient performance – that his counsel should have interviewed witnesses separately from each other – by citing to his aunt's testimony that

"there were certain details about life with Vinnie that she was not comfortable discussing in front of her mother." (*Id.* (citing Doc. # 14-42 at 83)).

When presenting to the ACCA his argument that the erroneous picture presented about Vinnie Scott violated *Strickland*'s prejudice prong, Scott cited testimony from the Rule 32 evidentiary hearing to demonstrate that "life with Vinnie . . . was filled with violence, abuse, physical and emotional neglect, and exposure to the worst kinds of behavior." (Doc. # 14-58 at 80-81 (citing Docs. # 14-45 at 57; 14-46 at 37) (discussing Vinnie's abandonment of Scott); 14-41 at 174 (discussing Vinnie and Charlie's favoritism towards other children)). Scott cited eight cases to support the contention that "the facts erroneously dismissed as cumulative by the Circuit Court are the type and character of evidence found to be adequate to show prejudice in similar cases." (*Id.* at 81 (citing *Cooper*, 646 F.3d at 1349-50; *Ferrell v. Hall*, 640 F.3d 1199, 1239-40 (11th Cir. 2011); *Johnson*, 643 F.3d at 932-35; *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008); *Hardwick v. Crosby*, 320 F.3d 1127, 1162-90 (11th Cir. 2003); *State v. Gamble*, 63 So. 3d 707, 719-22 (Ala. Crim. App. 2010); *Presley v. State*, 978 So. 2d 63, 69-71 (Ala. Crim. App. 2005); *Harris v. State*, 947 So. 2d 1079, 1128, 1133 (Ala. Crim. app. 2004))).

On both of the *Strickland* prongs, Scott's arguments in his brief to the ACCA contain "the contents of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Respondent bears the burden of showing that the ACCA's reliance on Rule 28(a)(10) falls within that rule's firmly established range. There is a substantial question about whether it has done so here. Furthermore, as shown above, the ACCA made merits-based rulings on these issues. And, because it appears the ACCA's application of Rule 28(a)(10) to Scott's

45

*Strickland* allegation about his grandmother extends into "unfirm" ground, the court addresses this issue as if state-barred procedural default does not apply to this portion of the subclaim.

### ii.    *Daniel* Prong One

Scott has failed to satisfy his AEDPA burden on the portion of this subclaim that asserts that his counsel were ineffective because they did not spend enough time and effort on the mitigation investigation, resulting in the presentation of mitigation evidence that diverged from reality. In this subclaim, Scott argues that the law is settled that reasonable preparation in a capital trial should take a "considerable amount of time," with one case noting that "a properly conducted capital trial can involve hundreds of hours of investigation, preparation, and lengthy trial proceedings." (Doc. # 1 ¶ 32 (quoting *McFarland v. Scott*, 512 U.S. 1256, 1257 (1994) and citing *Maples v. Thomas*, 565 U.S. 266, 272 n.1 (2012))). Scott also argues that "the amount of time spent is highly relevant to the reasonableness determination." (Doc. # 1 ¶ 33 (citing *Williams v. Alabama*, 791 F.3d 1267, 1277 (11th Cir. 2015), *Foust v. Houk*, 655 F.3d 524, 530 (6th Cir. 2011), and *Agan v. Singletary*, 12 F.3d 1012, 1018 (11th Cir. 1994))). Scott further points out that his trial counsel "did almost no investigation until the week or two before trial," and that Robbins filed for only 105 hours worked on the case (with Simpson not filing an Attorney's Fee Declaration at all). (Doc. # 1 ¶ 38).

Regarding the lack of effort by his counsel, Scott's habeas petition argues that although his counsel filed a motion seeking $1,500 to hire a private investigator (Doc. # 1 ¶ 39), the investigator "spent no time on mitigation, and billed barely $300, nearly all of that for serving subpoenas." (Doc. # 1 ¶ 41). It also describes that although his counsel visited Scott in jail "a few times, he learned little more than basic biographical information." (Doc. # 1 ¶ 42; *see also id.* ¶ 43). The petition further describes the efforts of Scott's counsel to contact and meet with Scott's family, concluding that they "failed to contact, much less call to testify, key family members who would

46

later provide powerful testimony at the Rule 32 hearing, including his aunt, Eliza Scott and his mother, Earnestine Jackson." (Doc. # 1 ¶ 45).

Respondent quotes from the ACCA's reasoning for dismissing this insufficient time theory (Doc. # 17 at 55-60) and argues that Scott's trial counsel had become sufficiently familiar with Scott's background to come up with a reasonable case strategy. (Doc. # 17 at 63-64).

Scott replies that his trial counsel's mitigation investigation was "woefully deficient" because they "devoted less than five out-of-court hours to investigating a mitigation defense." (Doc. # 20 at 22). Scott repeats his earlier argument that this fact is "highly probative of counsel's deficient performance under *Strickland*" and again cites to *Williams* and *Singletary*. (Doc. # 20 at 25). Without a sufficient investigation, Scott argues, counsel "could not have and did not make a strategic decision." (*Id.* at 25).

Scott argues that AEDPA deference should not be given to the ACCA's and Rule 32 court's denial of this portion of his subclaim because the ACCA's and Rule 32 court's rejection of it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' ruling in *Strickland*, and its progeny, and resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." (Doc. # 1 ¶ 30). Scott thus invokes § 2254(d)(1) and (d)(2); however, as explained below, Scott has failed to meet the standard under either clause of (d)(1) or the standard under (d)(2).

In reviewing this and Scott's other *Strickland* penalty phase claims, the court follows the structure of the Eleventh Circuit's *Daniel* decision in structuring its analysis. In *Daniel*, the petitioner challenged the ACCA's summary dismissal of his penalty phase *Strickland* claims. *Daniel*, 822 F.3d at 1261. The Eleventh Circuit explained that this specific habeas claim required

47

it to "answer two questions." *Id.* The "[f]irst[] [is] whether [the petitioner's] second amended Rule 32 petition and its attached exhibits pleaded enough specific facts that, if proven, amount[ed] to a valid penalty phase ineffective assistance of counsel claim." *Id.* If the answer to that question was "in the affirmative," then the second question is "whether the [ACCA's] decision to the contrary was unreasonable under § 2254(d)." *Id.* Therefore, the court must first determine whether Scott's Amended Rule 32 petition contains allegations sufficient to state a *Strickland* claim and, if so, the impact of AEDPA deference with respect to that claim.

It does not. Related to this subclaim, the Rule 32 petition asserted that trial counsel spent only some of the court-authorized amount for an investigator (Doc. # 14-37 ¶ 44) and that trial counsel spent fewer than four hours on the mitigation investigation. (*Id.* ¶ 73). The crux of the Rule 32 petition's argument on this subclaim, however, focused on evidence from the Rule 32 evidentiary hearing that Scott argues would have explained his propensity to violence and made him appear more sympathetic. This included evidence about the neglect Scott suffered at the hands of his mother (*id.* ¶¶ 75-77), possible sexual abuse he suffered at the hands of one of her drug partners (*id.* ¶ 76), physical and psychological abuse he suffered at the hands of his step-grandfather and grandmother Vinnie Scott (*id.* ¶¶ 77-78), his experience of being shuttled between institutions and various custodians (*id.*), early exposure to violence and gangs (*id.* ¶¶ 80, 82-83), early abuse of drugs and alcohol (*id.* ¶ 83), psychological and emotional issues linked to his unstable environment and sense that he was responsible for his younger sister's medical condition and death (*id.* ¶¶ 85-86), and his struggles with his sexual identity along with the desire not to be seen as gay. (*Id.* ¶ 89). The Rule 32 petition also focused on deficiencies of Scott's trial counsel in conducting their investigation, such as their failure to request any records related to Scott's childhood and incarceration, including medical, school, prison, and DHR records. (*Id.* ¶¶ 91-95).

48

Another failure the petition highlighted was the failure to contact or interview "in sufficient depth" numerous witnesses, instead having one brief conversation with an aunt and holding an hour-long meeting with several family members before trial. (*Id.* ¶ 99).

Starting from the beginning, Scott has not presented any legal support for his conclusion that a failure to use all the court-appointed investigator funds, failing to spend more than a specific number of hours on "mitigation," or failing to investigate specific records are, without more, *Strickland* violations. *See Strickland*, 466 U.S. at 688 ("It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Instead, Scott must show that a failure to spend a specific number of hours investigating or a failure to investigate specific records fall below an objective professional standard and affected his defense. But examining the evidence that Scott asserts his trial counsel should have presented to the jury does not tip the scales.

Once again, a reminder: the *Strickland* standard is a high burden. To show deficient performance, Scott's Amended Rule 32 Petition "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell "within the wide range of competent assistance." *Chandler*, 218 F.3d at 1315, 1317.

And, Scott did not overcome this burden with his Amended Rule 32 Petition. The evidence he highlights from the Rule 32 evidentiary hearing was either already presented to the jury in another form or could have been omitted due to a reasonable strategic judgment. For example, the penalty phase already included testimony about the neglect that Scott suffered at the hands of his mother (albeit in lesser detail than the Rule 32 evidence). So, it is true that the jury never heard about possible sexual abuse that Scott suffered, but Scott's counsel could have reasonably omitted

49

that evidence for two reasons. First, because it was only "possible." And second, out of a desire to avoid the appearance of presenting weakly supported theories to the jury.[2]

It is also true that the jury never heard about the physical or psychological abuse that Scott suffered while in the care of Vinnie Scott and her husband. But, Scott still must show that the failure to present this evidence was because of some deficiency on the part of his trial counsel. All he has pointed to is his lawyer's statement during the Rule 32 evidentiary hearing that he believed Vinnie Scott was one of the most stable people in his life. (*See* Doc. # 1 ¶ 147). This statement, made during an evidentiary hearing that occurred roughly twelve years after Scott's trial, does not obviously characterize his counsel as deficient. After all, competent trial counsel could reasonably have forgotten about this background detail so many years after the trial. Scott's counsel also could have reasonably been distinguishing between the care of Scott's mother – which was characterized by neglect, violence, and absence – and the care of Scott's grandmother – which although abusive and unloving, was at least more stable in the sense that Scott was provided with a consistent place to live, supervision, and food. And closer to the time of the trial, Scott's counsel could have reasonably omitted evidence of Vinnie Scott's abuse due to an inability to find a witness willing to testify about it or because they wanted to emphasize Scott's loving attitude toward her.

Finally, while it is true that Scott's counsel omitted evidence about his sexual promiscuity to overcome beliefs of others that he was gay, Scott's counsel could have omitted this information out of a desire to lessen the implication that Scott was being intentionally sexually promiscuous when he (as the jury found) raped or attempted to rape Latonya.[3]

---

[2] Scott has never identified who would testify about "possible sexual abuse," making this allegation vague and speculative.

[3] In *Suggs v. McNeil,* 609 F.3d 1218, 1231 (11th Cir. 2010), our circuit noted that certain types of mitigation evidence, such as alcohol or drug use for example, is a "two-edged sword" that "provides an independent basis for moral judgment by the jury." The same is true of this type of evidence.

Scott's petition also emphasizes that the jury did not hear evidence about Scott being shifted between custodians, experiencing instability and neglect in his mother's care, being exposed to gangs at an early age, and feeling responsible for his younger sister's medical condition and death – evidence that he asserts his counsel could have uncovered if they investigated certain records. (*Id.* ¶¶ 91-98). But this evidence was already presented in some form to the jury. For example, the jury heard about Scott being shifted between custodians when they heard Vinnie Scott testify that she adopted Scott and his younger sister at a very young age because "his mother asked us to." (Doc. # 14-20 at 100). The jury also heard about his mother's instability and neglect of her children when they heard that Ernestine had Scott when she was around sixteen or seventeen, that she prioritized alcohol over providing food for her children, that other family members "would have to take care of the kids" while Ernestine partied and drank, (*id.* at 84-89), and that Scott's mother had been addicted to drugs and alcohol for her whole life and was not a good mother to her children. (*Id.* at 104-05). The jury could observe Ernestine Jackson sitting in the courtroom in "jail clothes" and heard Inez Smith confirm that she was currently incarcerated, further filling in this picture. (Doc. # 14-20 at 84). The jury then heard about Scott being exposed to gangs at an early age when Inez Smith testified that he joined a gang after his younger sister died, which was when he was thirteen. (*Id.* at 88, 95). And, the jury heard from Inez that Scott "blamed himself" for his younger sister's medical condition and death. (*Id.* at 88).

In conclusion, Scott's Amended Rule 32 Petition does not plead sufficient information to establish a *Strickland* violation, so under *Daniel*, the ACCA's holding to this effect is due to be upheld on habeas review.

### iii.    *Daniel* **Prong Two (AEDPA Deference)**

Even if Scott's Amended Rule 32 Petition did plead sufficient information to establish a *Strickland* violation, he still has not satisfied the second step of *Daniel*, which is to overcome the

AEDPA deference owed to the ACCA's determination. As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts.

After careful review, the court concludes that the ACCA's and Rule 32 court's dismissal of Scott's *Strickland* Subclaim A(1) on this theory was not contrary to or an unreasonable application of law nor was it based on an unreasonable determination of the facts. Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory about insufficient time and effort was the ACCA's opinion on second collateral appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under Subclaim A(1), the denial of certiorari was not accompanied with an opinion, so the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's." *Wilson*, 584 U.S. at 125. The last reasoned state court judgment rejecting Scott's theory about evidence diverging from reality as the Rule 32 court's opinion on second collateral appeal. (Doc. # 14-39 at 28-63). Therefore, this court "presume[s] that the unexplained decision [by the ACCA and the Supreme Court of Alabama on this theory] adopted the same [merits-based] reasoning." *Wilson*, 584 U.S. at 125.

Scott has failed to carry his burden under § 2254(d)(1) because he has not identified how the ACCA or Rule 32 court misapplied clearly established federal law as that phrase is properly defined. Preliminarily, the ACCA's discussion of *Strickland* in the evaluation of Scott's ineffective assistance of counsel claim forecloses his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate

52

constitutional] []framework."). He also has not identified any factually indistinguishable Supreme Court decision with an outcome favorable to him. Scott's habeas petition cites these cases in support of this subclaim: *Strickland*, 466 U.S. at 691, *Rompilla*, 545 U.S. at 387, *Wiggins*, 539 U.S. at 521-22, *Williams*, 529 U.S. at 396, *DeBruce*, 758 F.3d 1263 (11th Cir. 2014), *Cullen v. Pinholster*, 563 U.S. 170 (2011), *McFarland*, 512 U.S. at 1257, *Maples*, 565 U.S. at 272 n.1, *Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015), *Foust v. Houk*, 655 F.3d 524 (6th Cir. 2011), *Agan v. Singletary*, 12 F.3d 1012 (11th Cir. 1994), *Jackson*, 42 F.3d at 1367, *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328 (11th Cir. 2011), and *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907 (11th Cir. 2011). Scott has cited seven Supreme Court cases, five Eleventh Circuit cases, and one Sixth Circuit case. The court evaluates each of these cases to determine whether any of them help Scott overcome his AEDPA burden under the contrary to clause of (d)(1) but notes that only Supreme Court holdings constitute "clearly established law" under (d)(1).

*Strickland*, although a Supreme Court case, simply did not have a ruling that was contrary to the ACCA's ruling and therefore cannot satisfy the contrary to clause of (d)(1). In *Strickland*, the defendant (against his counsel's advice) voluntarily confessed to three charged groups of crimes, leading defense counsel to have a "sense of hopelessness about the case." 466 U.S. at 672. In preparation for the sentencing phase, defense counsel "spoke with respondent about his background. He also spoke on the telephone with respondent's wife and mother, though he did not follow up on the one unsuccessful effort to meet with them. He did not otherwise seek out character witnesses for respondent. Nor did he request a psychiatric examination." *Id.* at 672-73 (internal citations omitted). The trial judge sentenced the defendant to death on each of the three counts of murder. On appeal, the defendant argued that his counsel had rendered ineffective assistance during the sentencing phase for several reasons: "he failed to move for a continuance to prepare

53

for sentencing, to request a psychiatric report, to investigate and present character witnesses, to seek a presentence investigation report, to present meaningful arguments to the sentencing judge, and to investigate the medical examiner's reports or cross-examine the medical experts." *Id.* at 675. Ultimately, the Supreme Court held that defense counsel in *Strickland* was not unreasonable and that the defendant did not suffer constitutional prejudice that would warrant overturning his conviction. *Id.* at 698-99. Thus, even if *Strickland* were factually indistinguishable, its result of upholding a conviction would not warrant overturning Scott's conviction.

*Rompilla* is also a Supreme Court case, but it is factually distinguishable. In *Rompilla*, the Supreme Court held that defense counsel were ineffective under *Strickland* for failing to make reasonable efforts to review a prior conviction file, even though they knew that the prosecution would "seek the death penalty by proving [the defendant] had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law." 545 U.S. at 383. Further, defense counsel "knew that the [prosecution] would attempt to establish this history by proving [the defendant's] prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial." *Id.* Because this prior conviction was a public document that was "readily available for the asking at the very courthouse where [the defendant] was to be tried," the Court held, the failure of counsel to examine the file fell below clear ABA standards and was unreasonable. *Id.* at 389.

This holding is distinguishable from Scott's theory as to inadequate time and effort, and evidence diverging from reality, because *Rompilla* involved specific evidence that was lacking, rather than an alleged lack of effort. In fact, *Rompilla* distinguished between nonspecific investigative efforts by counsel, such as "searches for school reports, juvenile records, and evidence of drinking habits" and "the opportunity to take a look at a file disclosing what the

54

prosecutor knows and even plans to read from in his case." *Id.* at 389. In Scott's case, unlike in *Rompilla*, there are no allegations that his trial counsel should have uncovered specific mitigation evidence that they knew that the prosecution would use during the sentencing phase. That decision is therefore factually distinguishable and *Rompilla* cannot satisfy the contrary to clause of (d)(1).

*Wiggins* is another Supreme Court case, but it does not help Scott overcome his burden under (d)(1)'s "contrary to" clause because it is also factually distinguishable. In *Wiggins*, after the defendant was convicted and sentenced to death, he sought postconviction relief and argued that his counsel were constitutionally inadequate under *Strickland*. 539 U.S. at 516. His counsel failed to investigate and present mitigating evidence of his dysfunctional background, which would have included evidence of physical and sexual abuse at the hands of his mother and foster parents. *Id.* For example, the defendant highlighted that defense counsel did not compile his social history, nor did they retain a forensic social worker to prepare such a social history even though the State had made funds available for that purpose. *Id.* at 517. Defense counsel's investigation "drew from three sources," including a psychologist (who conducted tests on the defendant but did not reveal anything of his history), a presentence report with "a one-page account of [the defendant's] 'personal history' noting his 'misery as a youth,' quoting his description of his own background as 'disgusting' and observing that he spent most of his life in foster care," and records kept by the Department of Social Services documenting the defendant's various placements in the foster system. *Id.* at 523. The Supreme Court first noted that the "standard practice in Maryland in capital cases at the time of [the defendant's] trial included the preparation of a social history report," and added that defense counsel's conduct also fell short of the ABA standards to "discover *all reasonably available* mitigating evidence." *Id.* at 524 (emphasis in original). Because counsel had

only acquired a "rudimentary knowledge . . . from a narrow set of sources" of the defendant's background, the Court held that their performance was deficient.

*Wiggins* is distinguishable from Scott's case, in large part because counsel in *Wiggins* did not present any mitigating evidence related to the defendant's background. To the contrary, Scott's counsel presented the jury with several sources of evidence about Scott's background. This included the testimony of Inez Smith, Scott's aunt (Doc. # 14-20 at 84), who testified about the young age of Ernestine Scott when she gave birth to Scott, about Ernestine's alcohol addiction, about how Scott blamed himself for his younger sister's handicap and later death, about how Scott joined a gang afterward, and about Ernestine's alcohol addiction and how it took precedence over feeding her children. (*Id.* at 84-89). Then the defense called Vinnie Scott, Scott's grandmother, who testified about her love for and adoption of Scott and how he took care of her when she was in the hospital. (*Id.* at 97-103). Defense counsel also called Icephen Goldthwaite (Scott's other aunt), who testified about Ernestine's alcohol and drug addiction and that Ernestine was not a good mother. (*Id.* at 103-09). Scott then took the stand and testified, although his testimony did not concern his background. (*Id.* at 110-21). This range of evidence presented through testimony is not "rudimentary" in the same way as the evidence in *Wiggins* and shows a significant difference between *Wiggins* and Scott's case – that counsel presented evidence about his background both at the trial and Rule 32 stages. Because Scott's case is distinguishable based on material facts from *Wiggins*, *Wiggins* cannot help Scott overcome his burden under the contrary to clause of (d)(1).

For similar reasons, *Wiggins* does not help Scott overcome his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Wiggins* was that defense counsel were ineffective under *Strickland* if they did not compile a social history report even though that was the standard practice in the state then and would have comported with ABA

Guidelines. *See Wiggins*, 539 U.S. at 524. In *Wiggins*, the quoted ABA Guidelines provided that a mitigation investigation "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added)). When applying those guidelines to the facts of *Wiggins*, the Court emphasized that counsel diverged from these "well-defined norms" in a significant way because they "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* Particularly "in light of what counsel actually discovered" later, the choice to abandon a mitigation investigation without learning key facts about the defendant's background was unreasonable in *Wiggins*. *Id.* at 525.

The ACCA did not unreasonably apply the *Wiggins* holding to Scott's case because Scott has not shown that his defense counsel violated any standard practice in Alabama at the time of his trial, nor that they disobeyed any ABA Guidelines. Scott summarizes the 1989 ABA Guideline 11.4.1 as follows: "counsel must obtain complete and accurate information relevant to the defendant's medical history, educational history, employment and training history, family and social history, and any religious or cultural inferences." (Doc. # 1 ¶ 35 (citing 1989 ABA Guidelines, 11.4)). But, Scott's counsel complied with this guideline by conducting a review of his background that included interviews with his mother, grandmother, and other family members, review of Scott's mental health evaluation from Taylor-Hardin, retaining Dr. Ackerson to evaluate Scott's mental health, and several meetings with Scott to discuss his background and possible helpful witnesses. Because of their investigation, counsel believed that the best strategy would be to humanize Scott and present him as a sympathetic witness.

57

*Williams* is yet another Supreme Court case, but it does not help Scott overcome his burden under the "contrary to" clause of (d)(1) because it is also factually distinguishable. In *Williams*, the defendant's trial counsel offered testimony from three witnesses – one of whom they had never interviewed before but had noticed in the audience and asked to testify on the spot. 529 U.S. at 369. The content of all three witnesses' testimony was to "briefly describe[] [the defendant] as a 'nice boy' and not a violent person." *Id.* Defense counsel also offered a taped excerpt from a psychiatrist's statement that related the defendant's statement that during one robbery he removed the bullets from a gun so that no one would be injured. *Id.* Defense counsel's closing argument largely emphasized how difficult it was "to find a reason why the jury should spare [the defendant's] life." *Id.*

The Supreme Court held that defense counsel's performance was deficient and prejudicial under *Strickland*, explaining that "counsel did not begin to prepare for [the sentencing phase] of the proceeding until a week before the trial," counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood," that they did not uncover or present evidence that the defendant's parents "had been imprisoned for the criminal neglect of [the defendant] and his siblings," that the defendant's father had severely beaten him, and that he had been temporarily committed to social services' custody. *Id.* at 395. Defense counsel had also failed to introduce evidence that the defendant was "borderline mentally retarded," that he had not advanced "beyond sixth grade in school," that the defendant was commended in prison for cracking a prison drug ring and returning a guard's missing wallet, or that the defendant was described as thriving in a regimented and structured prison ministry program. *Id.* at 396. In sum, the Supreme Court held, it was clear "that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.*

Scott's case is factually distinguishable from *Williams*. While the defense's witnesses during the *Williams* sentencing phase focused on vague positive assertions about the defendant, the defense's witnesses during Scott's sentencing phase offered specific positive assertions about Scott as well as mitigating evidence about his background – including that his mother had him when she was young and suffered drug and alcohol addiction while she raised him. This evidence also included that Scott blamed himself for his sister's disability and untimely death, that this guilt prompted him to join a gang, and that he and his sister struggled with food insecurity due to his mother's alcoholism. The quantity and quality of this mitigation evidence is significantly greater than that presented in *Williams*; therefore, Scott's case is factually distinguishable.

Nor does *Williams* help Scott overcome the unreasonable application clause of (d)(1). The clearly established holding of *Williams* was that trial counsel's performance is deficient and prejudicial under *Strickland* where defense counsel offered vague testimony from a small number of witnesses (some of whom they had not interviewed), did not begin to prepare for the sentencing phase until one week before trial, and otherwise failed to uncover extensive and available evidence of the defendant's background. The ACCA reasonably applied this clearly established holding. Scott's defense counsel offered witnesses whom they had previously interviewed and who testified to more specific evidence as compared to the witnesses in *Williams*. Scott's defense counsel began preparing for the sentencing phase prior to one week before trial. Scott's defense counsel also uncovered extensive available evidence about Scott's background. This included evidence that Scott had undergone a difficult childhood, that his mother's alcohol and drug addiction led to food insecurity for him and his sister, that he blamed himself for his sister's disability and untimely death, that he was passed between foster care and family-based care, and that he joined a gang at

a young age. This mitigating evidence is far more extensive than the incomplete and brief evidence presented in *Williams*, and thus the ACCA did not unreasonably apply *Williams*.[4]

*Cullen* is also a Supreme Court case, but it gives no aid to Scott in overcoming his burden under (d)(1)'s "contrary to" clause because it is factually distinguishable. And, even if it were not, its result would not change the result in Scott's case. In *Cullen*, the defendant was convicted in state court of two counts of first-degree murder after his defense counsel presented only one witness – his mother – during the sentencing phase. 563 U.S. at 176-77. This appeared to be a conscious choice and not the result of inadequate time for preparation, as defense counsel had declined the trial court's offer for a continuance before the sentencing phase, "explaining that he could not think of a mitigation witness other than [the defendant's] mother and that additional time would not 'make a great deal of difference.'" *Id.* at 176 (quoting trial record). Defense counsel also moved to exclude the prosecution's aggravating evidence "on the ground that the prosecution had failed to provide notice" under California law. *Id.* This motion was denied. *Id.* While the prosecution called eight witnesses during the sentencing phase, defense counsel called only the defendant's mother, who testified about the defendant's "troubled childhood and adolescent years," his siblings, and described him as "a perfect gentleman at home." *Id.* at 177 (quoting trial record in part). Defense counsel did not call a psychiatrist even though they had consulted one who had diagnosed the defendant with antisocial personality disorder (but no "extreme mental or emotional disturbance"). *Id.* (quoting appellate record). After the jury voted for death and the California Supreme Court affirmed, the defendant filed a habeas petition asserting a *Strickland*

---

[4] The court acknowledges that the Eleventh Circuit, on remand, found that Williams was not prejudiced by his counsel's deficient performance. However, the panel left their finding of deficient performance intact. *Williams v. Alabama*, No. 31-13734, slip op. at 15 (11th Cir. Apr. 3, 2026).

ineffective assistance of counsel claim. Specifically, he argued that his counsel "had failed to adequately investigate and present mitigating evidence, including evidence of mental disorders." *Id.*

The Court denied this *Strickland* claim after applying the AEDPA deferential standard to the state court's merits-based adjudication. *Id.* at 187. The Court reasoned that under clearly established precedent interpreting *Strickland*, "we presume that [the defense counsel's] arguments were part of his trial strategy." *Id.* at 191 (citing *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("[T]here is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect.") (alterations in original) (in turn citing *Strickland*, 466 U.S. at 690). The Court summarized that defense counsel's choice to "get the prosecution's aggravation witnesses excluded for lack of notice, and if that failed," to pursue a "family sympathy" mitigation defense, and then highlighted that "[t]imesheets indicate that [the defendant's] trial counsel investigated mitigating evidence." *Id.* at 191-92. This investigation included speaking with the defendant's mother, contacting a psychiatrist, researching epilepsy, and billing for other non-specified mitigation and sentencing phase preparation. *Id.* at 192. The Court added that the defendant was "an unsympathetic client, which limited their feasible mitigation strategies." *Id.* at 193. The Court then concluded that "[g]iven these impediments, it would have been a reasonable penalty-phase strategy to focus on evoking sympathy for [the defendant's] mother." *Id.*

Nor does *Cullen* help Scott satisfy his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Cullen* was that the "Court of Appeals misapplied *Strickland* and overlooked 'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Id.* at 195. Indeed, the ACCA's decision upheld the independence and wide latitude of Scott's counsel to make tactical decisions.

Furthermore, the logic of *Cullen*'s analysis under *Strickland* would lead to the same result as the ACCA reached. Just as the *Cullen* Court considered the reasonable trial strategy of evoking sympathy for their client despite the client's unsympathetic demeanor, the ACCA considered the reasonable strategy of Scott's trial counsel as they attempted to evoke mercy for their client despite his frequent outbursts in front of the jury. Therefore, *Cullen* also cannot help Scott overcome the unreasonable application clause of (d)(1).

*McFarland* is a Supreme Court decision, but is unhelpful to Scott. It involved a denial of a petition for writ of certiorari, and the portion that Scott quotes comes from is Justice Blackmun's dissent. (*See* Doc. # 1 ¶ 32 (quoting *McFarland v. Scott*, 512 U.S. 1256, 1257 (1994) (Blackmun, J., dissenting))). It is clearly established that "concurring and dissenting opinions in this Circuit do not constitute precedential law." *United States v. Hurtado*, 89 F.4th 881, 899 n.21 (11th Cir. 2023). *McFarland* is therefore not clearly established federal law as determined by the Supreme Court and cannot help Scott carry his burden under the contrary to clause of (d)(1). Nor does *McFarland* help Scott satisfy his burden under the unreasonable application clause of (d)(1), mainly because there was no clearly established holding.

*Maples* is another Supreme Court case. But, it does not help Scott overcome his burden under the contrary to clause of (d)(1) because it is factually distinguishable, and even if it were not, its result would not change the result in Scott's case. In *Maples*, an Alabama habeas petitioner was represented on appeal by two out-of-state attorneys serving *pro bono*. *Maples v. Thomas*, 565 U.S. 266, 270 (2012). Later, after those attorneys changed law firms and could no longer represent the habeas petitioner, they did not inform their client or the court. *Id.* at 270-71. Because of this lapse by counsel, the habeas petitioner was not informed when the Alabama trial court denied his postconviction petition, and his time for appeal ran out. *Id.* at 271. The Supreme Court therefore

considered whether this constituted "cause" to excuse state-barred procedural default in state court and concluded that it did. *Id.* at 289-90.

For obvious reasons, *Maples* is factually distinguishable from Scott's case. His trial and appellate counsel did not abruptly stop representing him at any point. There is no contention that Scott had "cause" for any of state-barred procedural default that impacts this habeas petition. (*See* Doc. # 1). Additionally, the comment that Scott quotes in his habeas petition – "One study of federal capital trials from 1990 to 1997 found that defense attorneys spent an average of 1,480 out-of-court hours preparing a defendant's case" – is not part of the Court's holding. *See Maples*, 565 U.S. at 272 n.1. Instead, it forms part of a three-paragraph background section of the Court's opinion that discusses Alabama's system for appointing counsel for indigent capital defendants. *See id.* at 271-73. Indeed, the Court made clear the narrow issue it focused on: "we confine our consideration to the question whether Maples has shown cause to excuse the missed notice of appeal deadline." *Id.* at 280. Therefore, *Maples* cannot help Scott satisfy his burden under the contrary to clause of (d)(1).

Nor does *Maples* help Scott satisfy his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Maples* was that where a client "lacks reason to believe his attorneys of record, in fact, are not representing him," *id.* at 283, that client has shown cause to excuse any procedural default that results from that abandonment. *Id.* at 289. This is far afield of the facts in Scott's case. Therefore, the court cannot say that the ACCA unreasonably applied the clearly established holding of *Maples*.

*Williams v. Alabama* is not a decision of the Supreme Court. Even if it were, it is of no assistance to Scott in overcoming his burden under the "contrary to" clause of (d)(1) because it is factually distinguishable. *Williams* involved a defendant sentenced to death in Alabama and had

filed a habeas petition. *Williams v. Alabama*, 791 F.3d 1267, 1270-71 (11th Cir. 2015). The petitioner brought before the Rule 32 court an ineffective assistance of counsel claim related to failure to conduct an adequate investigation. *Id.* at 1271. The petitioner had not brought this claim on direct appeal, but instead brought it for the first time in the Rule 32 court. *Id.* The Rule 32 court denied this claim and the ACCA affirmed, erroneously concluding that it was procedurally barred because it had been raised on direct appeal. *Id.* The Eleventh Circuit limited its review to the standard of review that a federal district court should use when reviewing the Rule 32 court's decision. *Id.* at 1273. In doing so, the Eleventh Circuit stated (as Scott quotes) that "the District Court must consider Mr. Williams's allegations that his lawyers spent 'less than ten hours' preparing for the sentencing phase of his trial and spoke with only Mr. Williams's mother and aunt." *Id.* at 1277. However, the panel wrote this admonition within a paragraph describing the standards that the district court should use to determine "whether to grant an evidentiary hearing." *Id.* In context, as this court reads it, the panel's point was that an evidentiary hearing might be necessary to permit the petitioner to prove his relevant factual allegation that his lawyers spent "less than ten hours" preparing for the sentencing phase.

In this matter, the ACCA did not rule contrary to, nor did it unreasonably apply, the holding in *Williams*. That holding was directed to a federal district court considering a habeas petition and also focused in part on the standards the district court should use on remand. *Williams* is therefore distinguishable and cannot help Scott overcome his burden under either clause of (d)(1).

*Agan v. Singletary* is not a Supreme Court case. Even if it were, it does not help Scott overcome his burden under the "contrary to" clause of (d)(1) because it is factually distinguishable. In *Agan*, a habeas petitioner who had pleaded guilty and been sentenced to death claimed that he had been given ineffective assistance of counsel because after his first lawyer withdrew, his second

64

lawyer barely communicated with him, did not request or receive a copy of his file, and spent fifteen hours on the case (seven of which involved investigation). *Agan v. Singletary*, 12 F.3d 1012, 1014-15 (11th Cir. 1994). The district court granted the habeas petition based on ineffective assistance of counsel and competency grounds. *Id.* at 1013. On de novo review, the Eleventh Circuit affirmed the district court's ruling, holding that the second lawyer's representation was objectively unreasonable and that it prejudiced the petitioner. *Id.* at 1018-19.

While the lawyer in *Agan* barely communicated with his client, Scott's lawyers often communicated with him beginning around February 2000 (two years before trial began), billed multiple hours corresponding with and reviewing correspondence from Scott, met with Scott in person at least four times, and had a phone call with him at least once. (Doc. # 14-49 at 58-60). Additionally, while the lawyer in *Agan* did not request or receive a copy of his client's file, and spent a mere seven hours investigating the case, Scott's counsel billed 27.5 hours for reviewing discovery, research, and trial preparation and prepared over thirty subpoenas. (Doc. # 14-49 at 58-60). Scott's counsel Robbins also testified that he reviewed Scott's mental health evaluation at Taylor-Hardin (Doc. # 14-40 at 112, 179-80) – records that suggested Scott grew up in a "chaotic family," engaged in substance abuse, was adopted, had no contact with his father, witnessed his mother's drug abuse, was involved in gangs, engaged in early alcohol and drug use, and engaged in self-mutilation (Doc. # 14-50 at 2-6); retained Dr. Kimberly Ackerson to evaluate Scott's mental health "with an eye towards possible mitigation" (Doc. # 14-40 at 153); talked to Scott at length about his background, family, and possible family members who could be helpful witnesses (*id.* at 102, 149-50); talked with Vinnie Scott, Scott's aunt, and Scott's mother before trial (and in at least one case, in his office) to go over their expected testimony (*id.* at 92, 151, 182); and developed

an understanding of Scott's background with a mother who abused alcohol and drugs. (*Id.* at 95, 179).

Nor does *Agan* aid Scott satisfying his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Agan* was that the performance of the petitioner's lawyer was objectively unreasonable and prejudicial under *Strickland*. Because the performance of Scott's lawyers is clearly distinguishable, the ACCA did not unreasonably apply this holding.

*Jackson* is not a Supreme Court case. Even if it were, it would not help Scott overcome his burden under the contrary to clause of (d)(1) because it is factually distinguishable. In *Jackson*, the habeas petitioner's trial counsel presented no mitigating evidence at all, either at the sentencing hearing before the jury or at two sentencing hearings before the court. *Jackson v. Herring*, 42 F.3d 1350, 1354 (11th Cir. 1995). The petitioner filed a petition for habeas corpus alleging a *Strickland* claim on this basis, arguing that she had family members and friends who could have offered "effective mitigating testimony had they been sought out by her counsel." *Id.* at 1355, 1362. Other potential mitigating evidence that could have been offered included the petitioner's "family history, her enormous personal hardships, her early pregnancy, her limited schooling, and her employment and personal relationships." *Id.* at 1363. The petitioner's trial counsel testified that he could not recall "what type of investigation he conducted into possible mitigation," *id.*, with the postconviction and habeas proceedings revealing that one of her lawyers had not done any mitigation investigation at all, and that the other lawyer had uncovered only "a small amount of information" that amounted to a "general background history." *Id.* at 1367-68. A federal district court granted relief on this *Strickland* claim. *Id.* at 1355. On appeal, the Eleventh Circuit affirmed on this basis, reasoning that although a state court's decision about whether an attorney's action was a tactical decision is a question of fact (meaning a federal court presumes the state court's

66

decision is correct), whether that tactical decision is a reasonable one is a question of law. *Id.* at 1367. In sum, the Eleventh Circuit concluded that the petitioner's trial counsel "did not make a *reasonable* 'strategic decision' to forego presenting mitigating evidence, and did not even undertake a *reasonable* investigation into such evidence." *Id.* (emphasis in original).

Unlike the trial counsel in *Jackson*, who did not conduct more than a general background investigation, Scott's trial counsel investigated several leads in mitigation, which included reviewing Scott's mental health evaluation from Taylor-Hardin (Doc. # 14-40 at 112, 179-80), retaining Dr. Ackerson to evaluate his mental health "with an eye towards possible mitigation" (*id.* at 153), meeting with Scott multiple times and interviewing him about his background and witnesses who could be helpful (*id.* at 102, 149-50), and interviewing at least three witnesses (some of whom testified at the sentencing hearing). (*Id.* at 92, 151, 182). More importantly, unlike the trial counsel in *Jackson*, who did not present any mitigating evidence at the sentencing phase, Scott's trial counsel did present mitigating evidence by putting five witnesses on the stand – Shaneka Scott, Inez Smith, Vinnie Scott, Icephen Goldthwaite, and Scott himself. (Doc. # 14-20 at 57-121). Because these were material facts underlying the *Jackson* court's decision to grant relief on the *Strickland* claim, *Jackson* cannot help Scott overcome his burden under the contrary to clause of (d)(1).

Nor does *Jackson* help Scott satisfy his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Jackson* was that trial counsel did not make a reasonable "strategic decision" to forgo presenting mitigating evidence because, after conducting little to no mitigation investigation, they did not inform themselves of the available options. Once again, Scott's trial counsel behaved differently than *Jackson*'s trial counsel. In particular, Scott's

trial counsel conducted a mitigation investigation and did not forgo presenting mitigation evidence. The ACCA therefore did not unreasonably apply the clearly established holding of *Jackson*.

*Cooper* is not a Supreme Court case. Even if it were, it does not help Scott in overcoming his burden under the "contrary to" clause of (d)(1) because it is factually distinguishable. In *Cooper*, a defendant was sentenced to death after his trial counsel presented only a single witness in mitigation – his mother. *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1337-38 (11th Cir. 2011). Although the petitioner's mother testified about the abuse that he suffered at the hands of his father as well as the generally difficult circumstances of his upbringing, no witnesses corroborated this testimony during the penalty phase before the jury. *Id.* at 1338. During the sentencing phase before the judge, the defense called an additional witness – a psychologist who had examined the petitioner. *Id.* at 1340. The jury voted for death and the court sentenced the petitioner to death. *Id.* at 1341.

The petitioner began postconviction proceedings, asserting a *Strickland* claim based on an inadequate mitigation investigation. An evidentiary hearing included testimony and evidence from five witnesses who corroborated the abuse that the petitioner's mother testified about. *Id.* at 1342-46. All five witnesses testified that they were not contacted by trial counsel and would have been willing to testify at trial. *Id.* at 1347. The petitioner's trial counsel also testified, explaining that they had not presented more mitigation evidence because they were not aware of whether there were mitigation experts available, and they reached dead ends when they sought to call several potential witnesses. *Id.* Trial counsel also could not remember whether they had obtained any of their client's school, legal, hospital, or background records. *Id.*

After the Florida Supreme Court denied relief on petitioner's *Strickland* claim, a federal district court granted relief, and the Eleventh Circuit affirmed. *Id.* at 1348-51. The Eleventh Circuit

reasoned that the Florida court's application of *Strickland* was unreasonable because "[u]nder the prevailing standards in 1984, the year of Cooper's trial, Cooper's attorneys did not conduct an adequate background investigation and unreasonably decided to end the background investigation after only talking to Cooper, Cooper's mother, and Dr. Merin." *Id.* at 1351.

*Cooper* is factually distinguishable from Scott's case. While in *Cooper* there was only one mitigation witness to present the major category of mitigating evidence in that case – the petitioner's childhood abuse – in Scott's case there were five witnesses who testified, two of whom focused on the mitigating evidence about Scott's difficult upbringing. (Doc. # 14-20 at 83-97 (Inez Smith), 103-10 (Icephen Goldthwaite)).

Nor does *Cooper* help Scott satisfy his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Cooper* was that trial counsel are ineffective if they limit their mitigation investigation to interviewing their client, his mother, and a psychologist and because of this investigation do not corroborate the testimony of that single witness. Scott's trial counsel, however, did not limit their mitigation investigation to these efforts. In addition to repeatedly interviewing their client (Doc. # 14-49 at 58-60; Doc. # 14-40 at 102, 149-50), they interviewed several witnesses (more than one of whom testified during the sentencing phase) (Doc. # 14-40 at 92, 151, 182), reviewed all discovery that they were provided (*id.* at 112, 179-80), and retained a mental health specialist to evaluate their client "with an eye towards possible mitigation." (*Id.* at 153). Therefore, *Cooper* cannot help Scott overcome his burden under (d)(1).

*Johnson* is not a Supreme Court case. But again, even if it were, it provides no help to Scott in overcoming his burden under the "contrary to" clause of (d)(1) because it is factually distinguishable. In *Johnson*, the petitioner's trial counsel did not begin his mitigation investigation or seek a continuance to do so until late on a Friday – three days before the sentencing hearing was

set to begin. *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 932 (11th Cir. 2011). Although the petitioner told his trial counsel that "he had a bad childhood, including an alcoholic and abusive father who would abandon the family," nothing suggested that trial counsel questioned him about his childhood and background. *Id.* Instead, the trial counsel's investigation into his client's family background merely consisted of talking on the phone with his client's father, who testified only days later. *Id.* When talking on the phone about this testimony, the trial counsel did not tell the father what it meant to be a "character witness" and when the father arrived at the hearing, the trial counsel did not speak with him until he was on the stand. *Id.* at 927. And, during the father's testimony, when the father denied being an abusive alcoholic, the trial counsel did not press the father or ask any other family member to testify. *Id.* at 932. Other sentencing phase testimony included a woman who knew the petitioner and told the jury that he was gentle but "has a complete personality change" when drinking. *Id.* at 913. She also believed the petitioner's father had a drinking problem, but that she "didn't see him that much when he did drink." *Id.* Finally, a clinical psychologist testified about the petitioner's inpatient alcoholism rehabilitation program and told the jury that "his primary problem is what is referred to as a character disorder" and that "alcoholism was secondary." *Id.* at 913-14. The psychologist also testified that "this has its origins in early childhood" and the petitioner's "early years were very traumatic." *Id.* at 914. The petitioner was also put on the stand and testified that "most of the time" his childhood was happy, but not when his mother and father were drinking heavily. *Id.* at 915.

The petitioner was convicted and sentenced to death, and on postconviction appeal, the Florida Supreme Court and a federal district court denied the petitioner's *Strickland* claim that his counsel was ineffective for failing to conduct an adequate mitigation investigation. *Id.* at 911, 930.

On appeal, the Eleventh Circuit reversed, holding that the performance of the petitioner's trial counsel was deficient and prejudicial. *Id.* at 938. The panel emphasized the proper focus is "on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Id.* at 931. The panel then explained that the trial counsel's performance was deficient because he should have known, given "overwhelming evidence of guilt," that the sentencing stage would be critical for his client. *Id.* at 932. But despite this, the trial counsel "waited until the eleventh hour to begin preparing for it" and specifically waited "until the guilt stage ended before beginning to investigate the existence of non-statutory mitigating circumstances." *Id.* This included failing to interview available and willing family members after his client told him that he had an abusive upbringing and failing to press the client's father about his alcoholism and abuse "simply because the father denied it." *Id.* at 932-33. The panel concluded that the state court's decision was contrary to or an unreasonable application of clearly established law in *Strickland*. *Id.* at 935.

*Johnson* is factually distinguishable from this case. Unlike the trial counsel in *Johnson*, who did not begin preparing for the sentencing phase until the "eleventh hour," the Attorney's Fee Declaration of John Robbins explains that he had began to prepare for the sentencing phase at least a year before trial when they began meeting with Scott to develop an understanding of his background. (Doc. # 14-49 at 59 (recording two hour-long meetings with Scott in March 2001 and one half-hour meeting with him in July 2001)). Robbins also testified during the Rule 32 evidentiary hearing that during his meetings with Scott, he talked at length with him about his background, family, and possible family members who could be helpful witnesses. (Doc. # 14-40 at 102, 149-50). The Attorney's Fee Declaration also indicates that roughly a year before trial, Scott's trial counsel had also begun to interview potential witnesses. (Doc. # 14-49 at 59 (recording

71

a half-hour phone conversation "with defendant's aunt")). Robbins further testified at the evidentiary hearing that, to the best of his recollection, he met with Scott's mother in his office before trial and that he met with Vinnie Scott and Scott's aunt before trial to go over their expected testimony. (Doc. # 14-40 at 92, 151, 182). And, unlike the trial counsel in *Johnson*, who failed to interview available and willing family members to present corroborating evidence of their client's abusive childhood, Scott's trial counsel interviewed at least three family members and presented testimony from two of Scott's aunts that specifically discussed his childhood abuse. (Doc. # 14-20 at 83-97 (Inez Smith), 103-10 (Icephen Goldthwaite)).

Nor does *Johnson* give Scott aid in satisfying his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Johnson* was that trial counsel's mitigation investigation was deficient because if it began at the eleventh hour; did not include interviews of willing and available witnesses who could have testified about abuse when no other witness testified about that topic; and did not include an interview of the single family member witness who was called to the stand. *Id.* at 1351-52. The ACCA did not unreasonably apply this holding here because in Scott's case none of these circumstances were present. As discussed above, Scott's trial counsel began their mitigation investigation well before the eleventh hour, interviewed several family member witnesses who later testified about Scott's abusive childhood, and interviewed witnesses (to the extent possible) before they got on the stand. The only mitigation witness whom Scott's trial counsel did not interview before she got on the stand was Shaneka Scott, but that was not due to any lack of effort on the lawyers' part. Rather, this was because she had just been taken into custody a few days earlier. (*See* Doc. # 14-20 at 38, 47-51). The ACCA reasonably applied *Johnson*'s holding.

72

*Foust* is not a Supreme Court case, nor is it even a controlling Eleventh Circuit case. It is a Sixth Circuit case. But, even if it were a Supreme Court case (or a controlling Eleventh Circuit case), it could not help Scott overcome his burden under the "contrary to" clause of (d)(1) because it is factually distinguishable. In *Foust*, the habeas petitioner's mitigation hearing included testimony from the petitioner's mother, father, and a psychologist. *Foust v. Houk*, 655 F.3d 524, 526 (6th Cir. 2011). However, as the Sixth Circuit emphasized, "their testimony pales in comparison to the horrific accounts detailed in records from Children's Services and in affidavits from Foust's siblings." *Id.* Additionally, the petitioner's attorneys "did not interview any potential witnesses," "gather any records from Children's Services," or "prepare Foust's parents or [the psychologist] in advance of their testimony." *Id.* at 527. The Sixth Circuit concluded that counsel's performance was deficient because "counsel did not even take the first step of interviewing witnesses or requesting records," *id.* at 536 (quoting *Porter v. McCollum*, 558 U.S. 30, 39 (2009)), and although they hired a psychologist, they did not "consult regularly" with him or "conduct an independent investigation." *Id.* at 537.

*Foust* gives Scott no assistance in satisfying his burden under the "contrary to" clause because it is factually distinguishable. While counsel in *Foust* failed to interview any potential witnesses, subpoena any records, or even consult with the psychologist who they put on the stand, Scott's trial counsel interviewed all mitigation witnesses (except Shaneka) whom they put on the stand, reviewed all discovery submitted to them (Doc. # 14-40 at 92, 112, 151, 182), prepared over thirty subpoenas (Doc. # 14-49 at 58-60), and consulted with the psychologist who they hired (Doc. # 14-40 at 153). Scott cites *Foust* to highlight that even though Foust's trial counsel spent 52.5 hours investigating mitigation evidence between the date of conviction and the date of the mitigation hearing, the Sixth Circuit still held this performance ineffective. (Doc. # 1 ¶ 33). But

the *Foust* court did not rely on this fact beyond using it to add to the context of an already deficient mitigation investigation. *See Foust*, 655 F.3d at 530. Once again, Scott's trial counsel conducted a materially different and more complete mitigation investigation. More importantly, the Sixth Circuit placed little weight on the hours spent, mentioning it once in the background section of the opinion. For these reasons, the court cannot conclude that the *Foust* decision (even if controlling) represents a numerical standard that should be categorically applied to *Strickland* litigation.

Nor would *Foust* help Scott satisfy his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Foust* was that attorney performance is deficient and prejudicial under *Strickland* if counsel fail to interview potential witnesses, subpoena records, and prepare any of the witnesses whom they put on the stand. Because the facts of Scott's case materially differ from those in *Foust*, the ACCA reasonably applied the (non-controlling) holding of *Foust*.

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 30). Although Scott invokes (d)(2), he has not pointed to any evidence that undermines the reasonableness of any factual determinations made by the state courts. That is, Scott has not shown that the ACCA's analysis of this portion of this subclaim phase was factually unreasonable. At most, Scott has pointed to undisputed evidence of what occurred during the trial and the Rule 32 evidentiary hearing. As discussed at length above, the ACCA did not unreasonably apply these undisputed facts in affirming the ACCA's denial of relief on this claim. Scott has also not overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

Indeed, after reviewing the ACCA's last reasoned decision, this court concludes that the ACCA reasonably applied the facts, including the facts that his trial counsel met with and called

Scott several times beginning in February 2000, billed multiple hours corresponding with him (Doc. # 14-49 at 58-60), billed 27.5 hours for reviewing discovery and trial preparation (*id.*), reviewed Scott's Taylor-Hardin mental health evaluation (Doc. # 14-40 at 112, 179-80), retained Dr. Ackerson to evaluate Scott's mental health "with an eye towards possible mitigation" (*id.* at 153), talked to Scott at length about his background and possible witness names (*id.* at 102, 149-50), spoke with at least three mitigation witnesses before the trial (*id.* at 92, 151, 182), and presented mitigation testimony about Scott's background and positive aspects of his personality. (*See* Doc. # 17 at 84-109). Based on the court's (d)(1) analysis above, it cannot be said that the ACCA unreasonably applied these facts by finding that Scott's trial counsel provided him constitutionally sound representation.

### b.    Failure to Retain Mitigation Expert

In Scott's Amended Rule 32 Petition, he first raised the argument that his counsel were ineffective because they failed to retain a mitigation expert.[5] (Doc. # 14-37 at 75-76). The Rule 32 court pointed out that Scott's trial counsel consulted Dr. Kamal Nagi and Dr. Kimberly Ackerson, and that Dr. Ackerson was considered to "perhaps provide some mitigation evidence," but that Scott's counsel reasonably elected not to pursue additional mental health experts after concluding that Dr. Ackerson had nothing useful to add. (Doc. # 14-39 at 47, 49). The Rule 32 court then concluded that additional "certain witnesses would have been largely cumulative of the matters presented at the penalty phase." (Doc. # 14-39 at 50).

Scott raised this argument in a brief to the ACCA, arguing that his counsel's performance was unreasonable because after they filed a motion for mitigation funds, "[e]ither the court granted that motion and Robbins failed to inform himself of that, or the court denied it or simply failed to

---

[5] A claim based on failure to retain a mitigation expert is part of the same *Strickland* mitigation analysis.

rule and the issue was never raised on appeal." (Doc. # 14-58 at 63, 93). He also argued that his counsel "failed to seek the assistance of an expert to help the jury appreciate the link between Scott's development as a child and adolescence, and the violent crime for which he was found guilty." (Doc. # 14-58 at 73). The ACCA construed Scott's argument before the Rule 32 court as a contention that his counsel "should have hired Dr. Karen Salekin, a forensic psychologist, as a mitigation expert to testify as to how multiple 'risk factors' that Scott experienced throughout his lifetime could have contributed to his actions in this case." (Doc. # 14-59 at 188). The ACCA further construed his argument to be that, if the jury had heard Dr. Salekin's testimony, there was a "reasonable probability that it would have found sufficient mitigating circumstances to" change their recommendation of death. (Doc. # 14-59 at 188). The ACCA concluded that this "claim here fails to satisfy the requirements of Rule 28(a)(10)," because "Scott provides no factual or legal authority for this claim. He also has failed to present any analysis on this issue demonstrating that his trial counsels' failure to hire Dr. Salekin or any mitigation expert to provide the testimony described above constituted ineffective assistance of counsel." (*Id.*). Alternatively, the ACCA denied this claim on the merits, explaining that "it is well settled that hiring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel." (*Id.*) (citing *Marshall v. State*, 182 So. 3d 573, 605 (Ala. Crim. App. 2014)). The ACCA also noted "the mere fact that a defendant can find, years after the fact, an expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." (*Id.* at 188-89 (citing *Marshall*, 182 So. 3d at 604)).

###### i.    This claim is not subject to state-barred procedural default.

Scott's theory related to failure to hire a mitigation expert is not barred from habeas review because the ACCA's application of Alabama Rule of Appellate Procedure 28(a)(10) did not rest

76

on independent and adequate state grounds. Once again, under the procedural default doctrine, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (internal quotation marks omitted) (alteration in *Ward*) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). However, "a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon 'adequate and independent' state grounds." *Ward*, 592 F.3d at 1156 (quoting *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)). Below, the court evaluates the ACCA's application of Rule 28(a)(10) under the Eleventh Circuit's three-part test. *See Judd*, 250 F.3d at 1313.

In light of these principles, the court returns to Scott's *Strickland* claim based on the theory that his counsel was inadequate because they failed to hire a mitigation expert. The ACCA held that because "Scott provides no factual or legal authority for this claim" nor any "analysis on this issue," he failed to comply with Rule 28(a)(10). (Doc. # 14-59 at 188). The ACCA alternatively evaluated this claim on the merits, explaining that "even if Scott had complied with the requirements of this rule, his argument would still be without merit because it is well settled that hiring a mitigation specialist in a capital case is not a requirement of effective counsel." (*Id.* (citing *Marshall v. State*, 182 So. 3d 573, 605 (Ala. Crim. App. 2014)). The ACCA added that the mere fact that a defendant can find, years after the fact, an expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." (*Id.* at 188-89 (citing *Marshall*, 182 So. 3d at 604)).

Going through the Eleventh Circuit's three step test, the last state court rendering a judgment here – the ACCA – clearly and expressly stated that it was relying on "Rule 28(a)(10)"

(Doc. # 14-59 at 188), to resolve the federal claim without reaching the merits of that claim. *See Judd*, 250 F.3d at 1313. Moving to the second part of the test, the ACCA's decision to apply Rule 28(a)(10) rests entirely on state law grounds, requiring that "the brief of the appellate or the petitioner shall contain . . . [a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Because this is not "intertwined with an interpretation of federal law," the second part of the test is satisfied. *See Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313). Although Scott disputes this (Doc. # 20 at 37), he does not clearly present his reasons for doing so. (*Id.* (stating that "the state procedural rule does not bar federal relief because it is not adequate to support the State Court's judgment and not independent of federal law")). In any event, according to a plain reading of Rule 28(a)(10), the second part of this state-barred procedural default test is met.

The third part of the test – which asks whether the state procedural is adequate, meaning firmly established, regularly followed, and not applied in an arbitrary or unprecedented fashion – is not met. Specifically, Scott contends that he complied with Rule 28(a)(10) because his brief "contained numerous legal citations supporting his claim" including a quote from the Eleventh Circuit decision *Morton*, 684 F.3d at 1169 and the 1989 ABA Guidelines. (Doc. # 20 at 37-38 (citing Doc. # 14-58 at 65-68, 74, 77)).

The record casts doubt on whether the ACCA relied on Rule 28(a)(10) in a firmly established manner. This case certainly did not fit into the category of cases in which the petitioner had done little or nothing to develop his claim on collateral review. Rather, when presenting to the ACCA his argument that the failure to retain a mitigation expert violated *Strickland*'s performance prong, Scott cited portions of the record that detailed the purpose of hiring Dr. Ackerson (the

78

motion to pay her fee), her bill, and the statement of mitigation coordinator Aaron McCall. (Doc. # 14-58 at 73-74 (citing Docs. # 14-49 at 199; 14-40 at 104-06, 108; 14-41 at 92-93, 103-04)). Scott also cited to the 1989 ABA Guidelines 1.1 mt. and 11.4.1(D)(7). (*Id.* at 74). Additionally, although it was not directly positioned within the paragraphs outlining the mitigation expert argument, Scott cited several cases in this subsection about trial counsel's performance at the penalty phase. (Doc. # 14-58 at 65-67 (citing *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995); *Ex parte Land*, 775 So. 2d 847, 853 (Ala. 2000); *Jackson*, 42 F.3d at 1367; *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *DeBruce v. Comm'r*, 758 F.3d 1263, 1274 (11th Cir. 2014); *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011); *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 932-33 (11th Cir. 2011))). Particularly his citation to *Wiggins* ties Scott's contention back to the mitigation expert – that the ABA Guidelines set forth what is expected of an attorney in a capital case, and that the relevant ABA Guidelines indicate Scott's counsel's performance was deficient. (*See id.* at 66, 74). Scott's arguments in his brief to the ACCA contain "the contents of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Respondent bears the burden of showing that the ACCA's reliance on Rule 28(a)(10) falls within that rule's firmly established range. There is a substantial question about whether it has done so here. And, because it appears the ACCA's application of Rule 28(a)(10) to Scott's *Strickland* allegation about the failure to retain a mitigation expert extends into "unfirm" ground, the court addresses this issue as if state-barred procedural default does not apply to this portion of subclaim A(1).

79

## ii.    *Daniel* **Prong One**

Although the claim is not procedurally barred (and that is a close call), Scott has failed to satisfy his AEDPA burden on the portion of Subclaim A(1) that asserts that his counsel were ineffective because they did not hire a mitigation expert. In this subclaim, Scott's habeas petition argues that "[a]lthough there might be cases where the failure to retain a mitigation expert could be reasonable, Scott's case is not one of them given the circumstances he faced in life." (Doc. # 1 ¶ 132). Scott's petition further contends that the decision not to hire a mitigation expert was not reasonable because "[b]oth the ABA Guidelines and court decisions have recognized the importance of expert evidence in death penalty cases." (*Id.*) (quoting American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 10.11 History of Guideline (2003); *Wiggins*, 539 U.S. at 533-34). In particular, Scott relies on the testimony of Dr. Salekin at the Rule 32 evidentiary hearing and highlights that his trial counsel "did not approach anyone to conduct anything similar to the analysis that Dr. Salekin did." (*Id.*).

Respondent counters that this claim fails on the merits because Scott has not overcome AEDPA deference on this claim and the ACCA correctly applied the *Strickland* standard. (Doc. # 17 at 65-66). Respondent also contends that trial counsel's strategy of not hiring a mitigation expert was reasonable, there was no evidence that the court ever approved funds for a mitigation expert, and Dr. Salekin's testimony would have been "largely cumulative" of other testimony during the sentencing phase. (*Id.* at 66).

Scott replies that the ACCA "ignored settled precedent regarding the role of expert opinion in a mitigation case, and, more specifically, misunderstood the testimony that Scott's mitigation expert, Dr. Karen Salekin, provided at the rule 32 hearing." (Doc. # 20 at 31). Specifically, Scott contends, this testimony provided a link between Scott's background and his moral culpability. (*Id.* at 31-32). Scott also cites *Morton v. Secretary, Florida Department of Corrections* for the

80

proposition that "expert evidence might well provide a link between the personal history evidence and that extenuation or reduction of the moral culpability of the killing that might call for a sentence of less than death." (*Id.*) (quoting *Morton v. Sec'y, Fla. Dep't Corr.*, 684 F.3d 1158, 1169 (11th Cir. 2012)).

As with the first portion of this subclaim, the court follows the Eleventh Circuit's pattern in the *Daniel* decision in structuring its analysis of this penalty phase *Strickland* claim. Thus, the court first examines whether Scott's Amended Rule 32 Petition pleads enough specific facts to amount to a valid penalty phase *Strickland* claim. The court then examines the ACCA's decision under AEDPA deference.

Related to this portion of this subclaim, Scott's Amended Rule 32 Petition alleges that although the trial court's electronic docket indicates that it granted a motion for fees to hire a mitigation specialist, counsel did not hire one. (*Id.* ¶¶ 48, 111). This is insufficient to establish a *Strickland* violation. Once again, the bar for establishing a *Strickland* violation is high, requiring that a petitioner show by a preponderance of the evidence that his counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Several factors weigh against this conclusion based on the Rule 32 Petition's pleadings. First, Scott's trial counsel hired a mental health expert, Dr. Kimberly Ackerson, and after reviewing her report concluded that her testimony at trial would not be helpful. This was largely because of a fear that she would testify that Scott was a "sociopath" and also due to her concerns that Scott was malingering. (Doc. # 14-40 at 154-55). This was without question a strategic decision by counsel not to hire a mitigation expert after already receiving an unfavorable report at the trial stage. Second, even without a mitigation expert, Scott's trial counsel were still able to present a substantive mitigation case that discussed his difficult childhood (including several risk factors) and redeeming qualities. For these

reasons, the court concludes that Scott's Amended Rule 32 Petition did not plead a sufficient *Strickland* claim about failure to hire a mitigation expert. Therefore, under *Daniel*, the ACCA's holding to this effect should be upheld on habeas review. But as discussed below, even if Scott's Amended Rule 32 Petition adequately pleaded sufficient information to establish a *Strickland* violation, he still has not satisfied the second step of *Daniel*. That is, he cannot overcome the AEDPA deference owed to the ACCA's determination.

### iii.    *Daniel*'s Second Prong (AEDPA Deference)

Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory about insufficient time and effort was the ACCA's opinion on second collateral appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under this subclaim, it denied certiorari without an opinion, so the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's." *Wilson*, 584 U.S. at 125.

Scott argues that AEDPA deference is not due to the ACCA's denial of this portion of the subclaim because the ACCA's rejection of it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' ruling in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, and resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." (Doc. # 1 ¶ 30). Scott invokes § 2254(d)(1) and (d)(2), but for the reasons explained below, Scott has failed to meet the standard under either clause of (d)(1) or the standard under (d)(2).

Again, a petitioner satisfies AEDPA's "contrary to" clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing

materially indistinguishable facts. The ACCA's discussion of *Strickland* in the evaluation of Scott's ineffective assistance of counsel claim eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). Nor has Scott carried his burden under the remaining portion of § 2254(d)(1) because he has not identified any factually indistinguishable Supreme Court decision with an outcome favorable to him.

Scott's habeas petition and briefing cites only these authorities in support this subclaim: the American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 10.11 History of Guideline (2003); *Wiggins*, 539 U.S. at 533-34; and *Morton v. Secretary, Florida Department of Corrections*, 684 F.3d 1157, 1169 (11th Cir. 2012). None of these authorities help Scott overcome his burden under (d)(1). First, (d)(1) requires reliance on clearly established Supreme Court precedent to overcome its burden. The ABA Guidelines are not Supreme Court precedent. Second, as discussed above, *Wiggins* is factually distinguishable from Scott's case, so it is of no help to Scott in satisfying his burden under the contrary to clause. Nor does it help him satisfy his burden under the unreasonable application clause. Once again, the clearly established holding of *Wiggins* was that defense counsel were ineffective under *Strickland* if they did not compile a social history report even though that was the standard practice in the state at the time (and comported with ABA Guidelines). *See Wiggins*, 539 U.S. at 524.

However, even if the statement about ABA Guidelines constituting the expectation for effective counsel were a clearly established holding (and, to be clear, it is not), *Wiggins* still does not help Scott with his burden under the unreasonable application clause of (d)(1). Connecting *Wiggins* with the ABA Guidelines, and even accepting the premise that the 2003 ABA Guidelines

set out what was expected of Scott's trial counsel during his 2002 trial, the ACCA did not unreasonably determine that Scott's trial counsel satisfied constitutional standards. Scott's petition quotes from the Guideline History that summarizes how the guidelines included "[l]anguage changes to underscore the range and importance of expert testimony in capital cases, the breadth of mitigating evidence, and counsel's duty to present arguments in mitigation." (Doc. # 1 ¶ 132) (reflecting alteration from quotation and not original language). Notwithstanding the "importance of expert testimony in capital cases," this standard could have been reasonably applied to uphold trial counsel's decision *not* to hire a mitigation expert. One reason for this is that the "expert testimony" emphasized in the Guidelines is unqualified – meaning that it could include a variety of types of experts, and not just mitigation experts. Additionally, the Rule 32 court found that although there was no evidence that the trial court approved funds for hiring a mitigation expert, Scott's counsel (1) still presented a substantive mitigation case that discussed his difficult childhood and redeeming qualities, and (2) concluded that the testimony of the psychologist whom they did hire would not help Scott's mitigation defense. It is likely that much of the expert evidence would have been cumulative of what trial counsel actually presented at the penalty phase. Furthermore, the mitigation presentation from trial counsel appears to have been effective at the penalty phase for a separate reason:   10 to 2 vote on the death penalty is the minimum amount to recommend execution under Alabama law. As such, counsel's mitigation presentation was effective given the closeness of the jury's advisory verdict to not recommending death. Therefore, the ACCA's decision was reasonable and well within the strictures of *Wiggins* and the ABA Guidelines. Obviously, despite the "importance of expert testimony," there could be some cases where the choice not to retain a mitigation expert is within the deferential range of effective assistance of counsel under the Sixth Amendment.

Finally, *Morton* cannot help Scott overcome his (d)(1) burden because it is not a Supreme Court precedent, is factually distinguishable, and its clearly established holding was reasonably applied by the ACCA. In *Morton*, the capital habeas petitioner went through two penalty phases (the second a retrial because of prosecutorial misconduct). *Id.* at 1161, 1164. At the first penalty phase, the petitioner's counsel presented a theory that their client "had not been nurtured as an infant and had been raised in a dysfunctional family to explain why he had committed murder at the age of 19." *Id.* at 1162. They also presented several witnesses, including a mental health expert who testified about this theory, but also testified that the petitioner was a sociopath and shared traits in common with serial killers. *Id.* at 1162-64, 1169. At the second penalty phase, even though one defense lawyer thought the expert was "not a great witness" and the expert himself wrote to them "I don't think it's a good idea to use me," defense counsel asked the expert to testify again (which he did). *Id.* at 1164. The petitioner was again sentenced to death, exhausted state remedies, and filed a habeas petition, which a federal district court denied. *Id.* at 1165. The Eleventh Circuit considered whether the state court unreasonably applied federal law, as determined by the Supreme Court of the United States, when it determined that defense counsel made a reasonable strategic decision by again presenting the mental health expert's testimony. *Id.*

The Eleventh Circuit affirmed, holding (among other things) that the decision to call the expert to testify again satisfied the deferential standard of *Strickland* because the petitioner's trial counsel could have reasonably determined that identifying their client as a sociopath could "mitigate his moral culpability." *Id.* at 1169. The panel, quoting from a dissent from a denial of a petition for a writ of certiorari, stated "'[e]xpert knowledge of human motivation' can be 'highly relevant in the eyes of the jurors, for it might . . . offer[] an alternative explanation for why [the

petitioner] killed.'" *Id.* (quoting *Boyd v. N. Carolina*, 471 U.S. 1030, 1034 (1985) (Marshall, J., dissenting from denial of petition for writ of certiorari) (alterations in original)).

*Morton* cannot satisfy the contrary to clause of (d)(1) because its outcome (i.e., rejecting the petitioner's *Strickland* claim) was not contrary to the outcome that the ACCA reached. *Morton* also cannot satisfy the unreasonable application clause of (d)(1) because the ACCA did not unreasonably apply its clearly established holding. Indeed, *Morton*'s holding can only indirectly apply to Scott's case. After all, *Morton* was applying the double deference of § 2254 and *Strickland* to conclude that counsel was correct to *hire* a mitigation expert. While the *Morton* petitioner argued that his counsel should *not* have hired a mitigation expert, Scott argues the opposite – that his counsel *should* have hired one. Applying § 2254'd double deference and *Strickland* to Scott's situation could (and here actually does) yield a different result. Moreover, even if *Morton* were on all fours with Scott's case (which, to be clear, it is not), the quote from Justice Marshall was not a clearly established holding, and in any event, it only noted that expert evidence *can* be relevant in the eyes of jurors. *Morton* simply does not hold that capital defense counsel must always hire a mitigation expert.

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 30). Although Scott invokes (d)(2), he has not pointed to any evidence that undermines the reasonableness of any factual determinations made by the state courts. That is, Scott has not shown that the ACCA's analysis of this portion of Subclaim A(1) phase was factually unreasonable. As discussed at length above, the ACCA did not unreasonably apply these undisputed facts in affirming the ACCA's denial of relief on this claim.

Scott has also not overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1). *See* 28 U.S.C. § 2254(e)(1)

86

(providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct"). As already discussed, a petitioner must provide "clear and convincing evidence" to overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation marks omitted).

### 2. Subclaim (A)(2) – Scott was not prejudiced by his trial counsel's assistance at the penalty phase of trial.

Accepting only for purposes of the analysis of this subclaim that Scott has adequately stated his trial counsel's deficient performance and overcome AEDPA deference on *Stricklan'*s first prong, his mitigation claim fails for an alternative reason: he has not shown prejudice. Scott's habeas petition argues that the evidence presented at the Rule 32 hearing is the type and character to show prejudice in similar *Strickland* cases. (Doc. # 1 ¶ 137). He also argues that if his trial counsel had presented a reasonable mitigation case, there is a reasonable probability that at least one more juror would have voted for life, and that is sufficient to show prejudice because the result would have been different. (*Id.* ¶ 138). These assertions miss the mark.

Respondent contends that this subclaim fails on the merits. First, Respondent highlights that the ACCA's ruling on the prejudice prong of *Strickland* was an alternative ruling because the ACCA correctly concluded that there was no deficiency. Next, Respondent quotes from the ACCA's opinion and notes that the ACCA adopted the Rule 32 court's finding that the witnesses and records that Scott presented were "largely cumulative of the matters presented at the penalty phase." (Doc. # 17 at 70 (quoting Doc. # 14-59 at 186 (in turn quoting Doc. # 14-39 at 50))). Respondent urges that this was a correct conclusion because, at trial, Scott's counsel "presented considerable evidence of Scott's tortured background." (*Id.* at 72 (quoting *Holsey v. Warden, Ga.*

87

*Diagnostic Prison*, 694 F.3d 1230, 1269 (11th Cir. 2012))). Respondent further contends that "a review of the record makes it clear that a reasonable jurist could agree with the ACCA's conclusion," discussing how the "egregious nature of the crimes that the jury found Scott guilty of" contrasted with the sad but unexceptional tenor of the evidence Scott presented at the evidentiary hearing. (*Id.* at 70-71). In particular, Respondent has emphasized the evidence Scott presented at the evidentiary hearing of abuse was "a far cry" from the type of evidence that courts have held to satisfy the prejudice prong. (*Id.* at 71) (quoting *DeYoung v. Shofield*, 609 F.3d 1260, 1291 (11th Cir. 2010)).

Scott replies that the Appendix that was attached to his habeas petition outlines the many ways that the Rule 32 evidentiary hearing diverged from the evidence presented at trial. (Doc. # 20 at 29 (citing to Appendix at Doc. # 1-1)). Scott also highlights the ACCA's failure to address the discrepancy between the belief of Scott's trial counsel about Vinnie Scott (that she was "a loving, stable influence" and the reality presented at the Rule 32 evidentiary hearing (that she was abusive and often beat Scott). (Doc. # 20 at 29). Scott similarly summarizes that, at the evidentiary hearing, Scott's mother testified about the extent of her alcohol and drug abuse as well as the impact that her lifestyle had on her children. (*Id.* at 30).

### a.    State Court Proceedings

Scott raised this subclaim in both his first Rule 32 petition (Doc. # 14-29 at 59-63, 65-66) and in his Amended Rule 32 petition. (Doc. # 14-37 at 90-91). The Rule 32 court denied this subclaim, finding that "certain aspects" of his prejudice claim had been presented during the penalty phase (or were "largely cumulative to information trial counsel already knew"). (Doc. # 14-39 at 50). The court then highlighted the "highly aggravated crimes" of which Scott was convicted and explained that the additional evidence Scott argued should have been presented was "not so extreme as to warrant relief." (*Id.* at 51). The court further pointed out Scott's "behavior

88

during the penalty phase" that "undermined the effectiveness of trial counsel's efforts." (*Id.*). This included evidence that he was dressed in "shower shoes, a t-shirt, and a tie" (*id.* (quoting Doc. # 14-40 at 120)), that he stated that he was reading *Hannibal Cannibal* during the trial, that he engaged in numerous outbursts in front of the jury, that he accused the victim's mother of being her daughter's killer, and that he accused the victim's father of being a "dope dealer." (*Id.*).

In considering this subclaim, the ACCA first held that the Rule 32 court had properly applied the *Strickland* standard for prejudice to Scott's Rule 32 petition. (Doc. # 14-59 at 190). The ACCA also held that "the circuit court did not abuse its discretion in discounting Dr. Salekin's testimony as cumulative" because the penalty phase of trial included testimony about Scott's difficult childhood and how it affected his life – specifically testimony from his aunts and grandmother about his mother's substance abuse and his gang involvement. (*Id.* at 191).

### b.    *Daniel* Prong One

In reviewing this second portion of Scott's *Strickland* penalty phase claims, the court again follows the structure of *Daniel* in its analysis. Thus, the court begins by examining whether Scott's Amended Rule 32 Petition adequately pleads *Strickland* prejudice.

In his Amended Rule 32 Petition, Scott argues that he was prejudiced because "the jury did not learn fundamental facts about Mr. Scott's childhood, mental illness, and even the night in question." (Doc. # 14-37 ¶ 116). The petition also asserted that "[t]he jury was unaware of the full impact of the medical, emotional, and environmental stressors that Mr. Scott faced as a young child, conditions that created a very alienated, isolated youth, abandoned by his entire family as he was growing up." (*Id.*). Scott argues that this information could have been "elicited from Mr. Scott's family and various records." (*Id.*). At another point in his petition, he also contends (without citing the record) that because his trial counsel never told the jury that he was high on cocaine and marijuana the night of the alleged murder, the jury could not have used that

89

information to find statutory and nonstatutory factors. (*Id.* ¶ 115 (citing Ala. Code § 13A-5-52(4))). Specifically, he asserts that the jury could have concluded that "even if he did commit the crimes alleged, [Scott] was not acting with the intent of a person thinking clearly and could bear only diminished responsibility for his actions." (*Id.* (citing *Hadley v. State*, 575 So. 2d 145 (Ala. Crim. App. 1990) (holding that alcohol use at the time of the incident was a mitigating factor))).[6]

These assertions are insufficient to establish prejudice under *Strickland*. Moreover, in any event, Scott's Rule 32 petition could not have adequately pleaded a *Strickland* claim because in addition to prejudice, a court must also find that there was deficient performance (which the court has already concluded was unsupported by the Rule 32 petition's allegations). To show prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As to Scott's first point (about the facts that the jury did not learn), his argument is undermined by the record of the state court jury trial. The state record shows that the jury learned about the difficulty of Scott's childhood and how it impacted him emotionally and behaviorally (causing him to blame himself for his sister's death and join a gang). (Doc. # 14-20 at 83-97, 103-10). Although the jury did not hear about Scott's mental illness, his counsel made a strategic decision to exclude testimony about that for two reasons: (1) Dr. Ackerson "called him a sociopath" (Doc. # 14-40 at 107) and (2) there was a reference in the Taylor-Hardin records to "concerns about malingering." (Doc. # 14-41 at 87-88). Calling Dr. Ackerson would have opened the door to this non-mitigating evidence and any mitigating impact of his mental illness would be diminished by his sociopathic diagnosis. Likewise, the Taylor-Hardin records would have opened the door to concerns about malingering, potentially offsetting any potential usefulness. And, to

---

[6] *But see Suggs,* 609 F.3d at 1231 (holding that evidence of alcohol and drug use are a "two-edged sword").

Scott's second point (about the probability that the jury could have used evidence of his drug use on the night of the events in question to find statutory and non-statutory mitigation factors), he offers no citation to the record to substantiate this, nor can the court discern any testimony from the record of the Rule 32 evidentiary hearing that would substantiate it. (*See* Docs. # 14-40; 14-41; 14-42; 14-43). Without a known witness who would testify about Scott's drug use on the night of the murder, this alleged mitigating evidence is speculative and cannot create a reasonable probability of a different sentencing outcome. *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357 (11th Cir. 2021) (holding that a petitioner's conclusory testimony without additional support was "precisely the kind of evidence" that courts "have held to be 'simply inadequate to undermine confidence in the outcome' of the proceeding."). Additionally, Scott undermines his own argument by citing testimony that suggested to the jury that he was likely on drugs. (Doc. # 14-37 ¶ 115 (citing Doc. # 14-16 at 144 ("we kind of . . . I thought he was on drugs or something"); (citing Doc. # 14-17 at 67 (saying that Scott was "just acting real strange. Almost stranger than usual."))). In conclusion, Scott's Amended Rule 32 Petition does not plead sufficient information to establish a *Strickland* violation, so under *Daniel*, the ACCA's holding to this effect should be upheld on habeas review. But even if Scott's Amended Rule 32 Petition did plead sufficient information to establish a *Strickland* prejudice, he still has not satisfied the second step of *Daniel*, which is to overcome the AEDPA deference owed to the ACCA's determination.

### c.   *Daniel* Prong Two (AEDPA Deference)

After careful review, the court concludes that the ACCA's dismissal of Scott's *Strickland* subclaim was not contrary to or an unreasonable application of law nor was it based on an unreasonable determination of the facts. Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory about prejudice was the ACCA's opinion on second collateral appeal. (Doc. # 14-59). Although the ACCA did not consider the merits of his claim

91

about Vinnie Scott's testimony being misleading, Scott's habeas petition does not include that in his prejudice subclaim; therefore, the court examines only the ACCA's opinion for the last reasoned state court judgment as to this subclaim.

Scott has not specifically explained (either in his habeas petition or in his reply brief) *why* he believes a jury would have been swayed by the additional mitigation evidence from the Rule 32 evidentiary hearing. For example, he does not name any mitigating factors he believes the jury could have found if they had heard the additional mitigating evidence. Instead, he provides only conclusory statements such as: "[h]ad Scott's trial counsel presented a jury with a reasonable mitigation case, there is a reasonable probability that at least one more juror would have voted in favor of life." (Doc. # 1 ¶ 138). Again, in his reply brief, Scott seems to rest on his argument about deficient performance of counsel by failing to hire a mitigation expert and examine his DHR files, which he says led to an erroneous characterization of Vinnie Scott as "a source of love and care for Scott," and omitting details about the extent of Scott's mother's alcoholism and money problems. (Doc. # 20 at 27-32). Scott asserts (without explaining how) that "[i]f presented with the wealth of mitigation evidence from the Rule 32 hearing, there is a reasonable probability that at least one more juror would have voted to spare Scott's life." (*Id.* at 32). Nor does Scott explain how any of the additional Rule 32 mitigating evidence would have undermined the three aggravating factors that the trial judge found or would have added to the list of several mitigating factors that the trial judge found.

Scott argues that AEDPA deference is not due to the ACCA's denial of this portion of this subclaim because the ACCA's rejection of it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' ruling in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, and resulted in

decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." (Doc. # 1 ¶ 30). Scott invokes § 2254(d)(1) and (d)(2), but as explained below, he has failed to meet his burden under either clause.

Again, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. Preliminarily, the ACCA's discussion of *Strickland* in evaluating Scott's ineffective assistance of counsel claim shows why he cannot rely on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). And, Scott has not carried his burden under the remaining portion of § 2254(d)(1) because he has not identified how the ACCA misapplied clearly established federal law as determined by the Supreme Court. Nor has he identified any factually indistinguishable Supreme Court decision with an outcome favorable to him.

Scott's habeas petition and briefing cites the following authorities in support of this subclaim: *Strickland*, 466 U.S. at 694; *Wiggins*, 539 U.S. at 537, 534; *Williams*, 542 F.3d at 1342, 1340; *Johnson*, 643 F.3d at 936, 932-35; *Cooper*, 646 F.3d at 1349-50; *Ferrell v. Hall*, 640 F.3d 1199, 1239-40; *Hardwick v. Crosby*, 320 F.3d 1127, 1162-90 (11th Cir. 2003); *Bertolotti v. Dugger*, 883 F.2d 1503 (11th Cir. 1989); and *Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008). None of these authorities help Scott overcome his burden under (d)(1). This is because (d)(1) requires citation of clearly established Supreme Court precedent to overcome its burden. Of these authorities, only *Strickland* and *Wiggins* are Supreme Court precedent, and those two decisions

93

are distinguishable. Upon review, the court also concludes that the ACCA did not unreasonably apply the clearly established precedents from those opinions. Finally, even if the other cited authorities were Supreme Court opinions, they would still not satisfy the contrary to or unreasonable application clause of (d)(1), as discussed below.

*Strickland* is distinguishable from Scott's case. In *Strickland*, the petitioner's counsel decided not to request a psychiatric report, investigate and present character witnesses, or seek a presentence report. *Id.* at 672-73. This was because they were concerned that if they presented evidence about their client's character and emotional state, the state could cross-examine their client and present psychiatric evidence of their own. *Id.* at 673-74. The decision not to request a presentence report was intended to avoid introducing evidence of their client's criminal history, which would undermine their claim that he had no significant criminal record. *Id.* At the sentencing hearing, the trial counsel emphasized that their client had expressed remorse and accepted responsibility for his crimes, had no history of criminal activity, and committed the crimes under extreme mental or emotional disturbance. *Id.* The trial judge nevertheless found that the aggravating circumstances outweighed the mitigating circumstances and sentenced the petitioner to death.

In his habeas petition, the petitioner argued that his counsel provided ineffective assistance under the Sixth Amendment because they failed to request a psychiatric report, investigate and present character witnesses, seek a presentence report, investigate medical reports, and present meaningful arguments to the sentencing judge. *Id.* at 675-76, 678. When reviewing this claim, the Supreme Court articulated the well-known two-pronged *Strickland* test for ineffective assistance of counsel claims. After concluding that the petitioner's counsel performed reasonably and thus were not constitutionally deficient, *id.* at 698-99, the Court also held that "respondent suffered

insufficient prejudice to warrant setting aside his death sentence." *Id.* at 699. This was because the evidence that the petitioner suggested his counsel should have offered at the sentencing hearing was weak evidence and would have merely shown that "numerous people who knew respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance." *Id.* at 700. But, "[g]iven the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances." *Id.*

Because the *Strickland* court held that the petitioner was not prejudiced by his counsel's performance, the ACCA's identical conclusion in Scott's case could not be contrary to the result in *Strickland*.

The ACCA also did not unreasonably apply the clearly established holding of *Strickland*, meaning that *Strickland* cannot help Scott overcome his burden under the unreasonable application clause of (d)(1). This is because, under the clear rule of *Strickland*, a defendant must show *both* that his counsel's performance was deficient *and* that it prejudiced him. Because the ACCA already concluded that the performance of Scott's counsel was not deficient, it was not necessary to examine prejudice at all because under the rule of *Strickland* his counsel was constitutionally effective. Even under the ACCA's alternative ruling on the merits of the prejudice prong, the ACCA reasonably applied *Strickland*'s clearly established holding. Its holding was that the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695.

95

The evidence that Scott contends his counsel should have presented at the sentencing hearing includes evidence that his grandmother, Vinnie Scott, was abusive, evidence that Scott had been sexually abused, and more detailed evidence of the depth of abuse Scott experienced during his childhood. (*See* Doc. # 1 ¶¶ 136-37). However, the record of the sentencing hearing indicates that Scott's trial counsel presented testimony of a difficult home life that included testimony that his mother was currently incarcerated due to alcoholism, that Scott believed he was responsible for his younger sister's disability and early death, that he had joined a gang to try to seek "love," that he had often been left alone at home to care for his younger sister, that his mother had been an alcoholic and drug abuser throughout her life, and that she was not a good mother to Scott. (Doc. # 14-20 at 83-97, 103-10). Because the evidence that was presented was substantially similar in content (even if not in degree or quantity) to the evidence that Scott contends his counsel should have presented and cumulative evidence is generally insufficient to establish a reasonable probability of a different sentencing outcome, the ACCA did not unreasonably apply the clearly established holding of *Strickland* when it concluded that Scott was not prejudiced by his counsel's behavior.

Nor does *Wiggins* help Scott satisfy his burden under either clause of (d)(1). This is the case for two reasons: first, *Wiggins* was distinguishable; and second, the ACCA did not unreasonably apply its clearly established holding regarding the prejudice prong. In *Wiggins*, the petitioner's trial counsel moved to bifurcate the sentencing phase of the trial into a portion focused on whether their client killed the victim by his own hand, as well as a second portion focused on mitigation. *Wiggins*, 539 U.S. at 515. After this motion as denied, the sentencing phase began and defense counsel told the jury that they would present evidence suggesting that someone else had killed the victim and that their client had tried to be a productive and non-violent citizen despite

96

having a difficult life. *Id.* Trial counsel did not, however, introduce any evidence of their client's life history and instead focused exclusively on their client's lack of direct responsibility for the murder. *Id.* at 515, 536. Before closing arguments, trial counsel proffered to the court that if the court had granted the bifurcation issue they would have presented additional mitigation evidence, including psychological reports and expert testimony. *Id.* at 516. The jury voted to sentence the petitioner to death. *Id.* On postconviction review, the petitioner argued that his counsel should have presented mitigation testimony about the severe physical and sexual abuse that he suffered at the hands of his mother, foster parents, foster siblings, and his supervisor in a Job Corps program. *Id.* at 516-17. Other testimony would have also detailed that the petitioner's alcoholic mother often abandoned the petitioner and her other children, leaving them to beg for food. *Id.* at 517.

On review, the Supreme Court noted that none of the state courts had reached the prejudice prong of the *Strickland* and therefore did not evaluate this prong under the deferential AEDPA standard. *Id.* at 534. The Court emphasized that "the nature and the extent of the abuse petitioner suffered" was "powerful" and included that he "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother." *Id.* at 535. The Court added that the petitioner had "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Id.* Based on all of this, the Court concluded that there was "a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing." *Id.* The Court further reasoned that "had the jury been confronted with his considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 536. This was because, the Court highlighted, the only significant mitigating factor that the sentencing jury heard was that the petitioner had no prior convictions; if

97

they had heard something about his "excruciating life history," it was reasonably probable that "at least one juror would have struck a different balance." *Id.*

*Wiggins* is distinguishable from Scott's case. While the defense counsel in *Wiggins* did not present any mitigation evidence about their client's difficult background, Scott's counsel actually presented such evidence. And, while the defense counsel in *Wiggins* did not present any of a specific type of evidence that would have permitted a finding on an additional mitigating factor, Scott's counsel presented the same "type" of mitigation evidence as offered at the Rule 32 evidentiary hearing – evidence that he had an incredibly difficult and abusive childhood. It is true that the evidence presented at the Rule 32 evidentiary hearing was more detailed, presented by more witnesses, and described in greater depth the difficulty of Scott's life preceding his criminal conviction. But, unlike in *Wiggins*, where the jury simply did not hear any evidence about an entire mitigating factor, Scott's jury did hear about his difficult childhood. Therefore, *Wiggins* is distinguishable and unable to satisfy the contrary to clause of (d)(1).

Nor can *Wiggins* be used to satisfy the unreasonable application clause of (d)(1). On the prejudice prong, *Wiggins* held that a defendant has been prejudiced if his counsel did not present any of the considerable evidence that supported a mitigation factor, and if "there is a reasonable probability that [a jury] would have returned with a different sentence" if that jury had "been confronted with this considerable mitigating evidence." *Id.* at 536. Applying this clearly established holding to Scott's case, the ACCA could have reasonably concluded that Scott was not prejudiced. This is so because Scott's counsel presented evidence of his difficult background, abandonment by his alcoholic and drug-abusing mother, and guilt and sorrow over the untimely death of his sister. Because the evidence from the Rule 32 evidentiary hearing also focused on Scott's background and how it could have mitigated his moral culpability for the crimes that he

98

was convicted of, the ACCA could have reasonably applied *Wiggins* to hold that there was not a reasonable probability that a jury that was simply presented with more (albeit much more poignant) evidence about Scott's background would have returned with a different sentence.

Similarly, *Williams* cannot help Scott overcome his (d)(1) burden. First, it is not a Supreme Court case, and therefore cannot be used to satisfy the "contrary to" clause of (d)(1). Nor does *Williams* satisfy the unreasonable application clause of (d)(1) because it cannot be read to show how the ACCA unreasonably applied clearly established Supreme Court holdings. In *Williams*, the petitioner asserted a *Strickland* claim based on counsel's handling of the penalty phase of trial. To prepare for the penalty phase, petitioner's counsel consulted three sources of evidence: the petitioner's mother, the PSI (which referenced abuse), and a psychologist's report about competency and mental state. At the penalty phase, defense counsel only presented testimony from the petitioner's mother, who testified that the petitioner had lived with his grandmother and aunt until age six. *Williams v. Allen*, 542 F.3d 1326, 1329 (11th Cir. 2008). She also testified that once the petitioner returned to live with his parents, his father often beat him, choked him, drank heavily, used marijuana, beat her in her son's presence, and was later "incarcerated for molesting and raping the couple's mentally retarded daughter." *Id.* The jury voted 9-3 to recommend life in prison without parole. *Id.* at 1329-30.

During the sentencing hearing, defense counsel did not present additional evidence but relied instead on mitigating evidence already presented, such as the PSI, which stated that the petitioner's mother "has an excellent reputation in the [] area." *Id.* at 1330. After the sentencing hearing, the trial judge found only one aggravating factor, but nevertheless overrode the jury's recommendation and sentenced the petitioner to death, holding that the aggravating factor outweighed the mitigating factors. *Id.* In particular, the judge emphasized the cold and calculated

nature of the crime, the fact that the petitioner appeared to have had loving people in his life including his mother and grandmother, and the impression that the petitioner's childhood was not "one of total deprivation." *Id.*

On direct and postconviction appeal, the petitioner asserted a *Strickland* claim that his counsel was ineffective because they failed to investigate and present mitigating evidence. The Rule 32 court held an evidentiary hearing at which several witnesses testified about the extreme and repeated abuse the petitioner suffered as well as the fact that the petitioner's mother at times perpetrated the abuse herself. *Id.* at 1331. There was also testimony about the "extreme neglect and deprivation" that characterized the petitioner's childhood. *Id.* at 1333. This included long periods of time when his parents left him unsupervised to roam the neighborhood, a lack of adequate food and clothing, a failure to be taught basic hygiene, lack of treatment for serious injuries, and eventually a state of "on-going captivity" after his parents moved to a remote area with no neighbors. *Id.* at 1333-34. The state courts denied the petitioner's *Strickland* claim, *id.* at 1341, and in doing so explained that there was no prejudice because the petitioner had not shown that the additional mitigating evidence would refute the evidence establishing the petitioner's guilt. *Id.* at 1343.

On appeal, after concluding that petitioner's counsel was deficient, the Eleventh Circuit concluded that the petitioner was prejudiced by his counsel's performance. *Id.* at 1342-43. This was because, the panel emphasized, the mitigation evidence presented at the Rule 32 hearing "paints a vastly different picture of his background than that created by [his mother's] abbreviated testimony." *Id.* at 1342. In particular, the Rule 32 testimony revealed that petitioner's childhood abuse was much more frequent and severe than what his mother's testimony had suggested, was not associated with ordinary parental discipline, and sometimes involved "deadly weapons." *Id.* at

100

1343. Additionally, while the trial judge had emphasized that he believed the petitioner was "cared for by his mother and grandmother" the Rule 32 evidence suggested that the petitioner's mother was neglectful and abusive. *Id.* And, while the trial judge had also emphasized that he believed that the petitioner's childhood was not "one of total deprivation," the Rule 32 evidence revealed that his childhood "was in fact characterized by an extreme level of deprivation, both physical and emotional." *Id.* The panel also noted that because the trial judge had found only one aggravating factor – a factor which was an element of the underlying charge – "this case is not highly aggravated" and thus the likelihood of prejudice was even higher. *Id.* The panel concluded that the state court had unreasonably applied *Strickland* because it had not considered the "possibility that the mitigating evidence, taken as a whole, might have altered the trial judge's appraisal of [the petitioner's] moral culpability." *Id.* at 1344. The Eleventh Circuit's opinion was reviewed by the Supreme Court. After granting certiorari, the Court reversed and remanded the case to the Eleventh Circuit. On remand, the panel confirmed their previous finding of cause (that trial counsel's mitigation investigation was inadequate) but held that the insufficient mitigation investigation was not prejudicial. *Williams*, slip op. at 17-18. This was because of the "serious aggravating circumstances" of the case, including the fact that Williams's murder took place in the commission of a rape and burglary, which outweighed any mitigation value of isolated instances of childhood abuse. *Id.* The panel specifically held that "[a] difficult and unsettled childhood featuring impoverished living conditions and exposure to substance abuse and violence is, tragically, so common that it provides little mitigating value, at least as Alabama sentencing courts see it." *Id.* at 17.

Applying the panel's on-remand holding in *Williams* to Scott's case, the court concludes that the ACCA did not unreasonably apply the clearly established Supreme Court holding in

101

*Strickland* as related to *Williams*. This is because unlike in *Williams* (where the mitigating evidence from the Rule 32 hearing specifically refuted grounds that the trial judge said he relied on), the mitigating evidence from Scott's Rule 32 hearing would not have refuted any of the aggravating circumstances the jury or trial judge found in Scott's case. (*See* Docs. # 14-24 at 36-42; 14-25 at 46-52). Specifically, the trial judge found three aggravating circumstances: (1) previous conviction of a felony involving the use or threat of violence to the person; (2) capital offenses committed while Scott was engaged in or attempting to commit Rape in the First Degree; and (3) the capital offenses were especially heinous, atrocious or cruel compared to other capital offenses. (*Id.*). The first two factors are objective, and a reasonable jury or trial judge would not have changed their finding on them even after hearing the additional mitigating evidence from the Rule 32 hearing. The trial court found the third factor applied, even though the jury was not instructed on it, and in its findings of fact elaborated that this factor "was intended to apply to only those conscienceless pitiless homicides which are unnecessarily torturous to the victim." (*Id.*). Thus, even if Scott's trial court might have found the additional Rule 32 mitigating evidence more compelling or evocative of sympathy than the evidence presented at trial, it would not have changed its finding on this factor because it focuses on the nature of the homicide, and not on the moral culpability of the perpetrator.

This is also true in considering the mitigating factors, as the additional Rule 32 mitigating evidence is irrelevant to the statutory mitigating factors that the trial judge did not consider. *See* §13A-5-51(2)-(6). Moreover, the trial judge found six non-statutory mitigating factors that all remain applicable even in light of the additional mitigating evidence. These include, roughly: (1) Scott's mother's alcoholism and his joining of a gang; (2) the fact that Vinnie Scott raised Scott and loves him, and that Scott was kind when he visited her in the hospital; (3) that Scott's younger

102

sister passed away when he was thirteen and that he was very sad at her passing; (4) that Scott is talented and has written books and a rap song as well as recorded a demo; (5) that Scott stated he had sex with five females in his age bracket in one year; and (6) "Any other mitigating circumstances offered pursuant to this code section." (*See* Docs. # 14-24 at 36-42; 14-25 at 46-52). The trial judge heard evidence of the abuse Scott suffered while under the care of Vinnie Scott and might have added this as an additional mitigating factor. But given the strength of the three aggravating factors that the trial judge found, as well as the numerous mitigating factors that already highlighted the difficulties of Scott's childhood, it is not clear that there is a reasonable probability – that is, a probability sufficient to undermine confidence in the outcome – that but for counsel's alleged unprofessional errors, the result of Scott's sentencing phase would have been different.

There are other significant differences between *Williams* and this case. While in *Williams*, the jury recommended life without parole, indicating that the trial judge's sentence of death was a close call, in Scott's case the jury recommended death. This is further underlined by the difference between the aggravating factors. In *Williams* there was a single aggravating factor, but, in Scott's case the trial judge found three. For all of these reasons, the court cannot conclude that *Williams* can help Scott carry his burden under (d)(1) of showing that the ACCA unreasonably applied clearly established holdings of the Supreme Court. Furthermore, the Eleventh Circuit's on-remand holding that Williams was not prejudiced by his counsel's insufficient mitigation investigation further evidences the panel's earlier holding's unhelpfulness to Scott. As stated, the trial court in Scott's case found more aggravating factors than did the trial court in Williams's case. And, Williams presented evidence of a childhood wrought with sexual abuse, physical abuse, substance abuse, and general instability. Scott presents the same type of evidence but as noted above, only

103

raises the possibility of sexual abuse. In totality, Scott has presented much weaker mitigation evidence in his attempt to counteract what are in his case arguably even worse aggravating factors. Thus, even if Scott had shown that his counsel's mitigation investigation was insufficient (and to be clear, he has not), he cannot show that the failure to present mitigation evidence was prejudicial in light of the serious aggravating factors.

Nor does *Johnson* help Scott carry his (d)(1) burden for this subclaim. First, *Johnson* is not a Supreme Court case and thus cannot help Scott satisfy his burden under the "contrary to" clause of (d)(1). Nor can it help him carry his burden under the unreasonable application clause. The court has detailed many facts of *Johnson*, so below it only supplements this discussion with those relevant to the prejudice prong of *Strickland*. During the sentencing phase in *Johnson*, petitioner's trial counsel presented testimony from the petitioner's father, a female friend, a clinical psychologist from his alcohol rehabilitation program, and the petitioner himself. *Johnson*, 643 F.3d at 932. His father's testimony included denying that he was an abusive alcoholic, and defense counsel did not press him on this (false) statement, nor did they proffer testimony from any other family members to discuss his alcoholism. *Id.* The other witnesses who discussed his father's alcoholism were the petitioner himself (who contradicted his father by suggesting that he was an alcoholic) and a female friend who stated her belief that the petitioner's father had a drinking problem although she added that she "didn't see him that much when he did drink." *Id.* at 913. And, while there was some suggestion from the clinical psychologist that the petitioner's "early years were very traumatic," there was no extensive evidence of abuse presented, *id.* at 914; in fact, the petitioner himself testified that "most of the time" his childhood was happy, but that it was not when his parents were drinking heavily. *Id.* at 915. The prosecutor summarized what he believed to be the mitigating circumstances as an "unhappy childhood, [a] drinking problem, [and that he]

reacts when he's threatened." *Id.* at 916. The aggravating circumstances that the prosecutor listed included a "long term pattern of violence," that the crime was "in a heinous and atrocious and cruel manner," and that there was not a "shred of legal or moral justification." *Id.*

The Eleventh Circuit evaluated the prejudice issue de novo (i.e., without giving AEDPA deference) because "the state courts did not decide the prejudice issue." *Id.* at 935. In this analysis, the panel concluded that the petitioner was prejudiced because "[t]he description, details, and depth of abuse in [the petitioner's] background that were brought to light in the evidentiary hearing in the state collateral proceeding far exceeded what the jury was told." *Id.* While the jury heard evidence suggesting that the petitioner had merely "cold and uncaring parents," the evidence from the Rule 32 evidentiary hearing established that his parents "were abusive alcoholics." *Id.* While the jury heard evidence suggesting that the petitioner had been placed in an orphanage because his father had to move for employment purposes, the Rule 32 evidence revealed that it was because his father deserted his family for three months. *Id.* The jury also never heard Rule 32 evidence suggesting that the petitioner was later sent to live with his grandparents "because the father had abandoned his family again," that the petitioner would huddle with his siblings in terror while his father beat his mother, that his mother inflicted physical and emotional abuse on him, that he witnessed several suicide attempts by his mother and later found her dead from a successful attempt, and that his grandparents psychologically tormented him when he was in their care. *Id.* at 936-37. The panel compared this disparity in evidence the jury heard with that of *Williams v. Taylor*, 529 U.S. 362, 396 (2000) and held that, because that decision found prejudice even under AEDPA deference, a de novo review in such a similar case should find prejudice. *Id.* at 937.

The ACCA did not unreasonably apply the clearly established holding of either *Johnson* or *Williams*. The clearly established holding of *Johnson* was that, where "[t]he description, details,

and depth of abuse in [the petitioner's] background that were brought to light in the evidentiary hearing in the state collateral proceeding far exceeded what the jury was told," there is prejudice. The evidence that Scott's defense counsel presented during his sentencing phase did not diverge to the same degree from the evidence presented during the Rule 32 evidentiary hearing as occurred in *Johnson*. For example, while the *Johnson* jury never heard a witness who was not the petitioner definitively corroborate even the basic fact that his father was an alcoholic, Scott's trial counsel presented multiple witnesses who testified that Scott's mother was an alcoholic. (Doc. # 14-20 at 84-89, 103-09). And, while the *Johnson* jury never heard any specific evidence of abuse beyond a psychologist's prognosis that he had experienced trauma, Scott's trial counsel presented multiple witnesses apart from Scott who supplied details of Scott's difficult childhood. (*Id.*). Further, while the *Johnson* jury never heard evidence that the petitioner had witnessed multiple suicide attempts by his mother and found her dead, Scott's jury heard evidence that he had pulled his younger sister off the bed and blamed himself for her untimely death. (*Id.* at 84-89). In sum, Scott's case is so distinguishable on its facts from *Johnson* that the court cannot conclude that the ACCA unreasonably applied *Johnson* (or its interpretation of *Williams*). Thus, *Johnson* cannot help Scott carry his burden under the unreasonable application clause of (d)(1).

Nor can *Cooper*. That decision is not a Supreme Court case and thus cannot help Scott satisfy his burden under the contrary to clause of (d)(1). But, further, it is of no aid to Scott in carrying his burden under the unreasonable application clause. The facts of *Cooper* have been summarized above, so the court only summarizes the facts relevant to the prejudice prong below.

In *Cooper*, the defense only presented a single witness in mitigation – his mother. *Cooper*, 646 F.3d at 1337-38. Although the petitioner's mother testified about the abuse that she suffered at the hands of his father, stated that the petitioner had witnessed this abuse, and stated that the his

father "was very hard on the children," no witnesses corroborated this testimony. *Id.* at 1338, 1349. During the sentencing phase before the judge, the defense called an additional witness – a psychologist who had examined the petitioner. *Id.* at 1340. The jury voted for execution, and the court sentenced the petitioner to death. *Id.* at 1341. In doing so, the trial judge made written findings in which he found six aggravators and no mitigators. The aggravators included the following: a previous capital felony conviction; that the capital felony was committed during a kidnapping; that the capital felony was to avoid lawful arrest; that it was for pecuniary gain; that it was especially heinous, atrocious, or cruel; and that it was committed in a cold, calculated and premeditated manner without any moral or legal justification. *Id.* The trial judge specifically rejected certain statutory mitigators, including the "substantial domination" mitigator, the age of the defendant at the time of the crime, and the non-statutory mitigator of "[a]ny other aspect of the defendant's character." *Id.*

In a postconviction evidentiary hearing, five new witnesses testified for the defense about the extent of the "everyday" abuse that the petitioner suffered at the hands of his father, his father's drinking, the fact that the petitioner had likely attempted suicide several times because he felt responsible for the beatings, his father's death from lung cancer when he was sixteen, his mother's abandonment of him, and that the petitioner's older brother also beat him "everyday" and "utilized him almost in the manner of a master to a slave." *Id.* at 1342-44. The Florida Supreme Court found that the mitigating evidence presented at the evidentiary hearing was cumulative to that presented at sentencing and rejected the petitioner's *Strickland* claim. *Id.* at 1348.

On appeal, the Eleventh Circuit first determined that the state court unreasonably determined the facts when it determined that the mitigating evidence presented at the evidentiary hearing was cumulative to that presented at sentencing. *Id.* at 1353. This was because it

mischaracterized the mother's testimony, which had only discussed the abuse she suffered and then generally referred to the father being "hard on the children" without discussing the father's specific abuse of the petitioner or the abuse petitioner suffered at the hands of his older brother. *Id.* at 1349, 1353. Reviewing the claim de novo, the panel then compared *Cooper*'s disparity in evidence to that of *Johnson* and listed the "wealth of mitigating evidence that was not presented to [the petitioner's] jury" that could entitle him to statutory and non-statutory mitigating findings. *Id.* at 1354. This included the statutory mitigator of age because although he committed crimes at age eighteen, and that "he was barely removed from being violently abused by his father and brother throughout his childhood." *Id.* at 1354. This also included the statutory mitigator of substantial domination, because the evidence of abuse by his older brother corroborated the psychologist's testimony that he had the "capacity to be dominated by older males." *Id.* This further included the non-statutory mitigators based on severe abuse throughout his childhood and teenage years by his father and brother, his abuse of drugs and alcohol beginning at age 11 (some of which likely led to neurological defects), his abandonment by his mother for stretches of time, his seventh-grade education level and learning deficits, and his history of depression and suicidal gestures. *Id.* at 1355. The Eleventh Circuit also highlighted that the prosecutor had emphasized to the jury the dearth of mitigation evidence presented. *Id.* The panel then concluded that given that some jurors had voted against death even with the dearth of mitigating evidence presented, "it is possible that, if additional mitigating evidence had been presented, more jurors would have voted for life." *Id.* at 1356.

The clearly established holding of *Cooper* therefore is that, on de novo review, where the trial judge found no mitigating factors, but where there were substantial categories of mitigating evidence that was not presented (or that was presented by only a single witness without

corroboration) and that would have supported several mitigating factors, trial counsel's deficient performance prejudiced the defendant. The ACCA did not unreasonably apply this clearly established holding. First, as to de novo review, *Cooper*'s holding on prejudice is not directly applicable to Scott's case. Second, unlike the petitioner in *Cooper*, Scott has not pointed to any additional mitigating factors that the Rule 32 evidentiary hearing evidence would have supported. And indeed, unlike the trial judge in *Cooper*, who found no mitigating factors, Scott's trial judge found several statutory and non-statutory mitigating factors. For all of these reasons, the court concludes that the ACCA did not unreasonably apply the clearly established holding of *Cooper*.

Nor does *Ferrell v. Hall* allow Scott to overcome AEDPA deference under (d)(1). First, *Ferrell* is not a Supreme Court case and thus cannot help Scott satisfy his burden under the "contrary to" clause of (d)(1). It also cannot help him carry his burden under the unreasonable application clause. In *Ferrell*, the jury did not learn "that [the petitioner] suffers from extensive, disabling mental health problems and diseases including organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy." *Ferrell v. Hall*, 640 F.3d 1199, 1203 (11th Cir. 2011). The jury also never learned that the petitioner had attempted suicide at age eleven, or that he suffered from other mental issues that interfered with his judgment. *Id.* Finally, the jury never heard evidence that the petitioner's father was physically abusive to them, that his family was repeatedly evicted from their home, that they suffered food insecurity, that those to whom the petitioner's father owed gambling debts had threatened the petitioner, or that the petitioner's mother suffered from depression and suicidal ideations. *Id.* After discussing all of this, the Eleventh Circuit concluded that the petitioner's counsel was ineffective and that their ineffectiveness prejudiced the petitioner. *Id.* at 1234. The panel emphasized four reasons for this holding: (1) the "new" mitigating evidence was "consistent, unwavering, compelling, and wholly

109

unrebutted; (2) the evidence of the petitioner's mental illness weakened the aggravating circumstances the jury found; (3) the mitigating evidence about the petitioner's mental health and childhood would have supported the defense counsel's theory of mercy at sentencing; and (4) the testimony from witnesses at the penalty phase during the original trial was sparse. *Id.* at 1234-36.

The ACCA did not unreasonably apply this clearly established holding. Although the first reason for the *Ferrell* holding likely holds true in Scott's case (where the Rule 32 evidentiary hearing testimony was consistent and compelling), the other three reasons do not. For example, none of the additional Rule 32 mitigating evidence in Scott's case would have undermined the three aggravating factors that the trial judge found applicable. As already noted, two of those factors were inherent to the convictions, and the third (that the crimes were especially heinous, atrocious, and cruel) would not have been undermined by mitigation evidence about Scott's difficult background. Also, not all of the mitigation evidence at the Rule 32 hearing would have adhered to defense counsel's plea for mercy. For example, putting on evidence about Scott's mental health issues could have involved cross-examination that revealed he was potentially a sociopath and may have been malingering.

Finally, the testimony from the witnesses at Scott's penalty hearing was not as sparse as that in *Ferrell*. Specifically, in *Ferrell*, the witnesses at the petitioner's penalty phase "averred that they did not believe [the petitioner] committed the murders; . . . that [the petitioner] did not get into any juvenile trouble; . . . to have mercy on him; . . . that [the petitioner] loved the victims, and had committed himself to Christ before the murders." *Id.* at 1236. Conversely, in Scott's penalty phase, defense witnesses that Scott's mother was currently incarcerated at the Birmingham City Jail due to alcoholism, that Scott had loved his younger sister Kaneisha Jackson, that Scott believed he was responsible for his younger sister's disability and early death because "at a young age Scott

110

may have accidentally pulled Kaneisha off a bed." (Doc. # 14-39 at 34). Inez further testified that Scott had joined a gang to try to seek "love," that Scott had often been left alone at home to care for his younger sister, and that Scott was talented and loved by his family and had shown love to others. (Doc. # 14-39 at 34). Vinnie Scott (Scott's grandmother) testified that she loved Scott and that he loved her, that Scott had taken care of her when she had to be hospitalized and when she returned home. (Doc. # 14-39 at 34-35). In his Rule 32 petition, Scott also argued that his grandmother "verbally and physically abused him," beating him so badly "that he climbed onto the roof of a two-story house and threatened to jump." (Doc. # 14-37 ¶ 232). Scott also alleges that his grandmother "would lock [him] in a closet for long periods of time." (*Id.*). Icephen Goldthwaite, Scott's aunt, also testified that Scott's mother had been an alcoholic and drug abuser throughout her life, that she was not a good mother to Scott, and that Scott was loved by his family, and especially by his cousin George. (Doc. # 14-39 at 35). This evidence is much more extensive than the sparse testimony of the defense's penalty-phase witnesses in *Ferrell*. Scott's new evidence is not enough to make the difference between his old and new mitigation cases comparable to the extremely wide gap between the old and new mitigation cases in *Ferrell*. Additionally, unlike *Ferrell*, Scott's new evidence applies to statutory mitigating factors. For all of these reasons, the ACCA did not unreasonably apply the clearly established holding of *Ferrell*.

Nor does *Hardwick v. Crosby* help Scott overcome his burden under (d)(1). First, *Hardwick* is not a Supreme Court case and thus cannot help Scott satisfy his burden under the "contrary to" clause of (d)(1). It also cannot help him carry his burden under the unreasonable application clause. In *Hardwick*, defense counsel presented no mitigating evidence at sentencing. *Hardwick v. Crosby*, 320 F.3d 1127, 1191 (11th Cir. 2003). This is obviously different from what occurred in Scott's case, where his trial counsel did present mitigating evidence from several witnesses during the

111

penalty phase. Additionally, because the petitioner had filed his habeas petition before AEDPA was enacted on April 26, 1996, the Eleventh Circuit in *Hardwick* evaluated the *Strickland* claim de novo and not under AEDPA review. *Id.* at 1157-58. This is unlike Scott's case, to which AEDPA clearly applies. Further, the *Hardwick* panel did not draw a conclusion about whether the petitioner was prejudiced; instead, it noted merely that the postconviction record "at least strongly suggests a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Id.* at 1191 (quoting in part *Williams*, 529 U.S. at 399) (cleaned up). Rather than granting relief on the *Strickland* claim, the panel remanded to the district court so it could conduct an evidentiary hearing on the statutory and nonstatutory mitigating evidence that defense counsel could have presented at the sentencing hearing. *See id.* at 1192. The ACCA therefore did not unreasonably apply *Hardwick* to Scott's case. Besides the distinguishing characteristics of *Hardwick* that are outlined above, *Hardwick* did not contain a clearly established holding on the prejudice prong of *Strickland*.

Nor does *Bertolotti v. Dugger* help Scott overcome his burden under (d)(1). First, *Bertolotti* is not a Supreme Court case and thus cannot help Scott satisfy his burden under the "contrary to" clause of (d)(1). It also cannot help him carry his burden under the unreasonable application clause. In *Bertolotti*, the petitioner asserted a *Strickland* claim about the ineffectiveness of trial counsel, arguing that his trial counsel was constitutionally defective for four reasons: "(1) counsel overlooked substantial evidence of [the petitioner's] psychological problems; (2) counsel overlooked evidence of [the petitioner's] traumatic childhood; (3) counsel overlooked evidence of voluntary intoxication; and (4) counsel failed to present a defense to felony murder." *Bertolotti v. Dugger*, 883 F.2d 1503, 1509 (11th Cir. 1989). The Eleventh Circuit panel denied relief as to all

four reasons and held that the petitioner's trial counsel was not constitutionally ineffective. *Id.* at 1511-16. The panel also held that petitioner did not suffer any prejudice from omission of a psychiatrist's testimony about the petitioner's schizophrenia because "we are not convinced that there is a reasonable probability that [the psychiatrist's] testimony would have had an effect on the jury's verdict of first-degree murder" or on the sentence of death. *Id.* at 1516-19. In particular, the panel highlighted "the three statutory aggravating circumstances presented to the jury" as weighing against a finding of prejudice.

The court concludes that the ACCA did not unreasonably apply the clearly established holding of *Bertolotti*. First, *Bertolotti* concluded there was no prejudice. And second, Scott's case resembles *Bertolotti* in that Scott's trial judge also found three aggravating factors – none of which would have been reduced or undermined by the additional Rule 32 mitigating evidence. Therefore, *Bertolotti* cannot help Scott overcome his burden under the unreasonable application clause of (d)(1).

Nor does *Lawhorn v. Allen* help Scott overcome his burden under (d)(1). First, *Lawhorn* is not a Supreme Court case and thus cannot help Scott satisfy his burden under the "contrary to" clause of (d)(1). It also cannot help him carry his burden under the unreasonable application clause. In *Lawhorn*, the petitioner brought a *Strickland* claim based on his trial counsel's failure to present a closing argument at sentencing. *Lawhorn v. Allen*, 519 F.3d 1272, 1296-97 (11th Cir. 2008). The Eleventh Circuit held that failing to do so was deficient performance because it "was not made after a thorough investigation of the law but was made based on a gross misunderstanding of a clear rule of Alabama criminal procedure." *Id.* at 1295. The panel concluded that this failure was also prejudicial because the closing argument in a sentencing phase of a capital trial is the "'last clear chance'" "to marshal all of the mitigating evidence before the jury and explain or minimize

113

the prosecution's evidence." *Id.* at 1296 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)). Specifically, as the panel emphasized, the defense counsel could have used the closing argument to refresh the jury's memory about the evidence supporting a reasonable statutory mitigating factor of substantial domination. *Id.*

The ACCA did not unreasonably apply *Lawhorn*. A major factual distinction is also grounds for a legal distinction: unlike the defense counsel in *Lawhorn*, Scott's defense counsel presented a closing argument after the sentencing hearing. (Doc. # 14-20 at 132-43). Because the Eleventh Circuit's clearly established holding in *Lawhorn* was that the failure to present a closing argument at sentencing was deficient and prejudicial, *Lawhorn* gives no aid to Scott in satisfying his burden under the unreasonable application clause of (d)(1). This is despite Scott's contention that the holding of *Lawhorn* was that where an Alabama jury recommended death 11-1, counsel "needed only to convince two other jurors to alter the outcome of the proceedings" and that his deficient performance "prejudiced [the defendant] because there is a reasonable probability that, but for his unprofessional error, the result of the sentencing proceeding would have been different." (Doc. # 1 ¶ 138 (quoting *Lawhorn*, 519 F.3d at 1297)). Although Scott is correct that this factor served as a basis of the *Lawhorn* panel's decision, another crucial reason for that decision was the prejudice resulting from the failure to conduct any closing argument. So, while a portion of *Lawhorn*'s holding rests on the number of jurors needed to be convinced to result in a different verdict, this does not mean that the ACCA unreasonably applied *Lawhorn*'s holding because a petitioner still must show that there was some reasonable probability of prejudice. Scott has not done so.

114

### 3. Subclaim (A)(3) – The ACCA did not violate federal law by failing to consider the cumulative impact of trial counsel's ineffective assistance at the penalty phase.

Scott next argues that (1) the cumulative effect of trial counsel's penalty-phase errors established ineffective assistance even if, individually, he has not shown a Sixth Amendment violation, and (2) the ACCA's decision was contrary to, or involved an unreasonable application of, clearly established federal law. (Doc. # 1 ¶¶ 140-42). Specifically, Scott quotes from the Eleventh Circuit case *Daniel* to emphasize that habeas relief is proper where a state court "failed to consider the prejudicial effect of trial counsel's deficient performance based on the 'totality of available mitigating evidence,' as established Supreme Court precedent clearly requires.'" (Doc. # 1 ¶ 141 (quoting *Daniel*, 822 F.3d 1248, 1277 (11th Cir. 2016) (citing *Wiggins*, 539 U.S. at 534)) (also citing *Maples v. Comm'r, Ala. Dep't of Corr.*, 729 F. App'x 817, 822-23 (11th Cir. 2018))). Scott also urges that the ACCA failed to evaluate the "cumulative impact of the mitigating evidence presented over four days at the Rule 32 hearing, and compare that evidence to the meager and profoundly misleading evidence presented at the penalty phase of trial." (*Id.* ¶ 142). He argues that "[h]ad the state court undertaken the proper analysis, the only conclusion that it could have reasonably drawn is that Scott's trial counsel provided ineffective assistance." (*Id.*).

Respondent counters that this subclaim is procedurally defaulted because it is raised for the first time here. (Doc. # 17 at 45-51). Alternatively, Respondent contends that "because the state courts below did not find *any* instances of deficient performance, there is no 'cumulative' error to review." (*Id.* at 46 n.6). Scott replies that this "claim" was not defaulted or unexhausted because it is merely a legal theory about the state court's duty. (Doc. # 20 at 40).

The court agrees with Respondent as to both procedural default and exhaustion. Although perhaps Scott could not have expected that the ACCA would have failed to consider the cumulative

115

impact of sentencing phase errors, he still could have (but failed) to raise this claim in his petition for certiorari before the Supreme Court of Alabama. (*See* Doc. # 14-60 at 2-176). Therefore, "unexhausted procedural default arguably applies to this subclaim." *See Sneed v. Raybon*, 2022 WL 3974490, at \*38 (N.D. Ala. Aug. 31, 2022) (finding arguable procedural default where a petitioner did not identify where he presented particularized arguments to the ACCA on cumulative prejudice error in the penalty phase).

Nor has Scott carried his burden of arguing that either exception to procedural default – cause and prejudice, and a fundamental miscarriage of justice – apply here. (*See* Docs. # 1, 20); *see McCoy v. Newsome*, 953 F.2d 1252, 1260 (11th Cir. 1992) ("a federal habeas corpus petitioner bears the burden of demonstrating cause for his procedural default in state court").

A habeas court may excuse a petitioner's procedural default and consider an unexhausted constitutional claim if he meets the cause and prejudice exception. *See Coleman*, 501 U.S. at 750 (recognizing that a petitioner may overcome the prohibition against habeas review if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law"). However, Scott did not argue that this exception applies. (*See* Docs. # 1, 20). "[A] petitioner's actual innocence serves as a gateway to consideration of constitutional claims procedurally defaulted in state court, such as failure to exhaust state remedies." *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1011 (11th Cir. 2012). However, such a claim must be supported by "reliable evidence not presented at trial." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). As with the cause and prejudice exception, Scott has made no argument that the actual innocence exception applies.

116

Even if this claim were not procedurally defaulted, it would fail on de novo review.[7] Scott correctly states that a state court must "consider the prejudicial effect of trial counsel's deficient performance based on the 'totality of available mitigating evidence'" (Doc. # 1 ¶ 141) (quoting *Daniel*, 822 F.3d at 1277 (citations removed)), and that a state court must not break up a penalty phase mitigation claim into "different subparts, then analyze[] them separately." (*Id.* (quoting *Maples*, 729 F. App'x at 822)). That said, in *Daniel*, the Eleventh Circuit first determined that the ACCA had unreasonably rejected the petitioner's claim of deficient performance under *Strickland*. *Daniel*, 822 F.3d at 1274. Nowhere in *Daniel* did the court suggest that finding a cumulative impact of prejudice could allow a court to find ineffective assistance of counsel even with no finding on deficient performance. Therefore, to succeed on this subclaim, Scott must show that there was *some* deficient performance to begin with, as well as *some* prejudice resulting from that deficient performance. But, as discussed above, Scott has failed to demonstrate any deficient performance or prejudice. And, just as with his arguments about *Strickland*'s prejudice prong, Scott has failed to explain exactly why the cumulative evidence creates a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Indeed, Scott points to no specific aggravating or mitigating circumstances that the jury would have balanced differently "absent the errors" that he alleges. *Stewart*, 476 F.3d at 1209. Therefore, for several reasons, Subclaim A(3) is due to be denied.

---

[7] AEDPA review is impossible here because there is no merits-based state court decision to which the court may defer on this subclaim.

**4.      Subclaim (A)(4) – The ACCA did not unreasonably determine the facts when it found that the evidence presented at the Rule 32 evidentiary hearing was cumulative.**

Moving to his (d)(2) arguments, Scott contends that the ACCA unreasonably determined the facts when it found that the evidence presented at the Rule 32 evidentiary hearing was cumulative. (Doc. # 1 ¶ 143). Specifically, he argues that Dr. Salekin's testimony was not cumulative because the overall purpose and content of the testimony was distinct from the mitigation evidence provided during trial. (*Id.* ¶¶ 144-45). He also argues that the DHR and medical records were not cumulative because (as he asserts his briefing to the ACCA showed) the DHR records "would have provided counsel a more complete understanding of Scott's childhood and life," contradicting his counsel's erroneous understanding that Vinnie was "the most stable person" in his life. (*Id.* ¶ 147 (citation removed)). Scott further contends that the ACCA incorrectly concluded that he had not identified any witnesses who could have testified to the specific evidence in the DHR records, because at his Rule 32 hearing he presented testimony of Icephen, Inez, Ernestine, Dwight Goldthwaite, and Dr. Salekin who "expanded further on the accounts in the DHR records" or "grounded" their opinion in the records. (*Id.* ¶ 150). He contends the other evidence presented at the Rule 32 hearing was not cumulative of the evidence at the jury trial, as reflected in Appendix A. (*Id.* ¶¶ 153-54). He argues, the appendix "reveals a vast disparity in the quantity, quality and content of the mitigation evidence" and highlights that the jury never heard the following details about his life: that he was abused physically and sexually by his mother's male friends when he was five or six; that his mother was a drug addict who was shot, resorted to prostitution, begged and stole money, and neglected Scott and his younger sister without food for long amounts of time; that the only "father figure" in Scott's life was a gang member who sold

118

drugs and robbed people; and that Scott had resorted to self-harm and at one point threatened suicide. (*Id.* ¶¶ 154-55).

Respondent argues that a reasonable jurist reviewing the record "could agree with the ACCA's conclusion." (Doc. # 17 at 70). Respondent explains how the Rule 32 evidentiary hearing did not present evidence that Scott's family was "exceptionally" poor, did not show that Scott suffered neglect while he lived with Vinnie Scott and her husband, and did not establish that Scott ever suffered from malnutrition or any other ailment. (*Id.* at 70-71). Respondent characterizes the "abuse" by Vinnie this way: "Scott was simply punished when he misbehaved." (*Id.* at 65). Respondent also contends that "the evidence presented at the evidentiary hearing did not show that Scott's childhood was so nightmarish as to establish a reasonable likelihood that the result of Scott's trial would have been different had such evidence been presented." (*Id.* at 72). This was due, the Respondent argues, to the "highly aggravated nature of Scott's crime." (*Id.*).

Scott's reply asserts that the ACCA "tortured the meaning of 'cumulative.'" (Doc. # 20 at 28). He contends that the other evidence presented at the evidentiary hearing was not cumulative "merely because it addresses the general topic of mitigation." (*Id.*). He elaborates by contending that several witnesses who did not testify at trial testified about the content of the DHR files, which "painted a vastly different picture" of Scott's family life. (*Id.* at 28-29 (quoting *Williams*, 542 F.3d at 1342))). For example, Scott highlights that while the jury had "heard that Vinnie Scott was a loving, stable influence," the Rule 32 evidence showed that she physically and emotionally abused him and allowed others to abuse him while he was in her care, that she adopted him for financial reasons, and that she favored her granddaughter and gave to her more food than she gave to Scott. (*Id.*). Finally, Scott contends that the ACCA erroneously dismissed Dr. Salekin's mitigation expert testimony as cumulative because they ignored Eleventh Circuit precedent "regarding the critical

119

nature of exactly the kind of opinion Dr. Salekin offered." (*Id.* at 31 (citing *Morton*, 684 F.3d at 1169.

To succeed under § 2254(d)(2), Scott must show that a denial of relief on his penalty-phase *Strickland* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in . . . [s]tate court." 28 U.S.C. § 2254(d)(2); *see also Boyd*, 592 F.3d at 1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). He must also overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct"). As already discussed, a petitioner must provide "clear and convincing evidence" to overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation marks omitted).

After review, the court concludes that, at most, Scott's contentions mark what is a reasonable disagreement with the ACCA's determination that the evidence presented at the Rule 32 evidentiary hearing was cumulative to that presented at trial. Fairminded jurists could disagree about whether this evidence was cumulative. For example, although the jury never heard that Vinnie was abusive to Scott, the jury heard evidence of other abuse that Scott suffered while in his mother's care. In that sense, the new mitigating evidence tied to Vinnie's abuse of Scott was cumulative to what the jury heard about his mother's abuse of him. Additionally, it was reasonable for the ACCA to conclude that the mitigation expert's testimony would have been cumulative to the evidence presented at trial. Scott's citation to *Morton* does not change this conclusion; indeed,

120

*Morton* was a decision that diverged both in facts and result from Scott's case. For example, in *Morton*, the Eleventh Circuit held that defense counsel's decision to *call* a mitigation expert was not ineffective assistance under *Strickland*. *Morton* certainly does not hold that the Sixth Amendment requires such a mitigation expert, or that a mitigation expert's testimony is always not cumulative to mitigation evidence offered at trial. Scott has therefore not overcome the presumption that this finding is correct under § 2254(e)(1).

In sum, because fairminded jurists could reasonably debate whether this evidence is cumulative, Scott has failed to satisfy AEDPA's (d)(2) exception or overcome (e)(1)'s presumption of correctness.

### 5. De Novo Review

Whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, as discussed below, even under de novo review, this version of his *Strickland* claim fails.

Again, in *Strickland*, the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel who represent criminal defendants at trial or on direct appeal. To prove that a conviction or sentence is unconstitutional because of ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance – "a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.*; *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)

("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be "highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Scott has not overcome the deference owed to his counsel's performance under *Strickland* because the failures that he highlights do not amount to deficient performance. Once again, Scott asserts that his counsel failed to invest enough time to adequately investigate potential mitigation defenses (*id.* ¶¶ 38, 45, 127, 130, 133), did not meet with "key family members" who could have testified (and for most of the friends and family they did meet, met with them briefly in a group setting) (*id.* ¶¶ 45, 130), did not make adequate use of the mitigation investigator (*id.* ¶¶ 41, 131), failed to "obtain records about Scott from schools, medical care providers, the Alabama Youth Authority, or the Alabama Department of Human Resources" (*id.* ¶¶ 46-47, 129), did not present a sufficient defense (both in terms of time to present evidence and strategy of "humaniz[ing]" Scott) (*id.* ¶ 50), and presented mitigation evidence that diverged tremendously from reality (including by presenting Vinnie as a loving and stable influence and by omitting information about the abuse Scott suffered) (*id.* ¶¶ 56, 59), and failed to retain a mitigation expert. (*Id.* ¶ 132).

First, none of these purported failures (either alone or in combination) constituted deficient performance. As noted above, Scott has not cited any controlling cases with holdings that would indicate that the performance of Scott's trial counsel was deficient. Nor has Scott overcome his burden under *Strickland*'s performance prong of showing by a preponderance of competent evidence that his counsel's performance was objectively unreasonable (*i.e.*, that his attorney performed below the minimum standard expected of defense counsel). Under the prevailing professional norms, as shown by case law and the ABA Guidelines, the performance of Scott's counsel was reasonable.

Second, Scott has not shown that these failures prejudiced him. As the *Strickland* Court acknowledged, "it is not enough for the defendant to [merely] show that the errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 694; *see also id.* ("Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense."). Scott must show cause and prejudice (that is, his counsel's error made a difference in the outcome of an important part or issue in the proceeding). Suffice it to say that the *Strickland* Court's holding does not support Scott's subclaim under (d)(1).

For all of these reasons, Scott's claim that he was not afforded effective assistance of counsel based on counsel's performance at the penalty phase is due to be overruled.

**B.      Claim B – Scott has not shown a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel at the guilt phase of trial.**

In Claim B, Scott maintains that his trial counsel were also ineffective under *Strickland* because they failed to assert a "no-intent" defense based on a theory that Latonya died by positional asphyxia. (Doc. # 1 ¶¶ 157-85). He maintains that this would have had the advantage of integrating the guilt phase and penalty phase theories, and that the ACCA's finding that Scott's expert was

not credible was unreasonable. (*Id.* ¶¶ 193-97). Below, the court divides these claims into the three subclaims Scott presents in his briefing.

### 1.    Subclaim (B)(1) – Scott has not shown that trial counsel was ineffective for choosing not to present a "no-intent" defense.

Scott contends that his counsel did not spend sufficient time and effort to prepare for the guilt phase, which led them to pursue a weak alibi theory of "smear" to contradict the State's DNA evidence. (Doc. # 1 ¶¶ 157-85). More specifically, he maintains that his attorneys should have asserted a "no-intent" defense based on the theory that Latonya died through positional asphyxia. (*Id.* ¶ 165). Scott lists why he believes it was unreasonable for his attorneys to fail to assert a "no-intent" defense: reasonable counsel should have quickly realized that it was "highly unlikely that the case could be defended successfully on a claim of innocence"; the defense counsel's approach of attempting to "hold the state to its burden" was a "huge gamble"; evidence in the form of a forensic pathologist's testimony could be viewed to support this theory; it was consistent with the evidence that Latonya's shorts and underwear were missing from her body when she was found; *Strickland* does not take into account the risk that an unreasonable jury could become inflamed by the no-intent theory; the acceptance of culpability under the "no intent" defense was consistent with the mitigation theory of mercy; and this theory was the only realistic one available. (*Id.* ¶¶ 168-74). Scott details the testimony of the forensic pathologist, Dr. Adel Shaker, who testified at the Rule 32 evidentiary hearing. (*Id.* ¶¶ 175-85). He concludes by arguing that the failure to present this evidence was prejudicial because, unlike the smear theory, it would have been supported by credible evidence, and because felony murder is not a capital crime. (*Id.* ¶¶ 186-92).

Respondent contends that the ACCA correctly applied *Strickland* to deny this claim, and quotes the ACCA's reasoning in support of this argument. (Doc. # 17 at 73-76). Respondent asserts that, at a minimum, reasonable jurists could agree with the ACCA's holding, and in particular in

its adoption of the Rule 32 court's determination that Dr. Shaker's testimony was not credible. (*Id.* at 76-77). Respondent highlights that Dr. Shaker's testimony had essentially been that, although Scott did not strangle Latonya with his hands, he "could have asphyxiated Latonya by wrapping his arm around her neck and 'put[ting Latonya] in the crook of [Scott's elbow].'" (*Id.* at 77 (quoting Doc. # 14-41 at 46)). Respondent further notes that the "no-intent" theory would have required Scott to admit to committing a lewd act on a ten-year-old girl, that defense counsel's guilt phase theory was much less questionable than this "no-intent" theory, that it was supported by the evidence's timeline of events, and that a reliance on reasonable doubt was a reasonable strategy. (*Id.* at 77-78). Respondent concludes that "[t]he mere fact that Scott was able to come up with another theory that trial counsel could have pursued does not establish that the theory employed amounted to IAC." (*Id.* at 78).

Scott replies that his counsel was ineffective because "they failed to conduct a reasonable investigation and explore plausible lines of defense." (Doc. # 20 at 42). He highlights that this "no-intent" defense would "have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture" at trial because it focused on a theory backed by some evidence. (*Id.* at 43 (quoting *Strickland*, 466 U.S. at 695-96)).

### a.    State Court Proceedings

Scott presented this claim in his Amended Rule 32 Petition (Doc. # 14-37 at 93-102) before the ACCA (Doc. # 14-58 at 25-28, 83-89) and to the Supreme Court of Alabama. (Doc. # 14-60 at 46-50). Therefore, it was fully exhausted.

Under the look through doctrine, the last reasoned state court judgment on this claim was the ACCA's. (Doc. # 14-59 at 180-83). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under Subclaim A(1), the denial of certiorari was not accompanied

with an opinion, so the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's." *Wilson*, 584 U.S. at 125.

In its opinion, the ACCA observed that the Rule 32 court had rejected Scott's claim because it found Dr. Shaker's testimony and theory not credible. (Doc. # 14-59 at 181 (quoting Doc. # 14-39 at 56-57)). One of the Rule 32 court's reasons for rejecting Dr. Shaker's theory – that Scott did not strangle Latonya with his hands, but could have accidentally asphyxiated her by wrapping his arm around her neck while on top of her sexually assaulting her – was that it was not credible. (*Id.* (quoting C. 1054-55)). As the Rule 32 court explained, Dr. Shaker was "denying the obvious" because Latonya "was found with an abrasion on her neck, hemorrhaging of the larynx, and petechial of the eye" which are "strongly consistent with strangulation." (*Id.* (quoting C. 1054-55)). The ACCA further emphasized that admitting that Scott had "committed a lewd act on a child" would have been highly prejudicial and importantly would have gone against Scott's express wishes. (*Id.* at 181-82 (quoting C. 1057)). Such an admission also could have "led the jury to more readily believe that Scott was also guilty of the rape of [Landris Wright]." (*Id.* at 182 (quoting C. 1057-58)). The ACCA added that "the trial court, not this Court, is in the better position to determine the credibility of an expert witness because the trial judge is able to observe the witness's demeanor." (*Id.* (citing *Bydrsong v. State*, 822 So. 2d 470, 473 (Ala. Crim. App. 2000))). Scott's trial counsel testified during the Rule 32 evidentiary hearing that given the risk of admitting some culpability for the Latonya Sager crime, and in light of Scott's express wishes, he "would not have taken" that approach. (*Id.* (quoting Supp. R. 142)).

b.    **AEDPA Deference**

Scott seeks de novo review of his *Strickland* subclaims under (d)(1) and (d)(2) of AEDPA. (Doc. # 1 ¶ 157). As explained earlier, a petitioner satisfies AEDPA's "contrary to" clause if the

126

state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts.

After careful review, the court concludes that the ACCA's dismissal of this *Strickland* subclaim was neither contrary to nor an unreasonable application of law nor was it based on an unreasonable determination of the facts.

The ACCA's discussion of *Strickland* in the evaluation of Scott's ineffective assistance of counsel claim eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). Scott has further failed to carry his burden under the remaining portion of § 2254(d)(1) because he has not identified any factually indistinguishable or supportive Supreme Court decision with an outcome favorable to him. Scott's habeas petition cites these cases in support of this subclaim: *Strickland*, *House v. Balkcom*, 725 F.2d 608, 617-18 (11th Cir. 1984), *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), and *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002). So, Scott has cited one Supreme Court case, two Eleventh Circuit cases, and one Ninth Circuit case. The court begins its analysis by evaluating the cases to determine whether any of the cases help Scott to overcome his AEDPA burden under the contrary to clause of (d)(1).

*Strickland* is a Supreme Court decision but it involved materially distinguishable facts. Namely, in *Strickland*, the defendant (against his counsel's advice) voluntarily confessed to three groups of charged crimes. 466 U.S. at 672. There was therefore no guilt phase at that trial. But, even if there were, the Court in *Strickland* ultimately held that defense counsel was not ineffective. *Id.* at 698-99. Thus, *Strickland* gives no aid to Scott in overcoming his burden under the "contrary

127

to" clause. This is so for two reasons: first, the facts are materially distinguishable; and second, even if they were not, the ACCA did not reach a different result than the *Strickland* Court did. *See Brown*, 544 U.S. at 141 (outlining the contrary to clause standard).

Nor does *Strickland* help Scott meet his burden under (d)(1)'s unreasonable application clause because he has not shown how the ACCA unreasonably applied the clearly established holding of that case. The clearly established holding of *Strickland* was that a petitioner must satisfy a two-pronged test to prove that a conviction or sentence is unconstitutional because of ineffective assistance: "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

The ACCA did not unreasonably apply this holding to this subclaim. In its opinion, the ACCA agreed with the Rule 32 court that Dr. Shaker's positional asphyxiation theory was not credible, and emphasized that reasonable counsel could have decided not to pursue this theory because admitting to sexually assaulting a ten-year-old would have been highly prejudicial, was directly against Scott's expressed wishes, and would have made the jury more likely to believe that Scott was also guilty of the rape of Landris Wright. (Doc. # 14-59 at 181-82). Scott's trial counsel maintained that he would not have used the positional asphyxiation theory at trial even if he had thought of it. (*Id.* at 182 (citing Doc. # 14-40 at 144)).

Once again, Scott bears the burden of proving the first *Strickland* prong "by a preponderance of competent evidence." *Chandler*, 218 F.3d at 1313. He must show that his

128

counsel's representation fell beneath an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. And, he "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). Scott cites *House v. Balkcom* to argue that one objective standard of reasonableness is to investigate all "plausible lines of defense." (Doc. # 1 ¶ 166 (quoting 725 F.2d at 617-18)). Scott also cites *Horton v. Zant* to argue that another objective standard is to "identify all reasonable options so that he can make a deliberate choice." (*Id.* (citing 941 F.2d at 1462)). These cases all reflect a commonsense idea: an attorney need not investigate all *possible* lines of defense, but just *plausible* lines of defense. In its opinion, the ACCA listed several reasons why it believed that the no-intent defense was implausible.

The trial record also reflects that Scott's counsel was familiar with a generic "no-intent" defense, because in the Motion for Judgment of Acquittal (made after the state rested), Robbins highlighted to the trial judge that "[t]he coroner did not testify that it was manual strangulation. He said it could be manual strangulation, could be suffocation, but he didn't say it was manual strangulation." (Doc. # 14-18 at 190-91). So, to be clear, this was not a situation where Scott's counsel failed to consider a no-intent theory; rather, they decided that rather than consulting experts to determine whether there were a possible medical theory to bolster it, they would emphasize a different theory of innocence. Therefore, finding that Scott's counsel was not deficient was a reasonable application of *Strickland*'s first prong.

Moreover, Scott has not shown that he established by a preponderance of the evidence that his counsel's performance was objectively unreasonable. *See Chandler*, 218 F.3d at 1313 (articulating preponderance standard). In his brief to the ACCA, Scott discussed potential benefits of the "no-intent" defense, but he did not deal with many of the risks that the ACCA highlighted.

(Doc. # 14-58 at 83-89). Further, even when he acknowledged one of the main risks – that this theory would have required Scott to admit to committing a lewd act on a ten-year-old, which the Rule 32 court had held could be "highly prejudicial" and inflame a jury – he did so unconvincingly. For example, Scott quoted from *Collier v. Turpin*, which held that in the context of *Strickland*'s prejudice prong, a court should assume that a jury is "reasonably" and "impartially applying the standards that govern the decision." (*Id.* at 86) (citing *Collier*, 177 F.3d 1184, 1203 (11th Cir. 1999)). But, just because a reviewing *court* should assume a jury is impartial when conducting a *Strickland* prejudice analysis does not mean that reasonably effective *counsel* must do so when crafting a trial strategy. Indeed, it would strain credulity to conclude that, to be objectively reasonable, counsel may *not* consider the prejudicial impact that a client's confession to raping a ten-year-old girl would have on a jury. There is at least an argument that advising a client to allow counsel to take that position – particularly where, as here, the client denied that act and instructed counsel not to pursue it – could itself be ineffective assistance of counsel. Scott's brief to the ACCA rested on similar contentions as those in his habeas petition – that his counsel should have investigated this theory as an option because it had possible merit. (Doc. # 14-58 at 87-88). By not rebutting the many reasons that Scott's counsel could have had for *not* pursuing such a risky theory, Scott did not present the ACCA with a preponderance of competent evidence to show that his counsel's performance was unreasonable.

In any event, Scott also has not shown that the ACCA unreasonably applied *Strickland*'s second prong when it found that Scott had not shown prejudice. First, and quite obviously, a defendant cannot be prejudiced if his counsel was not deficient. Second, Scott has not shown to the ACCA or this court, that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, "A reasonable

130

probability is [one] sufficient to undermine confidence in the outcome." 466 U.S. at 694. Scott simply has not rebutted any concern that the positional asphyxiation theory is risky, thinly supported, and highly prejudicial. Even reviewed de novo, it would strain reality for this court to determine that "there is a *reasonable* probability" that Scott would not have been convicted of his capital crimes and sentenced to death had his counsel pursued this theory. But, the court need not reach de novo review because Scott has clearly not overcome AEDPA deference on this claim – at least under (d)(1). The ACCA did not unreasonably apply the clearly established holding of *Strickland* to this subclaim.

*House v. Balkcom* also lends no help to Scott in overcoming his burden under (d)(1). First, *House* is not a Supreme Court case, and so it cannot help him satisfy his burden under the "contrary to" clause or unreasonable application clause. Even if it were, it contains facts that are materially distinguishable from those here. And on top of that, it is a pre-AEDPA case, so the interpretation of the *Strickland* standard in *House* does not translate to AEDPA deference.

In *House*, defense counsel "prepared no defense strategy. They filed no pretrial motions, sought no defense witnesses, failed to properly interview even [the family of-accused], and failed to interview the state's witnesses." *House*, 725 F.2d at 618. This utterly inadequate preparation led the defense attorney to offer "a haphazardly-constructed defense of impossibility, which was sure to be rejected because he offered no evidentiary support for such a defense." *Id.* The defense attorney also left the courtroom multiple times – including during the direct examination of a key prosecution witness and during the state's closing argument. *Id.* at 619. And then, his "closing argument to the jury consisted of a short bible verse." *Id.*

Unlike in *House*, Scott's defense counsel prepared a defense strategy that consisted of theorizing that semen from the couch was already there from Scott's "legal" sexual encounters and

131

smeared onto Latonya's leg. Scott's counsel filed pretrial motions. Scott's counsel sought a key defense witness (Shaneka Scott), at one point explaining to the court that "[w]e have given both the Birmingham Police Department and the Sheriff's Department, with the assistance of the bailiffs, several addresses and telephone numbers of what we believe to be her whereabouts" and explained how they worked with one of Scott's aunts during trial to get an address of an apartment where they expected Shaneka was and they provided that address to the Sheriff's Department and police. (Doc. # 14-18 at 194, 197). The defense expected her to testify, consistent with a statement she gave to the police on the day that Latonya was found dead, "that Willie Scott left the house that morning, and, when he left the house, Latonya Sager was still alive." (*Id.*). Scott's counsel knew that her testimony had been consistent over the intervening three years because they had spoken with "people close to the defense." (*Id.*). This was exponentially much more effort than that exhibited in *House*. Additionally, Scott's counsel did not haphazardly construct their smear theory of defense; they interviewed Scott about his sexual activity on the couch and hired an investigator to interview Scott's ex-girlfriend Rachel Hillary to ask about her sexual activity with him on that couch. (*See* Doc. # 1 ¶ 163 (citing Doc. # 14-41 at 80)); *see also* Docs. # 14-49 at 99 (Investigator's bill for interviewing Rachel Hillary); 14-50 at 19 (description of the interview)). Rachel told the investigator that she had had sex with Scott on the couch some time before the night of the alleged rape and homicide, but that she did not have sex with him that day because she was working. (Doc. # 14-50 at 19). The fact that the potential witness did not pan out does not negate the efforts of Scott's counsel to construct a reasonable defense. There was of course a problem with pursuing this theory unrelated to Hillary's story not meshing with Scott's. Presenting evidence that Scott had often engaged in sexual intercourse on the couch could give the jury the idea that he had unusual sexual proclivities and thus was more likely to have engaged in sexual

activity with Latonya and Landris. Nor is there any accusation that Scott's counsel ever left the courtroom during proceedings – and particularly during key proceedings. Indeed, Scott's counsel was alert and active during the trial of the guilt phase, objecting at various times and conversing with the judge at others. (Docs. # 14-15 at 122, 124; 14-16 at 62-63; 14-17 at 117, 167, 175; 14-18 at 12-13, 15, 139-40, 144, 184-85; 14-19 at 202-03). And, of course, Scott's counsel offered much more than a single Bible verse in their substantial guilt phase closing argument. (*See* Doc. # 14-19 at 120-46).

Nor does *House* help Scott overcome his burden under the unreasonable application clause of (d)(1). The clearly established holding of *House*, as it relates to the deficiency prong of *Strickland*, was that effective assistance of counsel requires a lawyer "to conduct a substantial investigation into any of his client's plausible lines of defense," meaning that "the lawyer [must] make an effort to investigate the obvious." *Id.* at 617-18. As already discussed, the positional asphyxiation theory was not a plausible line of defense. If Scott's counsel pursued this theory, they would have been required to assert that Scott was engaged in some type of sexual act with Latonya – a ten-year-old girl. The risks of this approach are numerous and obvious to any reasonable counsel. A jury hearing such a confession (either from Scott's mouth or by way of his counsel's assertions) could have believed he had a greater propensity to rape Landris Wright, making a conviction for that crime more likely. A jury also could have viewed such a confession as admitting to one part of the capital crime (attempted rape) for which Scott was charged, which could lead to a conclusion that Scott's claim that he lacked the intent to kill was simply not credible. That would make his capital conviction more likely and the same jury could have taken Scott's confession into account during the sentencing phase, making it more likely to vote for death. For these reasons, the court concludes that the no-intent positional asphyxiation theory was not plausible and thus

that the ACCA reasonably applied *House*'s holding. At a minimum, reasonable defense counsel could opt not to pursue such a defense.

And *House*'s clearly established holding, as it relates to the prejudice prong, is that "[p]rejudice is not required where the ineffectiveness of counsel is 'so pervasive that a particularized inquiry into prejudice would be unguided speculation.'" *Id.* at 620 (quoting *Washington v. Strickland*, 693 F.2d 1243, 1259 n.26 (5th Cir. 1982) (internal quotations omitted)). This hinged on the depth of the defense counsel's deficiency in that case. Because the ACCA did not unreasonably find that Scott's counsel was not deficient under *House*, the court also holds that the ACCA was reasonable in applying the prejudice holding of *House*.

Nor does *Horton v. Zant* help Scott meet his burden under (d)(1). First, *Horton* is not a Supreme Court case, and so it cannot help him satisfy his burden under the "contrary to" or unreasonable application clause. And, even if it were, it contains facts that are materially distinguishable from those in Scott's case. And, it is a pre-AEDPA case, so the interpretation of the *Strickland* standard in *Horton* does not bear directly on AEDPA deference.

In *Horton*, the Eleventh Circuit held that there was ineffective assistance of counsel where trial attorneys "did not put on mitigating evidence, or conduct any investigation, because they felt that mitigating evidence was appropriate only in gruesome cases involving torture." 941 F.2d at 1462. The panel held that "[t]his tactical decision was unreasonable" because "[m]itigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty." *Id.* Because those trial attorneys "began to follow one path, based upon a misinterpretation of the law, without ever evaluating the merits of alternative paths," they fell "below reasonable professional norms." *Id.*

134

This is distinguishable from Scott's case for several reasons. Apart from the obvious difference between a guilt and penalty phase claim, Scott's attorneys did much more than the attorneys in *Horton*. While those attorneys decided not to offer any mitigating evidence at all (essentially forgoing a penalty phase strategy), Scott's attorneys pursued a reasonable guilt phase theory, investigated evidence to support that theory (including a compelling statement from Shaneka Scott, whom they thoroughly attempted to locate) (*see* Doc. # 14-19 at 5-7, 85-90), pursued the theory by cross-examining the state's witnesses, and put on three witnesses that Scott had requested. (*Id.* at 41, 47-69). Moreover, unlike in *Horton* where the defense attorneys misunderstood the law, Scott's habeas petition does not assert that Scott's trial attorneys misunderstood the law when they pursued their guilt-phase strategy. (*See* Doc. # 1).

Nor can *Horton* aid Scott in overcoming his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Horton* as it relates to the deficiency prong of *Strickland* was two-fold: "[t]o fail to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms," and "our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton*, 941 F.2d at 1462 (citing *King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir. 1984)).

The ACCA reasonably applied both holdings to Scott's case. As to the first holding, Scott's case is not one in which his counsel misinterpreted the professional norms governing mitigating evidence (or, for that matter, presentation of guilt-phase evidence). As to the second holding, Scott's counsel investigated their options and made a reasonable choice between them. Scott again makes much of the fact that his attorneys' fee sheet reflects only "105 hours on the case, nearly all spent in trial and the week before trial." (Doc. # 1 ¶ 158). But again, *Strickland*'s deficiency prong

requires showing a deficiency that actually affected the trial – not merely pointing to one that could have potentially affected it. Scott's petition emphasizes that Scott's counsel "knew before trial that they had no evidence to undermine the circumstantial case on the capital charge." (*Id.* ¶ 160). But again, this does not mean a lack of evidence was because of a failure to investigate options. Some cases simply do not have a solid defense, like an alibi. Indeed, Scott's petition concedes that Scott's counsel investigated evidence to support their theory of defense by using their investigator to interview Scott's ex-girlfriend about their earlier sexual activity on the couch. (*Id.* ¶ 163). Finally, Scott emphasizes that his trial counsel did not contemplate using experts during the guilt phase and were unaware of the forensic science underlying positional asphyxia. (*Id.* ¶ 165). But all that *Horton* requires is that an attorney "investigate his options and make a reasonable choice between them." 941 F.2d at 1462. Scott cites no case that posits that hiring a guilt-phase expert in a capital murder trial is a professional norm, notwithstanding his bald assertion that the failure to consider this "option" was unreasonable. At the time of Scott's trial, Robbins had handled "close to forty capital murder cases, in fifteen years." (Doc. # 14-19 at 10). With this amount of experience, Robbins could have reasonably evaluated plausible defense strategies without first consulting an expert witness on every potential theory. Therefore, and especially under the deferential review that applies here, the court cannot conclude that the ACCA unreasonably applied the holdings of *Horton* on the deficiency prong of *Strickland*.

Nor did the ACCA unreasonably apply *Horton*'s holding as to the prejudice prong. The holding in *Horton* was that because the defense counsel had mitigating evidence that could have been presented but was not, and because the closing argument appeared at times to encourage the death penalty, there was prejudice. The factual distinctions already outlined between Scott's case

and *Horton* shows that the ACCA reasonably applied this holding when it found that Scott was not prejudiced by counsel's actions.

*Jennings v. Woodford* also does not help Scott overcome his burden under (d)(1). First, *Jennings* is not a Supreme Court case (nor is it even a controlling Eleventh Circuit case), and so it cannot help him satisfy his burden under the contrary to or unreasonable application clause. Even if it were, it contains facts that are materially distinguishable from those here. In *Jennings*, there was a strong potential mental health defense that defense counsel could have pursued, supported by their client's long-time heavy drug use, reports from their client's ex-wife that he had been diagnosed as schizophrenic and had attempted suicide, voluminous medical records pointing to significant mental health issues, and at least two involuntary commitments due to mental health issues. 290 F.3d at 1013. Although defense counsel had access to "stacks of medical records-subpoenaed by the district attorney" and had been told by his client's ex-wife about the schizophrenia diagnosis and attempted suicide, defense counsel did not review these records, subpoena any other records, discuss them with his client, meaningfully interview a psychiatrist who had examined his client, or pursue any form of mental health defense "because he had settled early on an alibi defense." *Id.* at 1014. Compounding these failures, the prosecutor even raised his concerns in open court that defense counsel had not reviewed his client's medical records and that this could be a ground for appeal. *Id.* at 1016. On review, the Ninth Circuit held that this was deficient performance because "the information [defense counsel] acknowledges he possessed would have put a reasonable attorney on notice that he needed to investigate mental health and drug-related issues more thoroughly." *Id.*

The material facts in *Jennings* are easily distinguishable from those here. For example, the un-investigated defense strategy in *Jennings* was much stronger than the no-intent strategy that

137

Scott now urges his counsel should have adopted. A client who has been diagnosed with schizophrenia and has been involuntarily committed multiple times for mental health issues is very likely to have not possessed the requisite criminal intent to commit a capital crime. Moreover, defense counsel in *Jennings* possessed evidence and witness statements to support this defense strategy. In Scott's case, the no-intent strategy was tenuous and would have required an expert to explain how it could have worked. It also would have required Scott to admit to intentionally engaging in sexual activity with Latonya – a ten-year-old girl. As already stated, this would have been risky and could have been highly prejudicial. Conversely, in *Jennings*, presenting documented evidence of a well-known mental health issue such as schizophrenia would have been a much stronger and less prejudicial defense strategy. For these reasons, *Jennings* is materially distinguishable.

Nor does *Jennings* help Scott satisfy his burden under the unreasonable application clause of (d)(1). The clearly established holding of *Jennings* related to the deficiency prong of *Strickland* was that an attorney's performance is deficient if the "information [defense counsel] acknowledges he possessed would have put a reasonable attorney on notice that he needed to investigate mental health and drug-related issues more thoroughly." *Id.* at 1016. As Scott puts it now, Scott's counsel did not possess information about the positional asphyxiation theory – nor were they even aware of this theory. (Doc. # 1 ¶ 165). And, as discussed, there would have been steep downsides if this theory were presented. Scott characterizes this as a failure to exert the effort to discover this theory, but again, the court cannot conclude the ACCA unreasonably determined that Scott's counsel performed consistent with professional norms when they did not investigate this theory. Furthermore, this underscores another point: unlike in *Jennings*, where defense counsel had

138

records that would have supported a much stronger mental health defense than the alibi defense he pursued, Scott's counsel did not have records or other evidence of this theory.

The clearly established holding of *Jennings* related to the prejudice prong of *Strickland* was that counsel's performance prejudices their client if it deprives him of the opportunity to "have a defense presented that would have negated the mental state necessary for a first degree murder conviction." *Id.* at 1019-20. Although Scott maintains that the positional asphyxiation theory would have done this for him, the court finds this implausible (in no small part because of the Rule 32 court's and ACCA's finding that Dr. Shaker's theory was not credible). (*See* Doc. # 14-59 at 181-82 (citing Doc. # 14-39 at 56)). In particular, the court draws this conclusion because a reasonable jury applying the law impartially could have found Dr. Shaker's theory implausible but found Scott's admission to committing sexual assault plausible, making his capital conviction and sentence more (or at least just as) likely. For these reasons, *Jennings* cannot help Scott satisfy the unreasonable application clause of (d)(1).

> ### 2. Subclaim (B)(2) – Trial counsel was ineffective by failing to present an integrated guilt and mitigation theory.

Scott maintains that his counsel was ineffective for failing to present a defense that integrated the guilt and penalty-phase strategies. (Doc. # 1 ¶¶ 193-96). Specifically, Scott highlights that this concept of an integrated theory enjoys support in the ABA Guideline 2.1 comment and case studies that indicate "an integrated defense is especially effective in avoiding a death sentence where the defense has a strong mitigation case and a weaker innocence case." (*Id.*) (citing Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different*, 42 MERCER L. REV. 695, 708-10 (1991); ABA Guideline 10.11 cmt. (2003)). Scott argues that counsel could have "challeng[ed] Scott's intent and then using Scott's troubled childhood and other

139

developmental factors," "provide a coherent explanation for Scott's actions that the jury could have credited during mitigation." (*Id.* ¶ 195).

Respondent contends that this claim is subject to state-barred procedural default because, as the ACCA held, Scott failed to comply with Rule 28(a)(10). (Doc. # 17 at 79). Respondent also quotes from the ACCA's alternative merits holding and argues that the ACCA correctly applied *Strickland* in denying this claim. (*Id.* at 80-81).

Scott replies that his theory was not procedurally defaulted, and that the ACCA's determination that his counsel "conducted their own extensive independent investigation into Scott's background for mitigation purposes" was an unreasonable determination of the facts because his counsel only conducted a five-hour investigation that did not include a review of DHR records or testimony of available witnesses. (Doc. # 20 at 45, 47). Scott adds that the ABA Guidelines "support" the idea of pursuing an integrated defense, and highlights that this was especially important because the innocence defense was "built on nothing but speculation." (*Id.* at 46-47).

### a.       State Court Proceedings

Scott presented this claim in his Amended Rule 32 Petition (Doc. # 14-37 at 93-102), before the ACCA (Doc. # 14-58 at 25-28, 83-89), and to the Supreme Court of Alabama. (Doc. # 14-60 at 46-50). Therefore, it was fully exhausted.

In that judgment, the ACCA first concluded that "Scott's claim here fails to satisfy the requirements of Rule 28(a)(10)" because it "provides no factual or legal authority for this claim." (Doc. # 14-59 at 192). The ACCA added that "He also has failed to present any analysis on this issue demonstrating that his trial counsel's failure to present this integrated theory constituted ineffective assistance of counsel." (*Id.* at 192-93). The ACCA alternatively analyzed this claim on

its merits, explaining that "the record shows that Robbins and Simpson conducted their own extensive independent investigation into Scott's background for mitigation purposes" and that during the Rule 32 evidentiary hearing, "Robbins testified that he spent time reviewing information regarding Scott's background and mental health and that he also interviewed Scott's mother, grandmother, and other family members in an effort to obtain helpful information concerning Scott's background." (*Id.*).

First, the court considers whether this subclaim is subject to state-barred procedural default. Again, under the procedural default doctrine, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (internal quotation marks omitted) (alteration in *Ward*) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). However, "a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon 'adequate and independent' state grounds." *Ward*, 592 F.3d at 1156 (quoting *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)).

Under the Eleventh Circuit's three step test, the last state court rendering a judgment here – the ACCA – clearly and expressly stated that it was relying on "Rule 28(a)(10)" (Doc. # 14-59 at 192), to resolve the federal claim without reaching the merits of that claim. *See Judd*, 250 F.3d at 1313. Although Scott correctly points out that the ACCA made an alternative ruling on the merits (Doc. # 20 at 48), he is incorrect in asserting that this bars the court from applying the state procedural bar. As the Eleventh Circuit has held, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the procedural bar doctrine and decline to reach the merits of the claim."

141

*Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Richardson v. Thigpen*, 883 F.2d 895, 898 (11th Cir. 1989)).

Moving to the second part of the test, the ACCA's decision to apply Rule 28(a)(10) rests entirely on state law grounds, requiring that "the brief of the appellate or the petitioner shall contain . . . [a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Because this is not "intertwined with an interpretation of federal law," the second part of the test is satisfied. *See Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313).

The third part of the test – whether the state procedural rule is adequate, meaning firmly established, regularly followed, and not applied in an arbitrary or unprecedented fashion – is also met here. Scott contends that he complied with Rule 28(a)(10) because his brief "provided ample factual support and cited law, including the ABA Guidelines, which establish that '[t]rial counsel must . . . integrate the defense theory and strategy used during the guilt phase with the projected affirmative case for life at the penalty phase.'" (Doc. # 20 at 47-48) (quoting Doc. # 14-58 at 89 (in turn quoting ABA Guideline 10.11 cmt. (2003))). On review of Scott's brief to the ACCA, he is correct that he cited the ABA Guidelines and a law review article discussing the effectiveness of an integrated defense where there is a strong mitigation case and weak innocence case. (*Id.* at 89) (citing Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different*, 42 MERCER L. REV. 695, 708-10 (1991)). His brief to the ACCA also asserted that a no-intent defense would have been coherent and characterizing the guilt-phase and penalty-phase presentations as "not integrated in any way." (*Id.* at 89-90). However, not once did Scott cite the record, and the only case he mentioned was *Strickland*, which he did in a concluding sentence: "Trial counsel's

142

failure to present a coherent integrated defense was both unreasonable and prejudicial under *Strickland.*" (*Id.* at 90).

Also, on this review of Scott's brief to the ACCA, the court concludes that the ACCA did not apply Rule 28(a)(10) in an arbitrary or unprecedented fashion when it concluded that Scott's subclaim was subject to procedural default. Rule 28(a)(10) states that "the brief of the appellate or the petitioner shall contain . . . [a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). At the very least, Scott does not cite to parts of the record that he relies on here, and in addition, he does not cite to either cases or statutes. Although Scott characterizes the ABA Guidelines as "law" (Doc. # 20 at 48), they are not cases or statutes as the rule requires citations to. Therefore, the third part of the Eleventh Circuit's state-barred procedural default test is met.

Finally, Scott has not carried his burden of arguing that he is eligible for the two exceptions to procedural default – cause and prejudice, and a fundamental miscarriage of justice. (*See* Docs. # 1, 20); *see McCoy v. Newsome*, 953 F.2d 1252, 1260 (11th Cir. 1992). Nor has he argued that he was actually innocent, which must be supported by "reliable evidence not presented at trial." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). Therefore, the court concludes that Scott's subclaim is subject to procedural default and he is not due habeas relief.

### b.      AEDPA Deference

Even if Scott's subclaim were not subject to state-barred procedural default, Scott still has not overcome AEDPA deference that is owed to the analysis of his claim. Preliminarily, the ACCA's discussion of *Strickland* in evaluating Scott's ineffective assistance of counsel claim eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at

342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). Nor has Scott carried his burden under the remaining portion of § 2254(d)(1) because, like in his brief to the ACCA, Scott cited no cases (besides a rudimentary reference to *Strickland* offered in a concluding sentence). Instead, he cited only two comments from the ABA Guideline (one from 1989 and one from 2003) as well as the same law review article from Mercer Law Review. (Doc. # 1 ¶ 194). Apart from *Strickland*, none of these citations are to Supreme Court cases. Even examining how *Strickland* might interact with these citations, the court cannot conclude that Scott has met his burden under (d)(1).

And, *Strickland* contains materially distinguishable facts. Namely, in *Strickland*, the defendant (against his counsel's advice) voluntarily confessed to three charged groups of crimes. 466 U.S. at 672. There was no guilt phase at that trial. But, even if there were, the Court in *Strickland* ultimately held that defense counsel was not unreasonable. *Id.* at 698-99. For both these reasons, *Strickland* cannot satisfy the contrary to clause of (d)(1).

Nor does *Strickland* help Scott overcome his burden under the unreasonable application clause of (d)(1) because he has not shown how the ACCA unreasonably applied its clearly established holding. The clearly established holding of *Strickland* was that a petitioner must satisfy a two-pronged test to prove that a conviction or sentence is unconstitutional because of ineffective assistance: "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

The state courts did not unreasonably apply this holding to Scott's subclaim. In its opinion, the ACCA focused its analysis on the effectiveness of counsel's mitigation investigation, emphasizing that "the record shows that Robbins and Simpson conducted their own extensive independent investigation into Scott's background for mitigation purposes." (Doc. # 14-59 at 193). The Rule 32 court more directly addressed the merits of the entire claim, reasoning that because Scott had failed to show that his counsel's decision not to pursue a no-intent defense was unreasonable, he also could not plausibly establish that his counsel's decision not to integrate the guilt and penalty phases by pursuing a no-intent strategy was unreasonable. (Doc. # 14-39 at 61-62). The state courts did not unreasonably apply *Strickland*'s holding. Although the ABA Guidelines advise counsel to integrate a defense and mitigation strategy (Doc. # 1 ¶ 194) (quoting ABA Guideline 2.1 cmt. (1989)), counsel cannot be found ineffective for choosing to avoid a defense that they deemed overly risky and prejudicial, even if it would have had the virtue of being integrated with the mitigation strategy. And, regarding the law review article, besides the obvious point that this is proof of an objective professional norm, Scott's argument is merely that "[c]ase studies suggest that an integrated defense is especially effective in avoiding a death sentence where the defense has a strong mitigation case and a weaker innocence case." (Doc. # 1 ¶ 194). The court is in no way suggesting that ideally an integrated defense may be the best approach in a death case. But, neither the ideal defense nor an integrated defense are available in every case. And, in any event, *Strickland* does not measure counsel's performance based on an ideal. The test is objective reasonableness. And Scott did not prove by a preponderance of the evidence to either the Rule 32 court or the ACCA that his counsel was objectively unreasonable in deciding not to pursue a risky

145

and highly prejudicial defense like the positional asphyxiation strategy. This is particularly so when the court applies the double deference of AEDPA over *Strickland* deference; Scott's subclaim is due to be denied because the court defers to the last reasoned state court decision denying this claim.

### 3.    Subclaim (B)(3) – Scott has not shown prejudice in light of his witness's lack of credibility

Scott maintains that the ACCA was wrong in ruling that his counsel's failure to present a no-intent defense did not prejudice Scott and in deferring to the credibility determination of the Rule 32 court. (Doc. # 1 ¶ 197). Specifically, he contends that "credibility questions are for the jury and not judges" under Alabama law and that the jury should have had the opportunity to consider Dr. Shaker's credibility. (*Id.* (citing *Sanders v. State*, 986 So. 2d 1230, 1234 (Ala. Crim. App. 2007))).

Respondent replies by quoting from the ACCA's opinion and concludes – without elaborating on this specific point – that it was neither contrary to, nor an unreasonable application of, clearly established federal law. (Doc. # 17 at 77)

Scott repeats his arguments about prejudice, emphasizing again that the "no-intent" theory would have permitted his counsel to argue that he was only guilty of felony murder, and asserts that this theory was backed by evidence (which, again, was exceedingly weak). (Doc. # 20 at 43). He also contends that the ACCA had refused to engage with these arguments when it simply accepted the Rule 32 court's opinion that the expert opinion was not credible. (*Id.* at 44).

### a.    State Court Proceedings

Scott presented this claim to the ACCA (Doc. # 14-58 at 85-86), and to the Supreme Court of Alabama. (Doc. # 14-60 at 48-50). Because it is a claim about the Rule 32 court's determination

of credibility, this is all that Scott could have done to exhaust his claim. Therefore, the court concludes it was fully exhausted.

### b. AEDPA Deference

Scott does not appear to specify which exception to AEDPA deference he believes applies to his argument. For completeness, the court presumes that he is relying on both (d)(1) and (d)(2).

Under the look through doctrine, the last reasoned judgment on this claim was the ACCA's. (Doc. # 14-59 at 180-83). In that judgment, the ACCA quoted from the Rule 32 court's reasoning, which was that "neither Dr. Shaker's testimony nor his theory as to the cause of death were credible or otherwise worthy of belief." (Doc. # 14-59 at 181 (quoting Doc. # 14-39 at 56)). The ACCA also quoted the more specific Rule 32 court reasoning that this expert testimony would have required defense counsel to argue that "at best, Scott did not strangle Latonya with his hands. Rather . . . Scott could have asphyxiated Latonya by wrapping his arm around her neck and putting Latonya in the crook of Scott's elbow, or worse asphyxiated her while he was on top sexually assaulting her." (*Id.* (quoting Doc. # 14-39 at 56-57) (cleaned up)). The ACCA's quote from the Rule 32 court added that the expert's testimony was "denying the obvious. The victim was found with an abrasion on her neck, hemorrhaging of the larynx, and petechial of the eye. . . . All three of these factors are strongly consistent with strangulation." (*Id.*) (quoting Doc. # 14-39 at 56-57). Finally, the Rule 32 court's reasoning concluded that under cross-examination, "Dr. Shaker reluctantly admitted that he could not exclude that the victim was suffocated or smothered to death." (*Id.* (quoting Doc. # 14-39 at 56-57)).

Scott has not overcome his burden under either the contrary to or unreasonable application clause of (d)(1). Specifically, Scott has cited no Supreme Court or federal authority which undermines any of the ACCA's reasons for denying this subclaim. Preliminarily, the ACCA's discussion of *Strickland* in the evaluation of Scott's ineffective assistance of counsel claim

147

eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). And, Scott has failed to carry his burden under the remaining portion of § 2254(d)(1) because, applying *Strickland*, Scott has not satisfied either clause. First, and as already discussed, *Strickland* is distinguishable. Second, and again, the ACCA did not unreasonably apply *Strickland*'s prejudice prong in determining that there was no prejudice.

Nor does Scott satisfy the exception to AEDPA deference under (d)(2). Scott has not pointed to any evidence that undermines the reasonableness of the state courts' factual determinations, nor has he overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct"). A petitioner must provide "clear and convincing evidence" to overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt") (internal quotation marks omitted).

Scott's habeas petition merely cites a case from the ACCA acknowledging that "the credibility of a witness is a question solely for the jury's determination." (Doc. # 1 ¶ 197 (quoting *Sanders*, 986 So. 2d at 1234)). Scott otherwise cites to various pieces of evidence to support the credibility of Dr. Shaker's expert testimony. These included the following: Dr. Shaker was "board-certified in anatomic and forensic pathology since 2007 and 2008" (*id.* ¶ 176); the positional asphyxiation theory was consistent with the DNA evidence and Latonya's missing shorts and

underwear as well as the fact that she was covered as if she were sleeping (*id.* ¶ 171); it was also consistent with Scott's outburst, "What happened at my house?," after learning about a death at the Huntington Lane house (*id.*); that her positioning on her stomach was consistent with positional asphyxia (*id.* ¶ 180); and that the physical evidence from the forensic photographs were consistent with positional asphyxia (*id.* ¶ 182-85). Neither his legal citation nor these factual citations are sufficient to satisfy the clear and convincing standard.

First, *Sanders v. State* discusses the credibility of witnesses in the context of the Alabama Rules of Evidence. This is irrelevant in this *Strickland* analysis. The Rule 32 court's and the ACCA's credibility determinations did not involve whether Dr. Shaker's testimony would have been *admissible*; rather, they were about whether presenting this testimony would have been effective trial strategy, which is the inquiry relevant to deficient performance and prejudice. Second, none of the factual cites are so clear and convincing as to require overriding the state court's factual determinations. Dr. Shaker's board certification is an administrative detail that only shows he would may have been qualified as an expert – it does not establish the credibility of his ultimate testimony. The fact that a positional asphyxiation theory would have been consistent with the DNA evidence and the position in which Latonya was found does not change the overarching impression that the theory itself was not credible, and certainly does not do so in a highly probable way. The fact that this theory was consistent with Scott's outburst, "What happened at my house?," similarly does not shore up the underlying theory. And, the photographic evidence Dr. Shaker discussed was itself shaky at best. For example, Dr. Shaker testified that asphyxia is a "diagnosis of exclusion" and that he drew conclusions based on the absence of certain photographs from the forensic pathologist. (Doc. # 1 ¶¶ 178-79). But, Dr. Shaker was board certified in 2007 and 2008, while these forensic photographs were taken between 1999 and 2002 – when professional

standards could have been different. It is also possible that an omission of certain photographs does not conclusively mean they were unremarkable; after all, the forensic pathologist could have failed to take them or they could have been not included in the record. Dr. Shaker also testified that there was only a "single abrasion on Latonya's neck under her chin" and that manual strangulation would have left more bruises and hemorrhages in her eyes. But, at another point, he testified that a child with Sickle Cell Anemia could have died very quickly if she were lying on her stomach. (*Id.* ¶¶ 181-85). A jury hearing this testimony could therefore still have concluded that Scott intentionally killed Latonya by suffocating her while she lay on her stomach, knowing that she had Sickle Cell Anemia, and that she would have had trouble breathing. In sum, Scott has not satisfied his burden under (d)(2) by showing clear and convincing evidence to overcome the state courts' factual determination.

For all these reasons, Scott has not overcome AEDPA deference on Claim B and the court must defer to the state courts' denial of this claim.

### 4.    De novo review

Whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, even under de novo review, this fails.

Once again, in *Strickland*, the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel who represent criminal defendants at trial or on direct appeal. To prove that a conviction or sentence is unconstitutional because of ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Scott has not satisfied either prong.

First, he has not shown that his counsel's performance was deficient. He attempts to do so by summarizing the low number of hours that counsel expended on his case (Doc. # 1 ¶¶ 158-59), pointing out that his counsel had no evidence to support their strategy of attacking the state's circumstantial case (*id.* ¶¶ 160-61) or their smear theory (*id.* ¶¶ 162-63), and listing reasons he believes that the positional asphyxiation theory was stronger than the innocence theory. (*Id.* ¶¶ 168-74). Again, a low number of hours standing alone is insufficient to demonstrate deficiency – Scott must show what about these hours expended translated into deficient performance. And, although Scott is correct that his counsel had no concrete evidence to support their chosen strategy of attacking the state's circumstantial case, this alone does not demonstrate ineffective assistance of counsel. An effective defense attorney sometimes must do the best that he can with the weak set of facts he is presented.

The crux of Scott's deficiency argument rests on whether his counsel fell below objective standards of reasonableness by not investigating an alternative, stronger, theory of positional asphyxiation. For many of the reasons already discussed, the court concludes that his counsel were objectively reasonable, and thus not deficient. Scott's attorneys were required to investigate all "plausible lines of defense," *House*, 725 F.2d at 617-18, and all "reasonable options," *Horton*, 941 F.2d at 1462. But, the key to those obligations is found in the modifiers "plausible" and "reasonable." A reasonable defense counsel could have concluded that the positional asphyxiation theory was neither. Among other problems, it would have required Scott to admit to intentionally engaging in forceful sexual activity with a ten-year-old and would have required a jury hearing this testimony to believe him that although he committed this violent and horrific act, he did not

mean to kill the victim. It also could easily have prejudiced a jury against Scott, or led them to view this admission as evidence establishing his propensity to commit forceful sexual crimes such as a rape (which, of course, would prove extremely problematic as to the other set of charges against Landris Wright). Indeed, it is worth repeating that it would strain credulity to conclude that, to be objectively reasonable, counsel may *not* consider the prejudicial impact that a client's confession to raping a ten-year-old girl would have on a jury. For these reasons, Scott has not satisfied his burden under the deficiency prong of *Strickland* to show by a preponderance of the evidence that his trial counsel's performance fell below objective professional norms.

Nor has Scott satisfied *Strickland*'s prejudice prong. A court need not reach the prejudice prong if it concludes that counsel was not deficient. But, even if Scott's counsel's performance was considered deficient (and, to be clear, it was not), Scott has not shown prejudice. On this prong, he emphasizes that "under Alabama law, felony murder is not a capital crime and without proof of intent, no conviction for capital murder would have been possible." (Doc. # 1 ¶ 192). But again, Scott must have shown that there was a *reasonable* probability that Scott would not have been convicted of his capital crimes and sentenced to death had his counsel pursued the positional asphyxiation theory. He has fallen far short of making that showing. For all the reasons already discussed, this theory was risky and highly prejudicial, and it is therefore probable that it would have led to the same result of a capital conviction and death sentence. Therefore, even under de novo review, Scott has failed to overcome his burden under *Strickland*.

For all of these reasons, the court denies Claim B.

C.      **Claim C – Scott has not shown a right to habeas relief due to his trial counsel's failure to contest Scott's competency.**

Scott next contends that his trial counsel's failure to provide him with effective assistance and the trial court's failure to hold a second competency hearing violated his due process rights to

152

be tried only if his competence was not subject to serious doubt. (Doc. # 1 ¶ 198). To be competent to stand trial, a criminal defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted); *cf.* Ala. R. Crim. P. 11.1 (defining a defendant's "mental incompeten[cy] to stand trial"). The competency standard asks "whether [the defendant] has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

Scott argues that the state court's denial of this postconviction claim was contrary to or unreasonable under AEDPA's (d)(1) and (d)(2) standards. (*Id.* ¶ 212). Respondent answers that the Alabama courts reasonably denied this collateral claim because it was inadequately pleaded under Alabama Rules of Criminal Procedure 32.3, 32.6(b), and 32.7(d). (Doc. # 17 at 81, 86).

Scott has failed to satisfy his AEDPA burden. The court summarizes the state courts' assessment of Scott's competency claim and then addresses this claim under AEDPA in the manner Scott has presented it – as two subclaims.

### 1.    State Court Proceedings

Scott has fully exhausted part of this claim. In his first Rule 32 petition, Scott raised this claim as a due process violation related to his incompetency to stand trial (Doc. # 14-29 at 8-11) and as a *Strickland* violation related to his counsel's failure to adequately prepare for the initial competency hearing and a failure to seek another hearing in the light of Scott's in trial conduct. (*Id.* at 33-43, 68). Scott raised both theories in a brief to the ACCA on first collateral appeal (Doc. # 14-54 at 32-38 (due process), 55-60 (*Strickland*)). And, Scott raised both theories in his petition for a writ for certiorari to the Supreme Court of Alabama. (Doc. # 14-60 at 57-61). Accordingly, both components of Scott's competency claim are exhausted under AEDPA.

In his Amended Rule 32 petition, Scott alleged that his "irrational decisions, disruptive behavior and combative arguments with his trial counsel created real and substantial doubt about his capacity to meaningfully participate and cooperate with trial counsel." (Doc. # 14-37 ¶ 153). Scott also asserted that he "demonstrated his lack of competency and inability to cooperate with counsel, repeatedly, and with increasing severity, during trial." (*Id.* ¶ 154). Scott offered several examples. For instance, he said, "It don't matter. I go to death row, I appeal. It don't matter. You going to give me death row. I know you will." (*Id.* ¶ 156). Another example was when he argued with his trial counsel in the jury's presence, prompting his counsel to yell, "Keep your damn mouth shut!" (*Id.*¶ 157). Scott recalled when he rapped during important phases of the trial. (*Id.* ¶¶ 158-59). Scott then explained that although he had been prescribed "a cocktail of psychotropic medications" at Taylor Hardin, his medical file from the Department of Corrections did not record whether those medications were administered and there is no evidence that Scott's trial counsel followed up about this. (*Id.* ¶ 160). Scott then postulated that, although Dr. Kamal A. Nagi testified at Scott's competency hearing that he was competent, "[t]he Mr. Scott who was present during trial, was, as best one can infer from the medical records, denied the very medication that caused the trial Court to conclude, in reliance on Dr. Nagi, that he was competent." (*Id.* ¶ 162). Scott argued that his counsel was ineffective because they allowed this behavior without objection and did not follow up about whether he was being given his prescribed medications. (*Id.* ¶ 160). Scott added that the trial judge also violated Scott's due process rights because she did not *sua sponte* conduct a second competency hearing. (*Id.* ¶ 163).

Citing subparts of Alabama Criminal Procedure Rule 32.2, the circuit court held that "[t]o the extent Scott challenges procedural due process principles, that claim is barred because it could have been raised at trial or on direct appeal." (Doc. # 14-33 at 52-53). And, noting Alabama

154

Criminal Procedure Rule 32.7(d), the Rule 32 court held that Scott's substantive due process claim "should be dismissed . . . for failure to state a claim upon which relief can be granted because the facts as alleged do not demonstrate incompetence." (*Id.* at 53). These state laws address burden and pleading requirements for Alabama postconviction proceedings. Under Rule 32.2(a), "A petitioner will not be given relief under this rule based upon any ground: . . . (3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b)[, which permits a defendant to plead that the court of original conviction was without jurisdiction to render judgment or to impose sentence]; or . . . (5) Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b)." Ala. R. Crim. P. 32.2(a)(3), (5). Rule 32.7(d) permits a circuit court to "either dismiss . . . or grant leave to file an amended petition" if that court "determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings." Ala. R. Crim. P. 32.7(d).

The Rule 32 court pointed to several deficiencies, including that Scott had had not pleaded "any facts to indicate that his alleged 'bizarre' behavior at trial was any different than the behavior he exhibited when the trial court first scrutinized his competence." (Doc. # 14-33 at 53). The Rule 32 court further noted that "[t]he record also does not support Scott's contention that his competency should have been questioned. Scott's outbursts, statements at trial[,] and disagreements with counsel do not exhibit a lack of competency." (*Id.*). The court added that the cases Scott cited to support his contention that the trial court should have conducted a second competency hearing were all "based on dissimilar facts." (*Id.*) (citing and distinguishing *Drope v. Missouri*, 420 U.S. 162, 175-80 (1975), *Agan v. Dugger*, 835 F.2d 1337, 1338-39 (1988), and

155

*White v. State*, 414 S.E. 2d 328, 330 (1992)). The court reasoned that "Scott's behavior is consistent with previous defendants who were found competent to stand trial." (*Id.* at 54) (comparing *Matthews v. State*, 671 So. 2d 146, 147-48 (Ala. Crim. App. 1995)). The Rule 32 court concluded that "Scott failed to plead a claim that would entitle him to relief. Therefore, this allegation is also summarily dismissed pursuant to Rule 32.7(d)." (*Id.* at 55) (citing Ala. R. Crim. P. 32.7(d)).

Scott appealed the Rule 32 court's summary disposition of his incompetency claim. (Doc. # 14-58 at 95-100). In his brief to the ACCA, Scott articulated "two distinct but intertwined questions: Did Scott's trial counsel fail to provide him effective assistance, and did the trial court deny Scott his constitutional right to be tried only if his competence is not subject to serious doubt." (*Id.* at 95). He then contended that his burden at the pleading stage is not to "prove incompetency by a preponderance of the evidence," and that his petition "adequately alleges that Scott's conviction was unconstitutional because he was incompetent to stand trial." (*Id.* at 96 (citing *Thomas v. State*, 908 So. 2d 308, 310 (Ala. Crim. App. 2004))). Scott added that "[a]lternatively, the Amended Petition alleges sufficiently that Scott's counsel failed to meet their obligation to contest his competency." (*Id.*). Specifically, Scott argued that his counsel rendered ineffective assistance because his counsel failed to ask for several reports that Taylor Hardin had prepared about Scott, present testimony from Dr. Ronan (whose report had "indicated that Scott had a major mental illness"), ask for Scott's DHR file, ask Dr. Nagi at the competency hearing about Scott's diagnosis of psychosis and prescription for antipsychotic medications, or offer any "affirmative evidence about Scott's mental condition." (*Id.* at 96-97). Specific to the court's failure to hold a second competency hearing, Scott contended that "[o]nce trial began, Scott's demeanor was sufficiently troubling to raise doubts about his ability to understand the proceedings and assist his counsel," with "[t]he most obvious example of the resulting prejudice [being] Scott's decision to

156

override the strategy of his trial counsel regarding which witnesses should take the stand in his defense." (*Id.* at 98). Scott argued that the Rule 32 court had erred in "focusing only on the allegations in the Amended Petition about Scott's behavior," rather than "the totality of these circumstances." (*Id.* at 99).

The ACCA agreed with the Rule 32 court's summary dismissal as to both theories. (Doc. # 14-59 at 200) ("We agree with the circuit court's determination here."); *see also id.* at 203 ("the circuit court properly dismissed this claim"). The ACCA did not state any new reasons for dismissing Scott's claim about the failure to hold a second competency hearing, but instead quoted Scott's Amended Rule 32 petition and the Rule 32 court's reasoning on this issue. (*Id.* at 195-200).

As to Scott's assertion that his counsel were ineffective, the ACCA acknowledged Scott's evidence of his mental illness before and during trial, but stated that "such evidence does not automatically indicate that he was incompetent to stand trial." (*Id.* at 201). The ACCA quoted from *Thomas v. State*, 766 So. 2d 860, 881-82 (Ala. Crim. App. 1998), to explain that "the evidence of a defendant's mental unfitness must indicate a present inability to assist counsel or understand the charges." (*Id.*) (quoting *Thomas*, 766 So. 2d at 881, in turn quoting *Cowan v. State*, 579 So. 2d 13, 15 (Ala. Crim. App. 1990)). The ACCA next noted that during the Rule 32 evidentiary hearing, Scott's trial counsel "testified that he had reason to believe that Scott was competent to stand trial based on his interactions with Scott and based on the fact that none of the medical professionals who evaluated Scott determined that he was not competent to stand trial." (*Id.* at 202) (quoting testimony in which Scott's trial counsel confirmed that he had rational discussions about the pros and cons related to the trial). The ACCA concluded that Scott had failed "to establish a 'real, substantial and legitimate doubt' that he was incompetent to stand trial." (*Id.*).

157

Scott then raised both theories on this claim to the Supreme Court of Alabama (Doc. # 14-60 at 57-61), which denied certiorari. (*Id.* at 177).

### 2.    Subclaim (C)(1) – Scott has not shown ineffective assistance of counsel based on the lack of a second competency hearing

A state court's summary dismissal of an inadequately pleaded Alabama collateral claim is due deferential treatment under AEDPA. *See, e.g.*, *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010) (per curiam) (recognizing that "AEDPA limits our review to whether the state court's determination that [the petitioner] failed to plead sufficient facts in his Rule 32 petition to support a [constitutional] claim . . . was contrary to or an unreasonable application of Supreme Court precedent" and "review[ing] the Rule 32 court's rejection of [the petitioner's constitutional] claim [under Rule 32.6] as a holding on the merits").

One of Scott's subclaims is that the trial court denied him "his constitutional right to be tried only if his competence is not subject to serious doubt." (Doc. # 1 ¶ 198). As explained earlier, a petitioner satisfies AEDPA's "contrary to" clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. A petitioner satisfies AEDPA's unreasonable application clause if he can show that the state court's application of the relevant constitutional standard was unreasonable. This AEDPA analysis requires this court to accord a state court "deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Richter*, 562 U.S. at 101. Consistent with § 2254(d)(1) deference, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (internal quotation marks omitted) (emphasis in original; internal quotations omitted) (quoting *Williams*, 529 U.S. at 410).

The ACCA adopted the Rule 32 court's reasoning – which in turn applied *Pate v. Robinson*, 383 U.S. 375, 377 (1966), *Dusky v. United States*, 362 U.S. 402, 402 (1960), and *Drope v. Missouri*, 420 U.S. 162, 175-80 (1975) – eliminating Scott's reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). (*See* Doc. # 14-59 at 198-200).

Scott has failed to carry his (d)(1) burden because he has not identified a factually indistinguishable, supportive Supreme Court decision with an outcome that was favorable to him, nor has he shown that the ACCA's analysis of this subclaim contained extreme constitutional error or unreasonably conflicts with clearly established Supreme Court precedent. Below, the court considers each of the six authorities that Scott cites in support of this subclaim. None of them help him carry his (d)(1) burden.

To support this subclaim and meet his (d)(1) burden, Scott relies on Supreme Court, Eleventh Circuit, Fifth Circuit, and Georgia state court cases: *Pate v. Robinson*, 383 U.S. 375 (1966), *Drope v. Missouri*, 420 U.S. 162 (1975), *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam), *Bruce v. Estelle*, 483 F.2d 1031 (5th Cir. 1973),[8] *Agan v. Dugger*, 835 F.2d 1337 (11th Cir. 1987), and *White v. State*, 414 S.E. 2d 328 (Ga. App. 1992). Importantly, these cases were pre-AEDPA, and therefore the competency claims raised in them were not reviewed under AEDPA deference. Thus, in *Pate*, *Drope*, and *Dusky*, the Supreme Court did not discuss whether the state courts unreasonably denied a competency claim under §2254(d)(1). Neither did the Fifth and Eleventh Circuits in *Bruce* and *Agan*. And *White*, apart from being a non-binding and out-of-

---

[8] The Eleventh Circuit has adopted as binding precedent decisions issued by the Fifth Circuit before October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

state case, is also pre-AEDPA. Nevertheless, the court contextually examines each authority to determine whether Scott's alleged circumstances sufficiently overlap in assessing whether the ACCA unreasonably rejected his incompetency claim under AEDPA.

In *Pate*, the Supreme Court began its habeas analysis by revisiting two core due process principles: (1) "the conviction of an accused person while he is legally incompetent violates due process," and (2) "state procedures must be adequate to protect this right." *Pate*, 383 U.S. at 378 (citing *Bishop v. United States*, 350 U.S. 961 (1956)). The *Pate* Court held that the trial court's failure to hold a competency hearing in light of the "uncontradicted testimony of [the petitioner]'s history of pronounced irrational behavior" deprived him "of his constitutional right to a fair trial." *Id.* at 385-86.

The evidence of the *Pate* petitioner's "long history of disturbed behavior" followed an incident when as a child "a brick dropped form a third floor hit [him] on the head." *Id.* at 378. Afterward, his "disturbed behavior" included hearing voices, receiving hospitalized psychiatric treatment, inexplicably leaving a job site for "two or three hours," being in a "daze" and "com[ing] back just as fresh," terrorizing his wife, shooting and killing his eighteen-month-old son, "attempt[ing] suicide by shooting himself in the head," and engaging in other acts of physical violence. *Id.* at 378-82 (internal quotation marks omitted). Additionally, "[f]our defense witnesses expressed the opinion that [the petitioner] was insane, and his counsel "throughout the proceedings insisted that [the petitioner]'s present sanity was very much in issue." *Id.* at 383-84. Given this record, the *Pate* Court rejected the state's determination that the petitioner had "intelligently waived th[e] issue by his failure to request a hearing on his competence at the trial; and further, that on the basis of the evidence before the trial judge no duty rested upon him to order a hearing sua sponte." *Id.* at 378.

160

*Pate* is distinguishable from Scott's case and cannot help him satisfy the "contrary to" clause of (d)(1). While the trial court in *Pate* never held a competency hearing, *see id.* at 376-77, Scott's trial court conducted one. (*See* Docs. # 14-15 at 72-104; 1 ¶ 209). Additionally, the strength of the evidence offered to support incompetency was much stronger in *Pate* and occurred over a longer period of time than in Scott's case. For example, in *Pate*, "four defense witnesses expressed the opinion that [the petitioner] was insane," and the state in response only offered a stipulation of what a director of the criminal court behavior clinic would have testified to. *Id.* at 383. Conversely, in Scott's case, no witness (let alone *four* witnesses) testified that Scott was insane. The *Pate* witnesses also detailed evidence of the petitioner's erratic behavior over the course of several years. *Id.* at 378-82. By contrast, Scott had no such history. He was not hospitalized for psychiatric treatment prior to his indictment, he did not attempt suicide during his trial, and his trial counsel never suggested that his sanity or competency was at issue during his trial. (*See* Doc. # 14-3 at 57 ("Mr. Scott did not have a history of psychiatric hospitalization or treatment for psychiatric disorder in the past."). Additionally, all the evidence that Scott details to support his incompetency-at-trial argument is within the context of his trial. This is also different from *Pate*, in which witnesses detailed evidence of the petitioner's "long history of disturbed behavior." *Pate*, 383 U.S. at 378. Scott has therefore not carried his burden of showing how his trial record was materially indistinguishable from *Pate*. Therefore, *Pate* cannot satisfy the contrary to clause of (d)(1).

Nor can *Pate* satisfy the unreasonable application clause of (d)(1). *Pate* held that "the evidence introduced on [the petitioner]'s behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived [the petitioner] of his constitutional right to a fair trial." *Id.* at 385. But, Scott received a competency hearing before his trial; the issue in this subclaim is whether the trial court should have *sua sponte* ordered a *second* hearing given his behavior during

trial. *Pate*'s clearly established holding compels no such result, and it follows that decision does not aid Scott in meeting his burden under the unreasonable application clause of (d)(1).

*Drope* also does nothing to help Scott satisfy either the contrary to or the unreasonable application clause of (d)(1). In *Drope*, the petitioner filed an unopposed motion for a continuance to receive a psychiatric examination and treatment. 420 U.S. at 164-65. The trial judge denied this motion and the trial proceeded as planned. *Id.* At trial, petitioner's wife testified that he and four acquaintances had forcibly raped her and that she had believed "that her husband was sick and needed psychiatric care and that for these reasons she had [initially] signed a statement disavowing a desire to prosecute." *Id.* at 165-66. She testified that she had changed her mind about not wanting to prosecute after petitioner tried to kill her on the Sunday evening before trial. *Id.* at 166. Petitioner's wife further testified that he would sometimes throw himself down the stairs if he did not get his way. *Id.* The day after this testimony, petitioner did not appear because he had shot himself in the stomach. *Id.* at 166-67. Over defense counsel's motions, the trial judge concluded that petitioner's absence was voluntary, so the proceedings would continue without him. *Id.* at 166. Defense counsel moved for a new trial, appealed, and when those efforts were unsuccessful began postconviction proceedings (which also did not succeed). *Id.* at 167-170.

On certiorari, the U.S. Supreme Court first acknowledged that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Id.* at 171. The Court then cited *Pate* noting that there "we held that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Id.* at 172 (citing *Pate*, 383 U.S. 375).

Ultimately, the question the Court faced in *Drope* was this: "whether the proceedings in this case were consistent with petitioner's right to a fair trial." *Id.* at 173. Applying a pre-AEDPA habeas analysis, the Court determined that "the record reveals a failure to give proper weight to the information suggesting incompetence which came to light during trial." *Id.* at 179. This information included "the testimony of the petitioner's wife that on the Sunday prior to trial he tried to choke her to death" and "repeated and confirmed information contained in the psychiatric evaluation attached to petitioner's motion for a continuance," as well as the petitioner's absence in the courtroom after an attempted suicide with a firearm after the first day of trial. *Id.* at 166, 178-79. The *Drope* Court held that a combination of the petitioner's psychiatric pretrial information, his wife's trial testimony, and his midtrial suicide attempt "created a sufficient doubt of his competence to stand trial to require further inquiry on the question." *Id.* at 180. The Supreme Court added that the "State is free to retry petitioner, assuming, of course, that at the time of such trial he is competent to be tried." *Id.* at 183.

*Drope* is distinguishable from Scott's case. While in *Drope* the trial judge denied a motion for a psychiatric examination and treatment, Scott was examined by a psychiatrist, prescribed treatment (although he raises question about whether his prescriptions were administered during trial), and given a competency hearing a few months before his trial began. These factual differences are material because, as the Court acknowledged in *Drope*, a trial court's failure to observe state statutory procedures requiring a competency hearing violates the Constitution. *Drope*, 420 U.S. at 172. Scott received a competency hearing, and he does not contend that Alabama statutes require anything more. (*See* Doc. # 1 ¶ 200 (discussing constitutional competence), ¶ 201 (discussing constitutional standard)). Therefore, unlike *Drope*, Scott cannot

plausibly claim that the trial court failed to follow state statutory procedures regarding a competency hearing, and thus cannot assert a constitutional claim on this basis.

Additionally, while the defendant in *Drope* was not present for a significant and crucial part of his trial (after shooting himself), Scott was present for his trial. This is a material factual difference because the *Drope* Court emphasized that "as a result of petitioner's absence the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him." *Drope*, 420 U.S. at 181. But in Scott's case, the trial court was able to observe his demeanor and interaction with his attorneys throughout trial. In fact, Scott himself emphasizes this, arguing that he "demonstrated his lack of competency and inability to cooperate with counsel, repeatedly, and with increasing severity, during trial." (Doc. # 1 ¶ 201). The trial court therefore made an informed decision that Scott remained competent and that there was no need for a second competency hearing. This distinguishes this case from *Drope*.

Nor does *Drope* help Scott satisfy the unreasonable application clause of (d)(1). The ACCA did not unreasonably apply *Drope*. For example, *Drope*'s central holding was that a court considering a defendant's competence must consider information available before trial as well as in-trial conduct to determine whether the information together creates "a sufficient doubt of [the defendant's] competence to stand trial to require further inquiry on the question," in other words, a competency hearing. *Drope*, 420 U.S. at 180. The trial court considered Scott's psychological history before and during trial and determined that Scott was competent. First, Scott was afforded a competency hearing before trial began, which permitted a thorough pre-trial examination into his competence. Second, unlike in *Drope*, the trial court was able to examine Scott's behavior throughout trial to determine his continuing competency. Although *Drope* makes plain that even

164

if a defendant is deemed competent "at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change," *Drope*, 420 U.S. at 181, as explained above, this holding underscored the defendant's absence because it meant the court was unable to observe his competence. The trial court here *was* able to observe Scott and his competence and make the factual determination that he remained competent to stand trial. So, the court cannot now hold that the ACCA unreasonably applied *Drope* when it affirmed the Rule 32 court's denial of this claim.

The ACCA reasonably applied *Drope*'s other holding – that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Id.* at 171. This is because it was reasonable to conclude that Scott had the capacity to understand the nature and object of the proceedings against him, consult with his counsel, and assist in preparing his defense. Scott now disagrees with this conclusion, arguing that his "irrational decisions, disruptive behavior and combative arguments with his trial counsel created real and substantial doubt about his capacity to meaningfully participate and cooperate with his trial counsel." (Doc. # 1 ¶ 200). To illustrate this, Scott details his in-trial behavior of "loud outbursts, volatile tirades, and verbal attacks on his lawyer, the Court, and various witnesses" as well as the trial court's threats to have him removed demonstrate that he was incompetent. (*Id.* ¶ 201). Additionally, Scott details his statement "It don't matter. I go to death row, I appeal. It don't matter," (*id.* ¶ 202) and "I don't mind the death penalty part. I really don't," (*id.* ¶ 203) as exhibiting "an unsettling death wish" that could never be made by a competent person. Regarding cooperation with his counsel, Scott describes how he "argued loudly several times with trial counsel in the presence of the Court and the jury" (*id.* ¶ 204), and how he twice began rapping during crucial moments in trial. (*Id.* ¶¶ 205-06).

Taken together, this evidence does not show that the ACCA's denial of relief on this claim was extreme constitutional error or conflicted unreasonably with clearly established Supreme Court precedent in *Drope*. It is, for example, reasonable to conclude that a criminal defendant who engages in loud outbursts, volatile tirades, and verbal attacks during trial still can understand the nature and object of the proceedings against him. In fact, Scott's statements about "I go to death row, I appeal" and "I don't mind the death penalty part" reveal that he understood the nature of the capital crimes with which he was charged as well as the potential for him to be sentenced to death. Not only that, but the ACCA emphasizes that during the Rule 32 court's evidentiary hearing, Scott's trial counsel John Robbins "testified that he had reason to believe that Scott was competent to stand trial based on his interactions with Scott and based on the fact that none of the medical professionals who evaluated Scott determined that he was not competent to stand trial." (Doc. # 14-59 at 202).

Further, just because a defendant argues with trial counsel or disagrees (even strongly) with counsel about trial strategy does not mean that the defendant lacks capacity to consult counsel and assist in preparing for his defense. Scott has the burden of pointing to clearly established Supreme Court case law that indicates that an argument about trial strategy indicates a lack of competency. He has not carried this burden. But, during trial, Scott's interactions with his counsel bolstered his competency because despite his trial counsel's disagreement, Scott was able to consult with his family, outside his counsel's presence, and convince the trial judge that he should be permitted to call three witnesses.

For example, Scott's defense counsel told the trial court judge that they believed the defense should rest (Doc. # 14-19 at 10) and that they were concerned about a letter Scott had written to a witness who might contain "a lie." (*Id.* at 16-17). But when the trial judge gave Scott

166

the floor, Scott detailed what type of testimony he expected these other witnesses to offer, including testimony about where he was at certain times surrounding the events in the case. (*Id.* at 25-26). Scott insisted that he never asked the witnesses to lie. (*Id.*). Scott discussed with the trial court judge whether he should call a witness named Keisha, and after the court suggested "[d]o you think if Keisha came in here and gave a different time, that that's going to make you look like you are lying, and hurt you? . . . Think about it," Scott agreed: "Yeah, it would hurt me," and concluded that he did not want to call Keisha. (*Id.* at 29). When Scott was discussing whether he would take the stand, he told the trial judge "I understand that he [the prosecutor] is going to drag out I shot somebody. No big. Everybody in the audience got a criminal record, if you want to put it like that." (*Id.* at 31-32). When asked whether his lawyers had explained "the pros and the cons about taking the stand" and whether he "understood everything they have said," Scott responded "Yes, I understood." (*Id.* at 32). Scott then offered the lucid thought: "You know, I feel like, if I do go to death row, I'll feel better when I put myself there." (*Id.*).

Scott exhibited additional clear-headed thought processes about the trial, which bolsters the ACCA's denial of relief on this claim. These include when Scott asked the court about whether the prosecution could ask him or a witness about the letter he sent to that witness, with Scott acknowledging "[the prosecutor] can ask me about it. I am saying what if I don't get up there?" and the court explaining "If you don't get up there, then he can't ask about it." (*Id.* at 37). This discussion continued about what might happen if Scott called one of his requested witnesses. (*Id.*). Scott told the judge "I want to take that chance, Judge," the judge replied "I am not going to be hearing anything down the road, like, 'He didn't tell me,' – " and Scott responded "I just want to be the next James Patterson. I am going to be honest with you." (*Id.* at 45).

167

Although Scott's James Patterson comment was out of place, the rest of this exchange indicates that Scott understood the nature of the capital proceedings, was considering the pros and cons of calling different witnesses, and the downside of taking the stand himself. He had discussed these points with his counsel until he understood them. And, despite the consistent objection of Scott's trial counsel, Scott was able to convince the trial judge that he should be able to call certain witnesses. This indicates that he was not only competent, but convincing.

This same conclusion holds true when examining another of Scott's arguments with trial counsel, indeed one that Scott highlights in his petition. (Doc. # 1 ¶ 204). Scott had an outburst in front of the jury right before they were excused for lunch. (Doc. # 14-16 at 190). After the jury was excused, Scott continued to argue about whether he could directly address the jury, and one of Scott's lawyers said "Willie, wait a minute. Wait a minute. You hush up! I am getting tired of this, now. . . . You keep your mouth shut . . . Keep your mouth shut. You are undoing everything we are trying to do. You are making a bad impression in front of this jury. Okay? Keep your damn mouth shut!" (*Id.* at 192). Scott cites no legal standard to support what apparently is his implicit argument that this kind of outburst is evidence of a lack of competency. The competency inquiry focuses on capacity, not demeanor. The question is whether the defendant understands the nature and consequences of the proceedings and can consult counsel with a reasonable degree of rational understanding. A defendant may be difficult, defiant, or even disruptive, yet still competent so long as he possesses that baseline understanding and ability. Poor behavior is not the legal equivalent of incapacity. Thus, obstreperous, rude, or insubordinate behavior – standing alone – reflects a failure of compliance (or even emotional immaturity), not a lack of competence. Scott has not carried his burden of showing that the ACCA unreasonably applied the clearly established precedent of *Drope*.

*Dusky* also does not satisfy Scott's burden under (d)(1) because it is distinguishable and because the ACCA did not unreasonably apply its clearly established holding. Scott cites *Dusky* for the proposition that "[t]he constitutional threshold of competence is met only where the defendant has a rational and factual understanding of the proceedings against him and is capable of rationally consulting with his lawyer about his defense." (Doc. # 1 ¶ 200 (citing *Dusky*, 362 U.S. at 402)).

Before *Dusky* reached the Supreme Court, the Eighth Circuit summarized the following facts of the case: the defendant was found guilty of unlawfully transporting across state lines a girl who had been kidnapped. *Dusky v. United States*, 271 F.2d 385, 386-87 (8th Cir. 1959). Defense counsel suggested that there was a question of his mental competency to stand trial, so the court committed the defendant for examination. *Id.* at 387. At a competency hearing, a report from the defendant's psychiatric examination revealed that "He is oriented as to time, place, and person," but diagnosed him with "[s]chizophrenic reaction." *Id.* at 387-88. An attachment to this report stated that "[b]ecause of this illness, he is unable to properly understand the proceedings against him and unable to adequately assist counsel in his defense." *Id.* at 389. A doctor also testified that although the defendant "understood what he was charged with . . . the defendant would be unable properly to assist his attorney in his defense 'because I do not think that he can properly interpret the meaning of the things that have happened.'" *Id.* The district court held (and the Eighth Circuit affirmed) that despite this testimony, the evidence about the defendant's competency "was not unequivocal" and because he was able to understand the proceedings against him, the defendant was competent. *See id.* at 397.

The Supreme Court reversed, holding that "the record in this case does not sufficiently support the findings of competency to stand trial" and that "it is not enough for the district judge

169

to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky*, 362 U.S. at 402 (alterations in original).

*Dusky* does not satisfy the contrary to clause of (d)(1) here because *Dusky* is distinguishable. In *Dusky*, psychiatrists explicitly testified that the defendant would *not* be able to understand the proceedings against him or properly assist his attorney in his defense. But here, the undisputed testimony of the psychiatrist who examined Scott, Dr. Kamal A. Nagi, was that Scott was competent to stand trial. (*See* Doc. # 1 ¶ 209 (discussing competency hearing documented at Doc. # 14-15 at 72-104)). Specifically, Dr. Nagi testified that "my finding is that [] Scott can assist his attorney in his own defense and assume the role of a defendant, and he is capable of understanding [] court procedure, and awareness of the charges pending, and the consequences of it. Test for courtroom knowledge, and record 90 percent." (Doc. # 14-15 at 76). Dr. Nagi also testified that "[a]t the time of the alleged offense, Mr. Scott knew right from wrong." (*Id.* at 77). Dr. Nagi added that Scott "did not have any psychotic symptoms, nor previous psychiatric disorder before . . . . The symptoms which he presented only occurred during incarceration, although he had chaotic childhood and upbringing, and involvement in a lot of drugs and (inaudible) behavior." (*Id.* at 78). This testimony is simply different from the testimony in *Dusky*, which indicated that the defendant "would be unable properly to assist his attorney in his defense," and that the defendant was diagnosed with schizophrenia. *Dusky*, 271 F.2d at 389. Dr. Nagi testified that Scott was only suffering from "personality disorder," and explained that this was not a recognized mental illness. (Doc. # 14-15 at 92-93; *see also id.* at 96 (also discussing drug abuse and

170

intoxication at the time of the crime)). Because these are materially distinguishable facts, *Dusky* cannot help Scott carry his burden under the contrary to clause of (d)(1).

Nor does *Dusky* help Scott carry his burden under the unreasonable application clause of (d)(1). The clearly established Supreme Court holding of *Dusky* was that "the 'test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. This test is substantially similar to the test that the court has already discussed at length above: that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope*, 420 U.S. at 171. Therefore, the court need not repeat its analysis here. The ACCA has not unreasonably applied this clearly established holding.

*Bruce v. Estelle* also does not help Scott carry his burden under the contrary to or unreasonable application clause of (d)(1). Scott cites *Bruce* for the proposition that habeas relief is appropriate where proof indicates a "real, substantial and legitimate doubt as to the defendant's mental capacity . . . to meaningfully participate and cooperate with counsel." (Doc. # 1 ¶ 200 (quoting *Bruce*, 483 F.2d at 1043)). *Bruce* cannot serve as authority under the contrary to clause of (d)(1) because although binding in this court, it is not a Supreme Court case.

But even if it were a Supreme Court case, *Bruce* is distinguishable. There, two physicians testified at a postconviction competency hearing that the defendant had not been competent to stand trial. *Bruce*, 483 F.2d at 1035. A separate physician testified that after an hour-long interview, he concluded that the defendant was competent, *id.*, and petitioner's attorney testified that he "was able to communicate with him and assist in his defense, [although] he did state that on two different

171

occasions during the trial [the petitioner] became emotional and erratic and for a short period each time [the attorney] felt that he was not competent to assist him." *Id.* A previous attorney who had been dismissed before trial (because he had insisted that the petitioner enter a plea of insanity) testified at the competency hearing that the petitioner "was unable to effectively communicate with him and was incompetent to assist in a criminal proceeding." *Id.* at 1035-36. The state court jury returned a verdict concluding that the petitioner was competent, and the state court adopted those findings. *Id.* at 1036. The district court denied this habeas claim.

On appeal, the Fifth Circuit emphasized that a competency hearing must be meaningful and fair. *Id.* at 1038. The Fifth Circuit panel held that the hearing was "fundamentally unfair" because the record showed that the proceeding intermixed distinct issues, including the petitioner's "criminal responsibility . . . mental competency to stand trial . . . [and] mental competency during the pending hearing." *Id.* at 1039. The panel also noted that the prosecutor had made several "inflammatory and prejudicial comments" during the hearing, *id.*, and that the jury instructions had been given an improper insanity standard to determine competency. *Id.* at 1040-41. Taken together, these errors made the hearing "fundamentally unfair." *Id.* at 1042.

*Bruce* is factually distinct from Scott's case for several reasons. While the competency hearing in *Bruce* involved issues beyond competency (which confused the jury in that case), Scott's competency hearing involved the single issue of competency and was litigated before a judge, not a jury. Although the decisionmaker (the jury) in *Bruce* could have been inflamed or prejudiced by improper prosecutorial comments, there were no such improper comments in Scott's case and (again) the decisionmaker was a judge, not a jury. Further, while the standard for competency was incorrect in *Bruce*, the standard the trial judge used in Scott's case was correct (as Scott does not dispute). Finally, although in *Bruce* there was some testimony that the defendant

was not competent, the sole witness at Scott's competency hearing was unequivocal in his opinion that Scott was competent. And, unlike the petitioner in *Bruce*, Scott does not identify a witness who would have testified that he was incompetent. Taken together, these material factual differences render *Bruce* useless to Scott in carrying his burden under the contrary to clause of (d)(1).

Nor can *Bruce* help Scott show there was an unreasonable application under (d)(1). The clear holding of *Bruce* was that a state court competency hearing must be fundamentally fair. *Bruce*, 483 F.2d at 1038. The ACCA did not unreasonably apply this holding in concluding that Scott's hearing was fair. Indeed, the only argument Scott presents in his petition about the fairness of his competency hearing was that Dr. Nagi was "[d]iscounting or disregarding Mr. Scott's history of mental illness" in concluding that "Mr. Scott's symptoms presented 'only during incarceration'" and that Scott was "a medically treated patient who was competent to stand trial." (Doc. # 1 ¶ 209). But, Scott cites no caselaw to support his implicit argument that a medical professional's opinion can make a competency hearing unfair if it discounts or disregards a history of mental illness. For these reasons, *Bruce* does not help Scott carry his burden under (d)(1).

Scott also cites the Eleventh Circuit's pre-AEDPA decision in *Agan v. Dugger* for the proposition that "[a] defendant's demeanor at trial, standing alone, is a sufficient basis for a court to determine that further inquiry is required." (Doc. # 1 ¶ 210 (citing *Agan v. Dugger*, 835 F.2d 1337, 1338 (11th Cir. 1987)). *Agan* lends no aid to Scott under (d)(1) because, although binding in this court, it is not a Supreme Court case. And, even if it were, *Agan* is factually distinguishable. There, the Eleventh Circuit considered whether there should have been an evidentiary hearing on the petitioner's claims of incompetency and ineffectiveness of counsel. *Agan*, 835 F.2d 1337, 1337 (11th Cir. 1987). The facts of *Agan* are as follows: after the death of a fellow prisoner in jail, the

173

petitioner confessed to the inmate's killing, re-confessed to the murder before both the grand jury and the sentencing judge, and waived his constitutional rights regarding the crime. *Id.* at 1338-39. The petitioner had told the grand jury and sentencing judge "that he had planned the murder for over two years, and that he regretted that [the dead inmate] had not died a more painful death." *Id.* at 1339. He also explained that he "was certain that, by confessing, he had almost guaranteed his receipt of a life sentence instead of a death sentence, and further announced that once he returned to prison, he would find and murder [the dead inmate's] 'partner.'" *Id.* The petitioner was sentenced to death. *Id.*

The Eleventh Circuit reasoned that this behavior "at a minimum, is bizarre and misguided and raises serious questions about [the petitioner's] reasoning ability." *Id.* The panel also detailed the "history of mental problems dating back to his youth," which included being discharged from the army three times, having three prison psychiatrists diagnose him with psychosis, receiving electric shock therapy, trying to hang himself in prison, asking to be "locked up because he felt that he was going crazy," and being diagnosed with schizophrenia. *Id.* The Eleventh Circuit panel concluded that "[s]ince no hearing was held in the state courts," and because this evidence raised "serious doubts regarding [the petitioner's] mental stability," an evidentiary hearing was necessary. *Id.*

As an initial matter, the court highlights that *Agan* never held that the petitioner was incompetent. The panel in *Agan* merely held that because there was no evidentiary hearing on competency at the trial court, and because there were serious questions about the petitioner's reasoning ability, the federal district court needed to hold an evidentiary hearing. The Rule 32 court in Scott's case conducted an evidentiary hearing that addressed the issue of Scott's

174

competency; therefore, even if *Agan* were factually indistinguishable (and, it is not), Scott's trial court did not rule contrary to *Agan*.

But, to be clear, *Agan* is distinguishable from Scott's case. In *Agan*, the petitioner had confessed multiple times to a murder, waived his constitutional rights, stated to the grand jury and sentencing judge that he regretted that the death had not been *more* painful, planned to return to jail to murder another person connected to the dead inmate, and fully expected that, despite this testimony, he was "guaranteed his receipt of a life sentence instead of a death sentence." *Id.* Scott exhibited a much more rational awareness of what he faced in his trial and what a reasonable trial strategy might entail. For example, Scott never confessed to the crimes he was charged with. He never explicitly waived his constitutional rights. He never testified that he wished he had been crueler in the commission of any crime. He never testified about plans to commit a similar crime. He never expressed any expectation that he was guaranteed a life sentence by confessing to a murder. To the contrary, Scott repeatedly confirmed that he understood that he faced the risk of the death penalty and that his lawyers had discussed with him the pros and cons of various trial strategies – including, for example, testifying in his own defense. For all these reasons, Scott's case is distinguishable from *Agan* and unable to satisfy the contrary to clause of (d)(1).

*Agan* also does not help Scott satisfy the unreasonable application clause of (d)(1). The clearly established holding of *Agan* is that "[a]n evidentiary hearing is necessary whenever a habeas petition alleges facts that, if true, establish his or her right to relief," *id.* at 1338, and that considering the petitioner's behavior in *Agan* there was enough of an issue regarding competency to require a hearing. *Id.* at 1339. The panel in that case concluded that "[s]ince no hearing was held in the state courts, such must be completed in the federal district court." *Id.*

175

The ACCA did not unreasonably apply this clearly established holding. An evidentiary hearing was already held by the Rule 32 court on several issues, and the hearing addressed the issue of Scott's competency. (Doc. # 14-59 at 202).[9] Therefore, there was no need for an evidentiary hearing to address the same question either before the ACCA (or now in this court, for that matter). Additionally, Scott's behavior at trial was materially different from the behavior of the petitioner in *Agan*, so the issue of his competency was not nearly as strong. For these reasons, *Agan* does not help Scott carry his burden under the unreasonable application clause of (d)(1).

Finally, *White v. State* does not aid Scott in carrying his burden under either clause of (d)(1). Again, to satisfy (d)(1), a petitioner must point to a factually indistinguishable, supportive Supreme Court case or a clearly established holding as recognized by the Supreme Court. While a binding circuit court holding can certainly help elucidate clearly established precedent of the Supreme Court, a Georgia state court holding does not assist Scott with his burden, particularly because he was convicted in an *Alabama* court. *White* does not clearly establish law under (d)(1). Nevertheless, for completeness, the court briefly details why *White* is distinguishable and how the ACCA did not unreasonably apply its holding.

In *White*, the petitioner's trial counsel moved for a new trial and testified that the petitioner had been "hostile, belligerent, and uncooperative" to his trial counsel. *White v. State*, 414 S.E. 2d 328, 329 (Ga. App. 1992). The trial court ordered a psychological evaluation and the psychologist who conducted the evaluation later testified that the petitioner "was not competent to stand trial at the time of the evaluation." *Id.* During the motion for new trial hearing, the trial court stated that it "was not sure" about the petitioner's competence during trial because while he was outspoken

---

[9] The court acknowledges that the Rule 32 court summarily denied Scott's claims under Rule 32.7(d), but notes that the evidentiary hearing included a line of questioning as to Scott's competency and counsel's perception.

during the first part of the trial, "he became totally silent [later] in the trial," and "[j]ust watching him I became concerned whether or not something was wrong with him mentally which would make it a problem for sentencing." *Id.* The Georgia Court of Appeals remanded the case for a determination of the petitioner's competence at the original trial, noting that the "statements of the trial court, on the record during the sentencing and motion for new trial hearings, establish that defendant's demeanor at trial was such that the trial court had a bona fide doubt regarding the defendant's competence." *Id.* at 329-30.

This is distinguishable from Scott's case. Although Scott was at times belligerent and uncooperative with his trial counsel, the psychologist who conducted his psychological evaluation did not testify that Scott was incompetent to stand trial. Moreover, the trial court never stated that it had any doubts during trial about Scott's competency. These statements were so pivotal as to cause the Georgia Court of Appeals to remand. But, there are no similar statements here.

The ACCA also reasonably applied the clearly established precedent of *White* (which, again, is not binding on this federal court and is thus insufficient to satisfy Scott's (d)(1) burden). This holding was that when a trial court's record (including statements by the trial court judge) "establish that [a] defendant's demeanor at trial was such that the trial court had a bona fide doubt regarding the defendant's competence," there should be a new trial at which the court determines the defendant's competency. *Id.* at 329-30. Again, Scott's case contained no such bona fide doubt regarding Scott's competency to stand trial, and the ACCA therefore did not unreasonably apply *White*.

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 212). But, although Scott invokes (d)(2), he has not pointed to any evidence that undermines the reasonableness of any factual determinations made by the state

177

courts. That is, Scott has not shown that the ACCA's analysis of his competency claim was factually unreasonable. Nor has he denoted any undisputed evidence of what occurred during the competency hearing and at trial. As discussed at length above, the ACCA did not unreasonably apply these undisputed facts in affirming the Rule 32 court's denial of relief on this claim. Scott has also not overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

Indeed, after reviewing the ACCA's last reasoned decision, the court concludes that the ACCA reasonably applied the facts, including the facts that the only witness at his competency hearing testified that he was competent. His trial counsel testified at the Rule 32 court's evidentiary hearing that Scott had been competent during trial, and that Scott exhibited the ability to rationally consider the possibility of capital punishment and the pros and cons of various trial strategies. Based on the (d)(1) reasoning above, the court cannot say that the ACCA unreasonably applied these facts when it concluded that Scott's constitutional rights were not violated when the trial court did not *sua sponte* hold a second competency hearing.

Whether under AEDPA deferential review or de novo review, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, even under de novo review, this claim fails. Scott's allegations fail to demonstrate any de novo due process violation under binding Supreme Court or Eleventh Circuit law. As already explained, Scott received a full and fair competency hearing at which Dr. Nagi testified he was competent. Furthermore, the trial court was under no obligation to *sua sponte* order a second competency hearing because throughout trial, despite his emotional outbursts and strange statements, Scott still exhibited a rational and factual understanding of the proceedings as well as the ability to rationally consult with and assist his lawyers about his defense.

### 3.    Subclaim (C)(2) – Scott has not shown ineffective assistance of counsel based on counsel's performance as related to Scott's competency throughout trial

Scott contends that his counsel was constitutionally ineffective when they failed to ensure that jail officers were treating Scott with antipsychotic medications. (Doc. # 1 ¶¶ 198, 204, 207). He also appears to argue that his counsel was ineffective for failing to more effectively contest Scott's competency during trial. (*Id.* ¶ 207 ("Effective counsel would never have let this happen.")). Scott asserts that the state courts' denial of this postconviction claim was contrary to or unreasonable under AEDPA's (d)(1) and (d)(2) standards. (*Id.* ¶ 212).

Respondent answers that the record shows "trial counsel had no reason to challenge Scott's competency" a second time; therefore, "a reasonable jurist could agree with the ACCA's rejection of Scott's claim." (Doc. # 17 at 86). Scott's reply expands on his ineffective assistance of counsel theory. He asserts that his counsel "failed to undertake an adequate investigation of Scott's competency and failed to present evidence of his lack of competency." (Doc. # 20 at 50). Scott argues that his counsel did so by failing to request additional reports beyond the one they received from Taylor Hardin, failing to present testimony from Dr. Ronan that Scott "had a major mental illness," failing to ask for the DHR file on Scott's family, failing to cross-examine Dr. Nagi about the fact that his report had diagnosed Scott with psychosis and that he noted other symptoms (e.g., thinking he was a demigod, hearing voices, and having multiple personalities), and failing to offer any affirmative evidence about Scott's mental condition (including his history of unstable living conditions and abuse). (*Id.* at 50-51). Scott adds that his counsel should have requested an additional competency hearing due to his behavior during trial. (*Id.* at 52).

Again, Scott has failed to satisfy his AEDPA burden. All the cases cited in support of this subclaim were discussed above in relation to his argument about the trial court's failure to hold a

179

second competency hearing. The court need not repeat its full analysis of each case here. Once again, all these cases are pre-AEDPA and thus do not reflect clearly established precedent about how to apply the deferential review of AEDPA. Moreover, none of these cases satisfies Scott's burden under (d)(1). The court again notes that the ACCA's adoption of the Rule 32 court's reasoning applying *Pate v. Robinson*, 383 U.S. 375, 377 (1966), *Dusky v. United States*, 362 U.S. 402, 402 (1960), and *Drope v. Missouri*, 420 U.S. 162, 175-80 (1975). Scott cannot rely on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). (*See* Doc. # 14-59 at 198-200).

In *Pate*, the Supreme Court never considered an ineffective assistance of counsel claim. But, even if it had, as discussed above, *Pate* is distinguishable and thus is inapposite to any analysis of the contrary to clause of (d)(1). The question in *Pate* was whether there should have been a hearing at all, and not whether a second hearing was necessary. *Pate*, 383 U.S. at 385. Additionally, the evidence of incompetency in *Pate* was strong and of a wholly different character than the evidence Scott points to in his case. Scott did not have any witnesses testify that he was insane, had not been hospitalized for psychiatric treatment prior to his indictment, did not attempt suicide during the trial, and did not have a "long history of disturbed behavior." *Id.* at 378. Additionally (and as already discussed), *Pate* did not compel the ACCA to hold that a second competency hearing was required. Because *Pate* does not indicate a second competency hearing was called for, it cannot be read to say that Scott's trial counsel was ineffective when they did not request a second hearing.

This is especially true when considering that *Strickland* necessarily layers a deferential analysis on top of the already deferential AEDPA standard. To overcome *Strickland* deference,

180

Scott must have shown, by a preponderance of competent evidence, that his counsel's performance was deficient, falling "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Applying this standard here, *Pate* does not satisfy Scott's burden to show that it was objectively unreasonable for Scott's trial counsel to have chosen not to request a second competency hearing. It was reasonable for counsel to avoid making a request that is not constitutionally compelled and instead to focus on defending their client on the merits.

*Pate* also does not discuss the duty of counsel to ensure that a criminal defendant continue receiving psychotropic medications or the duty of counsel to conduct an effective investigation before and cross-examination during a competency hearing, so it is inapplicable on those aspects of this subclaim. For these reasons, *Pate* does not help Scott carry his burden under the contrary to or unreasonable application clause of (d)(1).

*Drope* also does not help Scott with his (d)(1) burden. Although the petitioner in *Drope* had asserted a postconviction claim of ineffective assistance of counsel before the state court, that claim was not before the Supreme Court. *Drope*, 420 U.S. at 168-69. But, even if that claim had been before the Supreme Court, *Drope* is distinguishable from Scott's case for the reasons already discussed. Specifically, unlike the petitioner in *Drope*, Scott received psychiatric examination and treatment as well as a competency hearing before trial. *Id.* at 172. Additionally, while the petitioner in *Drope* was not present for a significant part of his trial after shooting himself, Scott was not absent for a portion of his trial and thus the trial court was able to observe his demeanor and continuing evidence of competency. *Id.* at 181. Because of these material factual differences, *Drope* cannot carry Scott's burden under the contrary to clause of (d)(1).

*Drope* also does not satisfy Scott's (d)(1) burden of showing that the ACCA committed extreme constitutional error or unreasonably applied a clearly established Supreme Court holding

181

in rejecting this *Strickland* claim. *Drope*'s central holding was that a court considering a defendant's competence must consider information available before trial as well as in-trial conduct to determine whether those categories of information together create "a sufficient doubt of [the defendant's] competence to stand trial to require further inquiry on the question." *Drope*, 420 U.S. at 180. Scott received a competency hearing before trial and was present during trial to allow the trial court to examine his continuing competency.

Because *Drope* does not suggest a second competency hearing was required here, Scott's trial counsel was not ineffective when they did not request a second competency hearing. *Strickland* dictates a deferential analysis of counsel's performance. Scott has not shown by a preponderance of competent evidence that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. During the Rule 32 court's evidentiary hearing, Scott's trial counsel said that "he had reason to believe that Scott was competent to stand trial based on his interactions with Scott and based on the fact that none of the medical professionals who evaluated Scott determined that he was not competent to stand trial." (Doc. # 14-59 at 202). Considering "the wide range of competent assistance," *Chandler*, 218 F.3d at 1317, and the fact that there are "countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, the court cannot now say that Scott's trial counsel were objectively unreasonable and deficient because they did not request a second competency hearing, particularly where *Drope*, as here, did not compel one.

This remains true even when examining the trial record, which Scott highlights in this claim, including where Scott engaged in loud outbursts, tirades, verbal attacks, and monologues about the fantasy of a future rap or fiction writing career, Scott's belief that he was a prophet of God, or a disconnected discussion about George W. Bush and the Nobel Peace Prize. (Doc. # 1 ¶

182

206 (citing to various places in the record)). Objectively reasonable counsel could have made a strategic decision to refrain from asking for a second competency hearing in these circumstances. This could have been because of concerns about malingering (which at least one healthcare professional suspected had occurred), to avoid raising frivolous motions or objections, to focus on the merits of the case, or to use counsel's limited time and effort during the trial in a more fruitful way than (again) addressing Scott's competency. The question is not whether these were the best strategic decisions that Scott's trial counsel could have made. Rather, the test is whether they were objectively unreasonable.

In *Drope*, the Court did not discuss the duty of counsel to ensure that a criminal defendant continue receiving psychotropic medications or the duty of counsel to conduct an effective investigation before a competency hearing and before cross-examination during the competency hearing. So, it is inapplicable to those aspects of this subclaim. For these reasons, *Drope* does not help Scott carry his burden under the contrary to or unreasonable application clause of (d)(1).

*Dusky* also gives Scott no aid on his (d)(1) burden. In *Dusky*, the Supreme Court did not consider an ineffective assistance of counsel claim. But, even if that claim had been before the Supreme Court, *Dusky* is distinguishable from Scott's case for the reasons already discussed. Specifically, in *Dusky* while there were psychiatrists who testified that the petitioner lacked competency, the undisputed testimony of Dr. Nagi at Scott's competency hearing was that he was competent. (*See* Docs. # 1 ¶ 209; 14-15 at 72-104). The specifics of that testimony are summarized above. And, as discussed, based on this material factual difference, *Dusky* cannot help Scott overcome his burden under the contrary to clause of (d)(1).

*Dusky* also does not satisfy Scott's (d)(1) burden of showing that the ACCA committed extreme constitutional error or unreasonably applied a clearly established Supreme Court holding

in rejecting this *Strickland* claim. *Dusky*'s central holding was that "the 'test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. Again, the ACCA did not unreasonably apply this holding in rejecting Scott's competency claim. Because the clearly established holding of *Dusky* did not compel a second competency hearing, it was not objectively unreasonable under *Strickland* for Scott's trial counsel not to have requested one.

Furthermore, *Dusky* did not discuss the duty of counsel to ensure that a criminal defendant continue receiving psychotropic medications or the duty of counsel to conduct an effective investigation before a competency hearing and before cross-examination during the hearing. So, it is inapplicable on those aspects of this subclaim. To the extent that the holding of *Dusky* could be applied to the claim that Scott's counsel should have ensured that their client received necessary medication to permit him to be competent, it again does not satisfy (d)(1)'s unreasonable application clause. For reasons already explained, Scott has not overcome his AEDPA burden of showing that he was constitutionally incompetent during trial. And, even if he is correct that he was not receiving his prescribed medications, such an alleged failure does not necessitate a finding that he was incompetent. Therefore, under *Dusky*'s clearly established holding, his counsel's failure to ensure that their client was receiving these medications would not have been objectively unreasonable.

Neither does *Bruce v. Estelle* help Scott carry his (d)(1) burden. *Bruce* is not a Supreme Court case, and does not satisfy the standards of (d)(1). In *Bruce*, the Fifth Circuit did not even consider an ineffective assistance of counsel claim. But, if that claim had been before the court, *Bruce* is distinguishable from Scott's case for the reasons already discussed. Again, unlike in

184

*Bruce*, Scott's competency hearing dealt only with a single issue, the hearing was before a judge (not a jury), it was not infected with improper prosecutorial comments, the court applied the correct legal standard for competency, and there was undisputed testimony that suggested Scott was competent. Based on these material factual differences, *Bruce* cannot help Scott overcome his burden under (d)(1)'s contrary to clause.

*Bruce* also does aid Scott in satisfying his (d)(1) burden of showing that the ACCA committed extreme constitutional error or unreasonably applied a clearly established Supreme court holding in rejecting this *Strickland* claim. *Bruce*'s central holding was that a state court competency hearing must be fundamentally fair. *Bruce*, 483 F.2d at 1038. The ACCA did not unreasonably apply this holding in rejecting Scott's competency claim. Because the clearly established holding of *Bruce* would not have compelled a second competency hearing, it was not objectively unreasonable under *Strickland* for Scott's trial counsel not to have requested one.

Nor did *Bruce* discuss the duty of counsel to ensure that a criminal defendant continue receiving psychotropic medications or the duty of counsel to conduct an effective investigation before a competency hearing and before cross-examination at such a hearing. So, it is inapplicable to those aspects of this subclaim. To the extent that the holding of *Bruce* could be applied to the claim that Scott's counsel should have conducted an effective investigation before and cross-examination during the competency hearing, it simply does not satisfy (d)(1)'s unreasonable application clause. There was no suggestion in *Bruce* that counsel's failure to investigate or explore every possibly fruitful avenue of cross-examination could render a competency hearing fundamentally unfair. Therefore, under *Bruce*'s clearly established holding, Scott's counsel's investigation before the competency hearing and before conducting cross-examination at the

185

hearing was not objectively unreasonable under *Strickland*. AEDPA deference to the *Strickland* findings under (d)(1) is due here.

*Agan* also cannot help Scott carry his (d)(1) burden. That Eleventh Circuit case cannot be applied to satisfy the standards of (d)(1). In *Agan*, the petitioner brought an ineffective assistance of counsel claim, and the Eleventh Circuit held that there should have been an evidentiary hearing on that claim. 835 F.2d at 1338. Even though *Agan* is the first case Scott cites that explicitly addresses a *Strickland* claim, it is distinguishable from his case. In *Agan*, the petitioner had two lawyers (one of whom withdrew), and "[t]he record indicates that neither attorney spent much time on [the petitioner's] case." *Id.* at 1340. The second attorney "spent only 15.25 hours on the case," "never spoke with [the first attorney] to familiarize himself with [the petitioner's] case; he did no legal research; and he interviewed only one witness in addition to [the petitioner] and the State attorney and investigator." *Id.* The Eleventh Circuit added that the attorney "did not even attempt to develop any defenses," and "neither attorney requested a competency hearing" even though their client had a "long history of mental problems." *Id.* The panel also noted that "[a]lthough they both advised [the petitioner] not to plead guilty, neither fully explained the consequences to him" of doing so. *Id.* There were other salient facts, including that the petitioner had confessed multiple times to a murder, waived his constitutional rights, stated to the grand jury and sentencing judge that he regretted that the death had not been *more* painful, planned to return to jail to murder another person connected to the dead inmate, and expected that, despite this testimony, he believed he had "guaranteed his receipt of a life sentence instead of a death sentence." *Id.* at 1339.

Unlike in *Agan*, Scott did not confess (much less do so multiple times) to a murder, did not explicitly waive his constitutional rights, never testified that he wished he had been crueler in the commission of any crime, never testified of plans to commit a similar crime, and never expressed

186

the irrational thought that he could be guaranteed a life sentence by confessing to a murder. To the contrary, Scott repeatedly confirmed that he understood that he faced the risk of the death penalty and that his lawyers had discussed with him the pros and cons of various trial strategies. Scott's lawyers were also completely different from those in *Agan*. While the *Agan* lawyers spent a total of 15.25 hours on the case, Scott's lawyers spent (as Scott's petition repeatedly emphasizes) 105 hours. (Doc. # 1 ¶ 38). While the *Agan* lawyers only interviewed one witness, Scott's lawyers called four witnesses to the stand during the guilt phase (Doc. # 14-19 at 47 (Charlie May Scott), 53 (Bonnie Scott), 62 (Rachel Hillary), 70 (Laquita Edwards, who invoked her Fifth Amendment privilege and did not testify)) and testified that they interviewed several witnesses in preparation for both the guilt and penalty phases. (Doc. # 14-58 at 22-23; 14-40 at 92; 14-41 at 81). The petitioner in *Agan* did not receive a competency hearing, but Scott did. Although the lawyers in *Agan* did no legal research and developed no defenses for Scott, Scott's lawyers did both. (*See* Doc. # 14-49 at 60 (billing 8 hours for "Research and trial preparation" and 2.5 hours for research and preparation of various motions). The *Agan* lawyers did not fully explain to their client the consequences of pleading guilty. But, Scott did not plead guilty, and he has never contended that his lawyers failed to inform him of the pros and cons of a plea decision. Scott's case is therefore materially different from *Agan* in a number of respects. It is of no utility to him in satisfying his burden under (d)(1)'s contrary to clause.

Nor does *Agan* aid Scott with respect to his (d)(1) burden of showing that the ACCA committed extreme constitutional error or unreasonably applied a clearly established Supreme court holding in rejecting this *Strickland* claim. Its central holding was that "[a]n evidentiary hearing is necessary whenever a habeas petition alleges facts that, if true, establish his or her right to relief," *id.* at 1338, and that considering the ineffective assistance of counsel claim, because it

187

is not "clear from the record" whether the petitioner's lawyers were ineffective, "an evidentiary hearing will have to be held" and "[s]ince no hearing was held in the state courts, such must be completed in the federal district court." *Agan*, 835 F.2d at 1340. The ACCA did not unreasonably apply this holding nor did it commit extreme constitutional error. An evidentiary hearing that addressed the effectiveness of Scott's trial counsel was held in the Rule 32 court. Indeed, Scott raised this claim before the Rule 32 court (Doc. # 14-37 at 103-07, 126-36, 150) and thus had the opportunity to explore it at an evidentiary hearing. Thus, *Agan*'s holding in no way compelled the ACCA to conclude that a second evidentiary hearing was necessary. Nor does *Agan* compel the conclusion that Scott's counsel were ineffective. The circumstances of *Agan* drove the Eleventh Circuit's conclusion that there was at least a question of ineffectiveness. But, those circumstances are absent here. And, *Agan* did not discuss a duty of counsel to ensure that a criminal defendant continue receiving psychotropic medications or any duty of counsel to conduct an effective investigation. That decision is inapplicable on those aspects of this subclaim. Therefore, it does not help Scott satisfy his burden under the unreasonable application clause of (d)(1).

*White* also cannot help Scott carry his (d)(1) burden. In *White*, the Georgia Court of Appeals did not consider a *Strickland* claim and *White* is not a pre-AEDPA decision. Moreover, it is a non-binding out-of-state decision. So, there are multiple reasons why it cannot help Scott overcome his burden under (d)(1). And, as *White* is factually distinguishable from Scott's case, he cannot use it to satisfy his burden under the contrary to clause of (d)(1). *White*'s clearly established holding was not unreasonably applied by the ACCA, as discussed above in subclaim C(1). Thus, *White* still cannot help Scott carry his burden under either clause of (d)(1).

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 212). Although Scott invokes (d)(2), he has not pointed to any

188

evidence that undermines the reasonableness of any factual determinations made by the state courts. That is, Scott has not shown that the ACCA's analysis of this *Strickland* claim was factually unreasonable. At most, he has pointed to undisputed evidence of what occurred during the competency hearing and at trial. As already explained, the ACCA did not unreasonably apply these undisputed facts in affirming the Rule 32 court's denial of relief on this claim. Scott has not overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

And indeed, upon reviewing the ACCA's last reasoned decision, the court concludes that the ACCA reasonably applied the facts, including the facts that the only witness at his competency hearing testified that he was competent, that his trial counsel testified at the Rule 32 court's evidentiary hearing that Scott had been competent during trial, and that Scott exhibited the ability to rationally consider the possibility of capital punishment and the pros and cons of various trial strategies. The court cannot say that the ACCA unreasonably applied these facts by concluding that Scott's constitutional rights were not violated when his trial counsel refrained from requesting a second competency hearing. Nor has Scott shown that the ACCA so erred in addressing whether he was receiving his prescribed medications during the trial, and in ruling on the scope of the investigation counsel conducted as part of the competency hearing.

Whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, even if de novo review is undertaken, this claim fails. Scott's allegations fail to establish a due process violation under binding Supreme Court or Eleventh Circuit law. As already discussed, Scott received a full and fair competency hearing at which Dr. Nagi testified he was competent. Furthermore, Scott's trial counsel were under no obligation to request a second competency hearing because, throughout

189

trial, and despite his emotional outbursts and strange statements, Scott still exhibited a rational and factual understanding of the proceedings as well as the ability to rationally consult with and assist his lawyers about his defense. And, even if it could be said that Scott's trial counsel did not ensure that he was taking his prescribed psychotropic medications, this was not objectively unreasonable under *Strickland* because Scott exhibited competency. Reasonable counsel could have determined Scott's outbursts were intentional or the result of poor behavior (after all, there were concerns about malingering). For these and other reasons discussed above, made a strategic decision to focus on developing the case for trial rather than attempting to relitigate what looked like a loser request for a second hearing. And, reasonable counsel could have prepared for the competency hearing as Scott's counsel did – by reading the report that they were provided and cross-examining Dr. Nagi without pressing him about discrepancies between the report and his hearing testimony.

For all of these reasons, the court denies Scott's request for relief based on this claim.

### D.    Claim D – Scott has not shown a right to habeas relief related to the consolidation of the rape and murder charges

Alabama Rule of Criminal Procedure 13.3(a) provides that "[t]wo or more offenses may be joined in an indictment . . . if they: (1) Are of the same or similar character; or (2) Are based on the same conduct or are otherwise connected in their commission; or (3) Are alleged to have been part of a common scheme or plan." Ala. R. Crim. P. 13.3(a). Scott maintains that his trial counsel were constitutionally ineffective under *Strickland* because they failed to "effectively challenge the State's request for consolidation of the counts against Scott for first degree rape, attempted murder, and burglary regarding Landris Wright [] with the counts for capital murder and first degree rape regarding Latonya Sager." (Doc. # 1 ¶ 213). Scott argues that the state court's denial of this postconviction claim was unreasonable under AEDPA's (d)(1) and (d)(2) standards. (*Id.* ¶ 238).

190

Again, Scott has failed to satisfy his AEDPA burden. Scott divides this claim into two subclaims: that his counsel failed "to vigorously apply the 'cross-admissibility' test for joinder-of-offenses under Alabama and federal law" and that his counsel failed "to argue that Scott would be 'substantially prejudiced' by the consolidation." (*Id.* ¶ 214). After summarizing the state courts' assessment of Scott's improper joinder claim, the court addresses the two subclaims in turn.

### 1.      State Court Proceedings

The ACCA on direct appeal recounted the facts that underlie this habeas claim:

> Scott was charged in three indictments. One indictment charged two counts of capital murder for the death of Latonya Sager – one count for the intentional murder of a child under the age of 14 years and one count for intentional murder during the course of, or during an attempt to commit, rape. In a second indictment, Scott was charged with one count of rape and one count of attempted murder for his assault on Landris Wright. The third indictment charged him with burglary for Scott's unauthorized entry into Gladys Smith's residence. On July 28, 2000, the State filed a motion pursuant to Rule 13, Ala. R. Crim. P., seeking consolidation of the offenses. The state argued that the actions were part of a common plan or scheme, that they were connected, and that they were of the same or similar character. The trial court granted the motion. On the morning of trial, Scott objected to the consolidation of the cases and requested that the trial court sever the capital charges from the noncapital charges. The trial court stated that the cases would remain consolidated for trial.

*Scott Direct*, 937 So. 2d at 1078 (internal citations omitted).

As the ACCA summarized, on the morning that the trial began, Scott's counsel orally raised the objection that "[w]e have previously had an argument on the State's Motion to Consolidate. We simply would renew our objection to consolidation of the capital offenses with the offense of burglary in the first degree and rape in the first degree." (Doc. # 14-15 at 124). Although his counsel alluded to a previous objection or "argument," there is no record of this that the court can discern and the ACCA on direct appeal noted that although defense counsel used the word "renewing," "we find no record of an objection prior to the first day of trial." *Scott Direct*, 937 So. 2d at 1078 n.3. Scott's lawyer continued that "the capital case should be tried on itself, on

191

the facts of this case, and the other offenses are not part of a scheme or plan, they are not similar in nature, and nor would they come under the realm of a 404(b)." (Doc. # 14-15 at 124). The prosecutor opposed this argument, contending that "there is evidence that links these two crimes. And without trying them together, it would be evidence that would come out in one, that would come out in the other." (*Id.*). The trial court judge then ruled simply that "[t]he cases will remain consolidated." (*Id.*).

On direct appeal, Scott raised a related but different version of this claim, arguing that the trial court erred in improperly joining the charges. (Docs. # 14-22 at 18-19, 29-33 (brief to ACCA); 14-26 at 102-05 (brief to Supreme Court of Alabama)). The ACCA quoted from *Lewis v. State*, 889 So. 2d 623, 661-62 (Ala. Crim. App. 2003), in which the ACCA had determined that the trial court did not err in joining two charges for trial. *Lewis* involved noncapital and capital offenses that occurred in the same county near where the defendant lived, involved "a young female with brown hair," a "murder, robbery, rape, and kidnapping or an attempt thereof," and a "knife." *Scott Direct*, 937 So. 2d at 1079 (quoting *Lewis*, 889 So. 2d at 661-62). Comparing the facts in *Lewis* to the facts in Scott's case, the ACCA highlighted that:

> The crimes were similar in that each victim was acquainted with Scott, were approximately 10 miles apart and the crimes were committed within a few hours of each other. In each incident, Scott raped or attempted to rape the victim and he physically assaulted the victims by choking and/or suffocating them. Evidence from the first crime scene was found at the second crime scene, and the police used evidence from the second crime scene to connect Scott to the death of Latonya Sager. Finally, Scott told his second rape victim that he had killed a girl earlier that evening.

*Id.* at 1079-80. The ACCA concluded that the "requirements of Rule 13.3(a) [] were fully satisfied here. Scott has not shown any compelling prejudice as the result of the joinder." *Id.* at 1080. Thus, "[t]he trial court did not abuse its discretion when it joined the charges for a single trial." *Id.*

192

In his first Rule 32 petition, Scott raised this point as a *Strickland* claim and therefore began to exhaust this claim. (Doc. # 14-29 at 43-52). He also raised this claim before the ACCA (Docs. # 14-54 at 61-63; 14-55 at 93-97) and the Supreme Court of Alabama (Doc. # 14-56 at 25, 75-85), satisfying his exhaustion requirement under AEDPA. In his amended Rule 32 petition, Scott again raised this claim (Doc. # 14-35 at 79-81), and in doing so pointed out a distinction in the ACCA's decision on direct appeal. Scott highlighted that on direct appeal, the ACCA only held that "[t]he trial court *did not abuse its discretion* when it joined the charges for a single trial." (Doc. # 14-35 at 80 (quoting *Scott Direct*, 937 So. 2d at 1080) (emphasis in original)). Because Scott had not raised a *Strickland* claim on direct appeal, Scott argued, the ACCA's denial of relief on his claim that the trial court had abused its discretion was inapplicable to his *Strickland* claim on collateral appeal. (*Id.*).

The Rule 32 court quoted from the ACCA's reasoning on direct appeal and acknowledged that Scott's specific contention in his Rule 32 petition was that his counsel did not raise the proper arguments in opposition to the State's consolidation motion. (Doc. # 14-33 at 70-71). The Rule 32 court then held that "[t]his court is not convinced that any additional argument by trial counsel would have resulted in a different decision or that it undermines the reasoning and holding by the [ACCA]. Since trial counsel cannot be ineffective for failing to raise a meritless claim or offering additional unmeritorious arguments, this allegation is summarily dismissed pursuant to Rule 32.7(d)." (*Id.* at 72 (citing Ala. R. Crim. P. 32.7(d))).

Scott raised this claim before the ACCA (Doc. # 14-58 at 103-04), and the Supreme Court of Alabama. (Doc. # 14-60 at 65). In his brief to the ACCA, Scott alleged that his trial counsel were ineffective "by failing to contest the consolidation of the rape case and the murder case" because they did not oppose the State's motion before the "eve of trial," and when they did, they

failed (1) "to vigorously apply the 'cross-admissibility' test for joinder-of-offenses under Alabama and federal law" and (2) "to argue that Scott would be 'substantially prejudiced' by the consolidation." (Doc. # 14-58 at 103-04 (citing *Ex Parte Pincheon*, 751 So. 2d 1219, 1223 (Ala. 1999), *Jenkins v. State*, 472 So. 2d 1128, 1129-30 (Ala. Crim. App. 1985))). He also argued that "[c]onsolidation reduced the probability that a jury would acquit Scott of either set of charges or avoid the death penalty and thereby prejudiced Scott." (*Id.* at 104). He again urged that the Rule 32 court had erroneously concluded that because the ACCA had denied a version of this claim on direct appeal, this decision precluded a *Strickland* claim based on the same facts. (*Id.*). Scott explained that "[t]he flaw in this is that both the trial court – and Scott – were denied the benefit of an informed, timely and vigorous advocacy by Scott's counsel." (*Id.*). If his counsel had effectively opposed the State's motion to consolidate the offenses, Scott argued, the trial court might have issued "a different, and equally supportable, ruling." (*Id.*).

Reviewing Scott's brief on second collateral appeal, the ACCA quoted from its own opinion on direct appeal (which is quoted and summarized above). (Doc. # 14-59 at 210-13). The ACCA reasoned that "Scott has failed to demonstrate that 'compelling prejudice' existed as a result of the joinder." (*Id.* at 213). The ACCA continued that "[b]ecause his argument is without merit, his trial counsel cannot be deemed to have rendered ineffective assistance for failing to raise a meritless issue at trial or on direct appeal." (*Id.* (citing *Hall v. State* 979 So. 2d 125, 150 (Ala. Crim. App. 2007))).

Scott then raised this claim to the Supreme Court of Alabama (Doc. # 14-60 at 65), which denied certiorari. (*Id.* at 177).

> **2.      Subclaim (D)(1) – Scott has not shown that trial counsel failed to raise the proper arguments to oppose the state's consolidation motion.**

194

A petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. A petitioner satisfies AEDPA's unreasonable application clause if he can show that the state court's application of the relevant constitutional standard was unreasonable. AEDPA requires this court to accord a state court "deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Richter*, 562 U.S. at 101. Consistent with § 2254(d)(1) deference, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (internal quotation marks omitted) (emphasis in original) (quoting *Williams*, 529 U.S. at 410).

Scott only explicitly refers to (d)(1)'s unreasonable application clause. (Doc. # 1 ¶ 238). But even if he had raised an issue related to (d)(1)'s contrary to clause, Scott has failed to carry his contrary to burden because he has not explained how the state court's decision applied a rule that contradicts the governing law set forth in Supreme Court cases, nor has he identified a factually indistinguishable Supreme Court decision with an outcome favorable to him.

The only Supreme Court decision Scott cites is *Strickland*, which is distinguishable from his case. In *Strickland*, the defendant's ineffective assistance of counsel claim was based on failures at the sentencing phase, and that decision in no way relates to a failure to object to a consolidation of counts. *Strickland v. Washington*, 466 U.S. 668, 675 (1984). In fact, the majority opinion in *Strickland* notes that the petitioner's counsel "actively pursued pretrial motions and discovery" but that the petitioner confessed to the charged crimes and waived his right to a jury trial. *Id.* at 672. Thus, *Strickland* contains no applicable holding regarding the question here. The *Strickland* petitioner also waived his right to an advisory jury at sentencing, so again, *Strickland*

195

is distinguishable because there was never any jury that could have been prejudiced due to consolidated charges. *See id.* at 672-73.

Scott has also failed to carry his (d)(1) burden under the unreasonable application clause as he has not shown how the ACCA committed extreme constitutional error or unreasonably applied clearly established federal as determined by the Supreme Court. Scott has cited no Supreme Court (or any other federal case law) besides *Strickland*; therefore, he cannot carry his (d)(1) burden to show that the ACCA unreasonably applied a clearly established holding. Scott also cites *Strickland* only once, and even then only offers a vague reference to the case name concluding that "[t]he state court's summary dismissal of this claim constituted an unreasonable application of *Strickland*." (Doc. # 1 ¶ 238). This does not satisfy Scott's high burden of proving an extreme constitutional error or unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 238). This argument fails. Although Scott invokes (d)(2), he has not pointed to any evidence that undermines the reasonableness of any factual determinations made by the state courts. That is, Scott has not shown that the ACCA's analysis of his consolidation claim was factually unreasonable. At most, he has argued that his counsel should have contested consolidation more effectively, which implies that the trial court unreasonably concluded that the charges should be consolidated. Consolidation of offenses for trial is, however, a legal question and not a factual determination. *King v. State*, 518 So. 2d 880, 884 (Ala. Crim. App. 1987). Moreover, even if it were a factual question, Scott has not pointed to specific evidence to overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

Whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. To be clear, Scott has not overcome AEDPA deference, and therefore this claim does not merit de novo review. However, even if the court were to engage in de novo review, it would reach the same conclusion. His claim fails.

*Strickland* held that to establish an ineffective assistance of counsel claim under the Sixth Amendment, a defendant must first "show that counsel's performance was deficient," and second "that the deficient performance prejudiced the defense." *Id.* at 687. The deficiency prong must be proven "by a preponderance of competent evidence," *Chandler*, 218 F.3d at 1313, and requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* As the *Strickland* Court observed, there are "countless ways [of] . . . effective assistance" and "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Consequently, an evaluating court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see, e.g.*, *Newland*, 527 F.3d at 1184 ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689).

Scott's first argument cites no authority. He simply contends that "it is unclear whether trial counsel even raised the significant arguments opposing consolidation prior to the start of trial." (Doc. # 1 ¶ 215). He further asserts that "[t]rial counsel ignored a crucial and potentially advantageous body of Alabama criminal procedure law by not making those arguments before trial . . . trial counsel effectively conceded this issue to the State until trial." (*Id.* ¶ 216). Scott then adds

197

that, before trial, Scott had filed a *pro se* motion objecting to joinder. (*Id.* ¶ 217). Specifically, in August or September 2000 (roughly two years before trial began), Scott filed a "Motion to Compel Election Or For Separate Tr[ia]ls" along with a letter to the court explaining that he was filing it himself because "my <u>two</u> attorneys won[']t file any." (*See* Doc. # 14-25 at 82-87). Scott argues that his "un-counseled attempt to raise these issues does not allay trial counsel's ineffectiveness on this issue. To the contrary, the fact that Scott had to file his own *pro se* motion further evidences that his trial counsel was ineffective and not paying attention to their own client's requests." (Doc. # 1 ¶ 217).

Again, the court must revisit the burdens on these arguments. Scott's burden on the first prong of the *Strickland* framework – deficiency – is to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. This is not a question of whether Scott's counsel failed to object at all to consolidation of offenses – here, Scott is merely quibbling with the timing and format of the motion. This kind of a nuanced criticism of trial counsel's performance resembles just the kind of "second-guess[ing]" that the Supreme Court cautioned against in a *Strickland* analysis. *Id.* And indeed, it could have been sound trial strategy for Scott's trial counsel to focus their pre-trial efforts (including the filing of written motions) on those motions most likely to be meritorious. Considering the extensive case law in Alabama defining charges that are proper for joinder under Alabama Rule of Criminal Procedure 13.3, the court concludes that an objection to joinder was unlikely to be meritorious – whether raised by Scott or his lawyers, or whether raised pre-trial by written motion or on the first day of trial through oral objection.

198

To consider whether a written pre-trial motion would have been meritorious (and thus whether there could have been a sound trial strategy in delaying the objection until the morning of trial), the court evaluates the state court cases that Scott cites.

Scott cites *King v. State*, 518 So. 2d 880 (Ala. Crim. App. 1987). In *King*, there were two pairs of indictments (four in total) that corresponded to two separate incidents involving burglary and rape or attempted rape of two women. *King*, 518 So. 2d 880, 881-82. The four indictments were consolidated for trial and the petitioner was convicted of all four charges. *Id.* The petitioner contended that the two pairs of indictments should not have been consolidated and that this was error under Alabama procedural rules. *Id.* at 883-84 (citing then Ala. R. Crim. Proc. Temp. 15.3, which was later incorporated into the permanent Rule 13.3, *see Hinkle v. State*, 86 So. 3d 441, 446 (Ala. Crim. App. 2011) (quoting *Ex parte Scott*,[10] 728 So. 2d 172, 181 (Ala. 1998))).

The ACCA summarized the two incidents. In the first, a woman fell asleep in her house at night and woke up to find a man kneeling over her. *Id.* at 882. She saw that the man was wearing "white high-top tennis shoes, blue jeans, a gray sweat shirt, and a black jacket," and remembered that a couple of weeks earlier she had seen someone outside her house "wearing jeans and shoes like the ones the man . . . was wearing." *Id.* The light bulbs in her house had been unscrewed and her phone had been unplugged. *Id.* The man attempted to rape her, warning her that he would stab her although he did not show her a weapon. *Id.* The woman argued with the man and eventually he left without having successfully raped her. *Id.* The woman "saw that the window in her daughter's room had been opened and its screen was off." *Id.* She later identified the defendant from a photographic array and a physical line-up. *Id.*

---

[10] Although they share a common name, the defendant in *Ex parte Scott*, 728 So. 2d 172 (Ala. 1998) is not linked to Scott or this case.

In the second incident, a woman had found a windowpane broken enough to unlock the window, a key missing, and the phone unplugged. *Id.* at 883. About one week later, the woman was in her residence at night and was talking on the phone to a male friend. *Id.* The woman then saw a shadow and then a man approaching her wearing "a pull-over shirt, blue jeans, and tennis shoes." *Id.* She attempted to fight him, and he started choking her, threatening to kill her. *Id.* He then began to rape her. *Id.* Later, the woman's male friend arrived, and the man threatened to kill him with a gun (although he did not show the weapon). *Id.* Later, the woman discovered that the light bulb in her back porch light had been unscrewed. *Id.* The defendant confessed to this rape and burglary. *Id.* Again, there were four indictments involved in this case and the trial court consolidated those indictments for trial. *Id.* at 881.

The ACCA set out a three-pronged test for a trial court to consider when ordering consolidation: "(1) it must ensure that the offenses charged in the respective indictments could have been joined in a single indictment; (2) it must be satisfied that the joinder meets the requirements set out in Rule 15.3(a) [later incorporated into the permanent Rule 13.3(a)]; and (3) it must be satisfied that the defendant will not be prejudiced within the meaning of Rule 15.3(d)." *Id.* at 884. The ACCA noted that a trial court's refusal to sever offenses "will be reversed only if the defendant proves that the court's decision constituted a clear abuse of judicial discretion." *Id.* The ACCA concluded that "the four offenses in this case properly joined in accordance with Rule 15.3(a) [which, again, later incorporated into Rule 13.3(a)], because they 'are of the same or similar character.'" *Id.* (citing Rule 15.3(a)(i)). Explaining that "the most important consideration is whether evidence of one offense would have been admissible at a trial of the other offense," *id.* (citation removed), the ACCA highlighted two "alternate tests." *Id.* This included "whether the circumstances of the offenses 'exhibit such a great degree of similarity that anyone viewing the

two offenses would naturally assume them to have been committed by the same person.'" *Id.*
(quoting *Brewer v. State*, 440 So. 2d 1155, 1161 (Ala. Crim. App. 1983)). The other was "whether
there is something 'novel' or 'peculiar' about the offenses that identifies them with the defendant."
*Id.* (quoting *Brewer*, 440 So. 2d at 1163). The ACCA reviewed several "illustrations" of such novel
or peculiar behavior:

> In *Thomas* [*v. State,* 409 So. 2d 955 (Ala. Crim. App. 1981)], both robberies
> committed by the defendant occurred within a half-hour and at locations less than
> a mile apart. The defendant carried a pistol, and made the victims – both Auburn
> students – remain in the bathroom while he cased the apartments. The assailant had
> trouble detaching the telephone cords in both dwellings and took no change on
> either occasion. Our court had no difficulty finding a sameness or 'pattern' in the
> two offenses.

> Similarly, in *Lewis* [*v. State,* 399 So. 2d 907 (Ala. Crim. App. 1981)], the
> defendant's prior robberies of elderly females by grabbing their purses as they were
> returning from the grocery store after dark established a 'design' or 'signature'
> pointing to the accused.

> In *Hayes* [*v. State,* 384 So. 2d 623 (Ala. Crim. App. 1979), *cert. quashed,* 384 So.
> 2d 627 (Ala. 1980)], the accused assaulted two young women at 3:00 a.m. near their
> own front doors, one as he was kissing her goodnight and the other as he was
> leaving after a 'friendly talk.' In both cases the assailant placed his hands around
> the women's backs and suddenly began to apply pressure to their necks.

> *Stanley* [*v. State,* 326 So. 2d 148 (1976)], dealt with two burglaries of the same
> house with the same tenant – five months apart. Likewise, *McDonald* [*v. State,* 329
> So. 2d 583 (1975), *cert. quashed,* 329 So. 2d 596, *cert. denied,* 429 U.S. 834
> (1976)], involved a judge who propositioned female litigants after calling them to
> his chambers, closing the door, and offering 'help' on legal matters pending before
> him.

> The attacker in *Hogue* [*v. State,* 312 So. 2d 86 (1975)], drove an orange car, stopped
> female drivers at mid-afternoon near the same exit on Interstate 59 to tell them their
> mufflers were not working, and then pulled a knife on them and demanded money.

> The *Mitchell* [*v. State,* 235 So. 2d 917 (1970)], assailant waylaid pre-teenage girls
> on their way to school by preying on their fears of his brown and white dog.
> Similarly, the *McKenzie* [*v. State,* 33 So. 2d 484 (1946), *cert denied,* 33 So. 2d 488
> (1947)], defendant lured women to the same secluded spot on the pretense of
> looking for a lost bracelet. In *Wilder*[ *v. State,* 1 So. 2d 317 (1941)], the thief
> managed to snatch women's purses in movie theaters by sitting next to them, then

201

> changing seats until he had a more advantageous position from which to steal their handbags.

*Id.* at 885 (quoting *Brewer*, 440 So. 2d at 1162-63).

The ACCA also reviewed examples in other cases that the *Brewer* court had discussed:

*Nichols v. State*, 422 So. 2d 804 (Ala. Crim. App. 1982) (in a trial for rape, admitting evidence of prior rapes in which victims testified that the defendant spoke in a "distinctively soft voice," kept victims from seeing his face, and asked whether the victims were "hiding anything under their pillows"), *Smith v. State*, 409 So. 2d 455 (Ala. Crim. App. 1981) (in a trial for rape, admitting evidence of a rapist previously apologizing to victims and returning them to a place of safety after attacking them), and *Breen v. State*, 349 So. 2d 113 (Ala. Crim. App. 1977) (admitting evidence that a defendant had previously used "sheet hems with green stitching to bind all of his victims"). *Id.* at 885 (citing *Brewer*, 440 So. 2d at 1163).The ACCA then reviewed two additional "helpful" examples: *Lawrence v. State*, 441 So. 2d 1021 (Ala. Crim. App 1983) (in a trial for a rape during which the defendant wore a ski mask, admitting evidence that defendant was previously observed trying to break into a house while he had a ski mask in his car) and *Primm v. State*, 473 So. 2d 1149 (Ala. Crim. App. 1985) (in a trial for rape, admitting evidence of previous attacks that also were against women, in the same city, during the early evening, at a motel on the by-pass, and with a gun). *Id.* at 885-86.

The ACCA applied this caselaw to the facts in *King*, concluding that "the four indictments were properly consolidated" because they shared the "following common features:

> (1) The assaults occurred within the immediate vicinity of each other and of King's residence, all within three minutes' walking distance; (2) they occurred in the late-night hours and six weeks apart; (3) the victims were black females, who lived with only a child and no spouse; (4) the assailant continuously attempted to strangle each woman and threatened to kill each; (5) he warned of inflicting harm to each victim with a weapon, but he never displayed any type of weapon; (6) in each incident, light bulbs were unscrewed at the residence; (7) the assailant of both women wore

202

high top tennis shoes; (8) each victim gave the same physical description of her attacker; and (9) each victim was repeatedly adamant that King was her assailant.

*Id.* at 886. The *King* court noted that it was not considering these similarities individually, but instead, was considering whether, as a group, the similarities outweighed the dissimilarities. *Id.* at 886-87. Finally, the court added that even if charges were proper for consolidation, a defendant can establish that a trial court abused its discretion if its failure to sever charges resulted in "compelling prejudice." *Id.* at 887 (quoting *Holsemback v. State*, 443 So. 2d 1371, 1377-78 (Ala. Crim. App. 1983), in turn quoting *Twelfth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1981-1982*, 71 Geo. L.J. 339, 494-98 (1983)).

Applying *King* to the facts here, for the motion to sever to be meritorious, his counsel was required to show that the offenses charged in the three indictments could *not* have been joined under Rule 13.3 or that the consolidation would have resulted in compelling prejudice. *Id.* at 884. First, Scott's counsel could not have satisfied the first prong because the two groups of offenses were of a "same or similar character." Specifically, and as the ACCA noted on direct appeal, the two groups of charges (associated with Latonya Sager and Landris Wright) shared the following similarities:

> each victim was acquainted with Scott, were approximately 10 miles apart and the crimes were committed within a few hours of each other. In each incident, Scott raped or attempted to rape the victim and he physically assaulted the victims by choking and/or suffocating them. Evidence from the first crime scene was found at the second crime scene, and the police used evidence from the second crime scene to connect Scott to the death of Latonya Sager. Finally, Scott told his second rape victim that he had killed a girl earlier that evening.

937 So. 2d at 1079-80.

These similarities resemble those in other Alabama cases that found behavior was "novel" or "peculiar" such that it could fit the "same or similar character" prong of 13.3. As in *Thomas*, 409 So. 2d 955, in which a defendant committed robberies (both against Auburn students) within

203

a half-hour and at locations less than a mile apart, made the victims remain in the bathroom during the crimes, and had trouble detaching telephone cords in each apartment, Scott was charged with committing rape or attempted rape (in both instances against young Black females who he knew) within a few hours and at locations roughly ten miles apart, and he choked or suffocated the victims during the crimes. Thus, like the defendant in *Thomas*, Scott committed the same type of crime against a similar victim within a small time window, within miles of each other, and engaged in similar behavior during the crimes.

Also, like in *Lewis*, 399 So. 2d 907, in which a defendant committed robberies of elderly females by grabbing their purses as they returned from the grocery store after dark, Scott committed the same type of crime (rape or attempted rape) against the same type of victim (young Black females whom he knew) by using a similar method (choking or suffocating them) and around the same time of day (at night or in the early morning).

Another case that shares similarities is *Hayes*. 384 So. 2d 623. There, a defendant assaulted two young women at 3:00 a.m. near their front doors by placing his hands around the women's backs and suddenly applying pressure to their necks. Like the defendant in *Hayes*, Scott committed the same type of crime (rape or attempted rape) against the same type of victim (young Black females whom he knew) around the same time (at night or in the early morning) and using a similar method (choking or suffocating them).

*King* cites several more cases that share these types of similarities. *See, e.g.*, *McDonald*, 329 So. 2d 583 (judge propositioning female litigants by calling them to his chambers, closing the doors, and offering "help" on legal matters); *Hogue*, 312 So. 2d 86 (defendant driving an orange car, stopping female drivers mid-afternoon near the same I-59 exit, telling them their mufflers were not working, and pulling a knife before demanding money); *Mitchell*, 235 So. 2d 917 (using a

204

brown and white dog to scare and waylay pre-teen girls on their way to school); *Wilder*, 1 So. 2d 317 (snatching women's purses in movie theaters by sitting next to them); *Nichols*, 422 So. 2d 804 (speaking in a "distinctively soft voice" during a rape, keeping victims from seeking his face, and asking victims whether they were "hiding anything under their pillows"); *Smith*, 409 So. 2d 455 (apologizing to victims and returning them to a place of safety after a rape); *Breen*, 349 So. 2d 113 (using "sheet hems with green stitching to bind all of his victims"); *Lawrence*, 441 So. 2d 1021 (storing a ski mask in a car during a previous crime when the current charge was for rape while wearing a ski mask); *Primm*, 473 So. 2d 1149 (previously attacking women in the same city during early evening at a motel on the by-pass with a gun).

Comparing the facts of *King* (in which the ACCA upheld consolidation) to the facts here supports the determination that consolidation was proper under Rule 13.3. In *King*, the defendant committed rape or attempted rape within three minutes' walking distance, late at night, against Black females who lived with only a child and no spouse, involved strangling and threats to kill, warning of inflicting harm despite not displaying a weapon, unscrewing light bulbs, wearing high top tennis shoes, and resulting in confident identification by each victim of her attacker. *King*, 518 So. 2d at 886. As in *King*, Scott committed the same type of crime (rape or attempted rape) within a close vicinity (10 miles), around the same time (within hours), against the same type of victim (young Black females whom he knew), involved the same type of attempt at restraint (choking or suffocating), and resulted in one victim confidently identifying Scott (Landris Wright) as well as identifying evidence on the deceased victim (DNA evidence on Latonya Sager).

Further, applying *King*'s legal test to decide whether consolidation is proper, the court below examined whether the similarities outweigh the dissimilarities in Scott's case. Scott argues the dissimilarities between the two groups of charges include the following: the Wright charges

205

involved Scott peeping through Landris's window, entering the bathroom while she was showering, struggling for about an hour, pulling a gun, forcibly penetrating Landris at least twice, holding Landris's head in the toilet while holding a gun to her head, using a glitter gel during the rape, forcing Landris to bathe in a tub of hot water and vinegar, and falling asleep with his leg over Landris's body afterward. (Doc. # 1 ¶ 225). By contrast, Scott argues, the Sager charges involved none of the Wright charges' peculiarities, and instead occurred in the early morning, with no signs of forcible penetration, no evidence that Latonya was forced to take a bath or had her head held in a toilet while being threatened with a gun, no evidence that Scott fell asleep next to Latonya, and no evidence that Scott attempted to remove evidence of sexual activity (given the traces of his semen on Latonya's right thigh). (*Id.* ¶ 226).

The similarities between the Wright and Sager charges far outweigh the dissimilarities. Scott was charged with committing a very similar crime (rape or attempted rape) against a similar victim (young Black women whom he knew) during a similar time frame (late at night or early in the morning) within a similar location (within ten miles) and using a similar method of subduing victims (choking or suffocating). Apart from the fact that Latonya Sager's death does not permit the court to conclude whether or not Scott engaged in similar activities such as peeping beforehand, struggling for up to an hour, holding her head in the toilet, threatening her with a gun, or falling asleep next to her afterward, the similarities that the record supports are notable and far outweigh the unique aspects of the crimes.

Applying the "cross-admissibility" test from *King* likewise makes clear that a motion to sever would not have been meritorious. Under Alabama Rule of Evidence 404(b), evidence of "other crimes, wrongs, or acts" is admissible as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ala. R. Evid. 404(b)(2). The central

206

question in Scott's guilt phase was his identity, and this was also particularly important in the capital charges related to the death of Latonya Sager, as the only physical piece of evidence connecting Scott to that crime was his DNA in traces of semen on Latonya's thigh. Therefore, distinctive practices such as committing the same type of crime against the same type of victim within the same time frame and vicinity and by using a similar method (choking or suffocating) would have been admissible as evidence of identity under Rule 404(b)(2). It was appropriate to allow a jury to hear that evidence and decide whether the same person committed the two crimes.

Scott's citations to cases in which courts have rejected the propriety of consolidation do not change this conclusion. For example, Scott cites *Jenkins v. State*, 472 So. 2d 1128 (Ala. Crim. App. 1985) and says that "the court reversed joinder of two rape and one indecent exposure charges" after finding "a lack of cross-admissibility of the evidence used to establish each of the charges." (Doc. # 1 ¶ 224). In *Jenkins*, as Scott summarizes, there were three sexual incidents involving three women – two of whom lived in the same house as the defendant. Apart from those similarities, the differences were stark, as one victim was "a married adult and was not related to Jenkins, although she knew him," did not live with Jenkins, and the rape of that victim was forcible. *Jenkins*, 472 So. 2d at 1129. The other two victims were the defendants' sisters in law, were underage (thirteen and nine) and lived with the defendant. *Id.* The defendant raped the thirteen-year-old defendant in a non-forcible manner and indecently exposed himself to the nine-year-old in the home in which they lived. *Id.*

The ACCA highlighted that although there was "some ground" for joining the rape of the sister-in-law with the indecent exposure to the other sister-in-law, the prosecution never contended that the rape of the married adult victim would have been admissible at the trial of the other two offenses, and ultimately the joinder was prejudicial. *Id.* The Wright and Sager charges in Scott's

case are much more similar to each other than the rape of the adult married woman was to the sisters-in-law incidents in *Jenkins*. The only similarities between the two groups of incidents in *Jenkins* were that the incidents were sexual, committed against females, and were committed in the same year (1982). Otherwise, the incidents were done in different ways (forcibly versus non-forcibly), on different properties, with different types of victims (one a married adult woman to whom the defendant was not related, and two unmarried underage females to whom the defendant *was* related and with whom he lived). When combined with the fact that the prosecution did not attempt to contend that the rape of the adult woman would have been admissible at a trial of the other two offenses, the facts of *Jenkins* are distinct from the facts here. Unlike the situation in *Jenkins*, the prosecutor in Scott's case explicitly stated that there was cross-admissibility of evidence: "there is evidence that links these two crimes. And without trying them together, it would be evidence that would come out in one, that would come out in the other." (Doc. # 14-15 at 124).

Scott also cites *Ex parte Pincheon*, 751 So. 2d 1219 (Ala. 1999), and asserts that there, "the Alabama Supreme Court overturned the joinder of interference-with-custody and rape charges. The Court found that other than the fact that the two victims were sisters, the two crimes were too dissimilar in character to provide any basis for cross-admissibility of evidence thereof." (Doc. # 1 ¶ 223). In *Pincheon*, the defendant was charged with interference with custody based on the facts that he, as a junior college student, developed a romantic relationship with a female high school student whose parents did not approve. 751 So. 2d at 1219. Her parents later charged the defendant with interference with custody of a minor child. *Id.* The next year, the female completed high school and moved in with the defendant. *Id.* at 1220. The next year, the couple visited her family, and her sister visited the couple's motel room. *Id.* The sister later alleged that the defendant raped her at the motel. *Id.* A grand jury indicted the defendant on three counts: interference with custody,

208

rape of the sister, and statutory rape of the sister (because she was between twelve and sixteen at the time). *Id.* at 1220-21. Defense counsel filed a motion to sever the rape charges from the interference with custody charge, but the motion was denied, and the ACCA affirmed this denial on appeal. The Supreme Court of Alabama reversed, explaining that the incidents happened two years apart and that the "only connection is that the alleged victims are sisters." *Id.* at 1223.

But Scott's case is different. There are numerous similarities between the Wright and Sager charges. The incidents were closer in time than the two-year time frame in *Pincheon* – indeed, they happened within several hours of each other – and the charged conduct was similar (rape or attempted rape). The Wright and Sager incidents involved similar methods of committing the crimes (choking or suffocation), occurred in the same vicinity, and Scott knew both victims. The facts of Scott's case are thus materially different from the facts in *Pincheon*, so while in *Pincheon* the court found that there was no significant connection or cross-admissibility of evidence between the two groups of charges, in Scott's case there is a much more significant connection and cross-admissibility of evidence. *Pincheon* thus does not support an argument that consolidation of charges in Scott's case was improper under Rule 13.3.

Finally, Scott cites *Kennedy v. State*, 640 So. 2d 22, 29 (Ala. Crim. App. 1993) for the proposition that "consolidation under 'common scheme or plan' prong of Rule 13.3(c)(3) is appropriate only in cases where [the] State could successfully invoke the 'common scheme or plan exception' to the collateral crimes evidence rule, *i.e.*, where there is cross-admissibility." (Doc. # 1 ¶ 221). However, *Kennedy* is distinguishable. There, the ACCA held that counts related to rape in the second degree and production of obscene matter of one victim (C.F.) should have been severed from counts related to interference with custody and production of obscene matter of a second victim (A.K.). 640 So. 2d at 29. After summarizing the cross-admissibility test, the ACCA

209

reasoned that the evidence related to the first victim (C.F.) would not have been admissible in a trial of counts related to the second victim (A.K.). *Id.* This was because:

> The criminal acts alleged to have been perpetrated against the two victims took place at different times and under different circumstances. The appellant was not charged with interfering with the custody of C.F. and he was not charged with raping A.K. The only connection between the two victims appears to have been that A.K. and C.F. were cousins, that A.K. introduced C.F. to the appellant, and that when the appellant was arrested for interference with the custody of A.K., the ensuing search of his residence disclosed nude photographs of both A.K. and C.F. The photographs, however, were *not* taken at the same time, and there is no evidence that either girl knew that nude photographs had been taken of the other. At trial, the offenses against A.K. and C.F. were proved by "different bodies of evidence." 8 *Moore's Federal Practice* ¶ 8.05[4] at 8–22.

*Id.*

Here, there were many more similarities between the Wright and Sager charges than were between the C.F. and A.K. charges. While the C.F. and A.K. incidents in *Kennedy* took place at different times and in different circumstances, the Wright, and Sager incidents took place within hours of each other and involved similar circumstances. They were within a ten mile radius, inside homes of people Scott knew, and involved a violent rape. While the C.F. and A.K. incidents involved different types of charges (interference with custody of A.K. and rape of C.F.), the Wright and Sager incidents involved similar types of charges (rape and attempted rape). It is true that the Sager incident also involved murder, but this difference does not overshadow the central similarity, which was that the murder was alleged to have occurred during a rape or attempted rape. While the obscene photographs found of C.F. and A.K. at the defendant's residence were not alleged to be connected in terms of timing, the Wright, and Sager incidents occurred within hours of each other. And, while there was no evidence that either A.K. or C.F. knew that nude photographs had been taken of the other girl, Landris Wright testified that Scott told her (in the early morning) that he had killed a girl the night before. (Doc. # 14-17 at 10 ("He was sitting on the bed, and he said

210

– he just upped and said, 'I killed a girl last night.'")). Because Latonya Sager was found dead that morning, evidence of Scott's admission to killing "a girl" such as Latonya the night before would be admissible in a trial of the Sager charges. In sum, *Kennedy* also does not establish that consolidation was in error, and thus does not establish that a written, pre-trial motion to sever would have been meritorious. Scott's trial counsel were thus not deficient for failing to file such a non-meritorious motion, nor could such a failure have prejudiced Scott.

It is worth adding that the ACCA discussed *Lewis v. State* at length. *Lewis* is a seminal case interpreting Rule 13.3. Neither Scott's habeas petition (Doc. # 1) nor his reply (Doc. # 20) briefing addressed that discussion, and this cuts against his argument. In *Lewis*, as the ACCA noted, on collateral appeal, the court considered whether capital murder charges had been properly joined for trial with noncapital murder charges. In upholding the joinder of these charges, the ACCA explained that "the crimes were of a similar character and [] evidence of each crime would have been admissible in a trial for the other as evidence of a common plan, scheme, or design, of Lewis's intent, and of Lewis's motive." *Lewis*, 889 So. 2d at 661-62. The ACCA detailed all the elements of the two groups of charges, including that they each occurred in the same county near where the defendant lived, they "each involved a young female victim with brown hair," they "each involved a murder, robbery, rape, and kidnapping or an attempt thereof," and the defendant planned to use a knife in each one. *Id.* at 662. The ACCA added that the evidence of the each crime would have been admissible in the trial of the other because it would be "evidence of a common plan, scheme, or design – to kidnap, rape, rob, and murder young women with brown hair who resembled and/or reminded [the defendant] of his ex-wife Lena – and of [the defendant's] intent and motive." *Id.*

As the ACCA correctly concluded on collateral appeal, a comparison between the Wright and Sager charges reveals a parallel degree of similar character and cross-admissibility. Also as in *Lewis*, both offenses occurred within the same county in which Scott lived. As in *Lewis*, each offense involved a young Black female that Scott knew. As in *Lewis*, each offense involved a similar crime – rape or attempted rape accompanied by the use of choking or suffocation. And, like in *Lewis*, evidence introduced related to the Wright charges was admissible in the trial of the Sager charges. Therefore, applying that seminal case here, this court concludes that the trial court's consolidation of the charges was not improper and that, even if Scott's trial counsel had filed a written pre-trial motion opposing consolidation, and even if they had explicitly cited the cross-admissibility test, those arguments would have failed. Trial counsel were not deficient for failing to raise an objection that has no merit, and such a failure is also not prejudicial, so the court rejects Scott's *Strickland* Subclaim D(1).

> **3.      Subclaim (D)(2) – Scott has not shown that trial counsel was ineffective for failing to adequately argue that Scott would be substantially prejudiced by the consolidation of the offenses.**

Scott also argues that his trial counsel were deficient under *Strickland* because they did not adequately assert that he would be substantially prejudiced by the consolidation of the offenses. (Doc. # 1 ¶¶ 228-236). Whether evaluated under the deferential AEDPA standard or under de novo review (and, to be clear, this claim is subject to AEDPA review), this argument lacks merit.

As discussed above, Scott only explicitly refers to (d)(1)'s unreasonable application clause. (Doc. # 1 ¶ 238). But, even if he had referred to (d)(1)'s contrary to clause, Scott has failed to carry his burden because he has not explained how the state court's decision applied a rule that contradicts the governing law set forth in the Supreme Court's cases. Nor has he identified a factually indistinguishable Supreme Court decision with an outcome favorable to him. The only

Supreme Court decision Scott cites is *Strickland*, which (as already discussed above) is distinguishable from Scott's case.

Scott has failed to carry his (d)(1) burden under the unreasonable application clause because he has not shown how the ACCA committed extreme constitutional error or unreasonably applied clearly established federal as determined by the U.S. Supreme Court. He has cited no Supreme Court or even federal case law besides *Strickland*, and thus to carry his (d)(1) burden, show that the ACCA unreasonably applied a clearly established holding in *Strickland*. And, for the reasons already discussed in Subclaim D(1), Scott has failed to overcome AEDPA deference under the (d)(2) clause as he has not pointed to an unreasonable factual determination by the ACCA or to specific evidence that would overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

Nevertheless, whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. To be clear, Scott has not overcome AEDPA deference, and therefore this subclaim does not merit de novo review. Further, even if the court were to apply de novo review, this subclaim would fail.

Scott has not shown how the consolidation of the Wright and Sager charges was error under Rule 13.3, so compelling prejudice is moot. The trial court would not have granted the motion to sever. Trial counsel are not deficient under *Strickland* for failing to raise non-meritorious arguments, and a failure to raise this particular non-meritorious argument did not prejudice Scott under *Strickland*'s second prong.

Whether consolidation would produce compelling prejudice is moot here because both cases that Scott cited to support his prejudice argument indicate that there is a risk of prejudice where "total unrelated, similar offenses are joined." *Pincheon*, 751 So. 2d at 1223. In *Jenkins*, the

court phrased it as "[t]he joinder prejudiced Jenkins because of the overwhelming likelihood that proof that he was guilty of one offense was used to convict him of another *even though proof of that guilt would have been inadmissible at a separate trial*." *Jenkins*, 472 So. 2d at 1130 (emphasis added). So, while Scott correctly quotes the reasoning from these cases – that joinder of sex crimes can result in prejudice because of a juror's "commonly held behavioral prejudices about hose who perpetrate sex crimes, mistakenly assuming that the commission of one type of sex crime predisposes to another kind," *Pincheon*, 751 So. 2d at 1223 (quoting *Jenkins*, 472 So. 2d at 1129-30) – this consideration of prejudice is limited by the first question of whether the charges are properly consolidated under Rule 13.3. After all, joinder of any crime with another crime necessarily results in some prejudice.[11] If all that was required to defeat consolidation was to show a risk of prejudice, courts would never be able to consolidate like charges, even if they satisfied Rule 13.3. Therefore, despite any inherent risk of prejudice that he may have faced from joinder of two sex crimes, joinder here satisfied Rule 13.3 and the failure of Scott's trial counsel to raise the prejudice argument was neither deficient nor prejudicial.

Even if the question of prejudice were not moot (that is, for example, even if the Rule 13.3 test were disjunctive), Scott has failed to demonstrate the "compelling prejudice" that Alabama courts require to carry a misjoinder claim. As the ACCA has held, "[i]t is only the most compelling prejudice that will be sufficient to show the court abused its discretion in not granting a severance. . . . A mere showing of some prejudice is not enough." *Lewis v. State*, 889 So. 2d 623, 660 (Ala. Crim. App. 2003) (quoting *Ex parte Hinton*, 548 So. 2d 562, 566 (Ala. 1989) (alterations in *Lewis*)). The ACCA in *Lewis* added that "[n]o prejudice results where . . . the jury could easily

---

[11] This supplies the basis for rules of evidence like Rule 404(b), which make "[e]vidence of other crimes, wrongs or acts" not admissible "to prove the character of a person in order to show action in conformity therewith." *See, e.g.*, Ala. R. Evid. 404(b).

have kept separate the evidence of the separate crimes." *Id.* (quoting *Hinton*, 548 So. 2d at 566) (alterations in *Lewis*)).

Applying this test to Scott's petition, the court concludes that he has failed to demonstrate why there was *compelling* prejudice in his case and why his jury would have had trouble keeping separate the evidence of the Wright and Sager charges.[12]  For example, Scott broadly argues that, in general, joinder of sex crimes like the Wright and Sager charges is prejudicial because a jury is likely to view such crimes as deviant and make assumptions about the type of person who commits sex crimes. (Doc. # 1 ¶ 229). In support of this conclusion, Scott argues that he had to "defend two rape charges at once, which although they were quite different factually, both involved technically juvenile victims, allegations of violence, graphic descriptions of Scott's behavior, and in one case the murder of a ten-year-old girl, all of which are emotionally charged issues." (*Id.* ¶ 230). Scott has cited zero case law to support the contention that these factual details made this joinder especially prejudicial. Scott also has not cited anything from the trial transcript to indicate that the court or the prosecution ever made statements likely to confuse the jury about which evidence was presented as to which crime. And, in any event, the court is not convinced that jurors would have confused the issues, especially given certain distinguishing features in the presentation of evidence. For example, Landris Wright was alive and testifying before the jury while Latonya Sager was dead and could not. Given the high burden of showing "compelling prejudice" that Scott bears on this misjoinder claim, the court concludes that Scott has not satisfied this burden and thus

---

[12] Even if it can be said that the ACCA applied a standard higher than the "unfair prejudice" standard set forth by *Strickland*, the court also finds that the claim fails on de novo review for the same reasons explained below. *Guardado v. Sec'y, Fla. Dep't of Corr.*, 112 F.4th 958, 990-91 (11th Cir. 2024). Scott has not established a reasonable likelihood of success in showing that the two charges, which were the same type of crime against a similar victim within a small time window, within miles of each other, and with similar behavior during the crimes, were improperly consolidated on the basis of unfair prejudice.

that he cannot demonstrate compelling prejudice from the consolidation of charges related to the two sex-related crimes.

Scott also argues that this consolidation resulted in prejudice because the Wright and Sager charges involved different evidentiary strengths. (Doc. # 1 ¶ 232-36). So, he contends that while "[t]he State's proof of the Sager charges was one spot of semen" (*id.* ¶ 233), the "Wright charges were supported by two witnesses and some circumstantial evidence" (*id.* ¶ 234) – evidence that included testimony from both the victim (Landris) and the owner of the apartment (Gladys) about Scott's "bizarre" behavior, Scott's possession of a gun, a police officer's testimony that Landris had flagged him down, and the fact that "Scott was found asleep at the scene of the alleged rape; and he was wearing only boxer shorts." (*Id.*). Initially, the court notes that the State had more proof of the Sager charges than a single spot of semen, including that the DNA from the semen matched Scott's DNA, that Scott lived in the house where Latonya Sager lived, that Scott was seen departing the crime scene after the murder, and that (according to Landris Wright's testimony) Scott announced that he had killed a girl earlier that night.[13]

Not only is Scott's argument wholly unsupported by the trial record, but it is also unsupported as a matter of law. The only case that Scott cites to support this theory – *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) – is an out-of-circuit federal case that is neither binding nor persuasive as to how a court should understand the *Alabama* Rules of Criminal Procedure. Indeed, while Scott's *Strickland* misjoinder claim is based on an interpretation of Alabama Rule of Criminal Procedure 13.3, the misjoinder claim in *Bean* was not even a *Strickland* claim, and it

---

[13] Although Landris's testimony was pertinent to the Wright charges, it would have been admissible in a trial of the Sager charges under Alabama Rule of Evidence 404(b) as evidence that made it more likely that Scott was Latonya's killer. *See* Ala. R. Evid. 404(b).

216

is based on the Fifth Amendment's due process clause. However, for completeness, the court discusses *Bean*'s legal reasoning as applied to this subclaim. *See Bean*, 163 F.3d at 1084.

Scott quotes the following from *Bean*: "'courts have recognized that the joinder of offenses in a single trial may be prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses.'" (Doc. # 1 ¶ 232 (quoting *Bean*, 163 F.3d at 1085)). In *Bean*, the Ninth Circuit held that because the evidence involved in the consolidated charges was not cross-admissible, consolidation was unconstitutional. *Id.* (noting that "there is 'a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible.'" (quoting *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986))). This rule does not change the result of the court's analysis because, as held above, the evidence involved in the Wright and Sager charges was cross-admissible.

Further, *Bean*'s statement that "the joinder of offenses in a single trial may be prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses" (Doc. # 1 ¶ 232 (quoting *Bean*, 787 F.2d at 1085)) refers to *prejudice*, which (again) is a moot point in Scott's case because Rule 13.3 of the Alabama Rules of Criminal Procedure authorized consolidation of the Wright and Sager charges. And, even if prejudice were not moot, the joinder of the Wright and Sager charges was not prejudicial due to a disparity in evidence because (as discussed above) there was no "great disparity" in the evidence of either charge. Therefore, in addition to the inapplicable posture of *Bean* (including that it was out-of-circuit, a federal case, not involving a *Strickland* claim, and not interpreting the Alabama Rules of Criminal Procedure), *Bean*'s holding would not change the result of the court's analysis on this claim.

For all of these reasons, the court denies this claim.

**E.      Claim E – Scott has not shown a right to habeas relief based on his *Strickland* claim that his trial counsel failed to object to biased jurors.**

The Sixth Amendment provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const.. amend. VI. In this claim, Scott maintains that his trial counsel were constitutionally ineffective under *Strickland* because they failed to object for cause to two biased potential jurors, and they also failed to use a peremptory strike on one of the two potential jurors. (Doc. # 1 ¶¶ 239-43). As explained below, this claim is subject to state-barred procedural default and on its merits would fail to overcome AEDPA deference. The court begins by summarizing the state court proceedings.

### 1.      State Court Proceedings

During voir dire, Scott's trial counsel asked the jurors "Is there anything that you feel we should know, either public[l]y, or in private, about yourself?" (Doc. # 14-16 at 41-42). Prospective juror number 58 indicated that she wanted to speak in private. (*Id.* at 43). When speaking in private, juror number 58 said "Y'all had asked about rape, and I was – and I didn't – I don't know why I didn't say anything, but one thing that happened so long ago, when I was ten, I was raped by my uncle, and he was later killed in a car accident." (*Id.* at 45-46). Juror number 58 affirmed that she felt that she would be able to separate her experience from this case "and decide the issues in this case fairly for both sides, without any regard to that incident[.]" (*Id.* at 46). She also stated that "I was young . . . it's a matter of forgiveness, too, knowing that a wrong was done." (*Id.*). Juror number 58 agreed that she felt she had come to terms with the incident and had forgiven her uncle, and that "you know, in serving on a jury, it's like, you know, I will put myself in his place. If there was something that I had done, I would want someone, you know, that could be – you know, listen

218

to the fact, aside from personal feelings." (*Id.* at 47). Scott's counsel did not object to juror number 58 for cause, but later used a peremptory strike to excuse her. (*Id.* at 97).

Juror number 373 indicated that she knew someone in the courtroom who turned out to be Latonya's father. (*Id.* at 86). The court brought juror number 373 back to chambers and the prosecutor stated, "I think you had indicated that you recognized somebody in the back, in the white T-shirt. Is that right?" (*Id.* at 93). Juror number 373 responded "Yes, it's the victim's mother – it's a friend of hers, I believe . . . We lived in the same community . . . It was a couple of years ago." (*Id.*). After being asked whether she could be fair to both sides despite knowing this person, she responded "Yes." (*Id.*). Juror number 373 clarified that the person she knew was "[t]he victim's mother's friend, the guy that was standing next to her . . . We lived in the same community, about six or seven years ago." (*Id.* at 94). Defense counsel told juror number 373 "[t]hat turns out to be, I think it is, Latonya, the dead girl, ten years old, it's her father." (*Id.*). Juror number 373 said, "I didn't know that," and then affirmed that it would "not at all" affect her decision, that "I don't personally know him," and that she did not see him on a regular basis. (*Id.*). Scott's trial counsel did not object for cause or use a peremptory strike on juror number 373, so juror number 373 ultimately served on Scott's jury. (*Id.* at 94-95).

On collateral appeal, Scott raised this claim in his first Rule 32 petition. (Doc. # 14-29 at 53-54). He also raised it to the ACCA (Doc. # 14-54 at 66-68) and to the Supreme Court of Alabama. (Doc. # 14-56 at 94-96). Scott raised this claim again in his Amended Rule 32 petition (Doc. # 14-37 at 145-47), in a brief to the ACCA (Doc. # 14-58 at 102-03), and before the Supreme Court of Alabama. (Doc. # 14-60 at 31, 64). Therefore, Scott fully exhausted this claim on both first and second collateral appeal.

Scott presented his federal claim to the ACCA as one of several constitutional violations "not addressed by counsel or the court." (Doc. # 14-58 at 102-03). Specifically, he argued that "[a] juror who knows the family of a murdered child, as one juror did here, should be excluded from a capital case. The burden on such a juror is too great, torn as she is between the duty to be fair and neutral, and the tug of community interaction." (*Id.* at 102-03). He also wrote:

> As for the other juror, the error lies in forcing Robbins to exercise a challenge he might have used on another juror. A mere assertion of fairness by the prospective juror whose own experience is very close to the facts in the case to be tried, is simply not a reliable indicator, not because the juror is lying, but because one's own history is a very powerful lens when seeing other events."

(*Id.* at 103).

When reviewing the Rule 32 court's summary dismissal of this claim, the ACCA noted that the Rule 32 court had reasoned that "Scott fails to meet his burden of pleading facts to establish either prong of the *Strickland* test" because: (1) juror number 373 had only a "loose connection" to the victim's father and juror number 58 "indicated during voir dire that she could be impartial," and (2) juror number 58 was removed with a peremptory strike and "Scott did not plead any facts indicating either that the jury seated was partial or identify any juror [who] would have been removed via a peremptory strike had he not used that challenge removing [juror number 58]." (Doc. # 14-59 at 209 (quoting Doc. # 14-33 at 72-73)). The ACCA then stated: "After reviewing the record, we agree with the circuit court's findings here." (*Id.*). The ACCA also held that Scott's brief "provides no factual support, citations to the record, or legal authority for this claim, nor has he presented any analysis on this issue." (*Id.*). Therefore, the ACCA held, Rule 28(a)(10) barred review of his claim. (*Id.*).

## 2.    This claim is subject to state-barred procedural default.

Once again, under the procedural default doctrine, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward*, 592 F.3d at 1156 (internal quotation marks omitted) (alteration in *Ward*) (quoting *Judd*, 250 F.3d at 1313). That is, of course, subject to the requirement that the "state court's rejection of a federal constitutional claim on procedural grounds . . . rests upon 'adequate and independent' state grounds." *Id.* (quoting *Marek*, 62 F.3d at 1301). The Eleventh Circuit uses "a three-part test . . . to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313 (citing *Card*, 911 F.2d 1516). "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Judd*, 250 F.3d at 1313. "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." *Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313). "Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

Evaluating these three steps, the last state court that rendered a judgment here – the ACCA – clearly and expressly stated that it was relying on "Rule 28(a)(10), Ala. R. App. P." (Doc. # 14-59 at 209), to resolve the federal claim without reaching the merits of that claim. *See Judd*, 250 F.3d at 1313. Although Scott correctly notes that the ACCA made an alternative ruling on the merits (Doc. # 20 at 57) (citing *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994)); *see also* (Doc. # 14-59 at 208-09) (ACCA addressing the merits), he is incorrect in concluding that this bars the court from applying the state procedural bar. The rule from *Alderman* is that "where a state

221

court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Richardson v. Thigpen*, 883 F.2d 895, 898 (11th Cir. 1989)). Like in *Alderman*, here, the ACCA stated that this claim was procedurally barred under Rule 28(a)(10) after alternatively stating, "we agree with the circuit court's findings here." (Doc. # 14-59 at 209).

Moving to the second part of the test, the ACCA's decision to apply Rule 28(a)(10) rests entirely on state law grounds, requiring that "the brief of the appellate or the petitioner shall contain . . . [a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Because the state court's interpretation was not "intertwined with an interpretation of federal law," the second part of the test is satisfied. *See Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313).

The third part of the test is also met. Scott does not dispute that Rule 28(a)(10) is "adequate, i.e., firmly established and regularly followed." *Id.* at 1157. What Scott disputes is whether the rule was applied "in an arbitrary or unprecedented fashion," *id.* (quoting *Judd*, 250 F.3d at 1313), stating that "the State Court arbitrarily applied Rule 28 here." (Doc. # 20 at 57). Upon review of Scott's brief to the ACCA, the ACCA correctly applied Rule 28(a)(10) to bar this claim. Scott's argument consisted of a single paragraph that stated his "contentions . . . and the reasons therefor," but contained no "citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Therefore, it did not comply with the state procedural rule and the ACCA's application of this rule was neither arbitrary nor unprecedented.

222

Nor has Scott carried his burden of arguing that he meets the exceptions to procedural default – cause and prejudice, and a fundamental miscarriage of justice. (*See* Docs. # 1, 20); *see McCoy v. Newsome*, 953 F.2d 1252, 1260 (11th Cir. 1992). Nor has Scott argued that he was actually innocent, which must be supported by "reliable evidence not presented at trial." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). Because Scott's claim is subject to state-barred procedural default, it cannot support habeas relief.

Even if it were not subject to state-barred procedural default, it would be due to be denied on the merits as well.

### 3. Scott has not met his AEDPA burden on his biased-jurors *Strickland* claim.

Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory in this claim was the ACCA's opinion on second postconviction appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory, the denial of certiorari was not accompanied with an opinion, so the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's. *Wilson*, 584 U.S. at 125.

Scott argues that AEDPA deference is not due to be given to the ACCA's denial of this claim because the ACCA rejected it "notwithstanding the fact that Scott's 'Amended Rule 32 petition and supporting exhibits are assumed to be true under Alabama law'" (Doc. # 1 ¶ 243) (quoting *Daniel*, 822 F.3d at 1261) was "an unreasonable application of *Strickland* and was based on an unreasonable application of the facts." (*Id.*). Scott invokes § 2254(d)(1) and (d)(2), but as explained below, Scott has failed to meet the standard under the governing law clause of (d)(1) or the standard under (d)(2).

223

Specifically, Scott contends that the ACCA's summary rejection of this claim was "an unreasonable application of *Strickland* and was based on an unreasonable application of the facts," thus asserting that AEDPA deference is not due under § 2254(d)(1) and (d)(2). (*Id.* ¶ 243). He specifically argues that his counsel had a "duty to object to biased potential jurors based on cause, and if not successful, to exercise a peremptory strike against them." (*Id.* ¶ 239 (citing *Virgil v. Dretke*, 446 F.3d 598, 609-10 (5th Cir. 2006))). Scott identifies two "biased potential jurors," including prospective juror number 373, who he says, "testified that she recognized one of the men in the audience because they 'lived in the same community' and that although it was someone she had met, she did not personally know him." (*Id.* ¶ 240 (quoting Doc. # 14-16 at 93)). According to Scott, "[t]his juror seemed quite surprised to learn that the man she recognized was the murder victim's father, stating '[o]h, I didn't know that.'" (*Id.* (quoting Doc. # 14-16 at 94)). Scott argues that the failure to use a peremptory strike or object to this juror for cause violated his Sixth Amendment right to effective assistance of counsel under *Strickland* because "it would have been appropriate to object to this juror for cause, and if not successful, to use a peremptory strike against this juror." (*Id.*).

The second "biased potential juror" was prospective juror number 58, who "testified that she had been raped as a ten year old by her uncle." (*Id.* ¶ 241). Scott argues that the failure to object to this juror for cause violated his Sixth Amendment right under *Strickland* because "[a]lthough she said that if she were a defendant she would want a juror who would 'listen to the facts aside from personal feelings,' as a practical matter, it is highly unlikely that she could separate her own personal experience from that of Latonya." (*Id.*) (quoting Doc. # 14-16 at 47). Scott also contends (without citing any caselaw) that "it is unlikely that the Court would have ruled against the objection to the juror because keeping the juror would not satisfy Alabama's standards

224

requiring impartiality and indifference." (*Id.*). Although Scott's counsel used a peremptory strike against juror number 58, Scott argues this was deficient and prejudicial because "trial counsel was forced to use one of its limited peremptory strikes against this clearly biased juror." (*Id.*).

Respondent counters that, in addition to being procedurally defaulted, this claim cannot overcome AEDPA deference. (Doc. # 17 at 44, 91-93). To make this point, Respondent quotes the alternative merits-based reasoning of the ACCA. (*Id.* at 91-93).

Scott's reply contends that his claim is not procedurally defaulted because "it was properly raised before the State Court." (Doc. # 20 at 57). Scott further argues that Respondent has not explained why the ACCA correctly decided this issue, and again states his argument that Scott was prejudiced by his counsel's deficient conduct of failing to request a strike for cause when both jurors were biased, and further in failing to use a peremptory strike against one of these jurors. (*Id.* at 55-56).

After careful review, the court concludes that Scott has failed to meet his burden under either § 2254(d)(1) or (d)(2) to show that the ACCA's dismissal of Scott's *Strickland* claim regarding failure to object to two biased potential jurors was an unreasonable application of law as determined by the Supreme Court of the United States or that it was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

Preliminarily, although Scott only explicitly refers to (d)(1)'s second clause (*id.* ¶ 243), even if he had referred to (d)(1)'s contrary to clause, he has not overcome AEDPA deference on such an argument. As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts.

225

The ACCA adopted the Rule 32 court's reasoning, which had applied *Strickland*, eliminating Scott's reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework.").

Scott further has failed to carry his (d)(1) burden because he has not identified a factually indistinguishable Supreme Court decision with an outcome favorable to him, nor has he shown that the ACCA's analysis of this claim contained extreme constitutional error or conflicts unreasonably with clearly established Supreme Court precedent. Below, the court considers each of the three authorities that Scott cites in support of this claim to demonstrate how they cannot help him carry his (d)(1) burden.

Scott cannot rely on *Virgil v. Dretke* to satisfy the contrary to clause because it is neither a Supreme Court case nor binding in this circuit. 446 F.3d 598 (5th Cir. 2006); *see Bonner*, 661 F.2d at 1209. And, even if it were binding, it does not clearly establish law under circumstances comparable to Scott's biased juror *Strickland* claim, and thus cannot satisfy his AEDPA (d)(1) burden. In *Virgil*, the Fifth Circuit panel upheld a challenge based on two potentially biased jurors. One "stated that his relationship with law-enforcement officers would preclude him from serving as an impartial juror." *Id.* The other "volunteered that his mother's mugging was 'weighing' on him as to whether he could be partial or impartial, finally concluding that he could not be 'fair and impartial.'" *Id.* at 609-10. The Fifth Circuit panel concluded that counsel's failure to challenge or strike these jurors was deficient under *Strickland* because those jurors "could not be 'fair and impartial.'" *Id.* at 610.

226

The facts in Scott's case are materially distinguishable. While the two jurors in *Virgil* stated that they could not be impartial, the two jurors in Scott's case responded *affirmatively* when asked whether they could be fair to both sides. (Doc. # 14-16 at 46, 93). Nor does *Virgil* aid Scott in satisfying his burden under the unreasonable application clause of (d)(1) because it does not suggest that the ACCA committed extreme constitutional error or conflicted unreasonably with clearly established Supreme Court precedent. The holding of *Virgil* was that counsel are deficient for failing to object to or strike jurors who explicitly stated that they would not be able to be fair and impartial. 446 F.3d at 610. Jurors number 58 and 373 did just the opposite here by stating that they could be fair and impartial. (Doc. # 14-16 at 46, 93). The ACCA therefore committed no extreme constitutional error and reasonably applied clearly established Supreme Court precedent when it did not find Scott's trial counsel deficient for failing to object to or strike juror number 373 and failing to object to juror 58.

*Strickland* also does not help Scott carry his burden under the contrary to or unreasonable application clauses of (d)(1). First, *Strickland* is distinguishable. In *Strickland*, the defendant's ineffective assistance of counsel claim was based on failures at the sentencing phase, and none of the purported failures included a failure to object to or strike a biased potential juror. *Strickland v. Washington*, 466 U.S. 668, 675 (1984). Moreover, the *Strickland* Court held that none of the six asserted failures in that case shown deficiency or prejudice. *Id.* at 699-700. Therefore, even if the facts in Scott's case were indistinguishable from those in *Strickland*, it still would not compel a different constitutional outcome.

Second, the ACCA did not commit extreme constitutional error or unreasonably apply *Strickland*'s holding. The holding of *Strickland* (as outlined above) established an ineffective assistance of counsel claim under the Sixth Amendment, and to succeed on such, a defendant must

first "show that counsel's performance was deficient," and second must "show that the deficient performance prejudiced the defense." *Id.* at 687. The deficiency prong must be proven by showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Scott has not shown his trial counsel fell below an objectively reasonable standard because he has not pointed to any measure of objectiveness that would have required his counsel to object to jurors 373 and 58. Rather, Scott has merely stated the conclusions that "it would have been appropriate to object to [juror number 373] for cause" and "keeping [juror number 58] would not satisfy Alabama's standards requiring impartiality and indifference." (Doc. # 1 ¶¶ 240-41) (not providing any citations to "Alabama's standards"). As the *Strickland* Court observed, there are "countless ways [of] . . . effective assistance" and "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court determines that, especially given the deference due to the judgments of trial counsel under *Strickland*, the decision of Scott's counsel not to object to either juror and not to use a peremptory strike on juror 373[14] was not objectively unreasonable. Furthermore, this is a question on which "fairminded jurists could disagree," and thus does not help carry Scott's burden under the unreasonable application clause of (d)(1). *Richter*, 562 U.S. 86, 101 (quoting *Yarborough*, 541 U.S. at 664).

Finally, *Daniel v. Commissioner* (the only other case Scott cites) does not help Scott carry his burden under (d)(1). It does not satisfy the contrary to clause because it is not a Supreme Court case and is distinguishable. Although the *Daniel* defendant asserted a *Strickland* claim, it was predicated on a constitutionally inadequate mitigation investigation at the penalty phase. 822 F.3d

---

[14] Of course, there is another problem with this argument. Scott has not shown a peremptory strike should have been used on juror 373 compared to other jurors who were struck. A party has limited strikes and it is often a matter of strategy about when and on whom to employ them.

1248, 1254 (11th Cir. 2016). There was no allegation in *Daniel* that any of the jurors were biased or should have been struck, so Scott's case is distinguishable from that decision. *Daniel* also does not satisfy the unreasonable application clause of (d)(1) because it does not show that the ACCA committed extreme constitutional error or unreasonably applied clearly established Federal law. The holding of *Daniel* was that a criminal defense attorney is constitutionally deficient if he fails "to conduct any timely and meaningful mitigation interviews with [the defendant] and his family," 822 F.3d at 1264, especially where the information the attorney had already uncovered "would have led a reasonable attorney to investigate further." *Id.* at 1266. *Daniel* further held that trial counsel can be deficient "for failing to investigate and challenge the state's reliance on [the defendant's] second degree burglary conviction" because it would have been easy to obtain the file on the prior conviction. *Id.* at 1271. The ACCA did not unreasonably apply these holdings because Scott never contended that his trial counsel somehow should have interviewed the jurors more extensively. Although Scott elsewhere raises the *Strickland* claim of ineffective assistance based on a purported failure to investigate mitigation evidence, this *Strickland* claim is not based on that theory and therefore, the holdings of *Daniel* are inapplicable.

Moving to (d)(2), Scott maintains that the ACCA's "summary dismissal of this claim . . . was based on an unreasonable application of the facts." (Doc. # 1 ¶ 243). Although Scott invokes (d)(2), he has not pointed to any specific factual determination that he believes was unreasonable, nor has he pointed to any evidence that undermines the reasonableness the ACCA's factual determinations. Nor has Scott overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

Indeed, upon reviewing the ACCA's last reasoned decision, the court concludes that the ACCA reasonably adopted and applied the facts found by the Rule 32 court, including the fact that

229

"*[a]s Scott notes in his petition*, [juror number 373] indicated that she did not personally know the victim's father and had only met him in the community," (Doc. # 14-59 at 209) (emphasis added), and that juror number 58 "indicated during voir dire that she could be impartial." (*Id.*). A presumption of correctness attaches to state court factual findings under § 2254(e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct"). Only by putting forth "clear and convincing evidence" may a petitioner overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable relationship between doubt.") (internal quotation marks omitted). The Supreme Court has not defined the purviews of § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304-05 ("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2)."); *see also Cave v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011) ("We have not yet had an occasion to completely define the respective purviews of (d)(2) and (e)(1), and this case presents no such opportunity."). But, to the extent that (e)(1) applies to a (d)(2) unreasonable factual challenge under AEDPA, Scott has not overcome with clear and convincing evidence (as he is required) the presumption that the ACCA assessed his *Strickland* juror bias claim correctly by concluding that "there is nothing to indicate that a challenge for cause should have been granted as to either prospective juror" and that Scott's counsel therefore committed no error. (Doc. # 14-59 at 209).

There are, therefore, multiple reasons to deny relief on this claim. First, because there is a state court ruling on the merits of this claim, it is subject to AEDPA deference and therefore, Scott

has a burden to satisfy under (d)(1) and (d)(2). Scott's (d)(1) burden is to point to factually indistinguishable Supreme Court opinions that require a different constitutional outcome, binding case law that shows extreme constitutional error, or an unreasonable conflict with clearly established Supreme Court precedent. Only some of the cases Scott has cited are binding and, in any event, none of the cases he cites show extreme constitutional error or clearly established precedent that the ACCA unreasonably applied. Scott's (d)(2) burden is to identify specific factual findings of the ACCA and provide clear and convincing evidence that those findings were incorrect or unreasonably applied. Scott did neither. Second, not only is this claim subject to AEDPA deference, but it is also subject to *Strickland*'s deferential standard – an additional standard that Scott has not overcome.

For all of these reasons, the court denies this claim.

F.    **Claim F – Scott has not shown a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel at the guilt phase of trial for several additional reasons.**

Scott maintains in this claim that his Sixth Amendment rights were violated because his trial counsel rendered ineffective assistance of counsel under *Strickland* when they failed to present compelling evidence to cast doubt on the significance of the DNA evidence against him. (Doc. # 1 ¶¶ 244-64). Scott divides this *Strickland* claim into two subclaims.

In one of his subclaims, Scott contends that his trial counsel should have presented (1) an explanation for how Scott's DNA might be present in semen on Latonya's thigh in a way that was unlinked to her murder, (2) evidence suggesting an alternative suspect for Latonya's murder, (3) evidence in the guilt phase to bolster the theory that Scott's semen had transferred from the couch to Latonya's thigh, (4) DNA evidence of the cushions on the couch (which Scott's counsel never asked for or obtained), (5) expert testimony explaining how the transfer theory could work,

231

evidence of Scott's personal history of relating to children, (6) DNA evidence of the long strands of hair on Latonya's body, or (7) evidence that could link Latrice with Latonya's death. (*Id.* ¶¶ 244-56).

In his other subclaim, Scott contends that his trial counsel failed "to procure the assistance of experts necessary to challenge the State's evidence" (*id.* ¶ 257), including "an independent DNA expert, forensic pathologist, and crime scene investigator" (*id.*), which was especially important because "[t]he State's case against Scott relied heavily upon expert testimony." (*Id.*). In presenting this claim, Scott does not identify any available expert witnesses or their anticipated exculpatory testimony.

In his habeas petition, Scott asserts that the ACCA's summary rejection of his first subclaim was "contrary to, or an unreasonable application of federal law, and based on an unreasonable application of facts." (*Id.* ¶ 256). He also asserts that the ACCA's summary rejection of this subclaim "constituted an unreasonable application of *Strickland* and was based on an unreasonable application of the facts.

Respondent counters that this claim is "procedurally defaulted because Scott failed to comply with Rule 28(a)(10) of the Alabama Rules of Appellate Procedure." (Doc. # 17 at 43-44). Although Respondent does not address this subclaim on the merits, it has with respect to its analysis of related arguments. "Scott raises a vague and extremely general claim that trial counsel rendered [ineffective assistance of counsel] by failing to hire experts who Scott himself does not name. Nor does Scott identify any particular testimony that these experts would have given." (*Id.* at 93). Respondent quotes from the ACCA's decision on collateral appeal rejecting this second subclaim. (*Id.* at 93-94). The quoted reasoning from the ACCA cited the Rule 32 court's opinion that "Scott's counsel adequately explored the improbability of [Landris Wright's] story regarding

the use of lotion and vinegar in both his questioning of witnesses and in his closing remarks." (*Id.* at 93) (quoting Doc. # 14-59 at 213) (in turn, citing Doc. # 14-33 at 67). Respondent's analysis of the ACCA's rationale also cited the Rule 32 court's view that "Scott's argument was nothing more than another attack on how his counsel formulated certain questions and executed defense tactics and that evidence contradicting [Landris Wright's] allegations was fully explored at trial." (*Id.* at 93-94) (quoting Doc. # 14-59 at 213-14 (in turn, citing Doc. # 14-33 at 67)).

Scott's reply contends that Respondent did not address the merits of his initial subclaim, that it was not procedurally defaulted, and that in any event, the ACCA's discussion of this first subclaim on the merits undermined any argument of procedural default. (Doc. # 20 at 58). Scott's reply also reasserts his arguments in support of his initial subclaim. Scott also argues that Respondent's merits-based response to his second subclaim was "conclusory and without merit" (*id.* at 60), that it was not procedurally barred, and that in any event, the ACCA's discussion of this second subclaim on the merits undermined any argument for procedural default. (*Id.* at 63).

As explained below, Scott has not met his AEDPA burden with respect to this claim. The court begins by summarizing the state court proceedings.

### 1.    State Court Proceedings

Scott raised this claim on collateral appeal in his first Rule 32 petition (Doc. # 14-29 at 22-33), in his brief to the ACCA on his first collateral appeal (Doc. # 14-54 at 63-66), and before the Supreme Court of Alabama. (Doc. # 14-56 at 25, 64-74). Scott also raised this claim on his second collateral appeal in his amended Rule 32 petition (Doc. # 14-35 at 73-79), in his brief to the ACCA on his second collateral appeal (Doc. # 14-58 at 104-08), and before the Supreme Court of Alabama on his second collateral appeal. (Doc. # 14-60 at 31, 66-69).

233

In his Amended Rule 32 Petition, Scott argued that his trial counsel erred because: they did not uncover before trial evidence that Landris Wright lied about her prior romantic relationship with Scott and their drug use on the night of the alleged crime (Doc. # 14-37 at 114); they did not introduce during the guilt phase any evidence that Scott had engaged in frequent sexual intercourse on the couch where Latonya's body was found (which they say would have substantiated why his semen might have been present on the couch) (*id.* at 115);[15] they did not ask for DNA analysis of the couch cushions (*id.*);[16] they did not present an expert witness who could explain the transfer theory (*id.*);[17] they did not present evidence of Scott's personal history of appropriate behavior toward children (*id.* at 116); they did not investigate or present evidence about Latrice's (Latonya's mother) background (*id.*); they did not test for or present evidence about the three long hair samples found on Latonya's body (*id.*); and they failed to engage necessary experts ("including an independent DNA expert, forensic pathologist, and crime scene investigator"). (*Id.* at 119). Scott argued that the failure to uncover certain evidence during pre-trial prejudiced him because "[i]t suggested to the jury that the defense was grasping a[t] speculative wisps, and had no real defense." (*Id.* at 118). Scott also argued that the failure to engage "necessary experts" prejudiced him – both separately and cumulatively—because "it amounted to a failure to put on a defense." (*Id.* at 121-22).

Finally, Scott argued that his trial counsel failed to address "obvious holes" in the State's case related to the Wright charges, including: that the State was missing evidence of vinegar and glitter lotion, that Wright testified that the vinegar bath came before the second rape, that it was

---

[15] Scott argues that only evidence of him having sexual intercourse on the couch was presented in the penalty phase. (Doc. # 1 at ¶ 115).

[16] Scott does not state what this DNA analysis would have shown.

[17] Scott does not identify an expert who would have been available to testify or what they would have said.

234

unlikely that Scott would have known where to find or why to use the vinegar, that Wright did not mention the vinegar bath and glitter lotion when she was interviewed at the crime scene, that the State had not turned over September 11 interview notes to the defense, that there was evidence that vinegar would not have washed away all body fluids from sexual intercourse, and that the rape kit results were negative. (*Id.* at 122-26).

The Rule 32 court denied relief on all these arguments. It reasoned that his claim about the prior relationship between Scott and Landris Wright was without a basis as "[t]he evidence tends to indicate that Scott harassed Landris Wright and her family and that Landris did not have a sexual relationship with Scott." (Doc. # 14-33 at 62). The Rule 32 court also noted that Scott did not name any witnesses who would have testified to this alleged prior relationship or how his trial counsel should have known about them. (*Id.*). Thus, the claim related to evidence of the Scott-Wright relationship was summarily dismissed under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. (*Id.*).

Regarding his claim about Scott and Wright using drugs together the night before, the Rule 32 court reasoned that "[t]rial counsel cannot be found constitutionally ineffective for making the professional judgment that the defense might be better received by avoiding discussion of Scott's alleged drug use," and that "the evidence [of Scott] tends to show that Scott harassed Landris Wright and her family and that Landris did not have a relationship with Scott." (*Id.* at 63). Thus, the assertion related to the drug use was summarily dismissed under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. (*Id.*).

Scott's assertion that he often engaged in sexual intercourse on the couch was rejected because the Rule 32 court reasoned that he failed to plead sufficient facts to prove deficient performance and prejudice. That is, the court noted Scott never showed how this evidence would

create reasonable doubt, did not plead facts about a time frame in which he had sexual intercourse on the couch, failed to name any witnesses who could have testified to this (much less how his trial counsel could have found them), and never pleaded facts about how his semen would have been in proximity to Latonya's body. (*Id.*). Thus, the claim related to the frequent sexual intercourse on the couch was summarily dismissed under Alabama Rule of Criminal Procedure 32.7(d). (*Id.*).

Regarding his claim about obtaining DNA analysis of the couch cushions, the Rule 32 court reasoned that Scott had failed to plead sufficient facts to prove deficient performance or prejudice because he did not "adequately explain what a DNA analysis of the cushions could have added to create a reasonable doubt of his guilt" due to the "location of the semen around the victim's pubic area and inside her thigh." (*Id.* at 64). Thus, the claim related to DNA analysis of the couch cushions was summarily dismissed under Rule 32.7(d).

And similarly, Scott's claim about his counsel's failure to retain and present necessary experts was found lacking because the Rule 32 court reasoned that Scott failed to plead sufficient facts to prove deficient performance or show prejudice. (*Id.* at 66). As the Rule 32 court explained, under *Dubose v. State*, 662 So. 2d 1189, 1192 (1995), a "defendant must show a reasonable probability that an expert would aid in his defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial." (*Id.* at 64). The Rule 32 court also observed that at trial, the DNA expert was questioned about how the semen smear could have been transferred from the couch cushions. (*Id.* at 65). Also at trial, in relation to the Wright charges and alternative explanations, the State's expert discussed the absence of semen on the bed sheet. (*Id.*). The Rule 32 court concluded that Scott failed to show the deficiency of this testimony, that he never explained what other experts could have been hired, and that he did not address the significance

236

of his contention that experts could have explained the absence of "glitter lotion" on the bed sheet. (*Id.* at 65-66).

The Rule 32 court also contested Scott's assertion that the "only evidence that linked Scott to Latonya's murder was the DNA match to the smear on her right thigh" (*id.* at 64) (quoting Doc. # 14-37 at 115), explaining that Scott admitted to Landris that he had killed a girl the night before, as "Officer Clark testified that when Scott was in the back seat of a patrol car, he explained: 'Bitch, I am going to kill you! I killed somebody last night!'" (*Id.*) (quoting Doc. # 14-17 at 134). The Rule 32 court added that "[t]his was corroborated by Landris Wright's testimony, who also testified that Scott had told her that 'he had killed a girl last night.'" (*Id.* at 64-65) (quoting Doc. # 14-17 at 3). And, the Rule 32 court also pointed out that Scott was near the scene where Latonya was killed, had exhibited strange behavior with Wright the day after the murder, and possessed a firearm that he acquired in the home where Latonya was found. (*Id.* at 65).

The Rule 32 court also dealt with Scott's arguments related to his history of appropriate relationships with children. It reasoned that Scott failed to plead sufficient facts to prove deficient performance or show prejudice. (*Id.* at 66). Specifically, the Rule 32 court noted, Scott did not name any witnesses (much less explain how his trial counsel could have discovered them), and the decision not to call such witnesses could have been strategic because "presenting evidence of extensive contact with minors by Scott could have just as easily prejudiced him." (*Id.*). Thus, the claim related to Scott's history of behavior with children was summarily dismissed under Rule 32.7(d).

Regarding his claim that trial counsel should have presented evidence of a potential alternative murder suspect – Latrice Sager – the Rule 32 court reasoned that Scott failed to plead sufficient facts to prove deficient performance or show prejudice. (*Id.* at 66-67). As the Rule 32

court noted, Scott did not name any witnesses (or explain how his trial counsel could have discovered them), and the decision not to call such witnesses could have been strategic because "without some definitive evidence, this court can also envision Scott being severely prejudiced at trial by the defense pursuing an uncorroborated theory that Latrice Sager may have murdered her own daughter." (*Id.*). Thus, the claim related to an alternative murder suspect was summarily dismissed under Rule 32.7(d). In a later opinion, on May 26, 2015, the Rule 32 court denied a different version of this *Strickland* claim, which asserted that Scott's trial counsel deficiently failed to investigate "the possibility of an alternative killer," explaining that Scott had "failed to present any evidence regarding this claim at the evidentiary hearing." (Doc. # 14-39 at 62).

Finally, Scott's claim that his counsel failed to address "obvious holes" in the State's case on the Wright charges cuts no ice on habeas review. The Rule 32 court noted that Scott's "counsel did explore the improbability of Wright's story regarding these issues in both his questioning of witnesses and in his closing remarks." (Doc. # 14-33 at 67). Because Scott had failed to plead sufficient facts to prove deficient performance or show prejudice, the Rule 32 court summarily dismissed the allegation under Rule 32.7(d). (*Id.*).

In his brief to the ACCA on his second collateral appeal, Scott argued that his trial counsel had failed to "retain experts whose testimony would have undercut Wright's testimony," including a "police investigative expert to opine about standard evidence-gathering practices, to underscore that physical evidence central to the credibility of Ms. Wright's accusation – a vinegar bottle and glitter lotion – was not found at the scene." (Doc. # 14-58 at 105). Scott also contended that "[a]nother expert would have explained the chemistry underlying the State's assertion that a vinegar bath would wash away all evidence of sexual intercourse." (*Id.*). He added that "his counsel failed to note and argue that the vinegar bath came *before* the second alleged rape." (*Id.*) (appearing

to cite Doc. # 14-18 at 146-47). Scott further argued that "regarding the murder charge, counsel failed to take steps to bolster even the sketchy attack on circumstantial evidence that they contemplated." (*Id.* at 106). Scott also asserted that "counsel could not contest the DNA evidence the State presented" but "failed to retain an expert who could opine on how the transfer theory could work." (*Id.* at 107). And, he argued that his trial counsel did not test hair strands on Latonya, use a court-funded investigator to investigate Latonya's mother and the "suspicious circumstances" of her other daughter's death a few weeks after Latonya's. (*Id.* at 107-08).

In his ACCA brief on his second collateral appeal, Scott cited the trial record six times and addressed one Fifth Circuit case, *Soffar v. Dretke*, 368 F.3 441, 478 (5th Cir. 2004), for the unremarkable proposition that "defense counsel had greater responsibility to retain defense expert where State's case was 'largely based on the testimony of [an] expert.'" (*Id.* at 107) (adopting quote alteration in brief).

The ACCA condensed Scott's claim into "two specific examples" that Scott cited to "demonstrate how his counsel were ineffective during [the guilt phase]." (Doc. # 14-59 at 213). The ACCA concluded that the Rule 32 court had properly dismissed the first example: that his "trial counsel rendered ineffective assistance for failing to retain experts whose testimony, he says, would have 'undercut' [Landris Wright's] testimony." (*Id.*) (quoting Doc. # 14-58 at 105). In support of its conclusion, the ACCA explained that "[a]fter reviewing the record and the testimony of Scott's trial counsel during the evidentiary hearing," it agreed with the Rule 32 court "that this subject was fully explored at trial." (*Id.* at 213-14). The ACCA agreed with the Rule 32 court's finding that Scott's counsel "adequately explored the improbability of [Landris Wright's] story regarding the use of lotion and vinegar in both his questioning of witnesses and in his closing remarks." (*Id.* at 213) (citing Doc. # 14-33 at 67). The ACCA further agreed with the Rule 32

239

court's finding that "Scott's argument was nothing more than another attack on how his counsel formulated certain questions and executed defense tactics and that evidence contradicting [Landris Wright's] allegations was fully explored at trial." (*Id.* at 213-14) (citing Doc. # 14-33 at 67).

The ACCA also concluded that Scott's second example under this claim should be denied, but did not cite the Rule 32 court's reasoning. Instead, it explained that "Scott's claims here fails [sic] to satisfy the requirements of Rule 28(a)(10)" because "[i]n his brief on appeal, Scott provides no legal authority for this claim, nor has he presented any analysis on this issue." (*Id.*). Scott's second example was that "with regard to his capital offense, his trial counsel rendered ineffective assistance for failing to attack the State's circumstantial evidence" (*id.* at 214) (citing Doc. # 14-58 at 106), and specifically for failing to retain "an expert who could have offered rebuttal testimony about how his DNA was 'transferred' to Latonya Sager's body or how he could have been exonerated by hairs that were found on Sager's body but were never tested." (*Id.*) (citing Doc. # 14-58 at 107). Scott's assertion that his counsel failed to "use his court-funded investigator to look into the suspicious behavior of Sager's mother both before and after Sager's murder," (*id.*) (citing Doc. # 14-58 at 107), was also dismissed as he did not cite to the record at all with regard to this second example. Scott did, however, cite *Soffar v. Dretke*, 368 F.3d 441, 478 (5th Cir. 2004) in support of one of his arguments, which was that "defense counsel had [a] greater responsibility to retain [a] defense expert where [the] State's case was 'largely based on the testimony of [an] expert.'" (Doc. # 14-58 at 106-08) (quoting, parenthetical, *Soffar*, 368 F.3d at 478) (quote alteration in brief adopted). The court next addresses each of Scott's subclaims, in turn.

> **2.      Subclaim (F)(1) – Scott has failed to demonstrate that trial counsel was ineffective for not uncovering and presenting compelling evidence that would have cast doubt on the significance of the DNA evidence.**

240

Respondent asserts that this subclaim is barred by state procedural default. (Doc. # 17 at 44). The ACCA considered it: "Scott's claims here fails to satisfy the requirements of Rule 28(a)(10)" because Scott's brief did not provide any legal authority or present any analysis on the issue. (Doc. # 14-59 at 214). But, applying the relevant principles to this subclaim, the record casts doubt on whether the ACCA relied on Rule 28(a)(10) in a firmly established manner.

Once again, the Eleventh Circuit uses "a three-part test . . . to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313 (citing *Card*, 911 F.2d 1516). Going through these three steps, the last state court rendering a judgment here – the ACCA – clearly and expressly stated that it was relying on "Rule 28(a)(10), Ala. R. App. P." (Doc. # 14-59 at 214), to resolve the federal claim without reaching the merits of that claim. *See Judd*, 250 F.3d at 1313. Although Scott points out that the ACCA made an alternative ruling on the merits (Doc. # 20 at 58) (citing *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994)), he incorrectly suggests that the ACCA made a merits-based ruling on this subclaim. (Doc. # 14-59 at 214).

Moving to the second part of the test, the ACCA's decision to apply Rule 28(a)(10) rests entirely on state law grounds, requiring that "the brief of the appellate or the petitioner shall contain . . . [a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Because this is not "intertwined with an interpretation of federal law," the second part of the test is satisfied. *See Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313).

The third part of the test, however, does not appear to be clearly met. Scott does not dispute that Rule 28(a)(10) is "adequate, i.e., firmly established and regularly followed." *Id.* at 1157. What

241

Scott contests is whether the rule was applied "in an arbitrary or unprecedented fashion." *Id.* (quoting *Judd*, 250 F.3d at 1313). The Eleventh Circuit has interpreted this "arbitrary or unprecedented" prong as meaning that "[t]he state court's procedural rule cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim to be considered adequate for the purposes of the procedural default doctrine." *Judd*, 250 F.3d 1308, 1313 (11th Cir. 2001). The Supreme Court of Alabama has construed Rule 28(a)(10) to require that "arguments in briefs contain discussions of facts and relevant legal authorities that support the party's position. If they do not, the arguments are waived." *White Sands Grp. LLC v. PRS II, LLC*, 998 So. 2d 1042, 1058 (Ala. 2008) (citing *Moore v. Prudential Residential Servs. Ltd. P'ship*, 849 So. 2d 914, 923 (Ala. 2002)).

With this principle in mind, the record casts doubt on whether the ACCA relied on Rule 28(a)(10) in a firmly established manner. This is because, at least for one argument, Scott's brief did not fit into the category of cases in which the petitioner had done little or nothing to develop his claim on collateral review. When arguing that his trial counsel should have retained an expert to "opine on how the transfer theory could work," Scott cited *Soffar v. Dretke*, 368 F.3d 441, 478 (5th Cir. 2004) for the contention that "defense counsel had greater responsibility to retain [a] defense expert where [the] State's case was 'largely based on the testimony of [an] expert.'" (Doc. # 14-58 at 107). To be sure, this was the only case that Scott cited even though he made several other contentions that he did not support with any citations to authority. Under *White Sands Group, LLC*, an Alabama court should conclude that a defendant has waived arguments if they are unsupported with a discussion of relevant facts and legal authorities. *See* 998 So. 2d at 1058. Therefore, the ACCA correctly applied the procedural bar of Rule 28(a)(10) as it relates to all of

242

Scott's arguments – almost. The one exception is Scott's argument that his trial counsel should have retained an expert to "opine on how the transfer theory could work." (Doc. # 14-58 at 107).

Although state procedural default applies to bar Scott's other theories, even if the court were to consider the entirety of the subclaim on its merits, it would fail to satisfy the AEDPA burden he must shoulder. Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory was the Rule 32 court's opinion on second postconviction appeal. (Doc. # 14-33). Although the Supreme Court of Alabama was the last state court to consider Scott's assertions, the denial of certiorari was not accompanied with an opinion. The ACCA issued an opinion, but it did not offer any merits-based reasoning as to this subclaim. (Doc. # 14-59). Therefore, the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the Rule 32 court. *Wilson*, 584 U.S. at 125.

Scott argues that AEDPA deference is not due to be given to the Rule 32 court's denial of this claim because the Rule 32 court rejected it "notwithstanding the fact that Scott's 'Amended Rule 32 petition and supporting exhibits are assumed to be true under Alabama law.'" (Doc. # 1 ¶ 256) (quoting *Daniel*, 822 F.3d at 1261). He also asserts the ruling is "contrary to, or an unreasonable application of *Strickland* and was based on an unreasonable application of the facts." (*Id.*). Scott thus invokes § 2254(d)(1) and (d)(2), but as explained below, he cannot meet the standard under either clause.

Scott's specific contention is that trial counsel failed to uncover and present compelling evidence that would cast doubt on the significance of the DNA evidence. (Doc. # 1 at 109). This "compelling evidence," he argues, would have included evidence presented in the guilt phase about how Scott's semen could have been left on the couch, DNA analysis of the couch cushions, evidence of Scott's previously appropriate behavior around children, DNA evidence from the three

243

long strands of hair found on Latonya's body, and circumstantial evidence of Latrice's lifestyle and her other daughter's death shortly after Latonya's that could point to Latrice as an alternative murder suspect. (*Id.* ¶¶ 244-56). Scott argues that because "[t]he only evidence that linked Scott to Latonya's murder was the DNA match to the smear on her right thigh," the failure of Scott's counsel to give the jury "a basis for accepting the DNA findings while remaining reasonably doubtful that the DNA evidence found its way onto Latonya's thigh in the course of her murder by Scott" was prejudicial and suggested that Scott's counsel "had no real defense." (*Id.* ¶¶ 244, 254).

After careful review, the court concludes that Scott has failed to meet his burden under either § 2254(d)(1) or (d)(2) to show that the ACCA's dismissal of Scott's *Strickland* claim regarding mitigating expert funds was an unreasonable application of law as determined by the Supreme Court or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

First, Scott has not overcome AEDPA deference under the contrary to clause of (d)(1). The Rule 32 court's discussion of *Strickland* eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). Nor has Scott carried his burden under the remaining portion of § 2254(d)(1) because he has not cited any Supreme Court case law in this subclaim. In fact, he cites only one case – *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016) – for the limited proposition that a "Rule 32 petition and supporting exhibits are assumed to be true under Alabama law." *Id.* So, even if *Daniel* were a Supreme Court case and even if it contained materially indistinguishable facts from Scott's case, it would only overcome

244

AEDPA deference if Scott could show that the holding in *Daniel* meant that the ACCA should have granted relief on his entire subclaim.

Similarly, *Daniel* does not help Scott overcome AEDPA deference under the contrary to clause of (d)(1) because it is factually distinguishable. The petitioner in *Daniel* presented specific allegations that stated a cognizable *Strickland* claim. But, Scott's allegations are vague and do not state a cognizable *Strickland* claim. As previously explained, although the *Daniel* defendant asserted a *Strickland* claim, it was predicated on a constitutionally inadequate mitigation investigation at the penalty phase. 822 F.3d 1248, 1254 (11th Cir. 2016). Specifically, in *Daniel*, defense counsel presented a single witness during the penalty phase, during which the defendant's mother testified about the defendant's ADHD and dyslexia conditions, that he dropped out of school in the tenth grade, that the defendant's biological father had died when the defendant was three, and that the defendant's stepfather had abused him (describing one specific instance in which he beat the defendant and damaged his kidneys). *Id.* at 1255-56. She also detailed that, after this incident, protective services removed the defendant from her home for ten months and that the defendant started drinking beer and using marijuana after he turned sixteen. *Id.* at 1256. During the sentencing phase, defense counsel called the defendant's mother again as well as his sister – both of whom asked the court to spare the defendant's life. *Id.* The trial court sentenced the defendant to death. *Id.*

Neither the *Daniel* jury nor the trial court heard the following additional mitigation evidence: the defendant's mother killed his father with a shotgun when he was three, and at some point before his tenth birthday and for several years, his stepfather repeatedly sexually assaulted him and he "was forced to engage in sex acts with his siblings while his stepfather watched." *Id.* at 1254. He was placed in special education classes and according to a postconviction

245

neuropsychological evaluation, he suffered from "lifelong borderline intellectual functioning" as well as "childhood dissociative disorder with psychotic features." *Id.*

Additionally, in the *Daniel* Rule 32 postconviction proceedings, the defendant asserted that his "trial counsel had almost no meaningful contact with him or his family prior to trial." *Id.* at 1263. The defendant, concerned that his counsel was ignoring him, filed a complaint with the Alabama Bar Association, so the only meeting that they had with him before trial (which was only three days before trial) focused largely on discussing that complaint. *Id.* at 1264. Additionally, when the defendant's mother reached out to trial counsel, trial counsel took very little time to talk with her and expressed no interest in future discussions. *Id.* When the defendant's sister attempted to contact trial counsel by calling several times and driving from Atlanta to Birmingham to trial counsel's office, trial counsel spoke with her only briefly and did not ask her basic questions about the defendant. *Id.* Considering these facts, the Eleventh Circuit in *Daniel* reasoned that the ACCA had unreasonably rejected for lack of specificity the petitioner's allegations of deficient performance at the penalty phase.

There are materially distinguishable facts in Scott's case regarding this claim. Namely, it contains no allegation that there was an inadequate presentation of evidence at the *penalty* phase. In contrast, in *Daniel*, the Eleventh Circuit only considered *Strickland* allegations related to the penalty phase. The type of evidence that counsel might seek to offer during the guilt phase differs from the type of evidence proffered during the penalty phase. Establishing reasonable doubt regarding the elements of a crime requires different proof than showing that the mitigating circumstances outweigh the aggravating circumstances, which is the standard applied during Scott's sentencing phase. Because this claim considers this materially different posture than the holding in *Daniel*, *Daniel* cannot help Scott satisfy the contrary to clause of (d)(1).

Moving to the governing law clause of (d)(1), the Rule 32 court correctly identified *Strickland v. Washington*, 466 U.S. 688 (1984) as the proper standard for evaluating Scott's ineffective assistance of counsel claim. (Doc. # 14-33 at 62-64, 66-67).

*Daniel* does no work at all in satisfying the unreasonable application clause of (d)(1). It did not involve any ruling that would show that the ACCA committed extreme constitutional error or unreasonably applied clearly established Federal law in this matter. Again, the Eleventh Circuit in *Daniel* held that the ACCA had unreasonably rejected the petitioner's allegations of deficient performance for lack of specificity. The Eleventh Circuit held that "no competent attorney in 2003 would have failed to conduct timely and thorough background interviews with the defendant and his immediate family members when they were ready, willing, and available to speak with trial counsel and even contacted counsel on their own." *Id.* at 1264-65. The panel further concluded "that the information uncovered by trial counsel in their cursory investigation would have led a reasonable attorney to investigate further." *Id.* at 1266. *Daniel* also noted that trial counsel can be deficient "for failing to investigate and challenge the state's reliance on [the defendant's] second degree burglary conviction" because it would have been easy to obtain the file on the prior conviction. *Id.* at 1271. And, it observed that trial counsel "failed to conduct a minimally adequate mitigation investigation" when they did not obtain his school records or discover the results of his childhood intelligence testing given "the totality of circumstances of his case." *Id.* at 1268-69. The panel was clear: "a reasonable attorney in 2003 would have at least asked for the appointment of qualified experts to explore [the defendant's] borderline intellectual disability." *Id.* at 1269.

The Rule 32 court did not unreasonably apply these holdings. After all, it was not considering a claim based on an inadequate mitigation investigation. The language of (d)(1)'s unreasonable application clause requires that the precedent be "clearly established Supreme Court

247

precedent," meaning that Scott must show more than an analogous set of facts. But, that is all he has shown here. While *Daniel* involved an inadequate *penalty* phase investigation, Scott's claim involves an allegedly inadequate *guilt* phase investigation. Although Scott has elsewhere raised the *Strickland* claim of ineffective assistance based on failure to investigate mitigation evidence, this claim is not based on that theory; therefore, the holdings of *Daniel* are insufficient to overcome AEDPA deference under the unreasonable application clause.

An additional distinction is worth noting. In *Daniel*, the penalty phase investigation involved a brief phone call with a guilt and penalty phase witness, a singular meeting with the defendant three days before trial that mostly discussed a topic other than the trial, and a brief meeting with the defendant's sister after she attempted (several times) to contact them. Scott's trial counsel met in person with guilt phase witnesses and corresponded with them – even though there is no evidence that the witnesses reached out to them to the same extent as the defendant's sister in *Daniel*. (Doc. # 14-49 at 59) (recording correspondence with a defense witness and a half-hour phone conversation with Scott's aunt). Scott's trial counsel also met with Scott in person and over the phone several times before trial to discuss substantive trial matters. (Doc. # 14-49 at 59-60) (recording four in-person meetings with Scott in addition to a phone conversation with him).

Not only are the factual circumstances of Scott's case different from those in *Daniel*, but also Scott's legal claims are distinct from those in *Daniel*. To the extent that Scott argues that his counsel conducted an inadequate guilt phase investigation, he presents theories that do not mirror the holdings of *Daniel*. Scott's theories for relief are that his counsel failed to obtain DNA analysis of the couch cushions (Doc. # 1 ¶ 246), retain and present an expert witness to explain the transfer theory (*id.*), uncover and present evidence that Scott had never exhibited any inappropriate interest in children (*id.* ¶ 247), investigate and present Latrice's background (*id.* ¶ 248), test three hair

248

samples from Latonya's body (*id.*), and uncover and present evidence that Latonya's purported

biological father had told Latrice he did not want Latonya and her sister in his house. (*Id.* ¶ 251).

Conversely, in *Daniel*, the defendant's claims were that trial counsel failed to have meaningful

contact with him and his family before trial, *Daniel*, 822 F.3d at 1263, obtain a file on his prior

conviction before trial, *id.* at 1271, obtain school records, *id.* at 1268, or discover the results of his

childhood intelligence testing. *Id.* at 1269. In other words, *Daniel* contained no habeas theories

about failure to obtain DNA testing, present expert testimony about a guilt phase forensics defense

(only a penalty phase mental health/mitigation expert), uncover and present character evidence, or

investigate alternative suspects. The holdings of *Daniel* are not directly relevant to what Scott

protests in this claim. Because the standard under the unreasonable application clause of (d)(1)

looks at whether there is an unreasonable application of "clearly established Federal law," *Daniel*

does not help Scott overcome his burden under the unreasonable application clause.

Moving to (d)(2), Scott maintains that the Rule 32 court's ruling was based on an

unreasonable application of facts. (Doc. # 1 ¶ 256). Although Scott invokes (d)(2), he has not

pointed to any specific factual determination that he believes was unreasonable, nor has he pointed

to any evidence that undermines the reasonableness the Rule 32 court's factual determinations.

Scott has not overcome the presumption of correctness that attaches to state court factual findings

by offering clear and convincing evidence under (e)(1).

Indeed, after review of the Rule 32 court's last reasoned decision on the theories presented

here, the court concludes that the Rule 32 court reasonably applied the facts, including the facts

that:

- Scott had not pleaded any "facts to develop a time frame in which he had sexual intercourse [on the couch] or who these witnesses are or how trial counsel could have discovered them," nor had he pleaded any "facts to show how his semen would have been found in proximity to Latonya's body." (Doc. # 14-33 at 63).

249

- Scott had not adequately explained "what a DNA analysis of the cushions could have added to create reasonable doubt of his guilt." (*Id.* at 64).
- There was more evidence linking Scott to Latonya's murder than the DNA match to the smear on her right thigh because "Scott admitted to 'killing a girl last night,' the day after the victim was killed, Officer Clark testified that when Scott was in the back seat of a patrol car, he exclaimed: 'Bitch, I am going to kill you! I killed somebody last night!" (*id.*), Landris Wright testified that Scott told her that he "had killed a girl last night" (*id.* at 64-65), "Scott was also placed at or near the scene where Sager was killed, exhibited bizarre behavior the day after the murder, and Scott possessed a firearm that had previously been at the home where the victim was found." (*Id.* at 65).
- Scott's trial counsel questioned the State's DNA expert "at length how the semen smear could have been transferred from the couch cushions" and "Scott does not explain how an independent expert would have provided more information than was already elicited on cross-examination or how further testimony on the matter would have changed the result." (*Id.*).
- Scott "failed to plead sufficient facts to show how the presentation of the Police Department's failures through an expert would have a reasonable probability of changing the outcome of the proceeding." (*Id.*).
- Scott failed "to show how an expert testifying as to the lack of [evidence of glitter lotion and semen on the bed sheet] would have a reasonable probability of changing the outcome of the proceeding." (*Id.* at 65-66).
- Scott failed "to specifically identify what other experts were available that should have been hired" and failed "to state what testimony could have been elicited to alter the result." (*Id.* at 66).
- Scott failed to name witnesses who could have presented evidence "about Scott's relationship with children that would have cast doubt on the likelihood that he tried to engage in forced sexual intercourse with a ten-year-old girl." (*Id.*).
- Scott failed to name witnesses or explain "how trial counsel could have discovered them" who could have testified about "a potential alternate murder suspect, Latrice Sager and or others." (*Id.*).

Based on this (d)(1) reasoning, the court cannot say that the Rule 32 court unreasonably applied these facts by concluding that Scott's trial counsel committed no error.

Whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, even under de novo review, this claim fails. Once again, in *Strickland*, the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel who represent criminal defendants at trial or on direct appeal. To prove that a conviction or sentence is unconstitutional

250

because of ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance – "a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.*; *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be "highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Scott has not overcome the deference owed to counsel's performance under *Strickland*. The failures he highlights do not amount to deficient performance. Again, Scott's first argument was that his counsel should have presented evidence during the guilt phase that would establish how Scott's semen could have been on the couch before Latonya laid down. (Doc. # 1 ¶ 245). He

251

argues that "[h]ad that evidence been presented before the jury decided guilt, there would have been a foundation for the transfer argument." (*Id.*). Scott concludes that he was prejudiced by his counsel's failure to present this evidence because had the jury heard this evidence, "it would have a basis for accepting the DNA findings while remaining reasonably doubtful that the DNA evidence found its way onto Latonya's thigh in the course of her murder by Scott." (*Id.* ¶ 254). Without evidence of Scott's sexual activities on the couch, Scott argues, it would have been plain to the jury that "the defense was grasping a[t] speculative wisps, and had no real defense." (*Id.*). But, Scott presents no legal or other authority to buttress this conclusion. And, in any event, the court cannot conclude that Scott has shown by a preponderance of the evidence that his counsel's failure to present such evidence during the guilt phase was objectively unreasonable. Indeed, there could have been several reasons why Scott's counsel decided not to present such evidence, including that they did not have such evidence or know where to obtain it, or that they were concerned that presenting evidence of frequent sexual encounters by Scott with different women would make the jury view him in a negative light. Scott has also failed to satisfy the prejudice prong because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Counsel made no unprofessional errors here. And, given the risk that the jury could have taken evidence of Scott's frequent sexual activities on the couch as further evidence of his bad character, the court cannot conclude that there is a reasonable probability that the jury would have acquitted him if it learned of this evidence. Thus, Scott's first *Strickland* theory about failure to present transfer evidence does not overcome *Strickland* deference.

Scott's second theory is that his counsel should have asked for or obtained DNA analysis of the couch cushions. (*Id.* ¶ 246). He elaborates. Scott contends that because the cushions were

252

never tested by anyone, his counsel could only present "a 'theory' about transference, not evidence." (*Id.*). Scott concludes by saying that he was prejudiced by his counsel's failure to present this evidence because had the jury heard this evidence, "it would have a basis for accepting the DNA findings while remaining reasonably doubtful that the DNA evidence found its way onto Latonya's thigh in the course of her murder by Scott." (*Id.* ¶ 254). And, he says because the jury did not hear analysis of the DNA present on the couch, it would have been plain to the jury that "the defense was grasping a[t] speculative wisps, and had no real defense." (*Id.*). Again, Scott presents no authority – legal or otherwise – to support how this theory demonstrates a *Strickland* violation. After close examination, the court concludes that there was no *Strickland* violation here.

Reasonable counsel could have decided not to obtain DNA analysis of the couch cushions for several reasons, including because they did not believe that it would be fruitful or that they were concerned that if the DNA analysis was positive for Scott, the State could have even more evidence to support that Scott was involved in the death of Latonya. Scott has also failed to satisfy the prejudice prong because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Not only does the court conclude that counsel made no unprofessional errors, but it also determines there were risks regardless of the results of the DNA analysis. If the DNA analysis were positive, the trier-of-fact could have taken that as proof that Scott was sexually active on the couch where Latonya was found dead, which would run the danger of the jury concluding that Scott committed a lewd sexual act on Latonya and was involved in her death. If the DNA analysis were negative or produced results for someone else, that would simply mean there was a lack of evidence connecting Scott to the cushions. But, that would not change the fact that Scott's DNA was found on Latonya's thigh, still leaving no plausible explanation other than

253

her rape and probable murder by Scott. The court cannot conclude that there is a reasonable probability that the jury would have acquitted him if it learned of the currently unknown results of the DNA analysis of the cushions. Thus, Scott's second *Strickland* theory about failure to test DNA on the couch cushions does not overcome *Strickland* deference.

Scott's third theory was that his counsel should have retained and presented an "expert witness who could explain how the transfer could occur and how it could be consistent with the evidence observed by the evidence technician and the medical examiner." (*Id.*). Scott concludes that he was prejudiced by his counsel's failure to present this evidence because had the jury heard this evidence, "it would have a basis for accepting the DNA findings while remaining reasonably doubtful that the DNA evidence found its way onto Latonya's thigh in the course of her murder by Scott." (*Id.* ¶ 254). Because the jury did not hear expert testimony about the transfer theory, Scott argues, it would have been plain to the jury that "the defense was grasping a[t] speculative wisps, and had no real defense." (*Id.*). But again, Scott presents no authority – legal or otherwise – to support how this demonstrates a *Strickland* violation. And, upon close examination, the court concludes that there was no *Strickland* violation here. Reasonable counsel could have decided not to retain an expert on a "transfer theory" for several reasons. For example, counsel could have done so out of an interest of focusing time and pre-trial preparation on theories and research more likely to bear fruit. Or, a concern that such expert testimony could be confusing or distracting to the jury.

Scott has also failed to satisfy the prejudice prong because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The court not only concludes that counsel made no unprofessional errors, but in the absence of anything more than Scott's bald assertion

254

about the benefits of such expert testimony, the court finds there is no reasonable probability that the jury would have acquitted him if it was presented with this evidence. Thus, Scott's third *Strickland* theory about failure to retain an expert witness on the transfer theory does not overcome *Strickland* deference.

Scott's fourth theory was that his counsel should have presented evidence "about Scott's personal history that would have cast doubt on the likelihood that he tried to engage in forced sexual intercourse with a ten-year old girl." (*Id.* ¶ 247). He elaborates on this theory by explaining that because his counsel did not conduct "an adequate investigation," they never learned of, and therefore never presented evidence about Scott's appropriate levels of interest in children. (*Id.*). Scott lists the types of evidence that could have been presented, including that family members could testify:

> that Scott was especially kind to children, that they often entrusted Scott with the care of their young children, and that there was never the slightest hint of inappropriate sexual interest. Scott was a frequent babysitter for Shaneka's two young daughters with no hint of any deviant behavior. Further, Latrice often asked Scott to babysit her daughters, Latonya and Ashley, and never reported, commented or hinted to anyone about any concerns.

(*Id.*). Scott may be suggesting that Latrice or Shaneka could testify to this point, but he stops short of saying this directly.

Again, Scott presents no authority – legal or otherwise – to support how this theory demonstrates a *Strickland* violation. And, upon close examination, the court concludes that there was no *Strickland* violation here. Reasonable counsel could have decided not to present evidence of Scott's frequent (even if appropriate) interactions with children for several reasons, including out of concern that evidence of Scott's frequent interactions with children could bolster the State's theory that he had an inappropriate interest in children (even if he did not act on it before Latonya). This is especially true when considering that some of this evidence includes descriptions of how

255

Scott was left alone with children as a babysitter. Scott has also failed to satisfy the prejudice prong because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Scott's counsel made no unprofessional errors, and further there were risks inherent in discussing Scott's frequent interactions with children. Thus, the court cannot conclude that there is a reasonable probability that the jury would have acquitted him if it learned that Scott had often interacted with and been left alone with children (including Latonya) before Latonya's death occurred. Scott's fourth *Strickland* theory about failure to present evidence about an appropriate level of interest in children does not overcome *Strickland* deference.

Scott's fifth *Strickland* theory was that his counsel should have investigated Latrice's background and presented to the jury evidence about her. (*Id.* ¶ 248). Scott also faults his counsel for failing to test three long hair samples from Latonya's body. (*Id.*). He elaborates that although the trial court had authorized such DNA testing, there was no evidence that it was done, and "there was no downside to having the hair tested. If it matched Scott, it would be consisted with his frequent presence on the couch. If it matched someone else, it would suggest an alternate murder suspect." (*Id.*).

Related to the investigation and presentation of evidence about Latrice, Scott explained that this evidence would have included that Latrice would sometimes smoke marijuana with Scott and was otherwise addicted to prescription drugs to treat symptoms of her sickle cell anemia. (*Id.* ¶ 249). Scott added that shortly before Latonya's death, Latrice had learned that she would likely not live past the age of thirty, that "[s]he was distraught by the prospect that [her] two [] daughters would grow up without a mother." (*Id.*). Another piece of evidence was that the night Latonya died was the only night that Ashley and Latonya were not together. (*Id.* ¶ 250). And, Scott asserts his

counsel could have presented evidence that Latonya's father (Ronald Porter) had kicked Latrice and her daughters out of his house, informing Latrice that "he didn't want to deal with the two girls." (*Id.* ¶ 251). According to Scott, Latrice was also dating a man at the time of Latonya's death who had told Latrice that "he liked her but not her daughters." (*Id.*). Scott added that although Latrice testified to the jury in Scott's case that her other daughter Ashley (who died a few weeks after Latonya) had grieved to death, the other explanation for her death was "that she died from complications of sickle cell anemia complicated by her mother giving her high doses of her mother's morphine." (*Id.* ¶ 252). Scott does not clarify who would have testified to any of this or what records or evidence existed to substantiate this claim.

Scott suggests that because Latrice had "exhibited a dramatic lifestyle change" after the death of her two daughters, including by adopting "a sexually provocative appearance and a new social life," the jury might have inferred a "less innocent" reason for the death of Ashley as well as a connection between Latrice and the death of Latonya. (*Id.* ¶ 253). As the court understands the theory, Latrice murdered her two daughters out of a desire to attract and keep a romantic partner and out of sadness that her daughters would otherwise grow up without a mother. (*Id.*).

Scott argues that he was prejudiced by his counsel's failure to present this evidence because had the jury heard this evidence "it would have [had] a basis for accepting the DNA findings while remaining reasonably doubtful that the DNA evidence found its way onto Latonya's thigh in the course of her murder by Scott." (*Id.* ¶ 254). To repeat, because the jury did not hear expert testimony about the transfer theory, Scott argues, it would have been plain to the jury that "the defense was grasping a[t] speculative wisps, and had no real defense." (*Id.*). He says that without an alternative explanation for Latonya's death, the jury had "no evidentiary basis to probe deeply into the crime – as shown by the barely one hour of deliberation on guilt." (*Id.* ¶ 254). Scott has

presented no authority to support how this theory demonstrates a *Strickland* violation. And, upon closer examination, the court concludes that there was not a *Strickland* violation. Reasonable counsel could have decided against presenting evidence of Latrice's background, drug use with Scott, or purported responsibility for the death of at least one of her daughters (Ashley) for several reasons. One obvious one is that suggesting that the mother of a deceased child (when the child was a victim of attempted or statutory rape and murder) was somehow responsible for that death could so inflame the jury against the defense that presenting such evidence would have been risky and potentially prejudicial. Although it is not at all certain how the jury would have viewed such a theory, what is clear is that counsel opting not to present it could have been making a reasonable strategic decision. Also, regarding the evidence that Latrice would use drugs with Scott, one reason counsel may not have presented such evidence is that implicating Scott as a drug user would prejudice the jury against him and could make them think he is more likely to have broken other laws.

Nor has Scott satisfied the prejudice prong. He has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Again, this "evidence" could prejudice the jury against Scott. The court simply cannot conclude that there is a reasonable probability that the jury would have acquitted him if it learned of this evidence. Therefore, Scott's fifth *Strickland* theory about failure to present evidence about Latrice as an alternate murder suspect does not overcome *Strickland* deference.

In sum, this subclaim fails for several reasons, including that it cannot overcome AEDPA deference, and even if it had, it would fail under de novo review.

258

### 3. Subclaim (F)(2) – Scott has failed to demonstrate trial counsel was ineffective for not engaging certain experts

Just as with Scott's subclaim about the failure to introduce DNA evidence at his guilt phase, Respondent characterizes his other subclaims – asserting that his trial counsel failed to engage necessary experts – as procedurally defaulted under Alabama Rule of Appellate Procedure 28(a)(10). (*See* Doc. # 17 at 44). Upon close examination of the ACCA's opinion, however, it is unclear whether the ACCA applied the procedural bar of Rule 28(a)(10) to both of these subclaims or just to the first one. This is because the ACCA's opinion explains that "Scott's *claims* here *fails* to satisfy the requirements of Rule 28(a)(1)." (Doc. # 14-59) (emphases added). The word "claims" is plural, suggesting that the ACCA meant to apply this procedural bar to both subclaims, but the verb "fails" suggests that the ACCA intended to apply the procedural bar to only a singular claim. Additionally, the structure of the ACCA's analysis weighs in favor of interpreting the procedural bar as only applying against the DNA evidence subclaim, as the ACCA provided a full merits-based analysis of the expert subclaim. The ACCA did not conduct any merits-based analysis of the former – concluding that it is barred by Rule 28(a)(10). (*See id.* at 213-14). Additionally, unlike other procedurally barred claims addressed in its opinion, the ACCA characterized its merits-based reasoning as an *alternative* ground for denial. The ACCA did not characterize its merits analysis of the expert claim. Rather, its rejection of that claim on the merits was the only ground for denial.

This ambiguity matters. To conclude that a claim is procedurally defaulted from federal habeas review, "the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Judd*, 250 F.3d at 1313. Because it is not clear that the ACCA relied on state procedural rules to resolve the expert subclaim, this court cannot conclude that this subclaim is subject to state-barred procedural default. Additionally, this claim is not procedurally defaulted

because Scott has adequately exhausted this claim by asserting it through two entire rounds of postconviction review, as summarized in the discussion of state court proceedings below. For these reasons, the court determines that Scott's expert subclaim is not subject to state procedurally barred or defaulted due to lack of exhaustion.

To begin with, Scott only explicitly refers to (d)(1)'s second clause. (*Id.* ¶ 243). But, even if he had referred to (d)(1)'s contrary to clause, he has not overcome AEDPA deference to such a claim. This subclaim contends that his "[t]rial counsel were ineffective in failing to procure the assistance of experts necessary to challenge the State's evidence." (Doc. # 1 ¶ 257). These experts, Scott argues, should have included "an independent DNA expert, forensic pathologist, and crime scene investigator." (*Id.*).

First, Scott has failed to carry his burden under (d)(1) because he has not shown that the ACCA misapplied clearly established federal law as determined by the Supreme Court or reached a different outcome than the Court. In fact, he has not cited any Supreme Court case law whatsoever with respect to this subclaim. The cases he cites include only: a non-binding federal case, *Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004); a state court case, *Dubose v. State*, 662 So. 2d 1189, 1196-99 (Ala. 1995); and *Daniel*, 822 F.3d 1248, which is again only cited for the limited proposition that a "Rule 32 petition and supporting exhibits are assumed to be true under Alabama law." (Doc. # 1 ¶ 264) (quoting *Daniel*, 822 F.3d at 1261). What is more, each of these cases is distinguishable and thus cannot satisfy the contrary to clause of (d)(1) for that reason.

*Soffar* was a pre-AEDPA case involving a defendant who was convicted of capital murder related to a bowling alley burglary and shooting of four victims – one of whom lived. *Soffar*, 368 F.3d 441, 443-44, 460-61, 463. The survivor was administered emergency medical attention that included neurosurgery, and he eventually gave four statements to the police. These statements

260

varied in their details. For example, in one instance, he said the robber was black, and in another he reported the robber was white. *Id.* at 449. In general, the statements indicated that a lone male robber whom the victim had never seen before gained entrance to the bowling alley by feigning car trouble and asking if he could fill a white plastic container with water for his car. *Id.* at 448-50. The robber later showed a gun and directed the manager to get money out of the cash register. *Id.* He also told all four people working at the bowling alley to lie on the floor in a semi-circular pattern before shooting all of them without provocation. *Id.* at 449-50. The survivor assisted a police artist in "developing a composite drawing of the lone perpetrator." *Id.* at 451.

The defendant was later arrested for speeding and for driving a stolen motorcycle. *Id.* The survivor failed to positively identify the defendant in a line-up. *Id.* at 453. Before he was assigned counsel, the defendant was questioned by police and signed three written statements that described his role in the burglary and shooting and implicated another man as the main perpetrator of the crimes. *Id.* at 452-56. In the third written statement, after learning that the man he had implicated had been released due to a lack of corroborating evidence, the defendant admitted that he shot two of the four victims, but insisted that it was at the direction of the other man. *Id.* at 455-56. The defendant's account and diagrams of the crime scene were "dramatically at odds with" the surviving victim's account and his diagrams, and the physical evidence in the case (including ballistics evidence) supported the surviving victim's version of events more than the defendant's version. *Id.* at 456.

The state court appointed two attorneys as the defendant's counsel. *Id.* at 457. Afterward, the defendant wrote the court-appointed attorneys a letter asserting that he "was on acid" when he took a polygraph test and that he "did not kill anyone." *Id.* at 458. At trial, neither the State nor the defense called the surviving victim to testify, although the neurosurgeon who had operated on the

surviving victim testified that he "could be suffering from retrogressed amnesia." *Id.* at 459 (emphasis in original). Defense counsel never attempted to interview the surviving victim, but at trial asked the neurosurgeon a question implying that he "had no useful memory of the offense." *Id.* The defense's main theory was one based on an alibi, and to support this theory the defendant's mother testified that the defendant had spent the entire weekend at issue "helping a family member move." *Id.* at 460. The jury returned a verdict of guilty, and during the penalty phase "defense counsel presented no testimony or mitigating evidence of any kind." *Id.* He was sentenced to death. *Id.* at 461.

> The defendant raised a *Strickland* claim in a petition for habeas corpus, arguing that he:
>
> was denied the effective assistance of counsel by virtue of his defense counsel's failure to investigate, develop, and present available evidence during the guilt phase of [the defendant's] trial specifically, the failure to retain a ballistics expert or develop ballistics evidence, and the failure to investigate, develop, or present evidence with respect to [the surviving victim's] statements to police.

*Id.* at 462. After concluding that the issue had been exhausted, *id.* at 465-71, a Fifth Circuit panel held that the defendant's trial counsel had been constitutionally ineffective under *Strickland*. *Id.* at 478. The court so ruled for two reasons: first, even though defense counsel were aware that the State did not plan to call the survivor as a witness, they did not investigate whether he could have been a helpful witness for the defense. Second, even though the State's case was largely based on the testimony of a ballistics expert, defense counsel did not consult with a ballistics expert and could not offer a reasonable explanation why they did not do so. *Id.* The panel also found that this deficient performance prejudiced the defendant because the evidence of guilt "was not so extensive as to render harmless defense counsel's errors," and relied on the self-incriminating statements even though the defendant had a "history of confessing to crimes he did not commit." *Id.* Adding to this was the fact that there was no eyewitness testimony that placed the defendant at the crime

262

scene, no fingerprint evidence implicated the defendant, no items from the crime scene were found in the defendant's possession, and no blood or hair samples matched the defendant. *Id.* at 478-79.

*Soffar* is distinguishable and therefore cannot help Scott carry his burden under the contrary to clause of (d)(1). It is a pre-AEDPA case, and it does not show how another federal court applied *Strickland* in an AEDPA context. Additionally, *Soffar* has materially different facts. For example, while in *Soffar* there was no physical evidence connecting the defendant with the crime, here there is DNA and circumstantial evidence connecting Scott with Latonya's murder. Scott's DNA matched the semen smudge on Latonya's thigh, Scott lived in the house where Latonya was found dead, and there was testimony that Scott said he had killed a girl the night before. (Doc. # 14-17 at 3). In contrast, in *Soffar* there were multiple discrepancies between the only evidence implicating the defendant – his confession – and all other evidence, including the eyewitness's recollection and the ballistics evidence. The ballistics evidence diverged from the defendant's confession, and it was plausible that delving into that evidence could have exculpated the defendant and undermined his confession. Conversely, Scott did not give any written confession to the police, there was both physical and circumstantial evidence implicating Scott in Latonya's death, and Scott has not pointed to any evidence that would suggest that further consultation of experts would have exculpated Scott. In any event, there were numerous factual discrepancies between Scott's case and *Soffar*, so in addition to the fact that *Soffar* is not a Supreme Court case, is non-binding, and is pre-AEDPA, it also is distinguishable in several material respects.

Nor does *Soffar* help Scott carry his burden under the unreasonable application clause of (d)(1). It is not a Supreme Court case, so it cannot assist Scott in satisfying that clause. Even if *Soffar* were a Supreme Court case, Scott has not shown how the ACCA committed extreme constitutional error or unreasonably applied the clearly established holding of *Sofffar*. Again, the

clearly established holdings of *Soffar* were that defense counsel are ineffective under *Strickland* if: (1) in a case with no physical evidence implicating their client, they fail to interview the only eyewitness to the crime; and (2) in a case where the State's case "was largely based on the testimony of a ballistics expert" and their client's confession (which diverged from the ballistics evidence), they fail to consult an independent ballistics expert. *Soffar*, 368 F.3d at 478. The first holding is irrelevant to this subclaim because there was no eyewitness to Latonya's murder and Scott does not contend that defense counsel should have interviewed any additional lay witnesses. The second holding is not wholly inapposite, but it still does not satisfy the unreasonable application clause of (d)(1) for a simple reason – the ACCA did not unreasonably apply it. Although Scott maintains that the State's case "relied heavily upon expert testimony," a key feature of the Fifth Circuit's holding in *Soffar* was that there was no physical or circumstantial evidence connecting the defendant to the crime. *See Soffar*, 368 F.3d at 443. Indeed, the most significant factor in the *Soffar* defendant's conviction appeared to be that he *confessed* to the crime. Therefore, when defense counsel learned that ballistics evidence contradicted their client's confession but aligned with the eyewitness's account (which did not directly implicate the defendant), they should have dug deeper and consulted a ballistics expert. *Id.* at 478.

Scott's case, by contrast, was not so predicated on expert testimony that the holdings in *Soffar* would have compelled his counsel to consult an expert. While the defense counsel in *Soffar* only needed to undermine their client's confession in order to have a chance to secure his innocence, Scott's defense counsel needed to explain much more: why their client's semen was on the inner thigh of a dead ten-year-old girl, in a house where he lived, and within hours of him telling two individuals that he had killed a girl last night. And, related to the Wright charges, Scott's defense counsel needed to explain why their client was found at the crime scene mostly undressed,

why Latrice had run (also undressed) into a public street to seek help, and why Latrice had then testified *as an eyewitness* that Scott raped her. While the eyewitness in *Soffar* failed to identify the defendant in a line-up, Landris identified Scott *and* led police back to the crime scene where he was sleeping (as she had told them he would be). Further, unlike in *Soffar*, where defense counsel was aware of ballistics evidence that contradicted their client's confession, Scott's defense counsel had no reason to believe that the DNA match to Scott was inaccurate or that a forensic pathologist could have convincingly testified about the transfer theory. Nor did defense counsel have reason to believe that a forensic pathologist would be able to convincingly testify about the absence of Scott's semen on Landris's bed sheet, or that a crime scene investigator could have testified in any compelling way about what the Birmingham Police Department neglected to do while investigating the respective crime scenes.

It is easy for a defendant to say, after a guilty verdict, that his counsel were ineffective for failing to hire any number of expert witnesses. *Soffar* did not hold that defense counsel can be ineffective if a defendant later identifies an expert they could have hired. Rather, *Soffar*'s holding relates to the need to hire an expert when counsel has reason to know that there is exculpatory evidence that such an expert would provide – in that case, ballistics evidence. Scott has fallen short of showing that counsel had reason to know that hiring a specific expert would reveal any exculpatory evidence. The ACCA did not misapply, and certainly did not unreasonably apply, the holding in *Soffar*.

Nor does *Dubose v. State* help Scott overcome his (d)(1) burden. Starting with the contrary to clause, *Dubose* is not a Supreme court precedent (or even a federal precedent) and is therefore unable to satisfy the contrary to clause of (d)(1), which requires citing "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Even if

265

*Dubose* were a Supreme Court case, it could not satisfy the contrary to clause because it is distinguishable from Scott's case.

In *Dubose*, the defendant was convicted of three capital counts against a single victim: murder during a kidnapping or the attempt thereof, murder during a rape or the attempt thereof, and murder during sodomy or the attempt thereof. *Dubose v. State*, 662 So. 2d 1156, 1158 (Ala. Crim. App. 1993) (hereinafter *Dubose I*). When the victim went missing, searchers located her body in her vehicle, and she was declared dead at the scene. *Id.* at 1159. The medical examiner collected semen from the victim's vagina. *Id.* at 1160. DNA analysis of "the sperm contained on the vaginal swabs taken from the victim" matched the defendant's DNA. *See id.* at 1163-64. Ultimately this proved to be the critical element in the State's case against the defendant as there was no other evidence that directly linked the defendant to the crime, no eyewitness testimony, and no "confession or any other concession of guilt" on the defendant's part. *Dubose v. State*, 662 So. 2d 1189, 1199 (Ala. 1995) (hereinafter *Dubose II*).

The State produced a DNA expert who testified to the accuracy of the process performed in the defendant's case and the statistical improbability of a false positive result. *See Dubose I*, 662 So. 2d at 1163-65. Citing the importance of the DNA analysis to the State's case against him, the indigent defendant requested funds to hire his own DNA expert. *Id.* at 1168-69. The trial court denied the defendant's request because his family and friends had raised $10,000 for him to retain counsel. *See id.* at 1169, 1170, 1175. At trial, the jury found the defendant guilty on all counts and the court sentenced the defendant to death. *Id.* at 1158. On appeal, the ACCA "reversed the conviction on the basis that the trial court had unconstitutionally denied the defendant's request for funds for a DNA expert to counter the expert DNA evidence offered by the State." *Dubose II*, 662 So. 2d at 1190-91. The Supreme Court of Alabama affirmed. *Id.* at 1199.

266

*Dubose* (which again, is not a federal case) cannot help Scott satisfy the contrary to clause because it is distinguishable from Scott's case and therefore is of no help to him in carrying his burden under (d)(1)'s contrary to clause. The *Dubose* court was not presented with a *Strickland* claim. Additionally, the crux of *Dubose* is whether the "*trial court* [] unconstitutionally denied the defendant's request for funds for a DNA expert." *See id*. at 1190-91 (emphasis added). By contrast, Scott's claim alleges that his *counsel* unconstitutionally failed to hire a DNA expert. As a result, even if *Dubose* were a Supreme Court case, the facts are materially distinct from Scott's *Strickland* claim.

Nor can *Daniel v. Commissioner* help Scott carry his burden under the (d)(1)'s contrary to clause. First, it is not a Supreme Court case. Second, it is distinguishable. Although the *Daniel* defendant asserted a *Strickland* claim, it was predicated on a constitutionally inadequate mitigation investigation at the penalty phase. 822 F.3d 1248, 1254 (11th Cir. 2016). There was no allegation that counsel should have hired "necessary experts" at the guilt phase. Although there was an allegation that counsel should have hired a "mental health/mitigation expert," *id.* at 1257, this related to the penalty phase and involved a different burden. While the guilt phase involves instilling reasonable doubt in the minds of the jurors as to whether a defendant committed a charged crime, the penalty phase involves introducing a sense of sympathy and understanding so the jurors may conclude that there were mitigating circumstances in a defendant's life that merit a lesser sentence than death. Because the facts and procedural posture of *Daniel* are distinguishable in material ways from Scott's case, it cannot help Scott overcome the contrary to clause of (d)(1).

Nor does *Daniel* assist Scott in overcoming his burden under the unreasonable application clause because it does not suggest that the ACCA committed extreme constitutional error or unreasonably applied clearly established federal law. The holding of *Daniel* is that a criminal

267

defense attorney is constitutionally deficient if he fails "to conduct any timely and meaningful mitigation interviews with [the defendant] and his family," 822 F.3d at 1264, where the information the attorney had already uncovered "would have led a reasonable attorney to investigate further." *Id.* at 1266. *Daniel* further held that trial counsel can be deficient "for failing to investigate and challenge the state's reliance on [the defendant's] second degree burglary conviction" because it would have been easy to obtain the file on the prior conviction. *Id.* at 1271. The ACCA did not unreasonably apply these holdings because, in addition to the fact that this subclaim does not deal with the penalty phase or mitigation evidence, there was no information related to DNA evidence that "would have led a reasonable attorney to investigate further." *Daniel*, 822 F.3d at 1266. Nor was there any information related to the "transfer theory" that would have led Scott's attorneys to believe that hiring a forensic pathologist would likely produce exculpatory testimony on that front. Nor was there any evidence at all about what the absence of semen on the bedsheet could mean. Indeed, it could mean any number of things, including that Scott raped Landris on the bed without producing semen. Finally, there was no evidence about what a crime scene investigator could have added by criticizing the way the Birmingham Police Department conducted their investigation. At most, such an expert would have pointed to possible things that the Department theoretically might have uncovered if it had conducted such an investigation. The ACCA reasonably applied the holdings of *Daniel* to Scott's case when it denied relief on this subclaim.

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 264). But, Scott has not pointed to any specific factual determination that he believes was unreasonable, nor has he pointed to any evidence that undermines the reasonableness the ACCA's factual determinations. Nor has Scott offered clear

268

and convincing evidence to overcome the presumption of correctness that attaches to state court factual findings. Therefore, Scott has not overcome AEDPA deference on this subclaim.

Whether AEDPA deferential review or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, even under de novo review, this claim fails. Once again, in *Strickland* the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel who represent criminal defendants at trial or on direct appeal. To prove that a conviction or sentence is unconstitutional because of ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance – "a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.*; *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be

269

"highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Scott has not overcome the deference owed to counsel's performance under *Strickland*. The failures that he highlights do not amount to deficient performance. Again, he argues that his trial counsel should have hired the following experts: a DNA expert, a forensic pathologist, and a crime scene investigator. (Doc. # 1 ¶ 257). First, Scott never identifies specific individuals who would have been willing and able to serve as experts at the time of trial. Second, the arguments he offers fail. He asserts that the DNA expert and the forensic pathologist would have "explained how the smear on Latonya's thigh could have been transferred from the couch itself, and could have spoken to the jury about the size, shape, and condition of that 'not wet, not dry' smear." (*Id.* ¶ 258). He also argues that they "would have put the significance of the DNA evidence into context, and addressed the reasonableness of Ms. Roland's statistical analysis." (*Id.* ¶ 259). Finally, Scott contends that these experts "could have also helped the jury understand that it simply does not make sense that the only evidence linking Scott to the attempted rape and murder of Latonya was the one semen spot." (*Id.* ¶ 260). For example, he says, the absence of physical trauma to Latonya's genitalia could have been relevant to the likelihood that Scott attempted to rape her and then murdered her. (*Id.*). Scott also claims that these experts could have tested the three long hair fibers around Latonya's body, examined the sheet for evidence of the "glitter lotion," and explained to the jury "the significance of the fact that Landris's bed sheet did not contain Scott's semen even though it should have had there been sexual intercourse on the bed." (*Id.* ¶ 261). Finally, Scott adds that a crime scene investigator could have told the jury about the Birmingham Police

270

Department's failures when it conducted an incomplete investigation of the two crime scenes. (*Id.* ¶ 262).

Related to prejudice, Scott maintains that if the jury had heard this testimony, they would have "had the opportunity to understand, in a light more favorable to Scott, the scientific evidence that they did hear, let alone the import of evidence that the State failed to find." (*Id.* ¶ 263).

Starting with Scott's arguments about expert testimony on his "transfer theory," he cites no authority at all to buttress his conclusion. And, in any event, Scott has not shown by a preponderance of the evidence that his counsel's failure to present such evidence during the guilt phase was objectively unreasonable. Indeed, Scott's counsel could have had several reasons for deciding not to present such evidence, including that doing so would have necessitated talking about Scott's frequent sexual encounters on the couch, which could have caused the jury to view Scott in a negative light. Scott has also failed to satisfy the prejudice prong on this point because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. That means that not only did his trial counsel not make unprofessional errors, but also there is a risk that the jury could have taken evidence of Scott's frequent sexual activities on the couch as further evidence of his bad character. There is no reasonable probability that the jury would have acquitted him if it learned of this evidence.

As to Scott's argument about expert testimony to place the significance of DNA evidence into statistical context, Scott cites *Dubose v. State* to support this proposition. But, this is a non-binding state court case, which is both legally and distinguishable. Indeed, *Dubose* held that the complexity of DNA technology makes it "doubtful that a defense attorney will have the requisite knowledge to effectively" understand the reports "without expert assistance." *Dubose*, 662 So. 2d

at 1196. But importantly, *Dubose* was considering whether the *trial court* should have approved funds for a DNA expert – not whether counsel was objectively unreasonable in failing to hire a DNA expert. *See id.* at 1192. *Dubose* also involved a situation unlike Scott's. There, "the only evidence that directly linked [the defendant] to the crime" was DNA evidence. *Id.* at 1199. In Scott's case, there was DNA evidence, circumstantial evidence (including that he lived at the home and knew Latonya), and testimony that Scott had made two statements suggesting that he had killed a girl the night before he was arrested for raping Landris. Indeed, Scott's counsel could have had several reasons for deciding not to hire a DNA expert, including the desire to focus on defenses that were more likely to be fruitful.

Scott has also failed to satisfy the prejudice prong on this point because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Not only did counsel not make any unprofessional errors, but Scott has not identified any specific evidence that he would have expected a DNA expert to provide. Rather, he only asserts that they could have put "the significance of the DNA evidence into context, and addressed the reasonableness of Ms. Roland's statistical analysis." (Doc. # 1 ¶ 259). Again, DNA evidence was *not* the only piece of evidence tying Scott to the Sager charges. Even if a DNA expert could have introduced some doubt into the minds of jurors about DNA evidence (and he has simply not explained how the expert would have done this), Scott's counsel still would have had to convincingly rebut the remaining and substantial evidence linking Scott to the Sager charges. Additionally, given that focusing efforts on the uncertain potential benefit of a DNA expert's testimony could have wasted valuable pre-trial preparation time, the court cannot conclude that there is a reasonable probability that the jury would have acquitted him if it learned of this evidence.

272

Scott complains also of the lack of other physical evidence relating to Latonya's rape and murder and the failure to investigate physical evidence related to those charges. But, his theories are contradictory. Although he claims that the lack of physical evidence connecting him with Latonya is evidence of his innocence, he later emphasizes that the Birmingham Police Department "conducted almost no forensic investigation at all." (Doc. # 1 ¶ 262). If Scott's trial counsel had presented expert testimony about both points, a jury could have found that the absence of more physical evidence linking Scott to the crime could have been because of the incomplete forensic investigation. For example, Scott maintains that the forensic investigation should have included testing hair fibers on Latonya's body, looking for Latonya's missing clothing, searching Scott's Lexus for Latrice's missing jewelry, and searching the room where Latonya was found for other physical evidence. (*Id.*). Any one of these could have turned up *more* evidence of Scott's guilt – not necessarily less. And Scott cites no authority buttressing his conclusion that his counsel was ineffective for failing to hire experts to testify about these points. And again, for the reasons noted above, Scott's counsel could have had good reasons for deciding not to pursue such evidence.

Scott has also failed to satisfy the prejudice prong for another reason. He has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Not only does the court conclude that counsel made no unprofessional errors, but also given the risk that the jury could have drawn its own conclusions about why there was not *more* physical evidence linking Scott to the Sager charges, the court cannot conclude that there is a reasonable probability that the jury would have acquitted him if this evidence had been "pursued."

As for Scott's arguments about his counsel's failure to hire experts to testify about the failure to examine physical evidence related to the Wright charges, Scott cited only one case –

273

*Soffar v. Dretke* – to support this proposition, and it does not help him establish a *Strickland* violation. To be clear, Scott only cites *Soffar* for a limited proposition: if a "State's case was built entirely on expert testimony," the defense counsel's "failure to impeach that testimony 'undermines confidence in the outcome [of the trial].'" (Doc. # 1 ¶ 263 (quoting *Soffar*, 368 F.3d at 478-79)). But, related to the Wright charges, the State's case was not built entirely (or at all) on expert testimony. Instead, the State's case was built largely on the testimony of the victim as well as several eyewitnesses. Apart from this failure to cite applicable legal support, the court cannot conclude that Scott has shown by a preponderance of the evidence that his counsel's failure to present such evidence during the guilt phase was objectively unreasonable. Indeed, Scott's counsel could have had several reasons for deciding not to present such evidence, including that they believed it would not be fruitful or that they did not want the jury to think about how much more evidence the State could have put on that would link Scott to the crime.

Scott has also failed to satisfy the prejudice prong because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Not only does the court conclude that counsel made no unprofessional errors, but also Scott has not explained specifically how the failure to point out a purportedly incomplete forensic investigation would have helped his defense. He merely states that they would have explained "the significance of the fact that Landris's bed sheet did not contain Scott's semen even though it should have had there been sexual intercourse on the bed," "the import of the absence of [glitter] lotion on the sheet," and "what should have happened" during the forensic investigation. (Doc. # 1 ¶¶ 261-62). Not only does this argument lack specificity but it also fails to explain a "reasonable probability" that but for the failure to hire such experts, the result would have been different. Again, Landris ran outside, took police back to the

room, and reported Scott had raped her. Scott's subclaim fails for multiple reasons – he has not overcome AEDPA deference and even under de novo review, Scott has not presented a valid *Strickland* claim.

For all of these reasons, the court denies Claim F.

G. **Claim G – Scott has not shown a right to habeas relief based on a theory that his appellate counsel failed to argue that the lack of funding for a mitigation investigation constituted ineffective assistance.**

Scott maintains that his Sixth Amendment rights were violated because his appellate counsel rendered ineffective assistance of counsel under *Strickland* when they failed to raise on appeal the trial court's apparent denial of his trial counsel's motion for mitigation funds (or the trial counsel's failure to note whether the trial court granted such a motion). (Doc. # 1 ¶¶ 265-71).

Scott asserts that the ACCA's summary rejection of this claim was "an unreasonable application of *Strickland* and was based on an unreasonable application of the facts." (*Id.* ¶ 271). He also argues that AEDPA deference is not due under § 2254(d)(1) and (d)(2). (*Id.*). Scott says that this motion was of import because "[m]itigation evidence is central to the determination of a death sentence" (*id.* ¶ 268) and Alabama courts have recognized that indigent defendants such as Scott are entitled to funding for mitigation experts if they show "a reasonable probability that the mitigation expert will assist in the defense and that the exclusion of the expert will result in a fundamentally unfair trial." (*Id.*) (citing *Dobyne v. State*, 672 So. 2d 1319, 1345-46 (Ala. Crim. App. 1994); *Beckworth v. State*, 946 So. 2d 490, 503 (Ala. Crim. App. 2005)).

Respondent counters that this claim is "meritless because Scott has never identified any ruling (written or oral) denying funding for mitigation assistance." (Doc. # 17 at 95). Respondent also quotes the ACCA's reasoning on Scott's second collateral appeal, which cited to the Rule 32 court's reasoning that there "may not even be a reviewable order that appellate counsel could have

275

challenged." (*Id.* at 95) (quoting Doc. # 14-28 at 59). The reasoning from the ACCA continued: "[t]his Court has previously held that we will not predicate error on a silent record." (*Id.* at 96) (citing *Minor v. State*, 914 So. 2d 372, 417 (Ala. Crim. App. 2004)). Respondent concludes that "[w]ithout the presence of any ruling on the record to appeal, Scott cannot point to any ruling that appellate counsel failed to appeal. Like the ACCA, this Court should not presume error from a silent record." (*Id.*) (citing *United States v. Gibson*, 678 F. App'x 823, 827 (11th Cir. 2017), *cert denied*, 583 U.S. 1075 (2018)).

Scott's reply contends that the ACCA's reasoning about the lack of any identifiable ruling denying mitigation funding was "an unreasonable determination of the facts, because the lack of a ruling is not dispositive." (Doc. # 20 at 63).

For the reasons explained below, Scott has not met his AEDPA burden with respect to this claim. The court begins by summarizing the state court proceedings.

### 1. State Court Proceedings

On September 19, 2001, roughly one year before trial began, Scott's trial counsel filed an Ex Parte Motion for Extraordinary Expenses to Hire a Mitigation Expert. (Doc. # 14-11 at 6-7). In that motion, Scott's trial counsel requested approval of up to $6,500 "to hire the Alabama Prison Project to assist him in the sentencing/mitigation phase of the trial." (*Id.* at 6). Attached to the motion was an affidavit of Aaron D. McCall, a mitigation coordinator at the Alabama Prison Project. (*Id.* at 8-10). In the affidavit, McCall explained what is typically involved in a mitigation investigation and noted "it is imperative from the very beginning that the defense team aggressively search out and put together a complete social, economic, educational, medical and mental health history of the client from birth to the present day." (*Id.* at 8). McCall added that a

276

mitigation investigation "necessary to adequately prepare for a capital murder trial, including penalty phase, generally requires a minimum of six months time." (*Id.*).

There is no record that the court or the parties can discern of the trial court ruling on this motion. (*See* Doc. # 1 ¶ 266) ("Either the court granted that motion and Robbins failed to notice, or the court denied it or simply failed to rule."); (Doc. # 17 at 96) ("Without the presence of any ruling in the record to appeal, Scott cannot point to any ruling that appellate counsel failed to appeal.").

Scott raised this claim on collateral review in his first Rule 32 petition. (Doc. # 14-29 at 69-72). Scott also raised this issue to the ACCA on collateral appeal. (Doc. # 14-54 at 84-86) (initial brief); (Doc. # 14-55 at 42-44) (reply brief). And, Scott raised this issue with the Supreme Court of Alabama. (Doc. # 14-56 at 103-06). On his second collateral appeal, Scott again raised this issue with the Rule 32 court (Doc. # 14-37 at 151-54), the ACCA (Doc. # 14-58 at 92-95), and the Supreme Court of Alabama (Doc. # 14-60 at 55-57). Scott fully exhausted this claim.

Scott presented his federal claim to the ACCA as arising under the Sixth Amendment and *Strickland*. (Doc. # 14-58 at 92). Specifically, he argued that "his appellate counsel's performance 'fell below an objective standard of reasonableness.'" (*Id.*) (quoting *Eagle v. Linahan*, 279 F.3d 926, 938-39 (11th Cir. 2001) (in turn quoting *Strickland*, 466 U.S. at 687)). Scott elaborated that his trial counsel were ineffective because "[e]ither the court granted that motion and Robbins failed to inform him[] of that, or the court denied it or simply failed to rule and the issue was never raised on appeal." (*Id.* at 92). Citing *Dobyne* and *Beckworth*, Scott argued that he was "entitled to the funding he sought," that "[m]itigation evidence is central to the determination of a death sentence," and that his appellate counsel's failure to use expert funds that were granted (or to object when the trial court denied the motion) was prejudicial. (*Id.* at 93).

277

When reviewing the Rule 32 court's summary dismissal of this claim, the ACCA noted that the Rule 32 court had reasoned that "Scott failed to allege whether or not the circuit court ever ruled on his request for funds for a mitigation expert and, thus, there 'may not even be a reviewable order that appellate counsel could have challenged.'" (Doc. # 14-59 at 194-95). The ACCA also stated: "We agree with the circuit court's finding here." (*Id.* at 195). Citing *Minor v. State*, the ACCA ruled that "[t]his Court has previously held that we will not predicate error on a silent record." (*Id.* (citing *Minor v. State*, 914 So. 2d 372, 417 (Ala. Crim. App. 2004))).

### 2.    Scott has not met his AEDPA burden on his *Strickland* mitigation expert funds claim

Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory in Claim G was the ACCA's opinion on second postconviction appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under this claim, the denial of certiorari was without opinion, so the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's. *Wilson*, 584 U.S. at 125.

Scott argues that AEDPA deference is not due to be given to the ACCA's denial of this claim because the ACCA rejected it "notwithstanding the fact that Scott's 'Amended Rule 32 petition and supporting exhibits are assumed to be true under Alabama law,'" (Doc. # 1 ¶ 271) (quoting *Daniel*, 822 F.3d at 1261), was "an unreasonable application of *Strickland*[,] and was based on an unreasonable application of the facts." (*Id.*). Scott invokes § 2254(d)(1) and (d)(2), but as explained below, he has failed to meet the standard under the governing law clause of (d)(1) or the standard under (d)(2).

Scott contends that "[t]here was no question about the importance of the motion and the anticipated investigation." (*Id.* ¶ 267). He further argues that "[m]itigation evidence is central to

278

the determination of a death sentence." (*Id.* ¶ 268) (citing *Whitehead v. State*, 955 So. 2d 448, 471 (Ala. Crim. App. 2006)). Finally, he contends that he "was entitled to the funding he sought." (*Id.*) (citing *Dobyne*, 672 So. 2d at 1345-46 and *Beckworth*, 946 So. 2d at 503). Therefore, Scott argues, his appellate counsel "should have made this argument as well as cited the numerous Alabama appellate decisions, such as *Beckworth* and *Dobyne*, requiring the disbursement of mitigation-expert funds." (*Id.* ¶ 269). Scott also argues that the failure to "raise a claim 'that is so obviously valid that any competent lawyer would have raised it,'" is evidence that counsel was ineffective. (*Id.* ¶ 270) (quoting *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001)). This was also "necessarily prejudicial," he argues, because this claim "would have had a reasonable probability of success." (*Id.*) (quoting *Eagle*, 279 F.3d at 943 and citing *Clark v. Crosby*, 335 F.3d 1303, 1312 n.9 (11th Cir. 2003); *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995)).

After careful review, the court concludes that Scott has failed to meet his burden under either § 2254(d)(1) or (d)(2). He has not established that the ACCA's dismissal of his *Strickland* claim regarding mitigation expert funds was an unreasonable application of law as determined by the Supreme Court of the United States and he has not shown there was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. To meet (d)(1)'s unreasonable application clause, Scott must show that the ACCA's analysis of this mitigation expert funds *Strickland* claim contained extreme constitutional error or conflicts unreasonably with clearly established Supreme Court precedent. Scott has failed to carry this burden.

279

The only binding authorities that Scott cites are *Eagle v. Linahan*, *Strickland*, and *Clark v. Crosby*. But, none of these authorities hold that counsel was constitutionally ineffective in failing to raise an appellate claim about denial of mitigation expert funds. Neither do these authorities hold counsel was ineffective in failing to raise an appellate claim with a similar legal strength as Scott's denial of mitigation funds claim. Therefore, none of these authorities can help Scott overcome his burden under the contrary to or unreasonable application clauses of (d)(1).

In *Linahan*, the Eleventh Circuit considered whether the failure of a petitioner's appellate attorney "to raise a *Batson* claim on appeal comported with the Sixth Amendment right to competent representation by appellate counsel." 279 F.3d at 938. At trial, the prosecutor used nine of its ten peremptory challenges against Black jury members. *Id.* at 930. The petitioner's trial counsel raised a *Batson* objection, but the trial judge overruled it, stating, "I think both of you were doing what you could to get the different races off." *Id.* 930-31. Petitioner requested that his appellate counsel include this overruled *Batson* objection as a ground for appeal, but the appellate counsel refused. *Id.* at 931. The Eleventh Circuit noted that the trial judge had made an explicit finding that established a prima facie *Batson* claim when he stated that "both [the defense and the prosecution] were doing what [they] could to get the different races off" through their peremptory strikes. *Id.* at 941. As a result, the panel held, the trial judge's overruling of defense counsel's *Batson* challenge was error, and it was further error not to require the prosecution to produce "a neutral explanation for challenging black jurors" as required by *Batson*. *Id.* at 941-42 (quoting *Batson v. Kentucky*, 476 U.S. 79, 96-97 (1986))). The Eleventh Circuit concluded that the deficient performance part of the two-part test in *Strickland* was met because "[t]he trial court's error in applying the rule in *Batson* is apparent on the face of the transcript . . . [and] [w]here, as here, appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent

280

lawyer would have raised it, no further evidence is needed." *Id.* at 943. Addressing the prejudice part of the *Strickland* test, the Eleventh Circuit panel reasoned that because it was "clear that [the petitioner's] *Batson* claim would have succeeded on appeal," his appellate counsel's performance "was necessarily prejudicial." *Id.* (citing *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990)).

The holding of *Linahan* can therefore be distilled this way: First, if a defendant's appellate counsel fails to raise a claim on appeal, that failure is deficient under *Strickland* if the claim "is so obviously valid that any competent lawyer would have raised it." *Id.* Second, if the claim "would have succeeded on appeal," then the appellate counsel's performance "was necessarily prejudicial" and thus satisfies the second part of the *Strickland* test for ineffective assistance of counsel. *Id.*

The ACCA did not commit extreme constitutional error or unreasonably apply *Linahan*'s holding. Under 28 U.S.C. § 2254(e)(1), the determination by the ACCA of a factual issue "shall be presumed to be correct." The ACCA determined that "it is unclear whether the circuit court ruled on his motion for mitigation fund and, if it did, whether it granted or denied this request." (Doc. # 14-59 at 195). So, unlike the *Batson* challenge in *Linahan*, which was valid and based on a clear trial record (because the trial judge acknowledged that race was the reason for the state's use of peremptory strikes), the trial record is far from clear in this case. Thus, it is hard for any reviewing appellate counsel or court to say whether the trial judge approved, failed to rule on, or denied Scott's motion. Without clarity as to what the trial court did, it is also impossible to say whether Scott's appellate counsel was ineffective for failing to speculate about what the trial court did and then object to it.

But, even if the record were clear – that is to say, if there were a trial court order denying Scott's motion for mitigation expert funds – Scott has not cited any binding cases that establish

that this would have been constitutional error. Scott cites the Eleventh Circuit case *Clark v. Crosby* for the proposition that an error can be prejudicial under *Strickland* if there is a "reasonable probability that the appellate court . . . would have granted [] a new trial." 335 F.3d 1303, 1312 n.9 (11th Cir. 2003). He offers no further argument on this point. The court is left to consider the other authorities Scott cites in deciding whether there was a reasonable probability that if Scott's appellate counsel had raised this claim, the ACCA would have granted a new trial. For the reasons discussed below, the court concludes that there was not such a reasonable probability. For that reason, the ACCA did not commit extreme constitutional error or unreasonably conflict with the holding of *Clark*.

Scott cites *Whitehead v. State*, an ACCA case, for the proposition that "criminal defense attorneys must fully investigate and present mitigation evidence during penalty phase in capital murder cases." (Doc. # 1 ¶ 268). To carry his burden under the unreasonable application clause of (d)(1), though, Scott must cite authority to show that the ACCA committed extreme constitutional error or that its ruling unreasonably conflicted with clearly established Supreme Court precedent. An ACCA case is not clearly established Supreme Court precedent, nor is it a binding interpretation of binding Supreme Court precedent (unlike, for example, a published opinion from the Eleventh Circuit).

Even if *Whitehead* were binding, its holding would not help carry Scott's burden under (d)(1). *Whitehead* merely holds that even where a defendant waived the presentation of mitigation evidence, a reviewing court should examine whether counsel engaged in an incomplete mitigation investigation. 955 So. 2d 448, 471-72 (Ala. Crim. App. 2006). Scott did not waive presentation of mitigating evidence and (unlike the counsel in *Whitehead*) his trial counsel presented mitigation

evidence. Therefore, the ACCA's denial of relief on this claim did not unreasonably conflict with the (non-binding) holding in *Whitehead*.

Scott further cites *Dobyne* and *Beckworth* for the proposition that "indigent defendants are entitled to receive funding to hire mitigation experts to testify during the penalty phase, provided that they show a reasonable probability that the mitigation expert will assist in the defense and that the exclusion of the expert will result in a fundamentally unfair trial." (Doc. # 1 ¶ 268). *Dobyne* and *Beckworth* do not aid Scott with his (d)(1) burden unreasonable application clause claim because they are non-binding state court cases. And, even if they were binding, they still do not inidcate that the ACCA in Scott's case committed extreme constitutional error or that its decision unreasonably conflicted with clearly established Supreme Court precedent.

*Dobyne* acknowledged that the Supreme Court had held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist." *Dobyne*, 672 So. 2d at 1345 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)). The ACCA in *Dobyne* noted that Alabama state courts had extended *Ake*'s holding to "require that the state provide the indigent defendant with other types of expert assistance upon a sufficient showing." *Id.* at 1346. Outlining what was required for an adequate showing, the *Dobyne* court stated that "it should first be determined that the evidence is 'critical.' Evidence is 'critical' for purposes of the due process clause if it could induce a reasonable doubt in the minds of enough jurors." *Id.* (quoting *Ex parte Sanders*, 612 So. 2d 1199, 1201 (Ala. 1993)).

In *Beckworth*, the ACCA explained that although defendants "may be eligible to receive funds to hire certain experts . . . [t]he funds . . . are not to be granted automatically upon request." *Beckworth*, 946 So. 2d at 503. Rather, "for an indigent defendant to be entitled to expert assistance

283

at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial." *Id.* (quoting *Ex parte Moody*, 684 So. 2d 114, 119 (Ala. 1996)). The ACCA continued: "To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense." *Id.*

Scott has not shown that the ACCA's ruling unreasonably conflicted with the holding of *Dobyne*. That is, he has not specifically shown that a mitigation expert was "critical" in the sense that it could induce a reasonable doubt in the minds of jurors. Nor has he shown an unreasonable conflict with *Beckworth* because he has not explained with any degree of specificity that a mitigation expert was "absolutely necessary to answer a substantial issue or question . . . or to support a critical element of the defense." *Beckworth*, 946 So. 2d at 503 (quoting *Ex parte Moody*, 684 So. 2d at 119). Scott's habeas petition merely states the conclusion that "[t]here was no question about the importance of the motion and the anticipated investigation. The motion itself explained the scope of what must be done in a capital case, and the value of expert assistance in the collection and presentation of mitigation information." (Doc. # 1 ¶ 267). This misconstrues the motion.

The motion stated that "[t]he Defendant is charged with capital murder, and if convicted of capital murder, the chances that he would receive a death sentence are high." (Doc. # 14-11 at 6). The attached affidavit explained in general terms that "it is imperative from the very beginning that the defense team aggressively search out and put together a complete social, economic, educational, medical and mental health history of the client," and that this "generally requires a minimum of six months' time." (*Id.* at 8). The affidavit also stated that results "of the social history

284

investigation process may have a bearing on decisions regarding competency to proceed, need for expert evaluations, need for medical treatment or other services in the jail while the case is pending, and plea negotiations." (*Id.* at 10). Nowhere did the motion, the affidavit, or Scott's petition explain how hiring a mitigation expert would have altered his sentence. Nor did the motion, affidavit, or petition state specifically what substantial issue or question that a mitigation expert would have answered, or what critical element of the defense that the expert would have supported. Therefore, even if *Dobyne* and *Beckworth* were evidence of clearly established Supreme Court precedent, the ACCA did not conflict unreasonably with their holdings.

Moving to (d)(2), Scott maintains that the ACCA's ruling was based on an unreasonable application of facts. (Doc. # 1 ¶ 271). Although Scott invokes (d)(2), he has not pointed to any specific factual determination that he believes was unreasonable, nor has he pointed to any evidence that undermines the reasonableness the ACCA's factual determinations. Nor has Scott overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

And indeed, upon reviewing the ACCA's last reasoned decision, the court concludes that the ACCA reasonably applied the facts, including the fact that "Scott failed to allege whether or not the circuit court ever ruled on his request for funds for a mitigation expert." (Doc. # 14-59 at 194). Indeed, the ACCA wrote, *"we agree with Scott* that it is unclear whether the circuit court ruled on his motion for mitigation funds, and if it did, whether it granted or denied this request." (*Id.* at 195) (emphasis added). Based on the (d)(1) reasoning above, the court cannot say that the ACCA unreasonably applied this fact by concluding that the record was unclear as to whether the trial court ruled on this motion, and that Scott's appellate counsel therefore committed no error.

There are, therefore, multiple reasons to deny relief on this claim. First, the record is unclear about what the trial court did with the motion for mitigation expert funds, so it would be extraordinary to conclude at this stage that the court must have rejected it. Second, because there is a state court ruling on the merits of this claim, it is subject to AEDPA deference; therefore, Scott has a burden under (d)(1) of pointing to *binding* case law that shows extreme constitutional error or that the ACCA's decision conflicted with clearly established Supreme Court precedent. Only some of Scott's cited cases are binding and none of them suggest extreme constitutional error or clearly established precedent that the ACCA unreasonably applied. Third, not only is this claim subject to AEDPA deference, but it is also subject to *Strickland*'s deferential standard – an additional hurdle that Scott has not overcome. Indeed, it would strain reason to conclude that Scott's appellate counsel were constitutionally deficient for failing to raise a non-viable claim on appeal.

For all of these reasons, the court denies this claim.

**H.    Claim H – Scott has not shown a right to habeas relief under a theory that his Sixth Amendment rights were violated when the trial court barred his counsel from talking with him about trial strategy with his relatives.**

Scott maintains in Claim H that his Sixth Amendment rights were violated when the trial court directed Scott to talk about trial strategy with two of his relatives in a separate room and barred his counsel from participating in that conversation. (Doc. # 1 ¶¶ 272-80).

Scott asserts that the ACCA's rejection of this claim was contrary to and an unreasonable application of Supreme Court precedent under § 2254(d)(1), as well as an unreasonable factual determination under (d)(2). (*Id.* ¶ 280). Respondent counters that this claim is procedurally defaulted under Rule 28(a)(10) of the Alabama Rules of Appellate Procedure, and that the ACCA's alternative merits-based ruling is due AEDPA deference – deference that Scott has not overcome.

286

(Doc. # 17 at 96-98). Specifically, Respondent argues that the ACCA correctly upheld the Rule 32 court's reasoning because "the record demonstrates that trial counsel encouraged communication between Scott and his aunts in the hopes that they could convince him not to testify." (*Id.* at 97-98). Scott's reply contends that it was irrelevant that his trial counsel had encouraged Scott to communicate with his family members. (Doc. # 20 at 65-66). He also argues that the ACCA unreasonably found that there is no record of the trial court barring communications between Scott and his counsel. (*Id.* at 66). Responding to Respondent's contention that this claim was procedurally barred, Scott argues that his claim was "properly raised before the state courts" and that "[i]n any event, the State Court undermined that Rule 28 line of argument by addressing this claim on the merits." (*Id.* at 69-70).

As explained below, Scott has not met his AEDPA burden with respect to this claim. The court begins by summarizing the state court proceedings.

### 1. State Court Proceedings

During the guilt phase, Scott was having a disagreement with his counsel about whether to rest his case without having Scott and other witnesses testify. (*See* Doc. # 14-19 at 10-15). Outside the jury's presence, Scott's trial counsel told the trial court that "[Scott] wants me to call witnesses that I – that I believe . . . can only damage the case." (*Id.* at 12). These witnesses included Laquita Edwards,[18] Jason Heaton, and Rachel Hillary. (*Id.* at 12, 15-16). Scott's counsel disclosed that the prosecution had shown them a letter that Scott wrote to Rachel about her testimony and counsel was concerned what may come out during cross-examination, making Rachel's testimony akin to "opening Pandora's box." (*Id.* at 18). Scott's counsel also noted that they had discussed this issue

---

[18] The court notes that Scott's counsel spelled this name "Vatquita Edwards" (*see* Doc. # 14-12 at 31), while the spelling used above and in the remainder of this memorandum opinion is what is reflected in the trial transcript.

with Scott as well as with his family members, and that at least one of Scott's aunts indicated that she believed Scott should not take the stand. (*Id.* at 18-19). His counsel also noted that "what is not out in front of this jury is he went to prison for shooting somebody" and that if Scott took the stand "that is certainly coming out." (*Id.* at 19).

The trial court then ordered that two of Scott's aunts enter the courtroom and told them "[t]his is an important decision for your nephew to make, and I want y'all to be here," before telling Scott: "[t]ell me what you want to say." (*Id.* at 25). Scott made a long statement before the trial court interrupted and told Scott that it sounded like he was "rapping." (*Id.* at 25-27). Scott continued with another long statement referencing Keisha's and Rachel's potential testimony. (*Id.* at 27-29). Scott agreed that he did not want Jason to testify, and next stated that he did not want Keisha to testify. (*Id.* at 29-30). Finally, Scott agreed that the two witnesses that he wanted were Rachel and Laquita. (*Id.* at 30). The court then questioned Scott about whether he understood the risks of taking the stand himself, and he admitted that although he wanted to testify, "my aunties don't want me to." (*Id.* at 33-34). At that point, the court said: "Why don't all of you go in that room, right there (indicating), with him, you all talk to him, and talk to him about these witnesses, too, that he has given his advice on." (*Id.* at 34). Then, the court said: "I don't want the lawyers going in there with them. I just want you and your family. You all talk about it, and, if you have any questions, then we'll call the lawyers in and let them talk with you." (*Id.* at 34-35). Scott then stepped into the courtroom holding area, his trial counsel had a brief on-the-record conversation with the court, and there was a brief recess before Scott and his family returned into the courtroom. (*Id.* at 35-36). Scott indicated that he was not going to testify and that he wanted Laquita and Rachel, as well as his "auntie" and "grandma." (*Id.* at 38-40).

The court stated, the opportunity for Scott to talk to his counsel and his family members about who was going to testify lasted from 1:30 pm to 4:05 pm that day. (*Id.* at 42). Scott's trial counsel did not object to the court having Scott to talk to his family members in a separate holding room. (*See id.* at 34-36).

Scott fully exhausted this claim on his collateral appeal by asserting it in his first Rule 32 petition (Doc. # 14-29 at 12-14, 54-55), in his brief to the ACCA (Doc. # 14-54 at 38-42, 69-70), and in a petition for a writ of certiorari to the Supreme Court of Alabama. (Doc. # 14-56 at 27-28, 106-10). Scott again raised this claim on his second collateral appeal by asserting it in his Amended Rule 32 petition (Doc. # 14-37 at 107-10, 147-48), in his brief to the ACCA (Doc. # 14-58 at 100-01, 34-35), and in his petition for a writ of certiorari to the Supreme Court of Alabama. (Doc. # 14-60 at 31, 62-63).

Scott characterized this federal claim to the ACCA as arising under the Sixth Amendment. (Doc. # 14-58 at 100-01). Specifically, he argued that he "was denied his Sixth Amendment right to counsel when the court barred Robbins [one of his lawyers] from a meeting with some family members to discuss trial strategy during a critical point in the trial." (*Id.* at 100). Additionally, Scott argued, the trial court's "post-meeting effort to repair the damage by encouraging Scott to talk to his counsel does not undo the Sixth Amendment violation." (*Id.* at 101). In his single paragraph of argument on this claim, Scott cited no cases. And, he only cited the record once (in reference to the Rule 32 court's order). (*Id.*).

In reviewing the Rule 32 court's dismissal of this claim, the ACCA noted that the Rule 32 court had "found this claim was procedurally barred and was without merit." (Doc. # 14-59 at 203). The ACCA then quoted from the Rule 32 court's decision:

> The record reflects that Scott wanted to testify at trial and call certain witnesses, and that defense attorneys advised him against both decisions. Neither Scott nor

defense counsel objected to the trial judge's decision to send Scott into a room to speak with his family about his decision to testify and call additional witnesses.

Regardless, the facts do not indicate that the trial court barred communications between Scott and his counsel. Instead, the facts reflect an effort by the trial court to promote a candid and productive discussion with Scott and his family. Following that exchange, the record indicates that the trial court encouraged collaboration with Scott and his counsel. In fact, the trial judge stated: "You all talk about it, and, if you have any questions, then we'll call the lawyers in and let them talk with you." [(citation omitted.)]

Scott has failed to show that he was denied his constitutional right to counsel. Scott further failed to state a claim that would entitle him to relief. Therefore, this claim is summarily dismissed pursuant to Rule 32.7(d), Ala. R. Crim. P. It is also procedurally barred pursuant to Rule 32.2(a)(3) and Rule 32.2(a)(5).

(*Id.* at 203-04). The ACCA stated, "we agree with the circuit court's findings here." (*Id.* at 204).

The ACCA also held that Scott's brief "provides no factual support or legal authority for this claim, nor has he presented any analysis on this issue." (*Id.*). Therefore, the ACCA held, Rule 28(a)(10) barred review of his claim. (*Id.*).

### 2.    Scott has not met his AEDPA burden on his Sixth Amendment sequestration claim.

This claim is due to be denied on the merits. Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory was the ACCA's opinion on second collateral appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under this claim, the denial of certiorari was not accompanied with an opinion, so the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's. *Wilson*, 584 U.S. at 125.

Scott argues that AEDPA deference is not due to be given to the ACCA's denial of this claim because the ACCA's rejection of it "was contrary to, or an unreasonable application of federal law, and based on an unreasonable application of facts." (Doc. # 1 ¶ 271). Scott thus

290

invokes § 2254(d)(1) and (d)(2), but as explained below, Scott has failed to meet the standard under either clause of (d)(1) or the standard under (d)(2).

Specifically, Scott contends that "the Sixth Amendment entitles the accused to unrestricted access to counsel throughout the course of trial." (Doc. # 1 ¶ 272). Scott cites *Geders v. United States*, 425 U.S. 80 (1976) for the holding that a court cannot prohibit "overnight contact between a defendant and his attorney" (Doc. # 1 ¶ 273), and that a defendant "requires the guiding hand of counsel at every step in the proceedings against him." *Geders*, 425 U.S. at 89. Scott also cites a case from the Seventh Circuit for the holding that a court could not "restrict communication between defendant and defense counsel even during a lunch recess." (Doc. # 1 ¶ 274) (citing *Sanders v. Lane*, 861 F.2d 1033, 1035 (7th Cir. 1988)). And, he cites a case from the Sixth Circuit with essentially the same holding as *Geders* and quotes from the case: "In the absence of extraordinary circumstances, which do not appear in this record, it is an abuse of discretion and a violation of the right of a defendant to assistance of counsel for a trial court to direct that the defendant have no communication with his counsel during a criminal trial." (*Id.* ¶ 275) (quoting *United States v. Bryant*, 545 F.2d 1035, 1036 (6th Cir. 1976)). Scott only references a single Eleventh Circuit case, and provides no explanation about its application. (*Id.*) (citing *United States v. Conway*, 632 F.2d 641 (11th Cir. 1980), *overruled on other grounds by Crutchfield v. Wainwright*, 803 F.2d 1103 (11th Cir. 1986)). Scott quotes from an Alabama Court of Criminal Appeals case: "Depriving a criminal defendant of the right to consult with counsel during court recesses – regardless of how brief the recesses may be – violates the constitutional right to effective assistance of counsel." (*Id.* (quoting *Payne v. State*, 421 So. 2d 1303, 1304-05 (Ala. Crim. App. 1982))). Finally, he cites two cases (a Fifth Circuit case and an Alabama state court case) for the

legal point that a deprivation of a Sixth Amendment right is a per se reversible error. (*Id.* ¶ 279) (citing *United States v. Johnson*, 267 F.3d 376, 379-80 (5th Cir. 2001); *Payne*, 421 So. 2d at 1304).

After careful review, the court concludes that Scott has failed to meet his burden under either § 2254(d)(1) or (d)(2). He has not shown that the ACCA's dismissal of his Sixth Amendment claim was contrary to or an unreasonable application of law as determined by the Supreme Court nor that dismissal was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. Scott has failed to carry his burden under § 2254(d)(1) because he has not identified how the ACCA misapplied clearly established federal law as determined by the Supreme Court. Nor has he identified any factually indistinguishable Supreme Court decision with an outcome favorable to him. Indeed, Scott has cited no authority, much less binding precedent, in which a court has overturned a conviction when a trial court ordered a defendant to confer with family outside the presence of his counsel – particularly without objection from trial counsel.

Scott contends that the ACCA committed constitutional error based on Supreme Court, in- and out-of-circuit precedent, and an Alabama Court of Criminal Appeals case. The Supreme Court case that Scott cites is *Geders v. United States*, 425 U.S. 80 (1976). But, as discussed below, Scott's case is different than *Geders*.

In *Geders*, a trial court had ordered the defendant "not to consult his attorney during a regular overnight recess, [which was] called while [the defendant] was on the stand as a witness

292

and shortly before cross-examination was to begin." 425 U.S. at 81. Thus, although "[i]t is common practice during such recesses for an accused and counsel to discuss the events of the day's trial," and "[s]uch recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed," the defendant was deprived of this opportunity to confer for seventeen hours. *Id.* at 88. The Supreme Court noted that "[o]ther courts have concluded that an order preventing a defendant from consulting his attorney during an overnight recess infringes upon this substantial right" and it emphasized that the period of non-communication was "for so long a period as 17 hours." *Id.* at 89. The Court concluded that defendant's Sixth Amendment rights were violated. *Id.* at 91.

*Geders* is distinguishable from this case. While the defendant in *Geders* was deprived of access to counsel for *seventeen* hours, during an overnight recess (a time in which lawyers and clients typically confer about strategy), Scott was deprived of access to his counsel for only a short time, reflected in the transcript as a "Brief recess." (Doc. # 14-19 at 36). He was not on the stand, and he still had unfettered access to his counsel. While the defendant in *Geders* did not have a choice about how long he was unable to access his counsel, Scott did have a choice – the judge told Scott that "if you have any questions, then we'll call the lawyers in and let them talk with you." (Doc. # 14-19 at 35).

To meet (d)(1)'s unreasonable application clause, Scott must explain how the ACCA's Sixth Amendment analysis contained extreme constitutional error. He has not (and could not have) done so with respect to *Geders* because the ACCA correctly applied the clearly established holding from *Geders* – "that an order preventing petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct- and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment." *Geders*, 425 U.S. at 91.

293

Indeed, the Supreme Court explicitly limited its holding in *Geders* to the facts before it, noting "[w]e need not reach, and we do not deal with limitations imposed in other circumstances." *Id.* Simply put, Scott was not prevented from consulting with his counsel at all, much less for a seventeen-hour overnight recess. Therefore, the ACCA's denial of relief on this claim was not a misapplication of the Supreme Court's governing law.

Scott fares no better in carrying his AEDPA burden based on the circuit cases he has cited (which, to be clear, cannot carry Scott's burden under the contrary to clause of (d)(1) because they are not Supreme Court cases). That is because *Sanders v. Lane*, 861 F.2d 1033 (7th Cir. 1988), *United States v. Bryant*, 545 F.2d 1035 (6th Cir. 1976), and *United States v. Conway*, 632 F.2d 641 (11th Cir. 1980), are all distinguishable from this case, and none of these cases shows that the ACCA's denial of relief on this claim conflicts unreasonably with clearly established Supreme Court precedent.

In *Sanders* (a non-binding, out-of-circuit, and pre-AEDPA case), the trial court prohibited a defendant "from having any contact with his attorney during a one-hour lunch recess that occurred during his testimony." 861 F.2d at 1033. Applying *Geders*, the Seventh Circuit panel noted that "every circuit that has considered the question has found that a bar on attorney-client consultation during even a brief recess can offend the sixth amendment." *Id.* at 1035. The court concluded that the defendant's Sixth Amendment rights were violated. *Id.* at 1039. However, the panel noted that "not all violations of the right to counsel warrant per se reversal," and that because the order "did not contaminate the entire proceeding," the error "was harmless beyond a reasonable doubt." *Id.* at 1040.

Even if *Sanders* were a Supreme Court case (which it is not) or even if it were a binding in-circuit case (which, similarly, it is not), it cannot help Scott carry his burden under the contrary

to clause of (d)(1) as it is distinguishable from this case. *Sanders* involved a lunch recess during which the defendant was *prohibited* from consulting with his counsel, while here Scott was not on the stand. Rather, the recess was for the sole purpose of allowing Scott to consult family, and he was permitted to consult with his counsel if he had questions. *Sanders* also cannot aid Scott in carrying his (d)(1) burden under the unreasonable application clause because its holding does not support a conclusion that the ACCA committed extreme constitutional error or conflicted unreasonably with clearly established Supreme Court precedent. First, the clear holding in *Sanders* was that, while a defendant is on the stand, "any judicial order prohibiting conversations between an accused and his attorney during a trial recess violates the sixth amendment." *Sanders*, 861 F.2d at 1039. The trial court here did not prohibit Scott from initiating a conversation with his attorney during the recess, and Sanders was not testifying; so, it did not violate the holding in *Sanders*. Second, *Sanders* also held that "unless the deprivation contaminates the entire proceeding, reversal should not be automatic." *Id.* at 1040. Scott has made no argument about how any alleged Sixth Amendment error in his case contaminated the entire proceeding. Indeed, it did not. Both before and after talking with his family, Scott had the opinion that Rachel and Laquita should testify. Scott has not satisfied his burden under (d)(1) because *Sanders* is distinguishable, and it does not suggest that the ACCA committed extreme constitutional error or conflicted unreasonably with clearly established Supreme Court precedent.

Like *Sanders*, *Bryant* is a non-binding, pre-AEDPA, and out-of-circuit case, and therefore cannot satisfy either the contrary to or the unreasonable application clause of (d)(1). Even if it could, it is factually and legally distinguishable. In *Bryant*, the trial court prohibited a defendant from speaking with her counsel during a one-hour noon recess that occurred during her direct testimony. *Bryant*, 545 F.2d at 1036. A panel of the Sixth Circuit held that the holding in *Geders*

295

applied to "an hour-long luncheon recess when a party on trial would ordinarily be entitled to consult with his attorney." *Id.* The panel also wrote that a defendant "is entitled to the advice of counsel throughout the trial." *Id.*

Scott's reliance on *Bryant* does not satisfy the contrary to clause of (d)(1) because it is distinguishable. Unlike the defendant in *Bryant*, Scott was not barred from talking with his counsel during the brief recess and, again, he was not on the stand. Scott was also free to speak with his counsel at any point. *Bryant* also does not speak to the unreasonable application clause of (d)(1) because, as a non-binding out-of-circuit case it does not suggest the ACCA committed extreme constitutional error, especially given that the trial court's order did not interfere with Scott's entitlement (as recognized in *Bryant*) "to the advice of counsel throughout the trial." *Id.* Indeed, Scott could bring his attorneys into the holding room to ask them questions and thereby gain their advice. Thus, *Bryant* does not satisfy Scott's burden under either clause of (d)(1).

Although *Conway* is an in-circuit decision, it does not help Scott carry his burden under either (d)(1) or (d)(2). The portion of the decision on which he relies is no longer good law. *Conway* said that "depriving a criminal defendant of the right to consult with counsel during court recesses – regardless of how brief the recesses may be – violates the constitutional right to effective assistance of counsel." 632 F.2d at 645. The Eleventh Circuit later issued an en banc opinion with six judges holding that a defendant must "object, move for a mistrial, or ask to discuss . . . aspects of the case" to preserve a Sixth Amendment claim related to a prohibition on conferring with counsel. *Crutchfield v. Wainwright*, 803 F.2d 1103, 1109 (11th Cir. 1986) (en banc). As the opinion put it: "we overrule *Conway* . . . to the extent [it] hold[s] that a denial of assistance of counsel is presumed whenever a trial judge instructs counsel not to confer with a defendant during a recess." *Crutchfield v. Wainwright*, 803 F.2d 1103, 1109 (11th Cir. 1986) (en banc).

As the Rule 32 court noted (and as the ACCA acknowledged by quoting the Rule 32 court), neither Scott nor his counsel objected to the trial court's conferral order, moved for a mistrial on this basis, or asked to confer despite the trial court's order. (*See* Doc. # 14-19 at 93) (moving for mistrial based on the trial court's later order that trial counsel put on three witnesses over their objection). Because he did not object, under *Crutchfield*, Scott cannot challenge the trial court's order, and the ACCA's decision was neither contrary to, nor an unreasonable application of clearly established Supreme Court precedent.

Scott also cites a single state court case for the proposition that "[d]epriving a criminal defendant of the right to consult with counsel during court recesses – regardless of how brief the recesses may be – violates the constitutional right to effective assistance of counsel." (Doc. # 1 ¶ 275). But, this does nothing to satisfy the contrary to clause of (d)(1) because it is not a factually indistinguishable Supreme Court precedent. And, the unreasonable application clause of (d)(1) is not satisfied because as a non-binding state court case, it does not demonstrate that the ACCA committed extreme constitutional error of conflicted unreasonably with clearly established Supreme Court precedent.

Although Scott does not discuss it, another key Supreme Court sequestration decision is *Perry v. Leeke*, 488 U.S. 272 (1989). In *Perry*, the Court held that, if a defendant is testifying on the stand and desires to consult with his lawyer during a fifteen-minute recess, he "does not have a constitutional right to advice." *Id.* at 284. In reaching this conclusion, the Court specifically weighed a defendant's interest in enjoying "unrestricted access to his lawyer for advice on a variety of trial-related matters," *id.*, against the desire of a trial court to "instruct a witness not to discuss his or her testimony with third parties until the trial is completed." *Id.* at 281. *Perry* therefore

provided a modification to *Geders* – while a seventeen-hour overnight recess is too long for prohibiting contact with counsel, a fifteen-minute recess during a witness's testimony is not.

Applying the rule in *Perry* to this case, the ACCA's denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. *Perry* is distinguishable from this case, in which Scott was not on the stand and could have accessed his counsel for advice whenever he desired. The ACCA did not unreasonably apply *Perry* – that a trial judge may prohibit consultation between a testifying defendant and his counsel during a fifteen-minute recess.

Scott alternatively asserts that the ACCA's decision was unreasonable under § 2254(d)(2). (Doc. # 1 ¶ 280). Under § 2254(d)(2), a petitioner may challenge the state court factual findings underlying an adjudicated federal claim as unreasonable based on the evidentiary record. *Wood v. Allen*, 558 U.S. at 293.

Scott's attempt to obtain habeas relief under (d)(2) is less developed than his (d)(1) position. Beyond disagreeing with the Rule 32 court's (and the ACCA's) outcome on collateral appeal, Scott offers little argument to show that the ACCA's decision contains "an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). In his first Rule 32 petition, Scott asserted that "the trial Court violated Mr. Scott's Sixth Amendment right to unfettered communication with trial counsel when it directed Mr. Scott and two of his relatives into a separate room to discuss trial strategy and specifically barred trial counsel from participating in that crucial conversation." (Doc. # 14-29 at 13). "Mr. Scott, with no more than an elementary school education, serious mental health issues, and an already documented history of incidents during the trial that raised doubt about his judgment, insisted on calling these witnesses." (*Id.*). Finally, Scott argued that "[a]lthough the Court stated

298

that it would allow Mr. Scott to confer with trial counsel if he had any questions, this 'permission' underscored, not cured, the Sixth Amendment violation." (*Id.* at 13-14).

In Scott's brief to the ACCA on his first collateral appeal, he argued that the trial court's order baselessly asserted that "counsel had time before and after the 'no lawyers' meeting to consult with Scott; that counsel suggested he talk to family members; and that counsel did not object to the 'no lawyers' meeting." (Doc. # 14-54 at 40-41); *see also id.* at 41 n.5 (pointing out the discrepancies in the record). Scott's reply brief describes "a fact not disputed" – that the trial court "ordered Scott's counsel not to speak to his client while Scott talked with family members about trial strategy." (Doc. # 14-55 at 22). The brief asserts that despite the State's insistence that the trial court offered "other opportunities . . . to confer with his counsel," this did not cure the denial of right to counsel. (*Id.* at 24). Scott's petition for a writ of certiorari to the Supreme Court of Alabama argued that the ACCA incorrectly found this claim "refuted by the record" because it reflected "weighing of the conflicting evidence." (Doc. # 14-56 at 106-07). Scott argued that the "key fact" was "[t]he Circuit Court barred Scott's lawyer from counseling Scott during a critical moment in a decision phase of trial." (*Id.* at 107). Scott's Amended Rule 32 petition contained virtually identical language to his first Rule 32 petition on this claim. (Doc. # 14-37 at 109). In Scott's brief to the ACCA on his second collateral appeal, he takes issue with the Rule 32 court's assertion that "the facts do not indicate that the trial court *barred* communications between Scott and his counsel," arguing "that is *exactly* what the facts show." (Doc. # 14-58 at 100-01). Scott notes that "[t]he trial court ordered [Scott's counsel] to wait outside, barring him from talking to Scott about a crucial issue in a crucial meeting." (*Id.* at 101). He presented a substantially similar argument in his petition for a writ of certiorari to the Supreme Court of Alabama. (Doc. # 14-60 at 62-63).

Finally, Scott's habeas petition before this court asserts nearly the same arguments to those in his first and amended Rule 32 petitions. (Doc. # 1 ¶¶ 276-78).

A rigorous examination of this evidence suggests that the only arguable discrepancy in the ACCA's adoption of the Rule 32 court's application of the facts was when the ACCA quoted the Rule 32 court's statement that "[r]egardless, the facts do not indicate that the trial court barred communications between Scott and his counsel . . . . [T]he record indicates that the trial court encouraged collaboration with Scott and his counsel." (Doc. # 14-59 at 203). According to Scott, this misrepresents the fact that his attorneys were not free to enter the holding room on their own initiative. Therefore, although it is undisputed that Scott was permitted to "call the lawyers in and let them talk with you" if he had "any questions" (Doc. # 14-59 at 203) (ACCA quoting from record); (Doc. # 1 ¶ 278) (not disputing this), Scott nevertheless claims that it violated his Sixth Amendment right that his attorneys could not independently choose to confer with Scott, even if he did not have any questions for them. As discussed above in the analysis of (d)(1), even if the ACCA's language could be misconstrued as implying that Scott's trial counsel had permission to confer with him on their own initiative, that does not mean that the ACCA relied unreasonably on the undisputed fact that Scott was free to ask his counsel questions. Nor does it alter the fact that he was not on the stand and that his counsel had the chance to give him advice after his meeting with the family before (or at least while) addressing the court about his desires. And, there is this added protection: the court engaged him in a colloquy about the subject at issue. Finally, it also does not change the undisputed fact that neither Scott nor his counsel objected, moved for a mistrial on this basis, or requested that his counsel enter the room with him.

Moreover, Scott's argument ignores that a presumption of correctness attaches to state court factual findings under § 2254(e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a

300

determination of a factual issue made by a [s]tate court shall be presumed to be correct"). Only with "clear and convincing evidence" may a petitioner overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward*, 592 F.3d at 1177 ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation marks omitted). The Supreme Court has not yet addressed the relationship between § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304-05 ("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2).")"; *see also Cave v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011) ("We have not yet had an occasion to completely define the respective purviews of (d)(2) and (e)(1), and this case presents no such opportunity."). But to the extent that (e)(1) applies to a (d)(2) unreasonable factual challenge under AEDPA, Scott has not overcome with clear and convincing evidence (as he is required to) the presumption that the ACCA assessed the Sixth Amendment no-conferral claim correctly.

In summary, Scott's referenced authorities do not overcome AEDPA's bar.[19]

## I.    Claim I – Scott has not shown a right to habeas relief because of improper prosecutorial comments to the jury.

Scott next contends that the prosecutor made improper comments "throughout the trial and in his closing" that violated Scott's constitutional rights to be tried solely on the basis of evidence presented to the jury and to be tried by a jury that has not heard such improper comments. (Doc. # 1 ¶¶ 281-90). At issue are the following comments:

---

[19] Because a dismissal due to AEDPA deference and procedural default tied to Rules 32.2(a)(3) and 32.2(a)(5) are appropriate, the court does not reach an analysis of the ACCA's reliance on Rule 28(a)(10) as another ground in support of dismissal.

(1) Following one of Scott's outbursts, [Prosecutor] stated: "Judge, I ask that some tape be put over his mouth, or shackles, or something."

(2) [Prosecutor] dismissed one of Scott's witnesses by stating: "I have no further use of this witness, your Honor."

(3) Throughout the trial [Prosecutor] referred to the alleged rape of [L.W.] as the "rape" not the "alleged rape."

(4) During his closing, [Prosecutor] stated: " . . . he just ejaculated between her legs. How sick and horrible that is; this [] crime."

(5) During his closing, [Prosecutor] asked the jury "to stop this dangerous man."

(6) In his rebuttal closing, [Prosecutor] stated: "And what is so eerie – and I – the first time I saw this, it just sent chills down my spine . . . . I mean, it just sent chills down my spine, thinking that – this is on his mind."

(7) In his rebuttal closing, [Prosecutor] urged imposition of the death penalty by stating, "If you don't do it for me, if you don't do it for Latrice, fine. But do it for this community."

(Doc. # 14-59 at 207) (internal citations omitted).

Scott seeks de novo review of this claim under § 2254(d)(1) and (d)(2). (*Id.* ¶ 290). Respondent counters that this claim is procedurally defaulted because in the state court Scott failed to comply with Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. (Doc. # 17 at 43-44). Respondent also quotes the alternative merits-based reasoning of the ACCA and argues that Scott cannot overcome AEDPA deference. (*Id.* at 98-101). Scott responds that this claim was not procedurally barred under Rule 28(a)(10) because "[i]t was squarely raised before the [ACCA]," and "the [ACCA] undermined that Rule 28 line of argument by addressing this claim on the merits." (Doc. # 20 at 72). Scott further addresses the merits-based argument by highlighting that Respondent merely "block quotes the [ACCA's] decision and argues, without explanation, that it was correct." (*Id.* at 70).

### 1.    State Court Proceedings

Scott fully exhausted this claim on collateral review by asserting it in his Amended Rule 32 Petition (Doc. # 14-37 at 110-13), to the ACCA (Docs. # 14-58 at 102 (initial brief); 14-59 at 35 (reply brief)), and the Supreme Court of Alabama (Doc. # 14-60 at 31, 63-64).

302

When reviewing the Rule 32 court's summary dismissal of this claim, the ACCA noted that the Rule 32 court had "evaluated the comments . . . in the context of the whole trial to determine whether the 'prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" (Doc. # 14-59 at 207). The ACCA then quoted from the Rule 32 court's decision:

> the majority of the prosecutor's comments were made during the closing portions of the trial. Moreover, the trial court instructed the jurors that their decision was to be made on the basis of witness testimony. As for the comments made during the trial, this court cannot conclude that these remarks prejudicially affected Scott's rights and deprived him of a fair trial. The jury heard compelling evidence of Scott's guilt and even absent the allegedly improper remarks of the prosecutor, this court is convinced that the jury's decision would have been the same.
>
> Scott failed to plead a claim that would entitle him to relief. Therefore, this allegation is summarily dismissed pursuant to Rule 32.7(d), Ala. R. Crim. P. It is also procedurally barred under Rule 32.2(a)(3) and Rule 32.2(a)(5).

(Doc. # 14-59 at 208). The ACCA stated: "We agree with the circuit court's findings here." (*Id.*). The ACCA also held that Scott's brief "provides no factual support, citations to the record, or legal authority for this claim, nor has he presented any analysis on this issue." (*Id.*). Therefore, as the ACCA held, Rule 28(a)(10) barred review of his claim. (*Id.*).

### 2. Scott has not met his AEDPA burden on his improper prosecutorial comments claim.

This claim is due to be denied. Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory was the ACCA's opinion on his second collateral appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under this claim, the denial of certiorari was not accompanied with an opinion. Therefore, the court "presume[s] that the unexplained decision adopted the same [merits-based] reasoning" as the ACCA's. *Wilson*, 584 U.S. at 125.

303

Scott argues that AEDPA deference is not due to the ACCA's denial of this claim because the ACCA's rejection of it "was contrary to, or an unreasonable application of federal law, and based on an unreasonable application of facts." (Doc. # 1 ¶ 290).

Specifically, Scott contends that the prosecutor's comments violated his constitutional rights and satisfied the two-part test for prosecutorial misconduct announced in *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). (Doc. # 1 ¶ 281). This test requires a showing that: "(1) the remarks [are] improper, and (2) the remarks…prejudicially affect[ed] the substantial rights of the defendant." *Id.* Scott argues that the prosecutor "expressed his own personal opinion about the evidence and Scott's guilt in violation of federal law" (Doc. # 1 ¶ 284) and that the prosecutor argued "his personal opinion to the jury . . . emphatically" by saying comments like "How sick and how horrible that is." (*Id.* ¶ 285). Scott further contends that the prosecutor used "vivid word choice coupled with [the prosecutor's] personal reaction to the evidence," stating, "what is so eerie . . . it just sent chills down my spine." (*Id.* ¶ 286). Scott states that the prosecutor "compounded the error when, during the rebuttal closing in the penalty phase, he urged imposition of the death penalty by stating: 'If you don't do it for me . . . do it for this community,'" which Scott states, "improperly brought his own feelings before the jury." (*Id.* ¶ 287). Finally, Scott argues, the prosecutor "acted inappropriately during the presentation of evidence" by personally attacking Scott and stating, after an outburst, "Judge, I ask that some tape be put over his mouth, or shackles, or something." (*Id.* ¶ 288). Scott also points to the prosecutor's comment after dismissing one of Scott's witnesses: "I have no further use of this witness, your honor," which Scott argues expressed "disdain for Scott's witnesses." (*Id.*). Next, Scott notes the prosecutor's use of the term "rape" rather than "alleged rape" throughout the trial, which he argues "conveyed to the jury that the rape was not a mere allegation but a fact." (*Id.*). Scott concludes by arguing that "[e]ven if no single

304

improper statement by the prosecutor would, by itself, warrant reversal, the cumulative effect cannot be ignored." (*Id.* ¶ 289).

After careful review, the court concludes that Scott has failed to meet his burden under either § 2254(d)(1) or (d)(2) to show that the ACCA's dismissal of this claim was contrary to or an unreasonable application of law as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. The ACCA's and the Rule 32 court's quotation from *Darden v. Wainwright* in the evaluation of Scott's due process claim eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. (Doc. # 14-59 at 207) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). In *Darden*, the Supreme Court considered improper prosecutorial comments during closing and noted that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The ACCA's analysis of Scott's improper prosecutorial comments claim stated that:

> the circuit court evaluated the comments quoted above in the context of the whole trial to determine whether the "prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" After doing so, the circuit court held that "the majority of the prosecutor's comments were made

305

> during the closing portions of the trial. Moreover, the trial court instructed the jurors that their decision was to be made on the basis of witness testimony. As for the comments made during the trial, this court cannot conclude that these remarks prejudicially affected Scott's rights and deprived him of a fair trial. The jury heard compelling evidence of Scott's guilt and even absent the allegedly improper remarks of the prosecutor, this court is convinced that the jury's decision would have been the same."

(Doc. # 14-59 at 207-08). In assessing the Rule 32 court's analysis, the ACCA correctly applied the standard in *Darden* for evaluating a claim about improper prosecutorial comments.

Scott has also failed to carry his burden under the contrary to clause of § 2254(d)(1) because he has not identified a factually indistinguishable Supreme Court decision with an outcome favorable to him. Indeed, Scott has cited no authority, much less binding precedent, in which a court has overturned a conviction when a prosecutor made factually indistinguishable comments in the context of a similar trial. Scott contends that the ACCA committed constitutional error based on Supreme Court and Eleventh Circuit precedent as well as Alabama state court cases. The Supreme Court cases that Scott cites are *Berger v. United States*, 295 U.S. 78, 88 (1935), and *United States v. Young*, 470 U.S. 1, 18-19 (1985). (Doc. # 1 ¶¶ 281, 281)*.* The court examines the context of these Supreme Court opinions before moving to the other cases that Scott cites. Both *Berger* and *Young* are distinguishable from this case. This is unsurprising. In *Young*, the Court stated that "[t]he line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *Young*, 470 U.S. at 7.

> In *Berger*, the prosecutor:

> was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

306

295 U.S. at 84. Despite the potential questionability of some of the statements by Scott's prosecutor, they did not rise to the level of the statements in *Berger*.

For example, a prosecutor's suggestion that tape be put over a defendant's mouth or that shackles be put on a defendant due to an outburst from that defendant is not the same as misrepresenting evidence or bullying a witness. Scott's prosecutor made this statement immediately after one of Scott's outbursts, which had also prompted Judge Bahakel to tell Scott: "Stop. Stop." (Doc. # 14-16 at 190) (listing in the trial transcript "(Outburst – inaudible.)"). The prosecutor's statement is distinguishable from the statements made in *Berger*. Additionally, the tone of "I have no further use of this witness, your Honor," while certainly disrespectful, is not the same as "bullying and arguing with witnesses," and did not misrepresent any facts in evidence like the prosecutor in *Berger* did. *Berger*, 295 U.S. at 84. Referring to the charged crime as a "rape" instead of an "alleged rape" is far from "assuming prejudicial facts not in evidence," or "putting [testimony] into the mouths of such witnesses." *Id.* The prosecutor in *Berger* did not express his personal opinion on how "sick" or horrible" the crime charged was, how "dangerous" the defendant was, or how "eerie" some testimony had been. So, those statements are factually distinguishable. Finally, there is no suggestion that the prosecutor in *Berger* made anything resembling a personal plea to the jury to render a specific verdict or sentence, such as the statement "don't do it for me."

*Berger* also does not help Scott to carry his burden under the unreasonable application clause of (d)(1) because the ACCA did not commit extreme constitutional error or conflict unreasonably with the clear holding of that decision. Relevant to this claim, the clear holding of *Berger* was that the prosecutor's misstatement of facts during cross-examination, unfounded suggestion of out-of-court statements, misleading statements about what a witness had said,

bullying of witnesses, and "conducting himself in a thoroughly indecorous and improper manner" in the context of a case that "was not strong" was prejudicial enough to require a new trial. *Berger*, 295 U.S. at 84-85, 88. In Scott's case, as discussed above, the case was strong and the prosecutor's comments are dissimilar; therefore, the ACCA's ruling did not conflict unreasonably with *Berger* in coming to a different result in Scott's case.

*Young* is also distinguishable from this case. In *Young*, the Supreme Court counseled that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *Young*, 470 U.S. at 11. In evaluating that context, the Court highlighted that, although the prosecutor had made inappropriate statements in rebuttal,[20] these comments were in response to the insinuation of defense counsel that the case "has been presented unfairly by the prosecution" and that the prosecutor had "deliberately withheld exculpatory evidence." *Id.* at 4. The defense did not object to any of these statements during trial.

*Young* is factually dissimilar in several ways from this case. While the *Young* prosecutor's comments included blatant expressions of his opinion that the defendant was guilty and that the jurors needed to convict him in order to do their job, Scott has not highlighted any record of the prosecutor expressly stating his opinion on Scott's guilt. For example, although Scott highlights the prosecutor's use of the word "rape" rather than "alleged rape" (Doc. # 14-18 at 135, 143-44), after Scott's defense counsel objected, the prosecutor immediately switched to referring to it as "alleged rape." (*Id.*). So, even if this comment could be construed as an explicit opinion that Scott was guilty, the prosecutor acknowledged his mistake in front of the jury and changed his

_____

[20] These statements included: "I think he was [guilty]," "I think he did," "I don't know what you call that, I call it fraud," "I think it's a fraud," and finally, "If you feel you should acquit him for that it's your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law . . . ." *Young*, 470 U.S. at 5-6.

308

terminology. Additionally, while the defense counsel in *Young* did not object to any of the prosecution's improper statements during trial, Scott's counsel objected to four of the seven listed statements. (*See, e.g.*, Docs. # 14-20 at 82, 145; 14-18 at 135, 143-44; 14-19 at 113, 119). These numerous factual differences mean that *Young* does not help Scott carry his burden under (d)(1) of showing a factually indistinguishable Supreme Court case that the ACCA misapplied.

But, even if *Young* were factually indistinguishable from this case, the outcome in *Young* still works against Scott, because the Supreme Court ultimately affirmed the defendant's conviction. The Court in *Young* concluded that, under a plain-error standard of review (because the defense had not objected to any of the statements), the prosecutor's statements "did not constitute plain error . . . nor are we persuaded that the challenged argument seriously affected the fairness of the trial." *Id.* at 20. The outcome in *Young* is the same as the outcome of the ACCA – upholding the guilty verdict despite the inappropriate prosecutorial comments.

Additionally, *Young* cannot help Scott carry his burden under the unreasonable application clause of (d)(1) because the ACCA did not misapply the holding of *Young*. That holding was that under a plain-error standard of review, "[v]iewed in context, the prosecutor's statements" (including blatant expressions of his personal opinion that the defendant was guilty and that the jurors needed to convict him in order to do their job) "although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young*, 470 U.S. at 16. The prosecutor's comments here are different from the prosecutor's comments in *Young*. Furthermore, the *Young* Court held that there was no plain error warranting reversal. The court cannot say that the ACCA misapplied the *Young* holding or committed extreme constitutional error by also not granting a new trial where the prosecutorial comments were not as extreme as those in *Young*.

Scott fares no better in carrying his AEDPA burden based on the Eleventh Circuit case he has cited (which, to be clear, also does not carry Scott's burden under (d)(1)'s contrary to clause). *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) is not a Supreme Court decision and, in any event, is distinguishable from this case. In *Eyster*, the Eleventh Circuit held that a prosecutor's questioning of a witness on redirect constituted improper vouching because "[t]he prosecutor's comments implicated the government's credibility," and as in *Berger*, the prosecutor at times "implied personal knowledge of additional evidence" not before the jury. *Id.* at 1207. Additionally, as the panel noted, this impropriety prejudiced the defendant's substantial rights because "the essence of [the] defense was attacking the credibility of certain key witnesses" and "no physical evidence was introduced connecting [the defendant] to [the crime]." *Id.* at 1208.

By contrast, here, Scott has not highlighted any statements by his prosecutor that attempted to vouch for the credibility of a witness. Further, even if he had, he has not shown that the "essence" of his defense strategy was to attack the credibility of witnesses. Additionally, a significant factual difference compared to *Eyster* is that while there was no physical evidence connecting that defendant to the charged crime, there is substantial physical evidence that connected Scott to the capital crimes of rape and murder here. Dr. Bruce Alexander (who performed the autopsy of Latonya Sager) collected and analyzed a "shiny substance around Latonya's pubic area and inside both of her thighs," discovering that the substance was semen that "contained Scott's DNA." *See Scott Direct*, 937 So. 2d at 1068-70 (citations omitted). There was also eyewitness testimony from one of the victims that Scott raped her. Scott has therefore shown no basis for challenging the ACCA's rejection of his prosecutorial allegations under either the contrary to or unreasonable application clause of (d)(1).

Nor has Scott carried his (d)(2) burden. Besides the conclusory statement that "[t]he state court's ruling was . . . based on an unreasonable application of facts," Scott offers no argument that the court can discern about what facts the ACCA unreasonably applied. In his Amended Rule 32 Petition, his brief to the ACCA on his second collateral appeal, and his petition for a writ of certiorari to the Alabama Supreme Court, he did not raise any of the facts he now disputes. (Docs. # 14-35 at 88-89; 14-37 at 110-13; 14-58 at 102; 14-60 at 63-64). Instead, the facts that Scott previously focused on were the statements of the prosecutor – statements that are undisputed because they are found in the trial transcript. Scott has therefore not pointed to any record evidence that shows an unreasonable factual error made by the state courts under AEDPA. Additionally, as discussed further below, the facts in the trial record show multiple links between Scott and the two charged crimes. This reasonably supports the conclusion that the prosecutor's comments did not prejudicially affect Scott's substantial rights.

Alternatively, even if this court were to apply de novo review here, Scott has not shown that the prosecution's comments resulted in such an unfair conviction that due process demands he receive a retrial. Even if it could be said that a key component of the test for prosecutorial misconduct – that the prosecutor's remarks were "improper" – could be satisfied (given the prosecutor's remarks), Scott has not shown (nor can he) that the second part of the test – that the remarks prejudicially affected his substantial rights – is met. Specifically, Scott has failed to explain how the prosecutor's comments rendered his conviction unfair given the evidence linking Scott with crimes related to both Latonya Sager and Landris Wright. Related to Latonya, Scott lived in the same house as she did, there was semen on Latonya's inner thigh near her pubic area containing Scott's DNA, and Latonya's body displayed signs of asphyxiation. Related to Landris, two witnesses (Landris and her aunt, Gladys Wright Smith) testified about Scott's strange behavior

311

the night of September 10, 1999 and the next morning, including when Scott pushed his way into Smith's home waving a gun and Landris testified that Scott attacked her by choking her, threatening her with a gun, and raped her twice. *Id.* There was also testimony that after the alleged rapes, when Landris ran outside to get help, she led police officers to the very spot she said they would find Scott – in Smith's apartment where he was wearing only his underwear. There was other evidence. Scott threatened to "chop up" Landris's brother. Scott stated "Y'all tripping about some pussy." Scott broke the glass in the apartment window as if attempting to escape, and police found a handgun beneath the bed. *Id.* Thus, Scott's habeas allegations do not overcome AEDPA deference, and further do not provide a basis for overturning his conviction even under de novo review.[21]

### J.    Claim K – Scott has not shown a right to habeas relief based on Alabama's capital sentencing structure.

Scott maintains in this claim that the Alabama capital statute is unconstitutional and violates his Sixth Amendment right to a jury trial. (Doc. # 1 ¶ 300). Specifically, Scott cites *Apprendi*, 530 U.S. 566, *Ring*, 536 U.S. 584, and *Hurst*, 136 S. Ct. 616, and argues that the Supreme Court has held that allowing a judge to make the factual findings necessary to support a death sentence violates the Sixth Amendment. He argues that his death sentence under the Alabama capital statute is unconstitutional because in *Hurst*, the Supreme Court applied *Ring* to invalidate a Florida sentencing scheme that he says was materially identical to Alabama's scheme because it "does not require the jury to make critical findings necessary to impose the death penalty," but "requires a judge to find these facts." (Doc. # 1 ¶ 300) (quoting *Hurst*, 136 S. Ct. at

---

[21] Because a dismissal due to AEDPA deference and procedural default tied to Rules 32.2(a)(3) and 32.2(a)(5) are appropriate, the court does not reach an analysis of the ACCA's reliance on Rule 28(a)(10) as another ground to support dismissal.

622). Scott quotes from Supreme Court caselaw and says that "Alabama's capital sentencing scheme is much like that of Florida" because "[b]oth require jury participation in the sentencing process but give ultimate sentencing authority to the trial judge." (*Id.* ¶ 301) (quoting *Harris v. Alabama*, 513 U.S. 504, 508-09 (1995) (citations removed)). He adds that the Supreme Court has vacated four Alabama death penalty sentences "in light of *Hurst*," indicating the constitutional infirmity of the Alabama capital sentencing scheme. (*Id.*) (citing *Wimbley v. Alabama*, 136 S. Ct. 2387 (2016), *Johnson v. Alabama*, 136 S. Ct. 1837 (2016), *Kirksey v. Alabama*, 136 S. Ct. 2409 (2016), *Russell v. Alabama*, 137 S. Ct. 158 (2016)). Scott specifically argues that his Sixth Amendment rights were violated when the trial judge made factual findings about "the existence of aggravating and mitigating circumstances and the weighing of those circumstances." (*Id.* ¶ 302). And here, "the trial court chose to *sua sponte* consider, find, and weigh an aggravating circumstance that was not requested by the prosecution, not included in the jury instructions, and not found unanimously by the jury beyond a reasonable doubt." (*Id.* (citations removed)). Scott argues that the ACCA erroneously held that *Hurst* did not apply to Scott's case because it was not retroactive. (*Id.* ¶ 303). That is, Scott asserts "*Hurst* merely applied the Supreme Court's prior holdings in *Apprendi* and *Ring* . . . which were each decided *before* Scott's conviction and sentencing." (*Id.*). Scott also contends that the ACCA erred in relying on *Ex Parte Bohannon* (which held Alabama's capital sentencing scheme constitutional) because *Bohannon* interpreted the Alabama capital sentencing statute "contrary to [its] plain language" and thus improperly applied *Hurst*. (*Id.* ¶¶ 304, 306). Scott concludes by arguing that "[e]ven if the jury had rendered a unanimous verdict with findings of aggravating and mitigating factors necessary to make Scott 'death eligible' . . . the verdict is still constitutionally infirm because the jury was repeatedly

313

advised that its verdict was merely a 'recommendation.'" (*Id.* ¶ 307). This, Scott claims, is unconstitutional under *Caldwell v. Mississippi*, 472 U.S. 320 (1985). (*Id.*).

Respondent counters that the ACCA addressed the merits of this claim on collateral appeal after the Rule 32 court's summary dismissal. (Doc. # 17 at 101-03). Respondent further argues that Scott has not shown that the ACCA's denial of relief on this claim was "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." (*Id.* at 104 (quoting 28 U.S.C. § 2254(d)(1))). Respondent also references Scott's ineffective assistance of counsel claims related to the failure to raise this objection during trial (*see* Doc. # 17 at 104), but because Scott did not clearly raise or argue the merits of this point as part of his Claim K (only referencing it in a footnote (*see* Doc. # 1 ¶ 302 n.8)), the court need not consider an ineffective assistance of counsel claim here.

Respondent relies on the Alabama Supreme Court decision in *Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016) for the point that the constitutionality of Alabama's capital sentencing scheme is not in doubt and that the ACCA's denial of relief on this claim was not an unreasonable application of clearly established federal law. (Doc. # 17 at 104-05). Respondent does so by quoting from *Bohannon*, which explained that "[n]othing in *Apprendi*, *Ring*, or *Hurst* suggests that, once the jury finds the existence of the aggravating circumstance that establishes the range of punishment to include death . . . the judge cannot evaluate the jury's sentencing recommendation to determine the appropriate sentence within the statutory range." (*Id.* at 105 (quoting *Bohannon*, 222 So. 3d at 534)). Respondent also noted that "the United States Supreme Court denied Bohannon's cert petition on January 23, 2017." (*Id.* at 106) (citing *Bohannon v. Alabama*, 137 S. Ct. 831 (2017) (mem.)).

314

Scott's reply reiterates that "[t]here is no material difference between this case and *Hurst*." (Doc. # 20 at 77). He also repeats his argument that the ACCA incorrectly "concluded that *Hurst* is not retroactive" (*id.* at 79), and that *Bohannon* was not reliable authority on the constitutionality of Alabama's capital sentencing statute because it misinterpreted the Alabama statute. (*Id.* at 80). Finally, Scott restates his argument that the court erroneously told the jury that its verdict was a mere "recommendation," which is unconstitutional under *Caldwell v. Mississippi*. (*Id.* at 82). To better understand the contours of this claim, the court begins with a discussion of *Apprendi*, *Ring*, and *Hurst*.

### 1.    Overview of *Apprendi*, *Ring*, and *Hurst*

In *Apprendi*, the Court addressed the interplay between the Sixth Amendment's right to a jury trial and a court's sentencing in a non-capital case. Under *Apprendi*, except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Later, in *Ring*, the Court revisited Arizona's capital sentencing framework that had survived Sixth Amendment scrutiny in *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled by Ring*, 536 U.S. at 609. Under Arizona's sentencing structure in place at the time, a defendant "could not be sentenced to death, the statutory maximum penalty for first-degree murder," without a separate judicial finding of "at least one aggravating circumstance" and "no mitigating circumstances sufficiently substantial to call for leniency." *Ring*, 536 U.S. at 592-93 (internal quotation marks omitted); *see Walton*, 497 U.S. at 649 (concluding that the Sixth Amendment does not require a state "to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances"). Thus, the jury played no role in the previously validated Arizona capital-sentencing process. *See Walton*, 497 U.S. at 643 (explaining that "[a]fter

315

a person has been found guilty of first-degree murder . . . . the court alone" decides whether to impose the death penalty) (internal quotation marks omitted). Although this system was found valid in *Walton*, upon reconsideration, and particularly in light of its decision in *Apprendi*, the *Ring* Court concluded that the Arizona structure violated the Sixth Amendment. *Ring*, 536 U.S. at 609.

The *Ring* holding led to the Supreme Court's invalidation of Florida's former capital sentencing structure in *Hurst*. *Hurst*, 577 U.S. at 102; *see id.* at 97 ("We granted certiorari to resolve whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring*."). Under Florida's prior framework, "the maximum sentence a capital felon [could] receive on the basis of the conviction alone [was] life imprisonment." *Id*. at 95. After a guilt finding, a jury provided an advisory sentence based on an evidentiary hearing and a judge held "a separate hearing . . . [to] determine whether sufficient aggravating circumstances existed to justify imposing the death penalty." *Id*. at 94.

Following this format, a jury found the petitioner in *Hurst* guilty of "[f]irst-degree murder[,] . . . a capital felony" under Florida law, not the lesser charge of felony murder. *Id*. at 95. "A penalty-phase jury recommended [7 to 5] that . . . [the] judge impose a death sentence," and "[t]he judge independently agreed." *Id.* at 94, 96. The *Hurst* Court concluded that Florida's statutory structure violated the petitioner's "right to an impartial jury" consistent with *Ring* because "the maximum punishment [the petitioner] could have received without any judge-made findings was life in prison without parole." *Id.* at 99, 102. As the *Hurst* Court clarified, "[a] jury's mere recommendation" in favor of the death penalty "is not enough" to satisfy the constitutional requirement that "a jury, not a judge, . . . find[s] each fact necessary to impose a sentence of death." *Id*. at 94; *see also id.* at 102 (overruling prior Supreme Court precedent "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is

316

necessary for imposition of the death penalty"). With these Supreme Court decisions in mind, the court reviews the ACCA's treatment of Scott's structural challenge to his death sentence under Alabama law.

### 2.    State Court Proceedings

Before his trial began, Scott challenged the potential imposition of the death penalty under Alabama's sentencing framework in a Motion to Bar Imposition of the Death Penalty Where Jury's Role and Factual Determinations are Deemed Advisory, citing *Ring v. Arizona*, *Apprendi v. New Jersey*, and *Caldwell v. Mississippi*. (Doc. # 14-11 at 25-31). Scott also filed a Motion to Declare the Alabama Capital Sentencing Process Unconstitutional and to Bar Imposition of the Death Penalty. (*Id.* at 47-54). In that filing, he cited *Ring* and *Apprendi*. After the trial ended, Scott raised this challenge on direct appeal. He maintained that his death sentence violated the Fifth, Sixth, Eight, and Fourteenth Amendments because "under *Apprendi* and *Ring* a jury must make any findings of fact in support of a sentence of death," but under Alabama's capital sentencing scheme, juries are not required to report specific factual findings, reach a unanimous verdict on each aggravating factor, or make findings about whether the aggravating factors outweigh the mitigating factors. (Doc. # 14-22 at 51-52). Scott did not reference *Hurst* and did not have the opportunity to do so, as that decision postdated his appeal.

Applying plain-error review, the ACCA explained why Alabama's capital sentencing structure and Scott's resulting death penalty do not suffer from any *Ring* deficiency. Specifically, the ACCA cited several Alabama decisions holding Alabama's sentencing scheme constitutional under *Ring* and concluded that "[b]ecause the claims Scott raises here have been rejected in previously decided cases, no plain error exists." (Doc. # 14-26 at 68) (quoting *Miller v. State*, 913 So. 2d 1148, 1167-68 (Ala. Crim. App. 2004) (listing cases)).

317

In his application for rehearing, Scott raised this portion of his claim and argued that the trial court improperly "instructed the jury during the sentencing phase that its decision as merely advisory and a recommendation only" in violation of *Caldwell v. Mississippi*. (Doc. # 14-26 at 46). Scott also asserted that, although this type of instruction was not unconstitutional in Alabama before *Ring* because of the structure of Alabama's sentencing scheme, this would not be so if Alabama's sentencing structure complied with *Ring* and had the jury play a determinative role. (*Id.* at 47).

In his petition for a writ of certiorari to the Supreme Court of Alabama, Scott did not raise this claim. (Doc. # 14-26 at 96-113).

In his Amended Rule 32 Petition, Scott argued that his trial counsel was ineffective in failing to object to findings of fact during the sentencing phase that violated *Ring v. Arizona*. (Doc. # 14-37 at 148). Specifically, he maintained that the trial court's decision to consider an additional aggravating factor that was not submitted to the jury was contrary to *Ring.* (*Id.*). This claim in his Rule 32 petition therefore is different from the claim asserted here – namely, Scott does not now take issue with ineffective assistance of counsel or the trial court's *application* of sentencing factors with respect to this claim. That assertion is made as part of another of his claims. Here, he directly challenges Alabama's capital sentencing scheme. Scott raised a similar argument in his collateral appeal to the ACCA. (Doc. # 14-58 at 101, 187). And, he similarly raised this ineffective assistance of counsel (based on a failure to object to improper findings of fact theory) in his second petition for writ of certiorari before the Supreme Court of Alabama:

> The Court of Criminal Appeals agreed with the Circuit Court that Scott's sentence neither violates *Ring v. Arizona*, 536 U.S. 584 (2002), nor *Hurst v. Florida*, 136 S. Ct. 616 (2016). Yet *Ring* made clear that the jury must unanimously find the aggravating factors or circumstances required to increase a punishment to the death penalty.

318

(Doc. # 14-60 at 61-62).

### 3.    Scott has not overcome AEDPA deference related to his structural challenge to his death sentence under the Sixth Amendment.

Scott divides his arguments in support of this claim into two Sixth Amendment subclaims, each tied to his right to a jury trial and what he claims to be an unconstitutional death sentence. (Doc. # 1 ¶¶ 300-306 (subclaim 1), 307 (subclaim 2)). Specifically, Scott faults Alabama's sentencing structure because (1) the jury did not decide whether there were aggravating and mitigating circumstances and whether the aggravating circumstances were outweighed by the mitigating circumstances (*id.* ¶ 302); and (2) the jury was told that its verdict was merely a "recommendation" in violation of *Caldwell*. (*Id.* ¶ 307).

First, both subclaims are due to be denied because they are unexhausted. Although Respondent did not raise this argument, it was not explicitly waived, which is the only way to waive this bar to habeas relief. *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (mere "failure to raise exhaustion does not constitute a waiver under AEDPA, which mandates that '[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement'").

Although Scott raised his aggravation subclaim on direct appeal to the ACCA (Doc. # 14-22 at 20, 50-59), he did not raise it before the Alabama Supreme Court on direct appeal. (Doc. # 14-26 at 96-113). Scott only raised his *Caldwell* subclaim in his application for rehearing to the ACCA (Doc. # 14-26 at 46); however, notably, he did not raise it before the Alabama Supreme Court. (Doc. # 14-26 at 96-113). Exhaustion requires that a petitioner "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of law resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting

*Boerckel*, 526 U.S. at 845). Although review by Alabama's highest court is discretionary, Scott must have at a minimum given the Supreme Court of Alabama an *opportunity* to review this issue, and he did not.

Nor did Scott exhaust these subclaims on collateral appeal as he did not assert those specific legal theories at that time. Instead, Scott asserted a variant of a *Ring* claim. He claimed his counsel was ineffective because they failed to object to findings of fact, in violation of *Ring*. (Docs. # 14-37 at 148; 14-58 at 101, 187; 14-60 at 61-62). Scott did not specifically raise the claim that he is due relief because Alabama's capital sentencing scheme is unconstitutional in violation of *Ring* or that the jury was told that its decision was merely a recommendation in violation of *Caldwell*. But, this type of specificity is required to properly exhaust state remedies on these subclaims:

> [T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."

*Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). Rather, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y, Fla. Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alteration in *Pope*) (quoting *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)). Because Scott did not present the same particular legal basis and specific factual foundation of these subclaims through an entire round of either direct appeal or collateral review, Claim K is unexhausted.

Further, Scott has not carried his burden of showing that he meets the requirements of the two exceptions to procedural default – cause and prejudice, or a fundamental miscarriage of justice. (*See* Docs. # 1, 20); *see also McCoy v. Newsome*, 953 F.2d 1252, 1260 (11th Cir. 1992). Nor has Scott argued that he was actually innocent, a position that must be supported by "reliable evidence

320

not presented at trial." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). Scott has not carried his burden of showing why this claim is not procedurally defaulted.

In addition, staying or dismissing this petition to allow Scott to exhaust this claim properly in state court would be futile under Rule 32.2(c) of the Alabama Rules of Criminal Procedure (due to the statute of limitations) and Rule 32.2(b) (due to the successive petition bar). Therefore, this claim is unexhausted and barred under AEDPA.

Second, even if this claim were properly exhausted (and, to be clear, it was not), it would be subject to AEDPA deference and due to be denied. Scott specifically argues that the ACCA's decision affirming his death sentence "involved an unreasonable application of clearly established Supreme Court precedent in *Apprendi*, *Ring*, and *Hurst*" (Doc. # 1 ¶ 306), and "involved an unreasonable application of clearly established law in *Caldwell*, particularly in light of *Apprendi*, *Ring*, and *Hurst*." (*Id.* ¶ 307). Because Scott limits his argument to the unreasonable application clause of (d)(1), the court focuses on whether Scott's cited authorities show that, in denying his appeal, the ACCA unreasonably applied Supreme Court precedent. In order to make this showing, Scott must point to a Supreme Court holding that overlaps substantially with his subclaims. Although Scott references several Supreme Court decisions on habeas review, none of these clearly establish that he has stated a cognizable Sixth Amendment claim or that the ACCA ruled unreasonably under (d)(1)'s deferential clauses.

For example, one of the authorities Scott references is unrelated to the constitutionality of a death sentence. (Doc. # 1 ¶ 300). *See Apprendi*, 530 U.S. at 469 (describing the constitutional question as whether "increas[ing] . . . the maximum prison sentence for an offense from 10 to 20 years" is permissible without a jury finding "made . . . on the basis of proof beyond a reasonable

321

doubt"). *Apprendi* does not advance Scott's AEDPA burden on his structural subclaim, which contested the validity of his death sentence.

Scott also references two capital cases: *Ring* and *Hurst*. (Doc. # 1 ¶ 300). However, Scott lacks a cognizable *Hurst* claim on habeas review because his case on direct appeal became final when the Alabama Supreme Court denied certiorari on February 17, 2006. *Scott Direct*, 937 So. 2d 1065; (Doc. # 14-26 at 115-85). That occurred before *Hurst* was issued. *See McKinney v. Arizona*, 589 U.S. 139, 145 (2020) (confirming that "*Ring* and *Hurst* do not apply retroactively on collateral review"). Consequently, Scott's focus on *Hurst* is material "only to the extent [the opinion] reflects an application and explication of the Supreme Court's holding in *Ring*." *Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 923 n.6 (11th Cir. 2017). Scott appears to assert that "*Hurst* merely applied the Supreme Court's prior holdings in *Apprendi* and *Ring* to Florida's capital sentencing scheme, which were each decided *before* Scott's conviction and sentencing." (Doc. # 1 ¶ 303). The court agrees that, to the extent that *Hurst* applies and explicates the Supreme Court's holding in *Ring*, it is material to this case.

But, even applying *Hurst* to understand the holding in *Ring*, that lends no support to Scott's aggravation subclaim under AEDPA. In *Ring*, the Supreme Court overruled *Waldrop* because Arizona's former sentencing structure did not incorporate a jury's finding on "the aggravating circumstance that makes the defendant death eligible." *McKinney*, 589 U.S. at 144; *Ring*, 536 U.S. at 608 ("overrul[ing] *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty"). Based on *Ring*, the *Hurst* Court identified a similar Sixth Amendment death-eligibility flaw in Florida's former approach to capital sentencing. *McKinney*, 589 U.S. at 144.

322

Scott asserts that his death sentence violates the Sixth Amendment because a jury did not make key factual findings underlying his sentence – namely, the existence of aggravating and mitigating circumstances and the weighing of those circumstances. (Doc. # 1 ¶ 302). Scott cites *Harris v. Alabama*, 513 U.S. 504 (1995), and quotes from the Alabama capital sentencing code (Doc. # 1 ¶ 301) (quoting Ala. Code § 13A-5-47(e) (1975)). Scott says that the Supreme Court has recognized that "Alabama's capital sentencing scheme is much like that of Florida" because "[b]oth require jury participation in the sentencing process but give ultimate sentencing authority to the trial judge." (*Id.*) (quoting *Harris*, 513 U.S. at 508-09, in turn citing Ala. Code § 13A-5-47(e) (1994); Fla. Stat. § 921.141(e)(1985)). Scott also cites four Supreme Court vacaturs of Alabama death penalty sentences "in light of *Hurst*." (*Id.*) (citing *Wimbley v. Alabama*, 136 S. Ct. 2387 (2016), *Johnson v. Alabama*, 136 S. Ct. 1837 (2016), *Kirksey v. Alabama*, 136 S. Ct. 2409 (2016), *Russell v. Alabama*, 137 S. Ct. 158 (2016)). The court disagrees.

Unlike the structural deficiencies present in *Ring* and *Hurst*, the Alabama sentencing format applicable to Scott required the jury to find him guilty of a capital offense beyond a reasonable doubt and that finding had to be made before he was eligible to be sentenced to death. Applying that threshold requirement, the jury convicted Scott of two capital crimes – capital murder during a rape in the first degree, or an attempt thereof, and capital murder of a person less than fourteen years old. Those death-eligible convictions triggered a penalty phase during which the jury was called on to make findings about Scott's punishment. The jury's guilty verdict regarding the crime of capital murder during a rape in the first degree, or an attempt thereof, qualified as an aggravating factor for the sentencing process under Alabama law. (Doc. # 14-23 at 24) (citing Ala. Code § 13A-5-49(4)).

323

Scott's argument that this structure violates *Ring* fails to acknowledge key distinctions between the capital structure in *Ring* and that in Alabama. First, after the jury convicted the petitioner in *Ring* of first-degree murder, only the trial judge "determine[d] the presence or absence of the aggravating factors . . . for imposition of the death penalty." *Ring*, 536 U.S. at 588. But here, after the jury convicted Scott of two capital crimes, the jury voted to impose the death penalty for both crimes. (Doc. # 14-23 at 22-23) (explaining that the jurors voted 10-2 for death for both Counts I and II). Second, unlike the jury's determination beyond a reasonable doubt that Scott's murder of Latonya involved a rape in the first degree, or an attempt thereof, the jury did not convict the petitioner in *Ring* of murdering his victim for pecuniary gain. *See Ring*, 536 U.S. at 594-95 ("[T]he judge determined that [the petitioner] committed the offense in expectation of receiving something of 'pecuniary value' and weighed that as an aggravating factor."). Here, a finding of committing these capital offenses "while the defendant was engaged in . . . or attempting to commit Rape in the First Degree" was "inherent in the jury's verdict of guilty," and this unambiguous guilt-phase finding carried over into Scott's penalty phase. (Doc. # 14-23 at 24).

Further, the other aggravating circumstance – Scott's previous conviction of a felony involving the use or threat of violence to the person (Assault First Degree, Case Number CC-96-4202) – is an objective finding that requires merely reviewing Scott's criminal record. (*Id*). (citing Ala. Code § 13A-5-49(2)). As to mitigating circumstances, Scott's age – nineteen – also qualified as an objective mitigating circumstance. (*Id.* at 27) (citing Ala. Code § 13A-5-51(7)).

Additionally, contrary to Scott's assertions, nothing in *Ring* or *Hurst* requires that a jury find beyond a reasonable doubt that an aggravating circumstance outweighs mitigating circumstances. *See McKinney*, 589 U.S. at 144 ("[A] jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the

324

ultimate sentencing decision within the relevant sentencing range."); *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013) ("*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances.").

Turning to Scott's *Caldwell* subclaim, which was raised in his application for rehearing to the ACCA, he conceded that "[p]rior to *Ring v. Arizona*, both the Eleventh Circuit and the United States Supreme Court had held that such an instruction was not reversible error because of the structure of the Alabama sentencing scheme." (Doc. # 14-26 at 47) (citing *Darden v. Wainwright*, 477 U.S. 168 (1986); *Duren v. Hopper*, 161 F.3d 655 (11th Cir. 1998); *Harich v. Dugger*, 844 F.2d 1464 (11th Cir. 1988); *Romano v. Oklahoma*, 512 U.S. 1 (1994)). However, he argued that because under *Ring* a "jury must play a determinative role, not merely an advisory one . . . the instruction to the jury that their findings are merely advisory is reversible error." (*Id.*). Neither the ACCA nor the Rule 32 court substantively addressed this argument. (*Id.* at 181; Doc. # 14-39 at 28-63). Therefore, there is no reasoned state court decision that this court can defer to. But again, this claim is procedurally defaulted because it is unexhausted. And even if it weren't, it would be due to be denied on de novo review.

Even on de novo review (which, to be clear, is not due here because of the reality of procedural default), *Caldwell* does not provide habeas relief to Scott. *Caldwell*'s clearly established holding is "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29. But, Alabama's sentencing scheme at the time of Scott's death sentence did not make the jury the "sentencer." Instead, before 2017, the trial judge had the authority to override a jury's recommendation of life imprisonment or death. But, in 2017, this authority was removed. *See* Ala.

325

Code § 13A-5-47(a). Further, this interpretation is supported by Eleventh Circuit precedent interpreting the Alabama sentencing structure in place at the time of Scott's sentencing. *See Duren v. Hopper*, 161 F.3d 655, 664 (11th Cir. 1998). In *Duren*, the Eleventh Circuit panel held that a trial court's instruction to the jury that its role was "advisory" under Alabama Code § 13A-5-46(d) (1975) "was entirely consistent with Alabama law," and "did not mislead the jury, diminish its importance, or absolve it of responsibility for its decision." *Id.* (citing *Harich v. Dugger*, 844 F.2d 1464, 1473 (11th Cir. 1988), *overruled on other grounds by Hurst v. Florida*, 477 U.S. 92 (2016)). Scott's *Caldwell* claim therefore fails for multiple reasons.

The authorities Scott points to do not show that the ACCA committed extreme constitutional error under § 2254(d)(1) in rejecting the structural challenges to his death sentence, and Scott has not requested or developed a basis for habeas relief under (d)(2). Thus, Scott has not carried his AEDPA burden in seeking habeas relief under the Sixth Amendment.

> **K.**     **Claim J – Scott has not shown a right to habeas relief on his *Strickland* claim for ineffective assistance of counsel due to a failure to object to the trial court's finding that Scott's attempted rape and murder was "particularly heinous, cruel, and atrocious."**

Scott maintains in this claim that his trial counsel's performance was ineffective at the sentencing phase because they failed to object to improper findings of fact. (Doc. # 1 ¶ 291). Specifically, he argues that because *Ring v. Arizona* makes clear that "the jury must unanimously find the aggravating factors or circumstances required to increase a punishment to the death penalty" (*id.*), it was improper for the trial court to add the "statutory aggravating circumstance of: 'The capital offenses were especially heinous, atrocious or cruel compared to other capital offenses'" to its Finding of Fact From Guilt Phase of Trial. (*Id.* ¶ 294). According to Scott, the fact that the trial court independently considered this aggravating factor "evidences that the trial court was influenced by this aggravating circumstance in weighing the aggravation and mitigation

326

factors and concluding that death was appropriate." (*Id.* ¶ 295). Because this was "contrary to *Ring*" (*id.* ¶ 296), Scott contends that his trial counsel's failure to specifically object "was ineffective assistance of counsel." (*Id.* ¶ 298). And, he asserts this ineffective assistance continued and "resulted in significant prejudice to Scott as the error here allowed the Court to make determinations that should be made by the jury and thus violated Scott's rights." (*Id.*). Scott also claims (without further elaboration) that the ACCA's rejection of this claim was contrary to and an unreasonable application of Supreme Court precedent under § 2254(d)(1), as well as an unreasonable factual determination under (d)(2). (*Id.* ¶ 299).

Respondent responds that "Scott abandoned this claim by failing to raise it on collateral appeal." (Doc. # 17 at 51). Specifically, Respondent points out, Scott "did not present this claim to the ACCA or to the Alabama Supreme Court," and so this claim is procedurally barred. (*Id.* at 51-52). Respondent did not argue this theory on its merits.

Scott's reply asserts that he did exhaust this claim by raising it on collateral review, citing to his amended Rule 32 petition. (Doc. # 20 at 73 (citing Doc. # 14-37 at 148-50)). Scott also reiterates his argument on the merits. (*Id.* at 73-75).

### 1. State Court Proceedings

Scott raised his ineffective assistance of counsel claim in his first Rule 32 petition (Doc. # 14-29 at 66-68), to the ACCA (Doc. # 14-54 at 81-84), again to the ACCA after remand (Doc. # 14-55 at 108-09), and finally to the Supreme Court of Alabama. (Doc. # 14-56 at 26-27).

In his Amended Rule 32 petition, Scott again raised this claim, arguing that his trial counsel were ineffective in failing to object to findings of fact during the sentencing phase that were in violation of *Ring v. Arizona*. (Doc. # 14-37 at 148). Specifically, he maintained that the trial court's decision to consider an additional aggravating factor that was not submitted to or found by the jury

327

was contrary to *Ring.* (*Id.*). Scott raised the same argument in his collateral appeal to the ACCA. (Doc. # 14-58 at 101, 187). Scott again raised this theory in a petition for writ of certiorari before the Supreme Court of Alabama, stating "[t]he Court of Criminal Appeals agreed with the Circuit Court that Scott's sentence neither violates *Ring v. Arizona*, 536 U.S. 584 (2002), nor *Hurst v. Florida*, 136 S. Ct. 616 (2016). Yet, *Ring* made clear that the jury must unanimously find the aggravating factors or circumstances required to increase a punishment to the death penalty." (Doc. # 14-60 at 61-62).

Exhaustion requires that a petitioner "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of law resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d at 1358-59 (quoting *Boerckel*, 526 U.S. at 845). "Alabama's discretionary direct review procedures bring Alabama [habeas petitioners] within the scope of the *Boerckel* rule." *Id.* at 1359 (internal quotation marks omitted) (quoting *Smith*, 256 F.3d at 1140).

Scott did just that. He gave Alabama courts one full opportunity to resolve this constitutional issue. Scott did this by raising his *Strickland* claim based on *Ring* to the Rule 32 court, the ACCA, and the Supreme Court of Alabama on collateral appeal. Therefore, Scott's claim is exhausted and not barred by procedural default.

### 2. Scott has not overcome AEDPA deference on the structural challenge of his death sentence under the Sixth Amendment.

Under the "look through" doctrine, the last reasoned state court judgment rejecting Scott's theory in Claim J was the ACCA's opinion on second collateral appeal. (Doc. # 14-59). Although the Supreme Court of Alabama was the last state court to consider Scott's theory under Claim J, the denial of certiorari was not accompanied with an opinion, so the court "presume[s] that the

unexplained decision adopted the same [merits-based] reasoning" as the ACCA's. *Wilson*, 584 U.S. at 125.

The ACCA rejected Scott's theory, reasoning that "[o]n direct appeal this Court addressed Scott's contention that Alabama's capital-sentencing scheme violates *Ring v. Arizona*. Specifically, this Court held that Scott was not entitled to relief on this claim because this claim has already been repeatedly rejected in Alabama." (Doc. # 14-59 at 204). The ACCA quoted from its decision on direct appeal. (*Id.* at 204-05 (quoting *Scott Direct*, 937 So. 2d at 1086 (in turn quoting *Miller v. State*, 913 So. 2d 1148, 1167-68 (Ala. Crim. App. 2004) (listing cases upholding Alabama's sentencing scheme after *Ring*)))). The ACCA concluded (1) that this claim "is without merit" and (2) "because this claim was raised and decided on direct appeal, it is barred pursuant to Rule 32.2(a)(4), Ala. R. Crim. P." (*Id.* at 205). The ACCA also considered Scott's argument in his reply, that his sentence violated *Hurst* (*id.* at 205); however, because Scott's habeas petition does not discuss *Hurst* with respect to this claim (*see* Doc. # 1 ¶¶ 291-99), the court will not evaluate this reasoning.

There is a lack of clarity involving the state court treatment of this claim, as it appears that Scott did not raise this exact claim on direct appeal, and therefore it likely was not barred by Alabama Rule of Criminal Procedure Rule 32.2(a)(4). Ala. R. Crim. P. 32.2(a)(4) ("[a] petitioner will not be given relief under this rule based upon any ground . . . [w]hich was raised or addressed on appeal or in any previous collateral proceeding not dismissed . . . .").

Because the ACCA alternatively evaluated this claim on the merits (by quoting from its reasoning on direct appeal), for completeness, this court will evaluate this reasoning under AEDPA deference and, alternatively, review de novo. After careful review, the court concludes that Scott has failed to meet his burden under either § 2254(d)(1) or (d)(2) to show that the ACCA's dismissal

329

of Scott's *Strickland* claim on this theory was contrary to or an unreasonable application of law and further has not shown that ruling was based on an unreasonable determination of the facts.

As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies the Supreme Court's governing law or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts.

As an initial matter, the ACCA's discussion of *Ring*, *Hurst*, and *Apprendi* in the evaluation of Scott's *Ring-Strickland* claim eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). Scott has further failed to carry his burden under the remaining portion of § 2254(d)(1) because he has not identified a factually indistinguishable Supreme Court decision with an outcome favorable to him. And, to meet (d)(1)'s unreasonable application clause, Scott must show that the ACCA's analysis of this *Ring-Strickland* claim contained extreme constitutional error or conflicts unreasonably with clearly established Supreme Court precedent. All of these efforts fail. Notably, Scott has cited no authority, much less binding precedent, in which a court has held that trial counsel provided ineffective assistance in failing to object to Alabama's capital sentencing structure, or to a capital sentencing structure identical to Alabama's. Scott also does not argue that the trial court violated Alabama law.

The only binding authority that Scott cites is *Ring,* which the court has distinguished. As the court concluded, *Ring* does not invalidate Alabama capital sentencing structure as applied to Scott. In addition to *Ring*, Scott references two Alabama state court cases – *Kuk v. State* and *Ex parte McGriff* – and argues that his trial counsel should have objected to the "particularly heinous, cruel, and atrocious" finding of fact during his sentencing phase. (Doc. # 1 ¶¶ 291-92, 294, 296).

330

Obviously, a state court case is not binding and therefore is insufficient to overcome AEDPA deference under (d)(1).

In addition to being non-binding, these state court decisions are either inapplicable or unhelpful to Scott's argument. *Kuk* involved a *Strickland* challenge based on trial counsel's failure to object to improper jury instructions, not to a finding of an aggravated circumstance not considered by the jury. 602 So. 2d 1213, 1218 (Ala. 1992). *Ex parte McGriff* applied *Ring* to Alabama's capital sentencing scheme and acknowledged that the constitutional minimum for subjecting a defendant to a death sentence was only that "the jury has unanimously found beyond a reasonable doubt the existence of *at least one* § 13A-5-49 aggravating circumstance." *Ex parte McGriff*, 908 So. 2d 1024, 1037 (Ala. 2004) (citing *Ex parte Waldrop*, 859 So. 2d 1181, 1187-88, 1190 (Ala. 2003) (emphasis added). Scott does not dispute that the jury found the existence of not one, but two § 13A-5-49 aggravating circumstances – that he "was previously convicted of a felony involving the use or threat of violence to the person," § 13A-5-49(2), and that the "capital offenses were committed while the defendant was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit Rape in the First Degree." § 13A-5-49(a). As the trial court noted in its sentencing order, "[t]his aggravating circumstance was inherent in the Jury's verdict of guilty, as charged in the indictment." (Docs. # 14-24 at 36-42; 14-25 at 46-52).

Scott references two additional Alabama state court cases – *Ex parte Waldrop* and *Ex parte Hodges*. But, the holdings of those cases are directly contrary to Scott's argument. (*Id.* ¶ 297). For example, *Ex parte Waldrop* considered how *Ring* and *Apprendi* apply to Scott's exact argument. The Supreme Court of Alabama rejected the argument that a trial judge's finding of especially heinous, atrocious, or cruel as compared to other capital offenses was "a factual

determination that under *Ring* must be made by the jury." 859 So. 2d at 1190. Because Alabama law only requires the existence of one aggravating circumstance to impose the death penalty, the Supreme Court of Alabama held that a trial judge's decision to find an additional aggravating circumstance was not unconstitutional under *Ring* or *Apprendi*. *Id.* Similarly, in *Ex parte Hodges*, the Supreme Court of Alabama held that where a defendant was convicted by a jury for committing a murder while engaging in robbery in the first degree (an aggravating circumstance), it did not violate *Ring* or *Apprendi* when the trial judge also found that the murder was "especially heinous, atrocious or cruel" because this was "implicated only in the process of weighing the aggravating and mitigating circumstances." 856 So. 2d 936, 944 (Ala. 2003). Scott argues that he believes these cases were wrongly decided ("these cases purported to allow the Alabama courts to do exactly what *Ring* was trying to prevent: have judges, and not the jury, make factual findings regarding aggravating factors"). But, even vehement disagreement with decisions does not change their holdings or otherwise hit the target. Scott has not pointed to clearly established case law that would defeat AEDPA deference on this subclaim.

Scott also maintains that the ACCA's ruling was based on an unreasonable application of facts under (d)(2). (Doc. # 1 ¶ 299). Although Scott invokes this subdivision, he has not pointed to any evidence that undermines the reasonableness of any factual determinations made by the state courts. That is, he has not shown that the ACCA's analysis of his *Ring* claim was factually unreasonable. Nor has Scott overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1).

Indeed, upon reviewing the ACCA's last reasoned decision, the court concludes that the ACCA reasonably applied the facts, including the fact that Scott's trial counsel failed to argue that his sentence violated *Ring*. (Doc. # 14-59 at 204). Based on the (d)(1) reasoning above, the court

cannot say that the ACCA unreasonably applied this fact by concluding that Alabama's capital sentencing structure is constitutional under *Ring* and that Scott's counsel therefore committed no error.

But, to be clear, whether AEDPA deference or de novo review applies, Scott must have a meritorious constitutional claim to qualify for habeas relief. Here, even under de novo review, this claim fails. Consistent with the court's analysis above, Scott's allegations fail to demonstrate a de novo Sixth Amendment violation under binding Supreme Court and Eleventh Circuit law. This is because, as already explained, Alabama's capital sentencing scheme does not violate the Sixth Amendment under *Ring* or its progeny (*Apprendi* and *Hurst*). *Strickland* scrutiny is "highly deferential." *Strickland*, 466 U.S. at 689. Applying that mandated deference here, the court cannot conclude that Scott's trial counsel committed error – much less *unreasonable* error – when they did not object to a scheme that is constitutional.

### L.    Claim L – Scott has not shown a right to habeas relief because the death penalty violates the United States Constitution.

Scott maintains that the death penalty violates the United States Constitution. (Doc. # 1 ¶ 308). Specifically, Scott cites a Supreme Court dissent: "[T]he death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishment[t].'" *Glossip v. Gross*, 576 U.S. 863, 909 (2015) (Breyer, J., dissenting). The dissent further notes "Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose." *Id.* at 909. It continues, "Perhaps as a result, most places within the United States have abandoned its use." *Id.* Scott concludes by stating "Indeed, at least 115 examples exist of death-row inmates receiving exonerations, including an Alabama man named Anthony Ray

Hinton, who was exonerated after 30 years on death row. (Doc. # 1 ¶ 308) (citing *Glossip*, 576 U.S. at 909-10).

The state responded that the ACCA addressed the merits of this claim on collateral appeal by affirming the Rule 32 court's summary dismissal of the claim. (Doc. # 17 at 106). The state quoted from the ACCA opinion, which wrote:

> Finally, Scott argues that Alabama's death-penalty scheme is cruel and unusual and violates both the United States Constitution and the Alabama Constitution. (Scott's brief, p. 99.) Specifically, he argues that Alabama's method of execution – lethal injection – constitutes cruel and unusual punishment in violation of the Eight and Fourteenth Amendments of the United States Constitution. (Scott's brief, pp. 96-97.)
>
> This Court has previously held that "'lethal injection does not constitute per se cruel and unusual punishment.'" *Townes v. State*, [Ms. CR-10-1892, Dec. 18, 2015] So. 3d (Ala. Crim. App. 2015) (quoting *McNabb v. State*, 991 So. 2d 313 (Ala. Crim. App. 2007)). In fact, both the Supreme Court of the United States and the Alabama Supreme Court have held that lethal injection does not constitute cruel and unusual punishment. See *Baze v. Rees*, 553 U.S. 35, 54-56[] (2008) (holding that lethal injection does not violate the Eighth Amendment); *Ex parte Belisle*, 11 So. 3d 323, 339 (Ala. 2008) (holding that lethal injection is not unconstitutional); see also *Glossip v. Gross*, [576 U.S. 863, 868-93 (2015)]. Therefore, Scott is not entitled to relief on this claim.

(Doc. # 17 at 106) (quoting Doc. # 14-59 at 214-15).

In reply, Scott repeats his original argument and does not specifically respond to the United States. (*See* Doc. # 20 at 82-83).

As shown by the quoted portion of the ACCA's opinion on collateral appeal, Scott's previous briefing on this issue often focused on how the *method* of the death penalty in Alabama – lethal injection – violated the Eighth and Fourteenth Amendments to the U.S. Constitution (as well as Article I Section 15 of the Alabama Constitution). His habeas petition does not reference the lethal injection method and instead argues that the death penalty itself violates the U.S. Constitution as a cruel and unusual punishment. (Doc. # 1 ¶ 308). Because the claim that Scott

pursued on collateral appeal was different from the claim Scott pursues in his habeas petition, the court evaluates the claim only as it appears in Scott's habeas petition.

The ACCA addressed the merits of this claim on direct appeal, concluding on plain-error review (this issue was not raised at trial) that Scott "has provided no references to any particular portion of Alabama's statute or to the proceedings now under review and he has failed to include any specific claims of equal-protection or due-process violations. His vague and conclusory allegations provide no basis for a finding of plain error." (Doc. # 14-26 at 67). Scott's petition to the ACCA argued that "[t]he death penalty itself and Alabama's death penalty sentencing scheme, in particular, violate the Eighth Amendment's prohibition under the evolving standards of decency doctrine." (Doc. # 14-22 at 58). This claim is due to be denied.

First, the claim is unexhausted. Scott made this argument on direct appeal (Doc. # 14-22 at 40-48), on second collateral appeal (Docs. # 14-58 at 111; 14-59 at 39-42), on application for rehearing before the ACCA on second collateral appeal (Doc. # 14-59 at 161-62), and on petition for writ of certiorari before the Alabama Supreme Court on second collateral appeal (Doc. # 14-60 at 72). However, he did not raise it before the Alabama Supreme Court on direct appeal. (Doc. # 14-26 at 95-114). Exhaustion requires that a petitioner "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of law resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Although review by Alabama's highest court is discretionary, Scott must have at least given the Supreme Court of Alabama an *opportunity* to review this issue. He did not. Further, staying or dismissing this petition to allow Scott to exhaust this claim properly in state court would be futile. This claim is barred by Rule 32.2(c) of the Alabama Rules of

335

Criminal Procedure (under the statute of limitations) and Rule 32.2(b) (due to the successive petition bar). The claim is unexhausted and barred from review under AEDPA.

Second, even if this claim were properly exhausted, it would be subject to AEDPA deference. Scott does not specifically invoke § 2254(d), but this claim appears to be asserted under (d)(1), as he asserts that the ACCA's analysis on direct appeal was contrary to and an unreasonable application of Supreme Court precedent.

A petitioner satisfies AEDPA's contrary to clause if the state court misapplies the Supreme Court's governing law or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. *Brown*, 544 U.S. at 141. "The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington*, 562 U.S. at 101. And again, the petitioner (Scott) bears the burden of showing that an adjudicated issue falls within § 2254(d)(1). *Woodford*, 537 U.S. at 25. Yet, he has not cited any governing Supreme Court law in support of this claim, quoting exclusively from a dissent in a Supreme Court case, *Glossip v. Gross*. (*See* Doc. # 1 ¶ 308). A Supreme Court dissent is not governing law. Therefore, Scott has not carried his burden under AEDPA and this claim is due to be denied under § 2254(d)(1).

### M.    *Martinez* issues.

With this court's authorization, Scott's counsel retained Angie Setzer of the Equal Justice Initiative as a *Martinez* expert. (Doc. # 33 at 3). Setzer completed a review of the record but did not identify any viable *Martinez* claims. (Doc. # 41 at 1, 6-14). Setzer stated that "postconviction counsel's representation was comprehensive and very effective." (*Id.* at 13). Thus, the habeas record requires no additional *Martinez* development.

## IV.    REMAINING REQUESTS

As noted previously, Scott seeks to conduct discovery and has requested an evidentiary hearing on his habeas claims. (*See* Doc. # 1 ¶ 309) (seeking "an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition" and "additional factual development"). Rule 8(a) of the *Rules Governing Section 2254 Cases* provides that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 7 allows a habeas court to "direct the parties to expand the record by submitting additional materials relating to the petition." Under Rule 6(a), a habeas court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." "A party requesting discovery must provide reasons for the request." Rule 6(b), *Rules Governing Section 2254 Cases*.

As the Eleventh Circuit has noted, "[i]f . . . the petitioner was diligent [in state court], 'a federal court must consider whether [an evidentiary] hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" *Ledford v. Warden, Ga. Diagnostic Prison*, 975 F.3d 1145, 1163 (11th Cir. 2020) (quoting *Schriro*, 550 U.S. at 474). A non-diligent petitioner "must satisfy the conditions of § 2254(e)(2)" to obtain an evidentiary hearing. *Id.* The Eleventh Circuit has also explained that an abuse of discretion standard applies when a district court denies an evidentiary hearing on a procedurally defaulted claim. *Id.*

Even in a case where a panel of the Eleventh Circuit assumed that the petitioner had "exercise[d] appropriate diligence" in state court, it upheld the district court's denial of a habeas hearing because the record "either refuted" his habeas allegations or his allegations "d[id] not

337

demonstrate" ineffective guilt-phase assistance. *Martinez*, 684 F. App'x at 926. The *Martinez* panel also clarified that "'[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.'" 648 F. App'x at 926 (quoting *Boyd*, 592 F.3d at 1304, in turn quoting *Schriro*, 550 U.S. at 474); *see also Cullen*, 563 U.S. at 182, 184 ("[l]imiting § 2254(d)(1) review to the state-court record" and precluding "evidence later introduced in federal court [a]s irrelevant" to the habeas analysis).

The court easily concludes that Scott has failed to demonstrate AEDPA error under (d)(1) or (d)(2) and there is no support for his petition. Consequently, discovery and an evidentiary hearing are unwarranted. *See Martinez*, 648 F. App'x at 926 ("[T]he district court need not conduct an evidentiary hearing if the record refutes the petitioner's factual allegations, otherwise prevents habeas relief, or conclusively demonstrates that the petitioner was not denied effective assistance of counsel.") (citing *Schriro*, 550 U.S. at 474)).

## V.   CONCLUSION

For all these reasons, the Petition for Writ of Habeas Corpus By Prisoner in State Custody Under Sentence of Death (Doc. # 1) is due to be denied or, alternatively, due to be dismissed. Rule 11(a) of the *Rules Governing Section 2254 Cases* requires the district court to address the question of a certificate of appealability when it enters a final order adverse to the habeas applicant. This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed

further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted). This court finds that Scott has not made a "substantial showing" under either of these standards. The court therefore denies a certificate of appealability on all his claims.

The court will enter a separate final judgment and order consistent with this opinion.

**DONE** and **ORDERED** this May 8, 2026.

_____
**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE